*To be argued by*
SARAH J. BERGER
*(10 Minutes)*

# New York Supreme Court

APPELLATE DIVISION -- SECOND DEPARTMENT

8 MAR 11 P1:37

*TO BE HEARD ON THE ORIGINAL RECORD*

Kings County
Ind.No.3066/04

A.D. No. 06-04858

PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*- against -*

GLEN CUMMINS,

*Defendant-Appellant.*

## BRIEF FOR DEFENDANT-APPELLANT

LYNN W.L. FAHEY
Attorney for Defendant-Appellant
2 Rector Street, 10th Floor
New York, N.Y. 10006
(212) 693-0085

SARAH J. BERGER
*Of Counsel*

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 5531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

The People's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

First Gang Expert Ruling and Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Abdul Mohammad Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Second Gang Expert Ruling and Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Charge Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Defense Summation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

People's Summation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Charge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Deliberations and Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

POINT I
APPELLANT WAS DEPRIVED OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL BY (A) HIS TRIAL COUNSEL'S OPENING THE DOOR TO PREJUDICIAL TESTIMONY FROM A GANG EXPERT, AS WELL AS HIS ELICITING THE COMPLAINANT'S MORE DETAILED DESCRIPTION OF THE SHOOTER AND PREJUDICIAL TESTIMONY THAT APPELLANT HAD THREATENED A WITNESS; (B) THE ADMISSION OF IRRELEVANT AND PREJUDICIAL TESTIMONY THAT A WITNESS "HAD TO MOVE" AND "COULD GET KILLED" BECAUSE SHE WITNESSED THE SHOOTING; AND (C) THE PROSECUTOR'S

MISCONDUCT ON SUMMATION IN WHICH HE MADE INFLAMMATORY APPEALS TO THE JURORS' SYMPATHIES, EXPLOITED THE ABOVE ERRORS TO ARGUE FROM FACTS NOT IN EVIDENCE AND VOUCHED FOR THE COMPLAINANT'S TESTIMONY . . . . . . . . . . 38

A. Defense Counsel's Ineffectiveness and Eliciting of Damaging and Prejudicial Evidence . . . . . . . . . . . . . . . . . . . . . . 39

B. Irrelevant and Prejudicial Evidence that Witnesses Were Afraid of Appellant . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

C. The People's Summation: Improper and Inflammatory Remarks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

POINT II
SINCE THE COURT CHARGED THE JURY ON TAMPERING WITH A WITNESS IN THE THIRD DEGREE INSTEAD OF INTIMIDATING A WITNESS IN THE THIRD DEGREE, (A) THAT COUNT MUST BE DISMISSED BECAUSE THE PEOPLE FAILED TO MEET THE HIGHER BURDEN, OR, (B) IN THE ALTERNATIVE, THERE SHOULD BE A NEW TRIAL ON THAT COUNT SINCE THE JURY WAS NEVER INSTRUCTED ON THE ELEMENTS OF THAT CRIME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

A. As Charged, the Intimidating a Witness Count Was Not Proved . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

B. Lack of Instruction on the Count of Intimidating a Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

----------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK, :

Respondent, :

-against- :

GLEN CUMMINS, :

Defendant-Appellant. :

----------------------------------------------------------------X

STATEMENT PURSUANT TO RULE 5531

1. The indictment number in the court below was 3066/04.

2. The full names of the original parties were People of the State of New York against Glen Cummins. The names of the parties have not changed on this appeal.

3. This action was commenced in Supreme Court, Kings County.

4. This action was commenced by the filing of an indictment on June 8, 2004.

5. This appeal is from a judgment convicting appellant, after a jury trial, of murder in the second degree, burglary in the first degree, and intimidating a witness in the third degree.

6. This is an appeal from a judgment of conviction rendered on April 28, 2006.

7. Appellant has been granted permission to appeal as a poor person on the original record. The appendix method is not being used.

## PRELIMINARY STATEMENT

Appellant appeals from a judgment of the Supreme Court, Kings County, rendered April 28, 2006, convicting him, after a jury trial, of murder in the second degree (P.L. § 125.25 (1)), burglary in the first degree (P.L. § 140.30 (1)), and intimidating a witness in the third degree (P.L. § 215.15 (1)), and sentencing him to concurrent terms of imprisonment of 25 years to life for murder and 25 years for first-degree burglary, and a consecutive term of 2 to 4 years for intimidating a witness in the third degree (Gerges, J., at trial and sentence).

Timely notice of appeal was filed and on January 9, 2007, this Court granted appellant poor person relief and assigned Lynn W. L. Fahey as appellate counsel.

Appellant is currently incarcerated pursuant to the judgment appealed. No stay has been sought.

Appellant had no co-defendants below.

## QUESTIONS PRESENTED

1. Whether appellant was deprived of his due process right to a fair trial by (a) his trial counsel's opening the door to prejudicial testimony from a gang expert, as well as his eliciting the eyewitness's more detailed description of the shooter and prejudicial testimony that appellant had threatened a witness; (b) the admission of irrelevant and prejudicial testimony that a witness "had to move" and "could get killed" because she witnessed the shooting; and (c) the prosecutor's misconduct on summation in which he made inflammatory appeals to the jurors' sympathies, exploited the above errors to argue from facts not in evidence and vouched for the eyewitness's testimony.

2. Whether, since the court charged the jury on tampering with a witness in the third degree instead of intimidating a witness in the third degree, (a) that count must be dismissed because the People failed to meet the higher burden, or, (b) in the alternative, there should be a new trial on that count since the jury was never instructed on the elements of that crime.

## STATEMENT OF FACTS

### Introduction

On April 2, 2003, a masked man entered the apartment of the 14-year-old Brenda Jones and her family, and shot and killed Alonzo Mack. Although Jones, who witnessed the shooting, did not tell police at the scene

that she knew the shooter, three months later, she told a detective that she had recognized appellant, an acquaintance from her neighborhood, as the shooter. She also said that he had warned her two days after the shooting that she should not "snitch," and a day later, told her that he had not committed the crime. Defense counsel elicited damaging details of Jones's description identifying appellant as the shooter. Although the detective knew appellant and saw him many times after Jones identified him as the shooter, he was not arrested until ten months later, after Jones identified him in a line-up. Appellant was indicted for murder, burglary, intimidating a witness, and related charges.

Jones testified without objection that her father told her not to tell the police she could identify the shooter because she could "get killed" and that the family moved shortly after the shooting because they felt they were in danger. Abdul Mohammad, who faced sentencing on two felony convictions and had entered into a cooperation agreement with the prosecution, testified that he had been a friend of appellant's and that appellant had told him that he was going to kill Mack, and after the shooting, that he had killed him. Although defense counsel objected to Mohammad's comment that appellant had threatened his life and the court

struck it, on cross-examination, he elicited the same information along with further details.

Counsel did not object to the introduction of testimony that appellant was a member of a gang and that Mack was a member of a rival gang. He did not ask for a limiting instruction on the use of this testimony, and opened the door on cross-examination of Mohammad to a gang expert who gave prejudicial testimony about gang terminology and gang activity. On summation, the prosecutor referenced the gang expert's testimony, as well as Jones's testimony about danger, and Mohammad's testimony about threats. In addition, he vouched for Jones's credibility, argued from facts not in evidence, and made inflammatory appeals.

The court neglected to instruct the jury on the elements of intimidating a witness in the third degree, mistakenly stating the elements of tampering with a witness instead. The jury convicted appellant of second-degree murder, first-degree burglary, and intimidating a witness in the third degree.

The People's Case

14-year-old Brenda Jones lived in a first-floor apartment at 92 Woodruff Avenue in Brooklyn with her parents, five brothers, and one

sister, Georgina Jones (10, 16).[1] On April 2, 2003, at about 6:00 a.m., Sergeant Frank Guarino of the Brooklyn Gang Squad and an emergency services team executed a search warrant at the apartment, directed at Brenda's older brother Harvey (Guarino: 182-83; B. Jones: 11). When the police arrived at the apartment, they found Alonzo Mack knocking on the door (Guarino: 183). Mack told Guarino that he did not live there, but that he had no place else to go and the family allowed him to stay there (Guarino: 184). Mack agreed to wait across the street while they executed the warrant (Guarino: 185). Mack had been a friend of the Jones family for about 15 years (B. Jones: 11).

Guarino recovered a 9-millimeter gun and ammunition from inside the first bedroom off the hallway, and arrested Harvey and another brother, Lavar (Guarino: 185). Georgina, then 13 years old, was aware that her brothers had several guns in the apartment, although Brenda claimed that she had not seen any (B. Jones: 29; G. Jones: 92). After the police left, Mack entered the apartment and went to sleep in one of the bunk beds inside the first bedroom, which was Harvey's room (Guarino: 187; B. Jones: 11-12, 31; G. Jones: 79-81).

---

[1]Numbers in parentheses refer to pages of appellant's trial transcript.

Brenda and Georgina knew appellant from the neighborhood by his nickname, "Coolie" (B. Jones: 18, 20; G. Jones: 82, 91). Although Brenda was not friendly with appellant and had never spoken with him, she had known him for a couple of years and saw him about two or three times a week, sometimes playing with her younger brothers (18, 40-42). He had never been to her apartment (18, 41). About twenty minutes after Mack entered the apartment, Derrick Hewlett, a friend of one of Brenda's brothers and also of appellant's, entered the apartment and asked to retrieve a book bag from the bedroom where Mack was sleeping (B. Jones: 13, 46; G. Jones: 80, 93). Derrick had a brother, Adonis, who was also a friend of appellant's (B. Jones: 13-14; G. Jones: 82). Hewlett got the book bag and left (B. Jones: 13).

A few minutes after Hewlett left, "Lucky," another friend of appellant's, came to the apartment and offered to take Brenda and her siblings to breakfast, something he had not done before (B. Jones: 14-15, 46; G. Jones: 83, 94). They declined, but Lucky stayed in the apartment, sitting in a back room with Brenda's parents and three younger brothers (B.

Jones: 15-16, 47; G. Jones: 85). Brenda and her sister were in the living room watching televison (B. Jones: 16, G. Jones: 84).[2]

After a knock on the door, Brenda went to answer it (B. Jones: 16: G. Jones: 85). There was a man at the door pointing a gun at her (16). She was scared, and in a matter of seconds, backed up and ran into another room in the back of the apartment (16, 19, 35-36). The man at the door wore black sweat pants, a black hoodie with the hood up, and a bandana which covered his chin and up to the bridge of his nose, so that just his eyes were showing (17, 32-33). As she was backing up, she saw the man turn into the first bedroom, aim the gun and shoot (20, 37). Before he kicked the door to the bedroom open, he said, "What's up, Harve?" (26, 35, 67-68).

On direct examination, Brenda testified that she recognized the shooter as appellant because of his "body structure" (17). On cross-examination, Brenda initially repeated that she recognized the shooter as appellant because of body structure, and specifically, that he was stocky, muscular, weighed about 238 pounds and was about 5 feet, 8 inches (34). When she was asked if, in addition to clothing, that was all she noticed,

---

[2]According to Georgina, Lucky remained in the living room with Georgina and Brenda (94-95).

Brenda added that she also recognized the voice based on the three-word remark (34-35, 49-50). Brenda also asserted that she had never seen anyone else in her neighborhood besides appellant who was about that height and weight (39).

Asked if there was anything special about the person's eyes, Brenda replied that there was not, and that they were not any particular or special color (39-40). However, she contradicted herself a few minutes later after defense counsel asked if there was anything other than build and voice which caused her to conclude that the shooter was appellant, responding that she saw the shooter's eyes, and that they were "shaped differently," "like oval shape" (50-51). Under further questioning, she agreed that she had just stated that the shooter's eyes were like anyone else's, and that there was nothing special about the eyes that she recognized (51).

Finally, as he concluded his cross-examination, counsel asked if the "only" reason Brenda determined the shooter was appellant was because of his size (66). Brenda agreed, stating, "the size" (66). The following exchange occurred:

Q And the voice?

A The size and the body.

[THE PROSECUTOR]: Objection [no ruling].

A Body structure.

Q Body structure?

A And the voice.

Q That's it?

A Yeah (66-67).

As Brenda ran into the back room, she said, "Oh, shit, Coolie just shot Alonzo" (B. Jones: 20). Georgina did not see the shooter, but she heard shots and heard Brenda say this as she ran to the back of the apartment (85, 102, 108). Lucky left after the shooting (B. Jones: 47). According to Georgina, he jumped out a back window and never returned (86-87, 98, 106). However, she told a detective after the shooting that he had returned to the apartment and left by the front door (Det. Charles Platt: 241).

The girls' father said that Mack was dead, and told them to call the police (B. Jones: 21,72; G. Jones: 86).[3] When the police arrived, Brenda gave them a description but did not say that she knew who the shooter was

---

[3]Mack died of a penetrating gunshot wound to the neck and torso (Dr. Floriana Persechino: 264). Four bullets were recovered from the body, and four shell casings and one bullet were found at the scene (PO Paul Dubrosky: 119; Persechino: 262-63). All were fired from a .40-caliber gun (Det. Robert Freese: 201).

(B. Jones: 21, 43-44, 49; Platt: 236-37). On direct examination, Brenda testified that she did not give the police appellant's name because she was "under the influence" of her father, and he had told her not to say anything (21-22). On redirect, after the prosecutor asked her what her father had told her "about naming the defendant" when the police arrived, Brenda responded that he had said not to do it, because she could "get killed" (72).

Defense counsel elicited that Brenda told the police that the shooter was stocky, about 5' 6" or 5' 7" and about 220 pounds (B. Jones: 43-44; Platt: 237). Although Brenda claimed that she told the detective that the shooter wore a black sweatshirt, Platt testified that, in fact, she had said that it was blue (B. Jones: 64; Platt: 236). According to Platt, Brenda told him that the shooter had said, "What's up, nigger?", not, "What's up, Harve?" (236). Detective Thomas Forte from the Crime Scene Unit arrived about 2:15 p.m. (138). He spoke with officers and detectives at the scene and prepared a report (149). That report stated that "two unknown males" wearing masks entered the apartment, produced guns, and shot the victim several times (149-51, 159, 161).

The shooting occurred at about 11:00 a.m. (B. Jones: 30). Detective Platt arrived at about 11:40 a.m, after receiving a call from his lieutenant

(129). On the way, about a half-block from the shooting, he saw appellant, whom he had known from the neighborhood for about 15 years, "casually walking" with a group of four or five other young men turn the corner of Woodruff Avenue onto St. Paul's (204-205, 209, 212, 229). Appellant was wearing a gray hooded sweatshirt (210, 238).

Two days after the shooting, Brenda and Georgina saw appellant outside their building with Adonis Hewlett and two others (B. Jones: 22; G. Jones: 87, 98). Appellant told Brenda, "Don't be snitching" (B. Jones: 22; G. Jones: 87-88, 98). Over objection, Brenda testified that she understood this comment to be a threat that "he would try to kill me or something," because he had killed Mack (B. Jones: 22-23). On cross-examination, she conceded that it could have meant that she should not reveal someone else's name, but she did not think so (52-53). Georgina understood the comment as meaning that she should not say anything about what happened in the apartment (G. Jones: 99). Defense counsel asked Georgina if she was "guessing" about what appellant had meant, and she responded that she was not guessing, because, "why would you tell a person you better not be snitching. You must be guilty" (101-102).

The next day, Brenda was with her sister and her mother on the corner of Woodruff Avenue when she saw appellant with his friend Abdul Mohammad (B. Jones: 23; G. Jones: 89, 99-100; Mohammad: 336). Appellant told her that he did not have anything to do with the killing, because he had been in the hospital after getting stabbed (B. Jones: 23; Mohammad: 336). Without objection, Brenda testified that she took this as a threat (B. Jones: 24). However, on cross-examination, Brenda testified that after appellant made this remark, he lifted his shirt and showed her a bandage, and she agreed that he did not threaten her (B. Jones: 53-54).[4]

Georgina testified that appellant said that he did not have anything to do with what happened in their apartment, and, without objection, that she took that to mean he was "guilty" of the killing (G. Jones: 89). On cross-examination, defense counsel elicited that she took this as a threat because, "That's like guilty. Why would you come up to us[,] tell us you don't have anything to do with it?" (100). Georgina agreed, however, that people knew about the shooting in the neighborhood, and that appellant did not otherwise threaten her (101).

---

[4]Platt testified that he had seen appellant one or two days before the shooting, and appellant informed him that he had recently been stabbed and treated at a hospital (212-13).

The Jones family moved into the shelter system sometime in April or May, 2003 (B. Jones: 70-71; Platt: 248). Brenda further testified, over objection, that they "had to move because it felt like we were in danger living there" (71). After Platt located them, he re-interviewed Brenda on July 16, 2003, and she told him that appellant had shot Mack, and also about the two incidents after the shooting when appellant had spoken to her (Platt: 216-18, 246; B. Jones: 55-56; 72). However, although Platt saw appellant over the next several months, he did not arrest him (247).

According to Brenda, she did not tell Platt about the two incidents before July because they were "moving around" and she "couldn't get in contact with him" (56). She knew where the precinct was, but she "didn't want to go all the way back to Brooklyn," and she did not have Platt's telephone number (57-58).

Ten months later, on May 14, 2004, Brenda and Georgina viewed a line-up at the precinct (B. Jones: 24; G. Jones: 90). When Brenda viewed the line-up, all the men had bandanas over their noses and mouths, and shower caps on their heads (B. Jones: 25; Platt: 220). Brenda identified appellant as the shooter (B. Jones: 25). When Georgina viewed the line-up, the faces were not covered, and she recognized appellant as the person she

knew from the neighborhood (G. Jones: 90-92). After the line-up, appellant was arrested (Platt: 225).

First Gang Expert Ruling and Testimony

A few months before trial, the prosecution had requested permission for an expert on gangs to testify at trial so that the jury could "understand the whole gang culture and why this murder would occur" (Minutes of October 18, 2005 at 4-9). A ruling was apparently postponed, and during the trial, Detective Platt testified outside the presence of the jury about his knowledge of gangs as it related to the case (163-75).

Platt testified that appellant had told him he was a member of the Crips gang (166). Platt also testified that he knew that Alonzo Mack was a member of the Bloods gang, based on police department and corrections records, and that the relationship between the two gangs was "hostile" (169-70). He also testified that his "understanding" was that appellant and Mack were "at war" (171).

During argument after the testimony and an apparent off-the-record conversation, defense counsel stated that his concerns had been "alleviated," because Platt would testify only that appellant had told him that he was a member of a gang (177-78). The court stated that it would not permit

testimony regarding any alleged "wars," and nor would Platt be allowed to testify that Mack was a member of a gang (178-79). The court added that testimony that appellant was a member of the Crips was "highly [relevant] to show motive and/or background information to complete the narrative" (179). Counsel stated that he had "no objection to that" (179). The court also noted that the detective was not permitted to testify about "any other bad acts" regarding appellant (180).

In testimony before the jury, Platt stated that appellant had told him that he was a member of the Crips gang (208, 227). He also described Adonis Hewlett, Lucky, and Abdul Muhammed as close "associates" of appellant (207, 231).

Abdul Mohammad Testimony

Abdul Mohammad, 25 years old, was a friend of appellant's for 4 or 5 years until 2003 (268, 270). Mohammad also knew Alonzo Mack (269). According to Mohammad, appellant belonged to the Crips gang and Mack was a member of the Bloods gang (269-70, 301). Mohammad denied being a gang member himself (300, 319).

In July, 2003, Mohammad was arrested for reckless endangerment and weapons possession after shooting a 9-millimeter gun in the vicinity of

30 people (272-73, 294-96). Although at first Mohammad was released on bail, in October, 2003, he was jailed because, according to Mohammad, he was late to court (316-17). Mohammad testified that he and appellant had a good relationship and saw each other almost daily until the friendship soured toward the end of 2003 (268, 270). Asked why, Mohammad stated that appellant had "threatened to kill him," and defense counsel objected (271). The objection was sustained and the jury told to disregard the remark (271).

Mohammad testified that after his friendship with appellant ended, he contacted his lawyer and then met with the District Attorney's office in March, 2004, in order to enter into a cooperation agreement (271-72). The agreement was signed in April, 2004, and he was released from jail in June because he had "made a deal" (272, 317-18).

Mohammad agreed to provide information and to testify before the grand jury about the death of Alonzo Mack (271-72). While the terms of the agreement were not clearly revealed at trial, Mohammad pled guilty to second-degree weapons possession and reckless endangerment in the first degree, and, apparently, in exchange for his cooperation, he was to receive a

sentence of between 3½ to 5 years (272-73, 306, 311).[5] When the prosecutor asked Mohammad if he knew what would happen if he did not "tell the truth," Mohammad replied that he would "go to jail" (273-74). In December, 2005, Mohammad was arrested in Binghamton for possession of narcotics with intent to sell, a B felony (274-75, 305, 310). While the cooperation agreement stipulated that he not be arrested again, that condition apparently was not enforced as Mohammad did not return to jail (293, 307, 311). Mohammad testified that no specific promises had been made to him in either the Brooklyn or Binghamton case, and he did not know what sentence he would receive (273, 276, 311).

According to Mohammad, in February, 2003, appellant told him that he had received information on a "slob," which, Mohammad testified, referred to a Blood (278). Mohammad knew that he was referring to Mack, whom Mohammad knew as "Free" or "Freedom" (279). Appellant told Mohammad that Mack was due to be released from prison that month, and that appellant was "going to handle that," "deal with the issue," "send him

[5]The range of sentences permissible for a first-time C violent felony conviction is between 3½ to 15 years. P.L. § 70.02. Mohammad denied knowing this, stating that the range was between 3½ to 7 years (305-306). Defense counsel's request before the jury for an "instruction" from the court as to the correct range was denied, and counsel made no further effort to correct the record (307).

home, good-bye," or "187" (280-81). Asked what "send him home" meant, Mohammad responded that "it means you know kill him" (281). The prosecutor also asked about the term "187," and Mohammad testified that in the "Crip gang that's a sign of murder" (281).

Mohammad claimed that on February 18, 2003, appellant called him to tell him that he had Mack there with him (281-82). Mohammad was surprised because appellant and Mack had "problems" (282). Mohammad further testified that the Crips and the Bloods gangs did not "like each other" (282, 301). According to Mohammad, appellant put Mack on the telephone, and Mohammad had a very brief conversation with him, although he was "shocked" about what was happening (282-83).

About an hour and a half later, Mohammad met up with appellant and Mack (283). Mack accused Mohammad of shooting him in 2002, although Mohammad denied this (284, 320-21, 337-38). Mack was holding a Timberlands box; appellant had apparently bought Mack a pair of boots (284-85).[6] After Mack left, appellant told Mohammad that he "got him," and was going to "rock him," meaning that he had a "plan" to "go after

---

[6]Mohammad identified the boots in a police photo depicting the crime scene as looking like the same pair (286-87).

him," that he was going to "send him home," and that meant "dead, kill him" (286). He also said, "I got that, I got that, I am gonna rock him to sleep" (339).

Almost two months later, on April 2, 2003, Mohammad saw appellant at Woodruff Avenue and St. Paul's Place (287-88). Appellant was wearing a black hoodie, and was with Lucky and Naftali, although Mohammad claimed that Lucky and Naftali were "not like in [their] conversation" (288, 314). Appellant said that it was "hot" and not to go "over there" (289). According to Mohammad, that meant that appellant had just "[done] something" (289). Appellant also stated that he had "just put that in," which meant to Mohammad that somebody just got shot or killed (289). Asked if appellant used "any other language" or "terminology," Mohammad replied that he had said, "That 187 is done" (289). He also said that he "just sent Free home," and he did "what he had to do" (290). After the prosecutor asked if appellant "show[ed] [him] anything," Mohammad said that he had showed him a .40-caliber gun (290).

When Mohammad saw appellant about an hour later around the corner, he had changed into a purple football jersey (291-92). Mohammad claimed that appellant told him that he had "hit him up four times" and he

knew that referred to Mack (292). Only Mohammad and appellant were present during this conversation (313).

On cross-examination, counsel asked Mohammad if he had "ever heard Glen Cummins say I am going to kill this man," and Mohammad responded that he had (302). Counsel continued, "You talked about [187], you talk about all kinds of nonsense. Ever hear I am going to shoot, kill this man?" (302). Mohammad again replied, "Correct" (302-303). Mohammad added that appellant had said he was "going to get him when he came home" and that he was "going to kill him" (303). Counsel asked if it was in "those words," and "not, 187," and Mohammad replied that it was "all that" (303). Counsel continued:

Q Never said I am going to shoot him, kill him. He said I am going to 187, that nonsense?

A In the sense of murder.

Q What it means to you?

A It means to everybody.

[Objection overruled].

Q Doesn't mean that to me.

[Objection sustained] (303-304).

Counsel also asked about what appellant had said on April 2 (312). Mohammad repeated that appellant had told him he "just put that work in," and "that means 187" (312). Asked if appellant had stated that he shot Freedom, Mohammad said, "Yes, he told me," and also that he had "rocked him to sleep, the whole term. 187 means you're dead" (312-13). Counsel responded, "That's what it means to you. But nobody else in this world?" (313). An objection was sustained (313). Counsel again asked if appellant had used the words, "I shot him," and Mohammad replied that he had, that he had told him that he shot him four times (313). Mohammad testified that he had no other conversations with appellant about the Mack shooting, although they continued to be friends (314-15).

Although Mohammad had testified that he contacted the district attorney's office when his friendship with appellant ended after appellant allegedly threatened to kill him, a remark that the jury was told to disregard, defense counsel nonetheless asked Mohammad if the reason he cooperated with the district attorney was to "save [himself] some time?" (315). Mohammad responded, "Not at all," and the following exchange then occurred:

Q You're doing this out of charity of your heart?

A Not at all[,] like I say[,] I was in danger.

Q You were in danger?

A I was incarcerated. He was sending messages.

Q Sending messages to you. How was he calling you?

A No through his ex-girlfriend (315).

The Second Gang Expert Ruling and Testimony

Immediately after Mohammad's testimony, the prosecutor requested to call an expert as to the meaning of the term "187," as well as "some other words" (339). The prosecutor continued:

> The People had no intention of calling an expert on that until [defense counsel] brought up the fact, kept asking repeatedly asking the witness in this case about what 187 means and consistently when the witness would testify what 187 means. [Counsel] is saying basically that it doesn't mean "kill" (339-40).

The prosecutor argued that an expert is used to "enlighten the jury," that the terminology used would not be understood by the average person, and that included other terms such as "slob" and "putting in work" (340). Defense counsel objected, because Mohammad testified that he was not a gang member and presumably would therefore not be familiar with gang

terminology (340-41). He also claimed that he had not asked Mohammad what the terms "187," "slob," or "putting in work" meant (341). He further argued that he had objected to the term on direct because it was "meaningless" to him and to "anybody" (341). Had he asked those "types" of questions, counsel stated, then he would be precluded from the argument, but because he had not, and "most important," because Mohammad was not a gang member, the testimony should not be allowed (341). Counsel also noted that it would prejudice the jury, particularly because there had been no testimony up to that point about appellant's involvement in a gang (341). The issue was a "simple" one, whether appellant had anything to do with the shooting, and "all" he wanted to know was if appellant said, "'I killed this guy,' period" (342).

The court responded that the issue was whether the jury could understand "something that is not within understanding of the average person," and the expert would be like an "interpreter to interpret what the meaning of the language is" (342-43). The court ruled that there would not be any general testimony about gangs, but only about language, and that the expert would have to understand the "specific gangs in these specific neighborhoods with this specific language" (343-44). Defense again stated

his "most vigorous," "strenuous" objection, that the testimony would be "irrelevant," "immaterial," and prejudice the jury (344). The court stated that although it had excluded testimony that there was a war between the two groups, it was "clear" that appellant and Mack were members of opposite gangs (345). The court also noted that appellant had indicated through "language which is not normal language" that he had "allegedly killed the deceased," and therefore that the jury was "entitled" to hear the evidence (346).

Detective Phillip O'Rourke was employed by the District Attorney's office and assigned to the Gangs Bureau (348). He had extensive experience conducting gang surveillance and interviews, and had received training on gang identifiers and gang language (348-51). He had interviewed gang members and learned about "their code, about tattoos, about graffiti," and looked for "specific intelligence on that gang as well as their rival gang" (350-51).

O'Rourke testified that the term "187" refers to the California Penal Code's homicide section, was used by the Crips to refer to a homicide, and was "written on the wall next to somebody's tag to label them for a homicide" (353). O'Rourke added:

> It is a code[,] they don't want anybody to know they are targeting that person for homicide. It is used during conversation to talk about a homicide (353).

O'Rourke also noted that the term was used in letters, "particularly anything out of prison," to represent a homicide (353-54). Although the term originated with the Crips in California, "like everything else," it had moved to the east coast (353). O'Rourke agreed that the term was "universal in all of Brooklyn and outside of Brooklyn" (354).

The term "slob" was also used by the Crips, according to O'Rourke, and was a derogatory word referring to a member of the Bloods gang (354-55). "Put in work" was a phrase used by Crip members as well as other gangs in New York City, and referred to "committing assault, robbery, homicide, stabbing, things of this nature and it is basic [sic] going out and doing, committing crimes" (355). O'Rourke asserted that there was a difference between the phrases "put in work" and "putting in work" (355). "Putting in work" is an "ongoing thing, you are putting in work, . . . you are representing a neighborhood," but "if you do it and you said, 'put in work,' that is something you already done, that is past tense" (355-56).

O'Rourke testified that the term, "rock to sleep" was also used by Crips and other gangs in New York City, and it was "basically when you are going to lull somebody in a false sense of security, get them to drop their guard around you, make them think you are their friend. . . ." (356).

O'Rourke agreed that non-gang members could understand much of this supposed "code," "if you listen to the music and if you are in the neighborhood hanging out or on the street, you would understand" (357).

Charge Conference

In listing the specific crimes it would charge, the court included second-degree murder, first-degree burglary, and "tampering with a witness in the third degree" (363). The court also showed the attorneys the verdict sheet, which listed the correct indicted charge of intimidating a witness in the third degree (365).

Defense Summation

Defense counsel told the jury that the case was "about a homicide, not about gangs, not about anything of that nature" (366-67). He questioned Brenda Jones's credibility, as well as her ability to see the shooter (368-73). He asserted that Brenda did not know who had committed the shooting, and

that Platt himself had concerns because he did not arrest appellant after Brenda told him that appellant was the shooter (370-71).

Counsel also questioned Abdul Mohammad's credibility (374-75, 377). He noted that although he agreed not to commit any other crimes, he was re-arrested in Binghamton, but nonetheless did not go back to jail for violating the agreement (375-76). According to counsel, this provided Mohammad with an incentive to lie (376). Counsel also asserted that Mohammad never said that appellant shot or killed Mack (376). Mohammad "talks about '187,'" but, counsel claimed, appellant never said "I shot this guy" (375). Counsel continued, "This guy talks about all kind of well I call it nonsense. Maybe it isn't" (376-77).

Counsel told the jurors they had an "obligation" to "put aside gangs" and to judge the case based on the evidence (381). The jurors should find appellant not guilty of all charges, including "tampering with witnesses," because "[n]o one made any threats" (381).

<u>People's Summation</u>

The prosecutor told the jury that Brenda Jones "knew" that appellant had shot Mack, and the jurors, after "listening to the evidence appropriated to you from the witnesses up on that witness stand you know it here and you

know it today" (382). Asserting that this was a "long-term thought out calculated murder," the prosecutor argued that the "plan" began when appellant told Mohammad that he had information about a "slob's" release, and that "slob" was a derogatory term used by Crips (382). According to the prosecutor, "we know" that appellant was a Crip, "although [defense counsel] would like you to think that has absolutely nothing to do with this case" (382-83). Continuing on this theme, the prosecutor added, "That's [defense counsel's] opinion. Ms. Millus [another prosecutor] and I have a different opinion. But it's your opinion in that matter that counts" (383).

Although Mohammad had testified only that appellant and Mack were in different gangs and the two gangs did not get along (282), the prosecutor asserted that "aside from the gang affiliation," Mohammad "knows" these two "do not get along. This defendant did not like Alonso Mack. He did not care for Alonso Mack. He wanted nothing to do with him except for his death" (383). According to the prosecutor, appellant bought Mack a pair of boots in order to "rock him to sleep," which, according to O'Rourke, meant that he was going to "lull a person to sleep, going to catch them off guard, going to make them think we are friends, a Trojan horse" (384). And because of this, the prosecutor claimed, Mack waited on the street while the

search warrant was executed at the Jones's home (385). The prosecutor added, "After all, what is he worried about?" and imagined Mack thinking:

> "I am friends with Glen. I know Glen is in that area but I am friends with him now. I have nothing to worry about." And he stays out there. In plain view [for] the whole world to see (385).

The prosecutor contended that the "next step" in the "plan" was when Derrick Hewlett, a "known associate" of appellant, went into the Jones apartment for a book bag, went into the room where Mack was sleeping, and now has "learned two important things," where Mack was and what he was doing (385-86).

At 11:15 a.m., a knock on the door ends Mack's life "as well as ending Brenda Jones['s] childhood" (387). When the shooter went to the bedroom and asked, "What's up Harv?", he could not have been looking for someone else, because he knew who was in the room, "his boys had gone in there" (387-88).

In assessing the credibility of the 17-year-old Brenda Jones, the prosecutor asked the jury, "Do you think that little girl wanted to be here? Do you think that little girl wanted to face him in open court? Say you know what, you're a killer. You murdered Alonso Mack? Do you think that's what

she wanted to come in to do? All that as well and come into all that and lie?" (389-90). Defense counsel's objection to "come into all of that," was sustained (390).

Brenda did not tell the police that she knew who the shooter was because her father told her not to because "he feared for her safety. Because she is a 14 year old girl who has to go back home to where an execution just took place" (391-92). And Brenda did not come forward because she "is 14. She lives where they all live, where this man, where his associate lives. She is frightened. She is scared. Her father told her don't come forward" (399). An objection was sustained when the prosecutor stated that he was "sure" there were more reasons, but he continued nonetheless, adding that there were "four or five reasons why Brenda didn't come forward" (399).

The jury can understand why she "might not have been forthcoming" because after "this execution," she sees appellant with Adonis, "another known associate," and he tells her not to "snitch" (392). The prosecutor told the jurors that he was "sure" they could figure out what was meant, and "I submit to you Brenda knew what it meant. It meant her safety" (392). And Georgina testified that it meant that he "must be guilty," when questioned by defense counsel, because "even a 13 year old child can figure

out what was going on there" (392-93). Although defense counsel wanted the jurors to believe that he "was speaking for someone else," even so, Brenda was still being threatened (392).

While defense counsel wondered what took Brenda so long to come forward, the prosecutor asked the jurors:

> What do you think took Brenda so long to come forward? She saw a murder committed in her . . . home. . . . She had been told not to snitch and she had been approached by the defendant. After that the girl was frightened. The girl was scared. She had to live at 92 Woodruff. And she and the family were so desperate to leave there that they actually took residence in a city shelter (394).

Here, an objection was overruled, and the prosecutor continued, telling the jurors that "that little girl did come forward" and "completed her description" (394).

As for Mohammad, while the jury may not like him, the prosecutor stated that he "didn't pick Abdul as a witness," and neither did the other prosecutor: appellant "is the one who chose Abdul Mohammad as a witness" (395). Although Mohammad did not come forward for almost a year, and defense counsel "will have [the jury] believe" he came forward because of the possibility of a shorter sentence, in fact, Mohammad came

forward because "he starts to get messages in jail. . . . He starts to fear for his safety [because of] that defendant. That is why Abdul comes forward. That is why Abdul comes out of jail. That is why Abdul helps tell you that [appellant] killed Alonso Mack (398-99).

The prosecutor responded to defense counsel's questioning why Platt did not arrest appellant after Brenda said that he was the shooter by stating:

> Now [defense counsel] talks about how [Detective Platt] used, viewed Brenda's testimony; how much faith he put in it. You don't have to do that. You know why? Because you have Charles Platt's testimony. You can have it read back to you, what Charles Platt said. Every time [defense counsel] asked him he never once doubted the word of Brenda, never once did he not believe that little girl (400).

After an objection, the court told the jurors only that it was their recollection that mattered, and that whatever the attorney said was "not evidence" (400).

While Detective Forte's report stated that two masked men had entered the apartment, the prosecutor claimed that Forte "had no idea where that came from." Forte had never said that "it came from Brenda Jones, never said it came from anyone who spoke to Brenda Jones" (401). "For all

we know . . . maybe Detective Forte got that information from Lucky" (401).

The prosecutor urged the jury to convict appellant of intimidating a witness in the third degree, arguing that the charge was "complete the minute this defendant went up to Brenda Jones and said don't be snitching" (401).

The prosecutor concluded his summation by telling the jury that in their opening, the People had asked that the jury "hold this defendant responsible for his actions," and that he was now asking for the "same thing" (402). He continued:

> I ask you to hold this defendant responsible for his actions because we live in a society with rules and with laws . . . , not one of this defendant's making. I ask you to hold this defendant responsible for his actions because young girls are supposed to be living, are supposed to walk down the street without being threatened (402-403).

An objection was sustained, but the prosecutor nonetheless continued, telling the jurors to hold appellant "responsible" because he had shot Mack "again and again" and for "that rage I ask you to hold him responsible" (403).

Charge

In charging the specific crimes, the court told the jury that count three was "tampering with a witness in the third degree," and the "following instructions" were applicable to that count (433). A person was guilty of tampering with a witness when

> knowing that a person is about to be called as [a] witness in a criminal proceeding, he wrongfully gets or attempted to compel such person [to] absent himself, herself from or otherwise to avoid or seek to avoid appearing or testifying at such proceeding by means of instilling in her a fear that the actor will cause physical injury to such person or another person (433).

The court then provided definitions of the terms "criminal proceeding" and "physical injury" (433-34). A "criminal proceeding" meant "any proceeding which constitutes a part of a criminal action" or "(b) an occurrence in a criminal court or is related to a respective pending or completed criminal action, either of this state or any other jurisdiction or involves a criminal investigation" (434). The court instructed the jurors that in order for them to find the defendant guilty of tampering with a witness, they must find the following elements:

> On or about April 2, '03 Brenda Jones was about to be called as a witness in a criminal proceeding.

> Two, that on that date in the county of Kings the defendant wrongfully compelled or attempted to compel Brenda Jones to absent herself from or otherwise to avoid or seek to avoid appearing or testifying at such proceeding by means of instilling in Brenda Jones a fear that the defendant would cause physical injury to Brenda Jones or another person. Three, that the defendant did so knowing that Brenda Jones was about to be called as a witness in such proceeding (434-35).

The court told the jury that it must find appellant guilty of tampering with a witness in the third degree if it found that the People had proven these elements beyond a reasonable doubt (435). The court did not mention the crime of intimidating a witness in the third degree or instruct the jury on its elements.

After the charge, when the court asked the attorneys if there were any exceptions, the prosecutor responded:

> When you read the indictment as to the tampering charge I don't have a copy of the indictment, was charged April 2nd. . . .I thought I heard earlier the third, no (438).

Defense counsel had no objections, and no further instructions were given (438-39).

Deliberations and Verdict

The jury began deliberations at lunchtime on January 30 (439-41). In addition to a request for all photos and diagrams, at 4:56 p.m., the jury requested "Brenda's testimony. . . the words spoken by the defendant at the point of entry to the apartment" (442; jury note, court file). The court sent the jury home, apparently without reading back the testimony (442). At 9:20 a.m. the next day, the jury requested Brenda's entire testimony (445; jury note, court file). The testimony was read back, and later that day, the jury reached a verdict, convicting appellant of second-degree murder, first-degree burglary, and intimidating a witness in the third degree (447; verdict sheet, court file).

# ARGUMENT

## POINT I

APPELLANT WAS DEPRIVED OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL BY (A) HIS TRIAL COUNSEL'S OPENING THE DOOR TO PREJUDICIAL TESTIMONY FROM A GANG EXPERT, AS WELL AS HIS ELICITING THE EYEWITNESS'S MORE DETAILED DESCRIPTION OF THE SHOOTER AND PREJUDICIAL TESTIMONY THAT APPELLANT HAD THREATENED A WITNESS; (B) THE ADMISSION OF IRRELEVANT AND PREJUDICIAL TESTIMONY THAT A WITNESS "HAD TO MOVE" AND "COULD GET KILLED" BECAUSE SHE WITNESSED THE SHOOTING; AND (C) THE PROSECUTOR'S MISCONDUCT ON SUMMATION IN WHICH HE MADE INFLAMMATORY APPEALS TO THE JURORS' SYMPATHIES, EXPLOITED THE ABOVE ERRORS TO ARGUE FROM FACTS NOT IN EVIDENCE AND VOUCHED FOR THE EYEWITNESS'S TESTIMONY. U.S. CONST., AMEND. XIV; N.Y. CONST., ART. I, § 6.

The main issue facing the jury was whether Brenda Jones correctly identified appellant as the masked man who entered her apartment and shot Alonzo Mack. Instead of being allowed to confine its focus to this issue, the jury was impermissibly distracted by irrelevant and prejudicial evidence. Through defense counsel's ineffectiveness, he elicited that appellant had threatened Mohammad and opened the door to an expert testifying about

gang activity. Counsel also failed to ask for a jury instruction that would have lessened the impact of the prejudicial evidence. Additionally, the prosecutor elicited prejudicial hearsay statements expressing Brenda Jones's father's opinion that appellant was a threat to their safety. Moreover, the prosecutor was able to exploit the impermissible evidence through an improper summation that further distracted the jury by inflammatory appeals and arguments based on facts not in evidence. These errors, singly and in combination, deprived appellant of a fair trial. U.S. Const., Amends. XIV; N.Y. Const., Art. I, § 6.

A. Defense Counsel's Ineffectiveness and Eliciting of Damaging and Prejudicial Evidence

The Sixth Amendment right to the effective assistance of counsel entitles a criminal defendant to "meaningful representation," People v. Baldi, 54 N.Y.2d 137, 147 (1981), or to competent representation that does not fall below an "objective standard of reasonableness." Strickland v. Washington, 466 U.S. 668, 687-88 (1984). While courts will not second-guess reasonable "strategic choices made by counsel after thorough investigation," Strickland, 466 U.S. at 690, "strategy" cannot serve as an excuse for failings that "cannot be explained convincingly as resulting from

sound trial strategy, but instead arose from oversight [or] carelessness." Eze v. Senkowski, 321 F.3d 110, 112 (2d Cir. 2003). A "strategic" decision is, by definition, a "conscious, reasonably informed decision." Cox v. Donnelly, 387 F.3d 193, 198 (2d Cir. 2004).

A strategic decision must be "reasonably plausible"; counsel is ineffective if he pursues "an inexplicably prejudicial course." People v. Zaborski, 59 N.Y.2d 863, 864-65 (1983). Moreover, where a single substantial error by counsel seriously compromises a defendant's right to a fair trial, it will qualify as ineffective representation. People v. Hobot, 84 N.Y.2d 1021, 1022 (1995). Counsel may be found ineffective for revealing information damaging to the defense, or for opening the door to otherwise inadmissible evidence, such as the client's criminal record. See, e.g., Zaborski, 59 N.Y.2d at 864-65 (counsel raised unsupported defense of entrapment, opening the door for prosecution to present highly prejudicial evidence); People v. Dove, 287 A.D.2d 806 (3d Dep't 2001) (in face of favorable Ventimiglia ruling, counsel brought out suppressed information); People v. Vannoy, 174 A.D.2d 790 (3d Dep't 1991) (defense counsel's questions entirely undermined favorable Sandoval ruling); People v. Lindo,

167 A.D.2d 558 (2d Dep't 1990) (counsel opened door to otherwise inadmissible and prejudicial evidence).

1. Opening the Door to Prejudicial Testimony From A Gang Expert

Counsel initially obtained a ruling from the court that no gang expert would testify, that the prosecution could elicit only that appellant was a gang member to show "motive" or for "background information to complete the narrative," and there would be no testimony about a "war" between appellant and Mack (177-79). The court noted specifically that the prosecution was not to elicit "any other bad acts" (180). Counsel stated that he had "no objection" to the ruling but neglected to ask the court to instruct the jury on the limited purpose of the evidence, so as to minimize the prejudice to appellant of being identified as a gang member.

Courts have ruled over and over again that when testimony about gang membership is allowed, there should be an accompanying instruction to the jury on the proper use of the evidence. See People v. Collazo, 45 A.D.3d 899 (3d Dep't 2007) (any prejudice to defendant through introduction of evidence of gang membership alleviated by court's repeated instructions regarding proper use of information); People v. Nealy, 32 A.D.3d 400, 401-402 (2d Dep't 2006) (prejudice to defendant from

testimony about gang membership alleviated by court's curative instructions); People v. Washington, 28 A.D.3d 335 (1st Dep't 2006) (prejudice to defendant from testimony about gang membership minimized by court's limiting instruction); People v. Wilson, 14 A.D.3d 463, 464 (1st Dep't 2005) (same, and court's "thorough" instructions minimized prejudice); People v. Joyner, 295 A.D.2d 625 (2d Dep't 2002) (same); People v. Newby, 291 A.D.2d 460 (2d Dep't 2002) (same, and court's "repeated" instructions alleviated prejudice).

As these cases unanimously recognize, without proper instruction, evidence that a defendant is a member of a notorious and violent gang may fatally affect a jury's deliberations. Without any limiting instruction, the jury was free to consider evidence of appellant's gang membership as evidence of criminal propensity and a propensity for violence, an entirely impermissible use of the evidence. See People v. Hudy, 73 N.Y.2d 40, 54 (1988).

As if this were not enough, counsel managed to undermine a favorable ruling disallowing a gang expert, by opening the door on cross-examination, causing the court to reverse its position and to permit testimony from a gang expert. Abdul Mohammad had entered into a

cooperation agreement with the district attorney's office in which he was to get a lower sentence on his felony convictions for reckless endangerment and weapons possession in exchange for his testimony against appellant. Moreover, he had been released from jail after signing the agreement, and remained out of jail even though he had been arrested for another felony upstate. Mohammad testified that appellant had told him that he was going to kill Mack, and also, after the shooting, that he had done so. Mohammad asserted that appellant had given him this information through the use of colorful slang or gang terms, such as "send him home," "rock him," and "187." Additionally, Mohammad claimed that appellant had shown him a .40-caliber gun immediately after the shooting, the same caliber as the ammunition found at the scene and in Mack's body.

Instead of attacking Mohammad's credibility on the basis of the cooperation agreement and establishing a clear motive to lie, defense counsel chose to attack the *meaning* of the terms testified to by Mohammad, implicitly crediting the *truth* of Mohammad's claims. On cross-examination, counsel referred to "187" as "all kinds of nonsense," as a term that meant "murder" only to Mohammad, and to "nobody else in this world" (302-304, 313). Moreover, the tactic made no sense, as Mohammad had

testified that appellant had told him that he shot Mack, and that he had shown him a .40-caliber gun immediately after the shooting, testimony that was not dependent on gang terminology.

Not surprisingly, immediately after Mohammad's testimony, the prosecutor asked to call an expert to explain the meaning of the term "187," as well as other words used by Mohammad, noting that they had "no intention" of calling such an expert until counsel "repeatedly" asked the witness about the meaning of the term (339-40). Defense counsel objected, arguing that there had been no testimony up to that point about appellant's involvement in a gang, and that it would prejudice the jury (341, 344). The court nonetheless agreed to the request, noting that the expert could "interpret" the language for the jury (345-46).

As a result, Detective O'Rourke was able to testify about "gang identifiers" and "gang language," specifically about Crips and their "code," "tattoos," "graffiti," and "rival gang[s]" (349-51). He testified that the term "187" referred to the California Penal Code's section on homicide, and was written on the wall next to someone's "tag" to "label" him for a homicide (353). He noted that it was a term used in conversation to talk about a homicide, and that it was often used in letters from prison (353-54). He also

claimed that the term "put in work" referred to committing crimes such as "assault, robbery, homicide, stabbing . . . ." (355).

Thus, as a result of counsel's opening the door, a jury which had heard nothing about gang activity up to this point, was now inundated with prejudicial information about "rival gangs," targeting someone for murder through the use of the term "187," often through the use of letters from prison, and that common gang activity included "assault, robbery, homicide" and stabbings. This testimony could not help but prejudice the jury through its references to violent criminal activity, rival gangs, and targeting others for murder.

While counsel was remiss in not asking for a limiting instruction once he knew that appellant was to be identified as a gang member, the damage was further exacerbated when counsel failed to ask for a limiting instruction after even more prejudicial testimony about gang activity was permitted. See Newby, 291 A.D.2d at 460-61 (counsel opened door to detailed testimony about defendant's membership in gang after challenging the reasonableness of the witness's belief that he was a gang member on cross-examination); People v. Fleegle, 395 A.D.2d 760, 762-63 (3d Dep't 2002) (counsel ineffective for failing to object to prior crimes evidence, eliciting

more such evidence, and failing to request a limiting instruction); Dove, 287 A.D.2d at 807 (decision to elicit uncharged crimes evidence might be viewed as "unwise but losing trial strategy," but coupled with counsel's failure to request limiting instruction, reversal mandated); Lindo, 167 A.D.2d at 558 (counsel opened door to otherwise inadmissible and prejudicial evidence).

2. Counsel's Eliciting of Prejudicial Testimony

On direct examination, Brenda Jones testified that she recognized appellant based solely on his "body structure." The weakness of the identification testimony was certainly the strongest aspect of the case for the defense. Yet, on cross-examination, counsel considerably lessened the strength of his case by eliciting further detail from Jones, including that the shooter was stocky, muscular, about 5' 8" and about 238 pounds, and that, in addition to body structure, she also recognized him because of his voice. See People v. Karamanites, 104 A.D.2d 899, 900 (2d Dep't 1984) (counsel effectively eliminated one of greatest weaknesses in prosecution case by eliciting details of complainant's description of the robbers).

Counsel also demonstrated ineffectiveness when he elicited damaging evidence on cross-examination that, on direct, he had successfully had

stricken. Mohammad had testified on direct examination that his friendship with appellant had ended because appellant had "threatened to kill him" (271). Defense counsel objected and the jury was told to disregard the remark. Mohammad also testified that he contacted his lawyer after the friendship ended, and entered into the cooperation agreement shortly thereafter (271-72).

As if counsel had entirely forgotten this exchange, on cross-examination, he asked Mohammad if he had cooperated with the district attorney in order to "save" himself time in prison (315). When Mohammad responded, "Not at all," counsel unwisely asked sarcastically if Mohammad was cooperating "out of the charity of [his] heart?" Mohammad replied, unsurprisingly, referring to his testimony on direct, "like I say, I was in danger." Counsel inexplicably continued, asking, "You were in danger?" Mohammad then responded that while he was incarcerated, appellant was "sending messages" through his ex-girlfriend (315).

Thus, as a result of counsel's ineptitude, prejudicial testimony that had previously been stricken was now before the jury. The testimony provided the jury with the very damaging impression of appellant sending sinister and threatening messages to Mohammad. See Vannoy, 174 A.D.2d

at 790 (counsel elicited damaging testimony; "devastating impact"). Counsel's carelessness thus permitted the prosecutor to argue on summation that Mohammad received "messages in jail" and "fear[ed] for his safety" because of appellant, and "that is why" he came forward, not, as defense counsel had attempted to argue, because of the possibility of a shorter sentence (398-99). See Vannoy, 174 A.D.2d at 791-92 (defense counsel's errors exacerbated when capitalized on by the prosecutor in summation).

B. Irrelevant and Prejudicial Evidence that Witnesses Were Afraid of Appellant

"A defendant is entitled to have the jury determine his guilt or innocence solely upon evidence tending to prove the crime charged and uninfluenced by irrelevant and prejudicial facts and circumstances." People v. Cook, 42 N.Y.2d 204, 208 (1977). Here, in addition to the prejudicial testimony elicited through defense counsel's ineffectiveness, the jury was also permitted to hear irrelevant and prejudicial testimony regarding "danger" to the eyewitness.

Brenda Jones testified, over objection, that her family "had to move" after the shooting "because it felt like we were in danger living there" (71). While Platt's testimony that he had difficulty locating Brenda because the

family had moved might have been relevant, Brenda's perception that they were in "danger" was both irrelevant to any issue and highly prejudicial. See People v. Cavallerio, 71 A.D.2d 338, 343 (1st Dep't 1979) (prosecutor could have elicited reluctance to testify because of fear of humiliation without bringing out prejudicial reference to other rape charges). The fact that Brenda felt herself to be in danger had no bearing on the identity of the shooter or on any element of the crimes charged.

Moreover, while on direct examination the prosecutor elicited only that Brenda did not tell the police appellant's name on the day of the murder because she was "under the influence" of her father and he had told her not to (21-22), on redirect, the prosecutor elicited the entirely unnecessary and prejudicial testimony that her father had told her she could be "killed" if she named appellant (72).

While it might have been relevant that Brenda's father told her not to give the police appellant's name in order to explain her failure to do so, the father's statement that otherwise she would be "killed," was impermissible and irrelevant hearsay. See People v. Jamerson, 99 A.D.2d 816 (2d Dep't 1984); Cavallerio, 71 A.D.2d at 343. The father's opinion that Brenda and the entire family were in danger was both speculative and irrelevant. There

was no evidence presented that the father's fear was related to anything that *appellant* had done. But it presented the danger that the jury would consider it evidence that appellant was a violent person and therefore more likely to have committed the crime. Its prejudicial effect far outweighed any potential probative value, and as inflammatory propensity evidence, is not permitted. See Hudy, 73 N.Y.2d at 56; People v. Alvino, 71 N.Y.2d 233, 241 (1987).

The prosecutor later exploited the improper admission of this testimony on summation, when he told the jury, again over objection, that Brenda was "scared," and the family "so desperate to leave there that they actually took residence in a city shelter" (394). See Vannoy, 174 A.D.2d at 791-92.

C. The People's Summation: Improper and Inflammatory Remarks

Instead of permitting the jury to focus on the issue presented, the prosecutor impermissibly sought to inflame and prejudice the jurors against appellant through improper appeals to sympathy, vouching, and reference to facts not in evidence.

The key issue facing the jury was whether Brenda Jones was able to correctly identify appellant as the shooter, particularly as the shooter wore a

bandana to cover his face, and she did not name appellant as the shooter for several months. In an apparent effort to shore up her testimony, the prosecutor repeatedly appealed to the jurors' sympathy, acted as an unsworn witness to exploit irrelevant testimony, and vouched for the eyewitness's testimony.

The prosecutor referred to the 17-year-old as a "little girl" several times, asking, "Do you think that little girl wanted to be here? Do you think that little girl wanted to face him in open court?" He also stated that the shooting had ended her "childhood," and that she had to go back home to where an "execution" had taken place. See People v. Bhupsingh, 297 A.D.2d 386 (2d Dep't 2002) (prosecutor made improper appeals to sympathy); People v. Smith, 288 A.D.2d 496 (2d Dep't 2001) (improper vouching and appeals to sympathy); People v. Andre, 185 A.D.2d 276, 278 (2d Dep't 1992) (improper comments included that witness was a "brave young girl" and jury should not "let her down").

In responding to the three-month gap between the shooting and when Brenda identified appellant, as well as Platt's failure to arrest appellant even after Brenda named him, the prosecutor went well beyond the four corners of the evidence in an effort to mislead and prejudice the jury. "It is

fundamental that the jury must decide the issues on the evidence, and therefore fundamental that counsel, in summing up, must stay within the four corners of the evidence." People v. Ashwal, 39 N.Y.2d 105, 109 (1976) (internal quotation omitted).

Here, the prosecutor violated this maxim several times, asking the jury to speculate: "What do you think took Brenda so long to come forward? She saw a murder committed in her. . . home" (394). She did not come forward because she "is 14. She lives where they all live, where this man, where his associate lives. She is frightened. She is scared. Her father told her don't come forward" (399). And although an objection was sustained when the prosecutor stated that he was "sure" there were more reasons, he continued anyway, adding that there were "four or five reasons why Brenda didn't come forward" (399). However, there was simply no testimony that Brenda did not come forward between April and July because she was "scared." Instead, she testified that she did not want to go "all the way" to Brooklyn to talk to Platt, and she did not have his phone number.

A prosecutor may not act as an unsworn witness to suggest that there is other evidence, not introduced at trial, that would support his case. Such "improper suggestions, insinuations and, especially, assertions of personal

knowledge are apt to carry much weight against the accused when they should properly carry none." Berger v. United States, 295 U.S. 78, 88 (1935); see also People v. Mendez, 22 A.D.3d 688, 689 (2d Dep't 2005); Smith, 288 A.D.2d at 497.

The prosecutor also impermissibly vouched for Brenda's testimony and again went beyond the four corners of the evidence in discussing why Platt did not arrest appellant after he was named by Brenda. The prosecutor stated:

> Now [defense counsel] talks about how [Detective Platt] used, viewed Brenda's testimony; how much faith he put in it. You don't have to do that. You know why? Because you have Charles Platt's testimony. You can have it read back to you, what Charles Platt said. Every time [defense counsel] asked him he never once doubted the word of Brenda, never once did he not believe that little girl (400).

These comments were improper for several reasons. First, the prosecutor misstated the evidence, as Platt had not testified that he "never once doubted" Brenda. Indeed, that Platt did not arrest appellant for ten months would suggest that he was concerned about the strength of the evidence based solely on Brenda's identification. In addition, the prosecutor was distorting the issue and misleading the jury, as the issue was

not solely one of veracity, but whether Brenda, particularly given the hoodie and bandana, might have been mistaken. See People v. Tolbert, 198 A.D.2d 132, 133 (1st Dep't 1993); People v. Langford, 153 A.D.2d 908, 909 (2d Dep't 1989). Finally, the prosecutor was improperly vouching for the credibility of the witness.

After an objection, the court merely told the jurors that it was their recollection that mattered, and what the attorney said was not evidence. This instruction was insufficient to eliminate the harm to appellant, as the court neither sustained the objection nor conveyed that what the prosecutor had said was improper. See People v. Richards, 78 A.D.2d 664 (2d Dep't 1980) (court instructing jurors that their recollection controlled and permitting prosecutor to continue in same vein not sufficient to erase harm of summation argument unsupported by record); People v. Symbato, 72 A.D.2d 780, 781 (2d Dep't 1979) (court instruction that jury's recollection of facts controlling not sufficient to erase harm of summation comment that was irrelevant and prejudicial).

The prosecutor was also able to exploit defense counsel's error in opening the door to the gang expert by alluding to O'Rourke's testimony and the slang terms allegedly explained by the testimony, including "slob"

and "rock to sleep" (382, 384). However, the prosecutor went beyond this testimony to improperly express his personal opinion, misstate the evidence, and attempt to inflame the jury. He told the jury that "we know" that appellant was a Crip, although defense counsel "would like you to think that has absolutely nothing to do with this case" (382-83). He added that although that was counsel's "opinion," he and the second prosecutor had a "different opinion." His disingenuous aside that it was the jury's opinion that mattered, coming as it did during the expression of his personal belief in the quality of the evidence, did little to ameliorate the harm.

The prosecutor also argued, using O'Rourke's testimony, that appellant had attempted to "rock [Mack] to sleep," that he was going to "lull" him into thinking they were friends by buying him a pair of boots in February (384). From this slender reed, the prosecutor argued that Mack had waited outside the Jones house two months later while the search warrant was executed because he now had "nothing to worry about," even though appellant was "in the area," he waited in "plain view [for] the whole world to see" (385).

This speculative argument was both unsupported by the record and also not fairly inferable from the evidence. See Ashwal, 39 N.Y.2d at 110;

People v. Anderson, 35 A.D.3d 871, 872 (2d Dep't 2006) (prosecutor's characterization of defendant's behavior unsupported by the record); Taylor, 296 A.D.2d at 512 (prosecutor distorted the facts in evidence). Even worse, the prosecutor continued to insinuate that appellant was a dangerous criminal, such that Mack would be in danger just standing on a sidewalk "in that area." A prosecutor may not try to convey to the jury, by insinuation, suggestion or speculation, the impression that the defendant is guilty of other crimes not at issue at the trial. Ashwal, 39 N.Y.2d at 110.

The prosecutor also resorted to arguing from facts not in evidence in order to counter the inconsistency revealed by Detective Forte's report, which stated that two masked men, not one, had entered the apartment. Forte had obtained the information in the report from other officers and detectives at the scene, who had presumably spoken to the one eyewitness, Brenda Jones. The prosecutor's comment that Forte "had no idea" where the information came from, and that "maybe" it came from Lucky was a complete distortion of the evidence, as Lucky had left the apartment immediately after the shooting. See Anderson, 35 A.D.3d at 872; People v. Robinson, 191 A.D.2d 595 (2d Dep't 1993).

The prosecutor also improperly stated his personal belief in appellant's guilt. He stated that Brenda "knew" that appellant had shot Mack, and the jurors also "know it today" (382). See People v. Pagan, 2 A.D.3d 879 (2d Dep't 2003) (reversal for, among other errors, prosecutor's vouching for the complainant's credibility); Smith, 288 A.D.2d at 497 (error for prosecutor to state that "of course he did it. This isn't an issue of who did it").

The prosecutor's final exhortation to the jury to "hold this defendant responsible for his actions" because "we live in a society with rules" and "young girls are supposed to . . . walk down the street without being threatened" was improper. Although an objection to this last comment was sustained, the prosecutor continued nonetheless, telling the jurors to hold appellant "responsible" for his "rage" (403). Suggestions that the jury use their verdict to send a message, rather than decide guilt or innocence, are blatantly improper. See Bhupsingh, 297 A.D.2d at 388 (prosecutor told the jury, "You can't make it better," but victim will know that "he didn't totally get away with it"); People v. Fogel, 97 A.D.2d 445 (2d Dep't 1983)

(condemning argument not to let defendant "get away with conning you" and that the "only way to stop" her is to find her guilty).

* * *

The cumulative effect of these errors denied appellant his right to a fair trial. See Berger v. United States, 295 U.S. at 88-89; People v. Calabria, 94 N.Y.2d 519, 523 (2000); Bhupsingh, 297 A.D.2d at 388; People v. Lewis, 262 A.D.2d 84 (2d Dep't 1999). The evidence of gang activity and threats to Mohammad, elicited only because of counsel's ineffectiveness, as well as the irrelevant and prejudicial testimony regarding Brenda's feelings of "danger," contributed to an aura of criminality, a specter that haunted appellant's entire trial. The prosecutor's summation, in which he exploited the above errors to insinuate that appellant was guilty of gang activity and other uncharged crimes, and during which he vouched for his witness and made inflammatory appeals to the jurors' sympathies, eliminated whatever semblance of a fair trial that remained.

"Evenhanded justice and respect for the fundamentals of a fair trial mandate the presentation of legal evidence unimpaired by intemperate conduct aimed at sidetracking the jury from its ultimate responsibility -- determining facts relevant to guilt or innocence." Calabria, 94 N.Y.2d at

523. The above errors so prejudiced and overshadowed the proceedings as to deprive appellant of the "evenhanded justice" and fair trial to which he was entitled. Id.; see also Darden v. Wainwright, 477 U.S. 168 (1986) (reversal required when summation comments so infected the trial with unfairness as to make the resulting conviction a denial of due process). Moreover, counsel's errors deprived appellant of "meaningful representation," Baldi, 54 N.Y.2d at 147, and counsel's ineffectiveness resulted in the introduction of such damaging evidence that there is a reasonable probability that, but for counsel's errors, the verdict might well have been different. Strickland, 466 U.S. at 684, 687.

The proof was not so overwhelming that these errors may be deemed harmless. There was only one eyewitness, Brenda Jones, and she had many impediments to her ability to observe the shooter. He wore a bandana that covered his face up to his eyes, and a sweatshirt with a hood worn around his face and covering his hair. Brenda acknowledged that there was nothing special about the shooter's eyes that allowed her to make an identification. She backed up quickly after seeing a gun, giving her only a few seconds to make an identification. She claimed that she recognized the man based solely on "body structure" and "voice," although she rather incredibly

claimed that only appellant matched this particular height and weight in her neighborhood, and the "voice" was based on a three-word remark. And it was only defense counsel's ineptitude on cross-examination that elicited Brenda's reference to voice, as well as additional details about the shooter's height and weight.

Moreover, when appellant told Brenda two days later that she should not "snitch," she may well have assumed that he was the shooter, rather than that he was speaking generally, or speaking for someone else, as even Brenda and the prosecutor recognized was a possibility.

There were other problems with the evidence. While the prosecutor claimed that the shooting was a long-term plot designed to kill Alonzo Mack, that hardly explained the shooter's remark, "What's up, Harve?", obviously directed at Brenda's brother Harvey, whose room the shooter aimed at, the same room where Harvey apparently stored guns and ammunition. There were also inconsistencies between Brenda's description of the shooter's clothing and the clothing Platt described appellant wearing immediately after the crime. Moreover, Platt was obviously concerned about the strength of the identification, as he did not arrest appellant for months after Brenda identified him as the shooter.

The only other evidence connecting appellant to the crime was Mohammad's testimony. But Mohammad had a clear motive to lie, as he had entered into a cooperation agreement, was released from jail because of his cooperation, and faced a much lower sentence on the basis of his continued cooperation. His testimony, which put him at the scene at exactly the moments that appellant happened to be allegedly talking about or meeting with Mack, strained credulity, particularly since he testified to conversations about Mack occurring only in February and then on the day of the shooting in April. Mohammad also testified that he had no other conversations with appellant about the shooting after April 2, even though they continued to be friends. Notably, Mack had accused Mohammad himself of shooting him in an earlier incident.

There is a reasonable probability that but for the admission of irrelevant and prejudicial testimony and the prosecutor's inflammatory comments, the verdict would have been different. Overall, these errors painted appellant as a member of a notoriously brutal gang, someone the jurors could not help but believe was guilty, particularly since they were never given limiting instructions on the proper use of the testimony concerning gang membership. While not all of the errors were objected to,

given their pervasiveness, counsel's ineffectiveness, and the substantial prejudice to appellant, his conviction should be reversed on the law and in the interest of justice, and a new trial ordered.

## POINT II

SINCE THE COURT CHARGED THE JURY ON TAMPERING WITH A WITNESS IN THE THIRD DEGREE INSTEAD OF INTIMIDATING A WITNESS IN THE THIRD DEGREE, (A) THAT COUNT MUST BE DISMISSED BECAUSE THE PEOPLE FAILED TO MEET THE HIGHER BURDEN, OR, (B) IN THE ALTERNATIVE, THERE SHOULD BE A NEW TRIAL ON THAT COUNT SINCE THE JURY WAS NEVER INSTRUCTED ON THE ELEMENTS OF THAT CRIME. U.S. CONST., AMENDS. V, XIV; N.Y. CONST., ART. I, § 6.

Appellant was charged in the indictment with intimidating a witness in the third degree and that is the crime that was listed on the verdict sheet. However, the court mistakenly charged the jury on tampering with a witness, a different crime, with different elements, and intimidating a witness was never mentioned. Since the People failed to establish that Brenda Jones was a witness in an ongoing criminal proceeding when appellant spoke to her two days after the crime, a burden they accepted when they failed to object to the charge as given, the intimidating a witness

count of the indictment must be dismissed. Alternatively, because the jury was never instructed on the elements of intimidating a witness, appellant is entitled to a new trial on that count.

A. As Charged, the Intimidating a Witness Count Was Not Proved

The court charged the jury that a person was guilty of tampering with a witness in the third degree when

> knowing that a person is about to be called as [a] witness in a criminal proceeding, he wrongfully gets or attempted to compel such person [to] absent himself, herself from or otherwise to avoid or seek to avoid appearing or testifying at such proceeding by means of instilling in her a fear that the actor will cause physical injury to such person or another person (433); see P.L. § 215.11.

A "criminal proceeding" meant "any proceeding which [(a)] constitutes a part of a criminal action" or "(b) an occurrence in a criminal court or is related to a respective pending or completed criminal action, either of this state or any other jurisdiction or involves a criminal investigation" (434); see C.P.L. § 1.20 (18).

The court further charged the jury that it must find that "Brenda Jones was about to be called as a witness in a criminal proceeding," that appellant "wrongfully compelled or attempted to compel Brenda Jones to absent

herself from . . . such proceeding," and that he did so, knowing that she was about to be called as a witness in such proceeding (434-35). To the extent the tampering instructions could be used by the jury to determine appellant's guilt of intimidating a witness, the People did not object to that charge, and they were obligated to prove those elements. People v. Malagon, 50 N.Y.2d 954, 956 (1980); People v. Kearse, 289 A.D.2d 507, 508 (2d Dep't 2001); People v. Free, 233 A.D.2d 463 (2d Dep't 1996).

The People did not meet this burden because they failed to show that Brenda Jones was a witness in a criminal proceeding. As this Court held in People v. Delgado, 143 A.D.2d 1033, 1034 (2d Dep't 1988), the "plain wording of the statute . . . does not encompass the situation at bar." As in Delgado, Jones was "neither a witness in a criminal proceeding nor a person about to be called as a witness." Id. Moreover, appellant had "neither been named, arrested, nor charged as being the perpetrator of a criminal offense." Id.; see also People v. Hollenquest, 173 A.D.2d 560 (2d Dep't 1991).

When the jurors convicted appellant of "intimidating a witness in the third degree," they were acting on the basis of the only instructions that had been given to them as to the third count listed on the verdict sheet. Those instructions included an element of the crime that was not proved by the

People. As the People failed to prove an essential element of the crime as charged to the jury, appellant's conviction on that third count of the indictment – intimidating a witness – must be reversed, his sentence vacated and that count dismissed. See Malagon, 50 N.Y.2d at 956; Kearse, 289 A.D.2d at 508-509; Free, 233 A.D.2d at 463-64; Hollenquest, 173 A.D.2d at 560.

B. Lack of Instruction on the Count of Intimidating a Witness

Alternatively, because the court failed to provide any instructions to the jury on the count of intimidating a witness, including the elements required for a conviction, appellant's conviction on that count must be reversed and a new trial ordered. U.S. Const., Amends. V, XIV; N.Y. Const., Art. I, § 6; Patterson v. New York, 432 U.S. 197, 210 (1977); Henderson v. Kibbe, 431 U.S. 145, 154 (1977).

A court must instruct the jury on the "material legal principles applicable to the particular case," including the elements of the crimes charged and any applicable definitions. C.P.L. § 300.10 (2). These principles mandate providing the jury with the statutory definitions of the charged crimes' elements. People v. Blacknall, 63 N.Y.2d 912 (1984); People v. Rosario, 300 A.D.2d 512, 513 (2d Dep't 2002).

A person is guilty of intimidating a witness in the third degree when, "knowing that another person possesses information relating to a criminal transaction," he

> (1) Wrongfully compels or attempts to compel such other person to refrain from communicating such information to any court, grand jury, prosecutor, police officer or peace officer by means of instilling in him a fear that the actor will cause physical injury to such other person or another person.

P.L. § 215.15 (1).[7]

Intimidating a witness includes additional elements not included in tampering with a witness, and, thus, is not a lesser included offense. See People v. Glover, 57 N.Y.2d 61, 64 (1982). Therefore, the jury was without guidance as to the basic elements of the crime charged, and it is impossible to determine if the jury reached a unanimous verdict on all elements of the crime charged. No conviction may stand "unless based upon trial evidence which is legally sufficient and which establishes beyond a reasonable doubt every element of such offense and the defendant's commission thereof." C.P.L. § 70.20. Accordingly, appellant's conviction on this count must be reversed and a new trial ordered.

---

[7]Subsection 2 deals with intentionally damaging property and is not applicable here.

While defense counsel did not object to the charge, a "charge so deficient as to amount to no charge at all" does not require preservation. People v. Williams, 50 N.Y.2d 996, 998 (1980). "The necessity to charge has the same imperative connotation as the opening statement by the District Attorney . . . , which cannot be waived." People v. Wallens, 297 N.Y. 57, 63 (1947); see also Matter of Vergari v. Walsh, 90 A.D.2d 801 (2d Dep't 1982) (court cannot decline to instruct the jury with respect to every element of the crime charged). Even if preservation were required, this Court should reverse appellant's conviction on this count in the interest of justice, see Rosario, 300 A.D.2d at 513. Moreover, counsel's failure to object is further evidence of ineffectiveness. See Point I (a), ante.

## CONCLUSION

FOR THE REASONS STATED IN POINT I, APPELLANT'S CONVICTION SHOULD BE REVERSED AND A NEW TRIAL ORDERED; FOR THE REASONS STATED IN POINT II(A), APPELLANT'S CONVICTION ON THE THIRD COUNT OF THE INDICTMENT SHOULD BE VACATED AND THAT COUNT DISMISSED; ALTERNATIVELY, FOR THE REASONS STATED IN POINT II (B), APPELLANT'S CONVICTION ON THE THIRD COUNT OF THE INDICTMENT SHOULD BE VACATED AND A NEW TRIAL ORDERED ON THAT COUNT.

Respectfully submitted,

LYNN W. L. FAHEY
Attorney for Defendant-Appellant

SARAH J. BERGER
Of Counsel
March 2008

# CERTIFICATION OF COMPLIANCE

The foregoing brief was prepared on a computer. A proportionally spaced typeface was used, as follows:

Name of typeface: Times New Roman

Point Size: 14

Line Spacing: Double

The total number of words in the brief, inclusive of point headings and footnotes, and exclusive of pages containing the table of contents, table of citations, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is 13,607.

Dated: New York, New York
March 11, 2008

Sarah J. Berger