To be argued by:
MORGAN J. DENNEHY
(10 Minutes)

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

GLEN CUMMINS,

Defendant-Appellant.

Appellate Division
Docket Number
2006-04858

Kings County
Indictment Number
3066/2004

RESPONDENT'S BRIEF

LEONARD JOBLOVE
MORGAN J. DENNEHY
Assistant District Attorneys
of Counsel

May 7, 2008

**CHARLES J. HYNES**
**DISTRICT ATTORNEY KINGS COUNTY**
**RENAISSANCE PLAZA**
**350 JAY STREET**
**BROOKLYN, NEW YORK 11201-2908**

# TABLE OF CONTENTS


Page

PRELIMINARY STATEMENT .... 1

STATEMENT OF FACTS .... 2
- Introduction .... 2
- The Trial .... 3
  - The People's Case .... 3
  - Defendant's Case .... 9
- The Verdict and the Sentence .... 9

POINT I -

DEFENDANT WAS NOT DEPRIVED OF A FAIR TRIAL BY HIS TRIAL COUNSEL'S REPRESENTATION OR THE PROSECUTOR'S CONDUCT. .... 10

Defendant's Counsel Provided Him With Meaningful Representation. .... 10

Defendant's Prosecutorial Misconduct Claim Is Largely Unpreserved For Appellate Review. Moreover, the Claim Is Meritless. In Any Event, Any Error Was Harmless .... 20

POINT II -

DEFENDANT'S LEGAL INSUFFICIENCY CLAIM IS UNPRESERVED FOR APPELLATE REVIEW. MOREOVER, THE CLAIM DOES NOT WARRANT THE EXERCISE OF THIS COURT'S INTEREST OF JUSTICE JURISDICTION .... 28

CONCLUSION -

FOR THE AFOREMENTIONED REASONS, DEFENDANT'S JUDGMENT OF CONVICTION SHOULD BE AFFIRMED. .... 30

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

GLEN CUMMINS,

Defendant-Appellant.

Appellate Division
Docket Number
2006-04858

Kings County
Indictment Number
3066/2004

## RESPONDENT'S BRIEF

## PRELIMINARY STATEMENT

Defendant Glen Cummins appeals from a judgment of the Supreme Court, Kings County, rendered on April 28, 2006, convicting him, after a jury trial, of Murder in the Second Degree (P.L. § 125.25[1]), Burglary in the First Degree (P.L. § 140.30[1]), and Tampering With a Witness in the Third Degree (P.L. § 215.11[1]). Defendant was sentenced to concurrent prison terms of twenty-five years to life for the murder count, twenty-five years for the burglary count, and two to four years for the tampering with a witness count (Gerges, J., at trial and sentence).

Defendant is incarcerated pursuant to this judgment of conviction. There were no co-defendants in this case.

## STATEMENT OF FACTS

### Introduction

On April 2, 2003, shortly after 11:00 a.m., inside an apartment located at 92 Woodruff Avenue in Brooklyn, defendant, a member of the Crips street gang, shot Alonzo Mack, a member of the rival Bloods street gang, seven times. Mack died from his injuries. Brenda Jones, a fourteen-year-old girl and a resident of the apartment, witnessed the shooting. Brenda knew defendant from the neighborhood and, even though he twice threatened her to keep silent, she later identified him in a lineup. In addition, before the shooting, defendant told his friend, Abdul Mohammed, that he was going to kill Mack, and in the hours after the murder, admitted to Mohammed that he had committed the act.

For these crimes, defendant was charged, under Kings County Indictment Number 3066/2004, with Murder in the Second Degree (P.L. § 125.25[1]), four counts Burglary in the First Degree (P.L. §§ 140.25[1]-[4]), Criminal Possession of a Weapon in the Second Degree (P.L. § 265.03), and Intimidating a Witness in the Third Degree (P.L. § 215.15[1]).

The Trial

The People's Case

ABDUL MOHAMMED was defendant's friend for five years, and they would spend time together on a daily basis (Mohammed: 268-69).[1] Defendant was a member of the Crips street gang (Mohammed: 269). Mohammed also knew Alonzo Mack, who was a member of the rival Bloods street gang (Mohammed: 270, 282, 301).[2]

In February of 2003, defendant told Mohammed that he knew when Mack was being released from prison, and that defendant was "going to handle that." Defendant also referred to "187," and Mohammed understood defendant's comments to mean that defendant was going to kill Mack (Mohammed: 279-81, 303).[3] Several weeks later, defendant telephone Mohammed and said that he (defendant) was with Mack. Defendant was pretending that he and Mack were friends (Mohammed: 281-83). In fact, defendant bought Mack a

---

[1] Numbers in parentheses refer to pages of the trial transcript; names preceding page numbers identify the witnesses whose testimony is cited. Numbers preceded by "S." refer to the transcript pages of the sentencing proceedings.

[2] Mohammed had pleaded guilty to weapon possession, and was awaiting sentencing when he testified at defendant's trial. Mohammed had entered into a cooperation agreement with the District Attorney's Office (Mohammed: 271-74, 293-300, 307-11).

[3] Detective PHILLIP O'ROURKE, an expert in the field of gang terminology, explained that "187" referred to the California Penal Law section for homicide, and it is a term used by the Crips when they are targeting someone for murder (O'Rourke: 352-54, 356-57).

pair of Timberland boots (Mohammed: 284-85). Mohammed was confused, but defendant explained that it was all part of defendant's plan, and that defendant was still going to kill Mack (Mohammed: 286-87, 301-02).

On April 2, 2003, fourteen-year-old BRENDA JONES was in the apartment she shared with her father, mother, five brothers, and her twelve-year-old sister, GEORGINA JONES, at 92 Woodruff Avenue in Brooklyn. At around 9:30 a.m., a police SWAT team broke down the door (B. Jones: 10-11, 28-30; G. Jones: 77-79, 92-93). Sergeant FRANK GUARINO was among the officers who had entered the apartment. He and his team were executing a search warrant. They recovered a gun from one of the bedrooms and arrested Brenda's and Georgina's older brothers, Harvey and Lavar (Guarino: 182-86).

Later that day, Alonzo Mack, a long-time friend of the Jones' family, came to the apartment and went to sleep in the brothers' bedroom.[4] Twenty minutes later, Derrick Ulett, a man whom Brenda and Georgina knew from the neighborhood, entered the apartment, went into the room in which Mack was sleeping, retrieved his book bag, and then left (B. Jones: 11-13, 30-31,

[4] Sergeant Guarino saw Mack outside of the apartment before the execution of the search warrant. Mack wanted to enter the apartment, but Sergeant Guarino said that he had to wait until the officers were finished. Mack said that he had nowhere to go, and that he would wait across the street. Sergeant Guarino later saw Mack standing across the street from the apartment building (Guarino: 183-85, 187).

45-47; G. Jones: 79-81, 93). Ten minutes later, a man named "Lucky" arrived and offered to take Brenda, Georgina, and their brothers, ages eight, nine and ten, to McDonalds. Lucky and Ulett were friends with defendant (B. Jones: 14-16, 46-48; G. Jones: 82-84, 93-95).

Lucky was in one of the apartment's back rooms with Brenda's parents and little brothers, and Brenda and Georgina were in the living room watching television, when someone knocked on the broken front door (B. Jones: 15-16, 31; G. Jones: 84-85, 97). Brenda opened the door and saw a man pointing a gun at her. The man was dressed in black sweat pants and a Black "hoodie" that was pulled up over his head. He had a black bandana over his mouth and nose, and even though Brenda could only see his eyes, she realized that he was the defendant because she recognized his body structure (B. Jones: 16-17, 31, 39-40, 49-50).[5] Defendant walked directly to the room where Mack was sleeping. He kicked in the door, said, "What's up now, Harve," and shot him. Brenda recognized defendant's voice. Defendant then left the apartment,

[5] Brenda knew defendant for "[a] couple of years," and would see him regularly two or three times a week. They did not have a relationship, but defendant played with Brenda's little brothers (B. Jones: 18, 40-41). Brenda believed that defendant weighed 238 pounds, was five feet, eight inches tall, and had a stocky build (B. Jones: 34).

and Brenda said, "Oh shit, Coolie [defendant] just shot Alonzo" (B. Jones: 18-20, 35-37, 42, 44-45, 50, 67-68).[6]

On the morning of April 2, 2003, Mohammed saw defendant on the street wearing a black "hoody," and defendant told him not to go over to Woodruff Avenue because it was "hot." Defendant also said that the "187 is done," and that he had sent Mack "home." Mohammed understood these remarks to mean that defendant had just killed Mack. Defendant then showed Mohammed his .40 caliber handgun (Mohammed: 287-91, 311-14).

On April 2, 2003, at 11:30 a.m., Police Officer PAUL DUBROSKY responded to the shooting at 92 Woodruff Avenue. When he arrived at the apartment, the officer went into a bedroom and saw a man lying facedown on a bed. The man was bleeding and appeared to have been shot (Dubrosky: 113-14, 126). Officer Dubrosky took the man's wallet out of his pants pocket and learned that his name was Alonzo Mack (Dubrosky: 115). The officer secured the crime scene and, several minutes later, emergency medical technicians arrived, examined Mack, and discovered that he was dead (Dubrosky: 115-16, 124, 131-32). On

[6] Georgina did not see the gunman, but she heard the shots, then heard Brenda say, "Oh shit, Coolie just shot at Alonzo Mack" (G. Jones: 85, 97-98, 102, 108).

the following day, Officer Dubrosky went to the Kings County Morgue and identified Mack's body (Dubrosky: 120).[7]

Detective THOMAS FORTE of the Police Department's Crime Scene Unit arrived at the apartment inside 92 Woodruff Avenue at 2:15 p.m. (Forte: 137-38, 149). Detective Forte recovered ballistics evidence from a bedroom, including four discharged bullet shell casings, a deformed bullet and six cartridges that had not been fired from a gun (Forte: 139-45). The detective gave the ballistics evidence to Officer Dubrosky, who then vouchered it (Dubrosky: 117-20).[8]

Detective CHARLES PLATT had been a police officer and detective in the 70th precinct for over twenty-four years. He knew many of the area residents, including defendant. In fact, he and defendant would see one another on a weekly basis for the last twelve to fifteen years, and their relationship was "cordial" (Platt: 204-06, 227). Defendant had told Detective Platt that defendant was a member of the Crips street gang (Platt: 208, 227).

---

[7] Doctor FLORIANA PERSECHINO performed an autopsy on Mack's body. Mack had been shot seven times in the neck, chest, shoulder and arm. These gunshot wounds caused his death (Persechino: 256-66).

[8] Detective ROBERT FREESE tested the ballistics evidence and concluded that it all had been fired from the same gun (Freese: 199-202).

When Detective Platt learned about the shooting at 92 Woodruff Avenue, he went to the apartment and saw the victim. Detective Platt then went back to the stationhouse and interviewed Brenda. She appeared to be scared (Platt: 208, 213-15, 228, 231-32, 235). Brenda gave a description of the gunman, but she did not reveal his identity because her father had instructed her not to (B. Jones: 21-22, 43-44, 49; G. Jones: 104). During the course of his investigation, Detective Platt had additional conversations with Brenda and her family, and, ultimately, defendant was regarded as a possible suspect (Platt: 216-18, 245-48).

Two days after the murder, Brenda and Georgina saw defendant outside of their building.[9] Defendant warned Brenda not to snitch. On the following day, defendant confronted Brenda again and told her that he did not have anything to do with the murder. Brenda and Georgina regarded these exchanges as threats (B. Jones: 22-24, 52-54; G. Jones: 87-90, 98-102).

On May 14, 2004, Brenda went to the 70th police precinct stationhouse with Detective Platt and viewed a lineup. Each of the lineup participants were dressed like the murderer, with hoods over their heads and bandanas over the mouths and noses (B. Jones: 24-25, 54; Platt: 219-22). Brenda recognized defendant

[9] Georgina knew defendant because she saw him "all [of] the time" in the neighborhood (G. Jones: 91).

and identified him as the man who had shot Mack and had threatened her afterward (B. Jones: 25-26). Georgina also viewed a lineup and identified defendant as the man who had twice threatened Brenda after the shooting (G. Jones: 90-92; Platt: 222-24). Detective Platt then placed defendant under arrest (Platt: 225).

Defendant's Case

Defendant did not present any witnesses on his behalf (366).

The Verdict and the Sentence

On January 31, 2006, the jury convicted defendant of Murder in the Second Degree, Burglary in the First Degree, and Tampering With a Witness in the Third Degree (447-48).[10]

On April 28, 2006, defendant was sentenced to concurrent prison terms of twenty-five years to life for the murder count, twenty-five years for the burglary count, and two to four years for the tampering with a witness count (S. 7-8).

[10] Even though defendant was charged in the Indictment with Intimidating a Witness in the Third Degree, and that charge was referred to when the verdict was read (447), the court charged the jury with the crime of Tampering With a Witness in the Third Degree (433-35).

POINT I

DEFENDANT WAS NOT DEPRIVED OF A FAIR TRIAL BY HIS TRIAL COUNSEL'S REPRESENTATION OR THE PROSECUTOR'S CONDUCT.

Defendant claims that his counsel provided him with ineffective assistance because he elicited damaging testimony from two witnesses, opened the door to allegedly prejudicial testimony from an expert on street gangs, and failed to ask for a limiting instruction with respect to the expert. Defendant also claims that the prosecutor committed misconduct by eliciting from Brenda Jones that she was afraid of defendant, and by making several allegedly improper summation remarks. Defendant's prosecutorial misconduct claim is largely unpreserved for appellate review because most of the alleged errors were never objected to below. Moreover, each of defendant's claims is completely meritless. In any event, any errors committed by the prosecutor were harmless in light of the overwhelming evidence of defendant's guilt.

Defendant's Counsel Provided Him With Meaningful Representation.

Under the New York State Constitution, a defendant's right to effective assistance of counsel is satisfied when, under the totality of the circumstances existing at the time of representation, counsel provided defendant with "meaningful representation." People v. Benevento, 91 N.Y.2d 708 (1998);

People v. Satterfield, 66 N.Y.2d 796, 798-99 (1985); People v. Baldi, 54 N.Y.2d 137, 146-47 (1981). Similarly, under the federal constitution, a defendant is entitled to "reasonably effective assistance," which, in light of all the circumstances, does not fall "outside the wide range of professionally competent assistance." Strickland v. Washington, 466 U.S. 668, 687, 690 (1984).

Additionally, under federal constitutional law, to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate prejudice, i.e., a reasonable probability that the result of the trial would have been different but for counsel's unprofessional errors. Id. at 694. Although, under the state constitution, a defendant need not show a reasonable probability that he would be acquitted but for counsel's errors, defendant nevertheless must show that counsel's errors deprived him of a fair trial. Benevento, 91 N.Y.2d at 711. Defendant here has failed to show that his trial counsel's performance was deficient, or that any alleged deficiency deprived him of a fair trial.

Defendant's attorney, George Sheinberg, Esq., provided defendant with meaningful representation. Counsel advanced a defense of mistaken identification, arguing that the People's eyewitness, Brenda Jones, was a scared kid who could not possibly have gotten a good view of the assailant because only his eyes

were visible through the hood and the bandana that he was wearing. As evidence of the claimed unreliability of Brenda's identification, counsel argued that Detective Platt had waited several months to arrest defendant, even though the detective knew exactly where to find him. Counsel also vigorously attacked the credibility of another important witness, Abdul Mohammed, by eliciting and exploiting his prior criminal conduct, his cooperation with the District Attorney, and his motive to falsely implicate defendant. Counsel articulated these arguments in his summation, which was well-presented and persuasive.

In addition, counsel made appropriate objections and effectively cross-examined the People's witnesses. Considering Brenda's unwavering eyewitness identification of defendant -- a man who she had know for many years -- and defendant's numerous incriminating statements to his former friend, Mohammed, the fact that counsel ultimately was unsuccessful does not mean that counsel was ineffective. See People v. Baldi, 54 N.Y.2d at 144. Thus, defendant received meaningful representation. See People v. Hewlett, 71 N.Y.2d 841, 842 (1988) (defense counsel who, inter alia, delivered opening and closing statements, cross-examined People's witnesses, and made appropriate objections provided meaningful representation).

Defendant now claims that his counsel was ineffective because he elicited from Brenda a specific physical description

of the shooter and the fact that she had recognized his voice, and elicited from Mohammed that defendant had threatened him after the shooting. Defendant also claims that his counsel was ineffective because he opened the door to allegedly prejudicial testimony from an expert on street gangs, and failed to ask for a limiting instruction after the expert testified. Defendant's claims are meritless.

During his cross-examination of Brenda, defense counsel asked numerous questions designed to undermine the reliability of her identification of defendant as the shooter. For instance, counsel asked Brenda about the shooter's extensive efforts to conceal his identity by covering his face, and Brenda conceded that the only visible feature was the man's eyes (B. Jones: 31-34). Undoubtedly because Brenda had testified on direct that she had known it was defendant because she had recognized his "body structure" (B. Jones: 17), counsel asked Brenda about the shooter's build, and Brenda provided a general description by stating that the shooter weighed about 240 pounds and was five feet, eight inches tall (B. Jones: 34).

Later during his examination, counsel asked Brenda a series of questions to suggest that the identification was flawed because Brenda waited a significant period after the shooting to come forward and tell the police that defendant was the shooter (B. Jones: 49). Immediately thereafter, counsel asked Brenda,

"And in your mind you felt the perpetrator or the shooter was the defendant, is that right?" Brenda replied, "Yes." Counsel then asked, "And the only reason you felt that way is because of the build, is that right?" Brenda replied, "Build and his voice." Counsel then asked questions which established that Brenda's claimed voice recognition was based upon a single comment made by the shooter ("What's up now Harve") (B. Jones: 49).

Defendant now claims that defense counsel erred in eliciting from Brenda her general description of the assailant and the fact that she had recognized his voice. However, counsel's questions to Brenda with respect to the physical characteristics of the shooter's body were proper, because Brenda had stated on direct that her identification was based solely upon the shooter's "body structure," so it was, therefore, incumbent upon counsel to explore what was so unique about the body structure to support a positive identification in a murder case. By asking about the shooter's build, counsel in fact showed that the body structure was not particularly uncommon.

Furthermore, Brenda had maintained all along that the shooter's body structure alone had formed the basis of her identification, and in an obvious attempt to highlight to the jury the potential problems with basing an identification on so thin a thread, counsel asked Brenda again if the shooter's build was the reason why she thought it was defendant. This time,

however, Brenda changed her testimony and said that in addition to the build, she had recognized defendant's voice. Clearly not expecting such a response in light of the fact that Brenda had not divulged this fact during the prosecutor's direct examination, counsel attempted to diminish its effect by getting Brenda to admit that the shooter had uttered only four words. Thus, even though Brenda volunteered testimony which was harmful to the defense, counsel's reason for asking the question which preceded the response was sound, and counsel can not be faulted for unintentionally eliciting such an unforeseen comment.

Defendant next claims that counsel improperly elicited from Mohammed that, after the shooting, defendant was sending threatening messages to him. Defendant's claim is meritless. Mohammed provided crucial testimony about defendant's comments to him before Mack's murder that defendant intended to kill Mack, and after the murder that defendant had committed the act. Mohammed even testified that on the day of the shooting, defendant had shown Mohammed the murder weapon. On direct, Mohammed testified that he and defendant had been close friends, but that since the shooting they had had a falling out. The prosecutor pressed for details, and Mohammed said, "He [defendant] threatened to kill me" (Mohammed: 271). Defense counsel objected, and the court sustained the objection and instructed the jury to disregard the testimony (271).

During his cross-examination, defense counsel predictably seized upon Mohammed's criminal history, and the fact that he was testifying pursuant to a cooperation agreement he had entered into with the District Attorney, in an attempt to undermine his credibility. Defense counsel asked Mohammed if he was cooperating with the District Attorney to reduce his jail sentence on his recent case. Mohammed replied, "Not at all" (Mohammed: 315). Counsel then asked, "You're doing this out of [the] charity of your heart?" Mohammed replied, "Not at all like I say I was in danger," and explained that he was friendly with defendant's ex-girlfriend, and that defendant was sending messages to Mohammed through the ex-girlfriend (Mohammed: 315-16). Defense counsel then asked Mohammed where he was during this time, and Mohammed said that he was locked up on Riker's Island. Counsel used this information to contradict Mohammed's direct testimony that he was at liberty during this time, and to further illustrate his cooperation with the District Attorney, who consented to his release in exchange for his testimony (Mohammed: 316-17).

Counsel's questioning of Mohammed did not constitute ineffective assistance. On the contrary, counsel effectively exploited every aspect of Mohammed's past that reflected negatively on his credibility (i.e., his extensive criminal history, his entering into a cooperation agreement with the

District Attorney, his failure to adhere to the terms of that agreement by getting re-arrested in Binghamton). Part of that line of questioning included a well-minded attempt to establish that Mohammed was testifying not as a concerned citizen, but as a desperate criminal who would say anything to selfishly minimize his own exposure to a lengthy prison sentence. When Mohammed refused to concede that he was cooperating because he wanted to "save [him]self some time," counsel sarcastically asked if he was testifying "out of [the] charity of your heart." Mohammed then claimed that he felt that he was in danger, and instead of objecting, counsel asked some follow-up questions which, under the circumstances, were effective.

Indeed, not only did counsel imply that Mohammed was also lying about the threats, but he used Mohammed's answers to impeach an aspect of his direct testimony about his liberty at that time, and then segued into questions which further illustrated to the jury that Mohammed was beholden to the District Attorney because the District Attorney had consented to his release from Riker's Island. Thus, even tough counsel's questions resulted in Mohammed claiming that he felt endangered by defendant, counsel turned Mohammed's claim against him, by suggesting that it was not true, and using it to further undermine his credibility.

Finally, defendant claims that counsel was ineffective for opening the door to prejudicial testimony from the People's street gang expert, and for failing to request a limiting instruction after the expert concluded his testimony. Defendant's claims are meritless.

During Mohammed's testimony, he recounted the conversations that he had had with defendant before and after the murder, and most of defendant's incriminating statements consisted of slang terms used by gangs to describe certain activities, including "187," "slob," "putting in work," and "rocking to sleep." During his cross-examination of Mohammed, defense counsel questioned Mohammed's interpretation of the meaning of these terms, and suggested that the terms were cryptic, at best, and did unequivocally refer to murder. At the conclusion of Mohammed's testimony, the prosecutor requested permission to call a gang expert to explain the meaning of the slang terms referred to by Mohammed during his testimony (339-40).

The court granted the request not because defense counsel had opened the door, but because Mohammed had recounted important conversations with defendant during which defendant had used terms that were beyond the understanding of the average person. The court analogized the situation to one where an interpreter is required when someone said something in a foreign language (342-46). Over counsel's objection, Detective Phillip O'Rourke was

qualified as an expert in gang terminology, and explained the meaning of the terms referred to by Mohammed during his testimony (O'Rourke: 352-56). Notably, after Detective O'Rourke was qualified as an expert, during the four pages of his direct testimony, he commented only on the slang terms at issue, and never spoke about any general gang activities or conduct.

As an initial matter, even had counsel not attacked Mohammed's testimony regarding defendant's admissions by arguing that the words that defendant supposedly had used were ambiguous, the People would have still been entitled to call an expert, because, as the court correctly noted, the meaning of the slang terms were unknown to the common juror. See People v. Cronin, 60 N.Y.2d 430, 433 (1983) ("It is for the trial court in the first instance to determine when jurors are able to draw conclusions from the evidence based upon their day-to-day experience, their common observation, and their knowledge, and when they would be benefited by the specialized knowledge of an expert witness"); People v. Vizzini, 183 A.D.2d 302, 305 (4th Dept 1992) (a qualified expert may testify about the meaning of narcotics code and jargon). Thus, defense counsel's questions to Mohammed about the terms did not enable the People to call an expert they otherwise would have been prevented from calling.

Moreover, defendant was not prejudiced by the expert's testimony. Indeed, the testimony was extremely brief and was

limited to the meaning of the terms that Mohammed had included in his testimony. The expert did not refer to gangs' general propensity for violence, or to any conduct whatsoever that would suggest that defendant had committed the murder.[11]

Accordingly, because defendant's counsel provided him with meaningful representation, defendant's ineffective assistance of counsel claim should be rejected and his judgment of conviction affirmed.

Defendant's Prosecutorial Misconduct Claim is Largely Unpreserved For Appellate Review. Moreover, the Claim Is Meritless. In Any Event, Any Error Was Harmless.

Defendant claims that the prosecutor committed misconduct by eliciting from Brenda that she and her family were afraid of defendant. In addition, defendant claims that the prosecutor made improper summation comments, including referring to Brenda's fear, vouching for her credibility, appealing to the jurors' sympathy, arguing facts not in evidence, and acting as an unsworn witness. Many aspects of defendant's prosecutorial misconduct claim are unpreserved for appellate review because defendant did not object to some of the conduct which he now claims was

[11] Because of the limited scope of the expert's testimony, and the lack of prejudice resulting therefrom, counsel's failure to request a limiting instruction was not erroneous because such an instruction was neither required nor appropriate under the circumstances.

erroneous. Moreover, the entire claim is meritless. In any event, any errors were harmless.

Defendant first claims that the prosecutor improperly elicited from Brenda that she and her family were afraid of defendant. However, this testimony was admissible because it was relevant to explain why Brenda had waited to identify defendant by name to the police. During his direct examination, the prosecutor asked Brenda why she had provided a description of defendant to the police in the minutes after the shooting, but had not told them that the shooter was defendant. Brenda explained that she had not given defendant's name because her father had said, "Don't say nothing" (B. Jones: 21-22). Brenda then testified about the threats from defendant in the days that followed, and the fact that she believed that defendant "would try to kill [her]" (B. Jones: 22-23).

During cross-examination, defense counsel asked Brenda, "Now just going back a little, you never told any of the detectives on the day of the shooting who you thought the perpetrator was, is that right?" Brenda responded, "No" (B. Jones: 49). Counsel also asked Brenda several questions about the significant delay between defendant's threats and Brenda's reporting of that conduct to the police. Brenda explained that she and her family had moved and that she had been unable to contact Detective Platt (B. Jones: 55-58). Counsel also elicited from Brenda that even

though they were aware of the threats, neither Brenda's mother nor her father had contacted the police (B. Jones: 60-61).

On re-direct examination, the prosecutor asked Brenda why her family had moved, and, over defense counsel's objection, Brenda explained that they "had to move because it felt like [they] were in danger living there" (B. Jones: 71). The prosecutor then referred to defense counsel's questions to Brenda about her father's failure to call the police. The prosecutor asked, "And what did he [Brenda's father] tell you about naming the defendant when the police arrived." Brenda responded, "He said 'Don't do it because you can get killed'" (B. Jones: 71-72).

Defendant now claims that Brenda's testimony about moving out of fear, and about her father's warning not to identify defendant by name, was improper because it was prejudicial.[12] However, contrary to defendant's assertion, the testimony was admissible on Brenda's re-direct examination because during his cross-examination, defense counsel had given the jury the impression that Brenda's identification was unreliable because she had not immediately identified defendant as the shooter, and then had moved away and did not bother to even report the threats from defendant. The prosecutor was, therefore, permitted to

---

[12] Defendant's claim concerning Brenda's testimony about her father's warning is unpreserved because defendant failed to object when the testimony was elicited (72).

elicit explanations from Brenda about why she had waited to identify defendant and why she had moved away from the area. Indeed, considering that defendant was charged in the Indictment with intimidating Brenda by twice threatening her, Brenda's fear of defendant was hardly surprising or prejudicial.

Defendant next claims that the prosecutor committed misconduct by making the following comments during his summation: 1) that Brenda was so scared and desperate that her family had to move into a city shelter (394); 2) that Brenda was a "little girl" who did not want to face defendant in open court (389); 3) that Brenda had not immediately identified defendant because she was scared (399); 4) that Detective Platt "never once doubted the word of Brenda" (400); 5) that defendant was a member of the Crips street gang (383); 6) that defendant had lulled Mack into believing that the two were friends, and that Mack, comfortable in this knowledge, had waited in front of the Jones' apartment "[for] the whole world to see" (385); 7) that a detective had "no idea" who the source was for a reference in a police report to two masked men; 8) that Brenda "knew" that defendant was the shooter, and that the jurors also "know it today" (382); and 9) that the jury should hold defendant responsible for his conduct (403).

Defendant's summation error claim is largely unpreserved for appellate review, because defendant either did not object to some

of the challenged remarks, or he only raised general, unelaborated objections. See C.P.L. § 470.05(2); see also People v. Sherwood, 279 A.D.2d 486, 486-87 (2d Dep't 2001); People v. Sticatto, 278 A.D.2d 345, 345-46 (2d Dep't 2000) (each holding that defendant had failed to preserve his summation error claim for appellate review because either he had not objected or had raised general objections to the challenged comments below).

Moreover, at one point, in response to a defense objection, the court instructed the jurors that it was their recollection of the evidence that controlled, and the arguments of the attorneys were not evidence (400). Thereafter, at the conclusion of the summations, defense counsel never moved for additional instructions or a mistrial. Thus the lower court was never apprised of defendant's claim on appeal that the challenged summation comments deprived defendant of a fair trial.

In any event, all of the challenged remarks were entirely proper because either they were fair comments on the evidence presented, or were directly responsive to defense counsel's summation comments. In his summation, defendant's attorney argued that the case was not about gangs, but about whether the People had proven beyond a reasonable doubt that defendant had shot Mack (367). Counsel argued that only one witness, Brenda Jones, had witnessed the shooting, and her identification of defendant was unreliable because: 1) she was a traumatized young

girl that was living in a dysfunctional household (368); 2) she had told the detectives on the day of the shooting that she did not "know who did it" (369-70); 3) Detective Platt had "discounted Brenda's statement" because he waited a long period of time to arrest defendant, even though defendant was still residing in the neighborhood (370-71); and 4) Detective Forte had learned from officers on the scene that two masked men had came into the apartment (371-73).

In direct response to defense counsel's summation comments about Brenda's claimed lack of reliability based upon her failure to initially identify defendant, the prosecutor argued that Brenda's reluctance to name defendant was understandable given her age and the fact that she was scared. In addition, the prosecutor addressed defense counsel's comment about Detective Platt's inaction for several months supposedly because he did not believe Brenda by stating that "never once did he [Detective Platt] not believe that little girl" (400). Finally, the prosecutor argued that Brenda's identification was reliable and that she "knew" that defendant was the perpetrator. Because these remarks were in direct response to defense counsel's summation remarks, they were completely proper. See People v. Marks, 6 N.Y.2d 67, 77-78 (1959), cert. denied, 362 U.S. 912 (1960); People v. Cariola, 276 A.D.2d 800 (2d Dep't 2000); People v. Scotti, 220 A.D.2d 543, 544 (2d Dep't 1995).

In addition, the remarks that were not directly responsive to the defense's summation comments were proper because they were within the broad bounds of permissible rhetorical comment afforded counsel during summation. Moreover, many of the remarks were fairly inferable from the evidence. Indeed, the prosecutor's reference to defendant's membership in the Crips, defendant's plan to trick Mack into thinking they were friends, Mack's presence across the street from the Jones' apartment building on the morning of the murder, and the fact that the detective who completed a police report which stated that there were two perpetrators did not know the source of that information, were all facts that had been elicited from the People's witnesses. Thus, because the remarks were based upon the evidence presented, they were completely proper. See People v. Galloway, 54 N.Y.2d 396, 399 (1981); People v. Salaman, 231 A.D.2d 464, 465 (1st Dep't 1996); People v. Scoggins, 227 A.D.2d 204, 205 (1st Dep't 1996).

In any event, any error in the prosecutor's summation was harmless and does not warrant the reversal of defendant's judgment of conviction. See People v. Crimmins, 36 N.Y.2d 230, 241-242 (1975); People v. Roopchand, 107 A.D.2d 35, 36 (2d Dep't), aff'd 65 N.Y.2d 837 (1985).

The court minimized any alleged prejudice by informing the jury that the attorneys' arguments were not evidence (1B, 1E).

See People v. Vazquez, 277 A.D.2d 333 (2d Dep't 2000). Furthermore, the evidence of defendant's guilt was overwhelming. In addition to the compelling identification made by Brenda Jones -- an eyewitness who knew defendant for many years --, defendant's friend, Abdul Mohammed, testified about defendant's incriminating statements that he had made before and after the shooting. Mohammed stated that defendant had told him that he was going to kill Mack, and that after the murder, he showed Mohammed his gun and admitted to him that he had committed the deed. Finally, both Brenda and her sister, Georgina, testified about the two encounters with defendant on the street after the murder during which defendant threatened Brenda to remain silent. Thus, there is no significant probability that, but for the alleged misconduct, the verdict would have been different. See People v. Ryant, 278 A.D.2d 345 (2d Dep't 2000); People v. Phifer, 278 A.D.2d 254 (2d Dep't 2000).

Accordingly, defendant's claim should be rejected and his judgment of conviction affirmed.

POINT II

DEFENDANT'S LEGAL INSUFFICIENCY CLAIM IS UNPRESERVED FOR APPELLATE REVIEW. MOREOVER, THE CLAIM DOES NOT WARRANT THE EXERCISE OF THIS COURT'S INTEREST OF JUSTICE JURISDICTION.

Defendant correctly claims that he was charged in the Indictment with Intimidating a Witness in the Third Degree, that the Court mistakenly charged the jury on the elements of Tampering With a Witness in the Third Degree instead, and that the People did not prove the elements of the tampering charge beyond a reasonable doubt. However, defendant never alerted the trial court that the charge was erroneous (438-39), nor did he advance the legal insufficiency claim that he raises on appeal (365-66).

Therefore, his present claim of error is unpreserved for appellate review. See C.P.L. § 470.05(2); People v. Udzinski, 146 A.D.2d 245, 259 (2d Dep't 1989) ("where the variance between the theory of the prosecution in the indictment and the theory of the prosecution as charged to the jury is so slight that no possibility exists that the defendant was deprived of his right to fair notice of the basis of the accusations against him, then no question of law is presented for review unless the defendant objects or takes exception to the charge at trial"); see also People v. Gray, 86 N.Y.2d 10, 20 (1995); People v. Diem, 77 N.Y.2d 885 (1991); People v. Gomez, 67 N.Y.2d 843, 844-45 (1986).

Moreover, defendant's claim does not warrant this Court's exercise of its interest of justice jurisdiction because the People presented legally sufficient evidence to prove all of the elements of third-degree witness intimidation, and that charge is the same level felony (a class E felony) as the third-degree tampering charge, and its elements are nearly identical.

Accordingly, defendant's claim should be rejected and his judgment of conviction affirmed.

## CONCLUSION

FOR THE AFOREMENTIONED REASONS, DEFENDANT'S JUDGMENT OF CONVICTION SHOULD BE AFFIRMED.

Dated: Brooklyn, New York
May 7, 2008

Respectfully submitted,

CHARLES J. HYNES
District Attorney
Kings County

LEONARD JOBLOVE
MORGAN J. DENNEHY
Assistant District Attorneys
of Counsel

# Certificate of Compliance
## Pursuant to 22 NYCRR § 670.10.3(f)

This brief was prepared on a computer. A monospaced typeface was used, as follows:

Name of typeface: Courier New
Point size: 12
Line spacing: Double

According to the word count of the word processing system used to prepare the brief, the total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is 6,332.

Morgan J. Dennehy
Assistant District Attorney

Copy **AFFIDAVIT OF MAILING**

STATE OF NEW YORK)
COUNTY OF KINGS )

I, Bimla Singh, being sworn, state: I am employed in the Office of the District Attorney for Kings County and am over the age of 18.

On the 7th day of May 2008, I served this document by enclosing 2 copies in a postpaid envelope addressed to Sarah J. Berger, Esq., Lynn W.L. Fahey, Esq., Appellate Advocates, 2 Rector Street, 10th Floor., New York, New York 10006, attorney for Glen Cummins, at his/her office and by causing it to be deposited in an official depository of the United States Postal Service within the State of New York.

TERRY-ANN LLEWELLYN
NOTARY PUBLIC-STATE OF NEW YORK
No. 02LL6131197
Qualified In Kings County
My Commission Expires August 01, 2009

Sworn to before me this 7th
day of May 2008