SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF KINGS - CRIMINAL TERM - PART 17

--------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

Plaintiff,

-against-

GLENN CUMMINS,

Defendant.

--------------------------------------------X

Indictment # 3066/04 HEARING

360 Adams Street
Brooklyn, New York 11201

July 21, 2005

B E F O R E:

HONORABLE ABRAHAM GERGES,
Justice.

A P P E A R A N C E S:

OFFICE OF CHARLES J. HYNES, ESQ.
DISTRICT ATTORNEY - KINGS COUNTY
350 Jay Street
Brooklyn, New York 11201
BY: SCOTT OCCHIOGROSSO, ESQ.
Assistant District Attorney
For the People

18-B ASSIGNED COUNSEL PLAN
50 Court Street
Brooklyn, New York 11242
BY: GEORGE SHEINBERG, ESQ.
For the Defendant

VANESSA PICCIRILLO
Senior Court Reporter

THE CLERK: This is number six on our hearing calender, indictment number 3066 of 2004, Glenn Cummins. C-U-M-M-I-N-S.

MR. SHEINBERG: George Sheinberg, 50 Court Street, Brooklyn, New York representing Mr. Cummins.

Judge, I prefer him speaking --

MR. OCCHIOGROSSO: Scott Occhiogrosso, O-C-C-H-I-O-G-R-O-S-S-O, for the office of the district attorney.

Also present, Judge, is an intern Mike, last name, S-T-E-F-A-N, as in Nancy, C-L-E-L-L-I.

If the Court doesn't mind.

THE COURT: It's my understanding, first question I have, is the district attorney going to introduce this in their direct case?

MR. OCCHIOGROSSO: Yes. We wouldn't rule out the possibility of using it on our direct case.

THE COURT: Okay. We will then hear from the defense counsel whether he wants a hearing on this.

MR. SHEINBERG: Judge, I have reviewed the DD5 that was given to me regarding the alleged statement that my client made, this just question and answer, it's not inculpatory. It certainly maybe exculpatory.

In any event I would withdraw the request for

a hearing on the statement. But before I do that I would like my client to be here so I can confer with him.

THE COURT: We are going to do that.

MR. SHEINBERG: Okay.

THE COURT: We are going to wait. Don't tell him to leave yet, it could be a change.

MR. OCCHIOGROSSO: Okay.

MR. SHEINBERG: Yeah.

(Whereupon, there was a pause in the proceedings.)

THE COURT: Please take his cuffs off.

MR. SHEINBERG: Your Honor, if I may, the case has been called in I understand on Mr. Cummins.

THE COURT: Yes.

MR. SHEINBERG: I just reviewed the DD5 regarding Mr. Cummins's alleged statement to the police he had it before, we have had it during discovery. I am going to withdraw my application for a Huntley hearing based upon the non-complicity in that statement or the statement --

THE COURT: I think so the record is clear, let's put what the alleged statement is on the record so that we don't have a question later on that's not the statement that we are discussing.

MR. OCCHIOGROSSO: Judge, I am sorry, it's in its entirety it's in a report, it's a question and answer. If you want we can read it question and answer or make a part of it a part of the Court file.

THE COURT: Was that the DD5? What's --

MR. SHEINBERG: Yes, DD5 follow-up, 63.

THE COURT: That's the one the district attorney, that's the, that's the open statement that the defendant made; is that correct?

MR. OCCHIOGROSSO: That's right, Judge.

THE COURT: All right.

MR. SHEINBERG: If you want to put it into evidence later you can.

THE COURT: We have identified it for the record.

MR. SHEINBERG: Okay.

MR. OCCHIOGROSSO: If I could have a moment to tell the detective.

THE COURT: What kind of a hearing is this?

MR. OCCHIOGROSSO: Dunaway/Wade.

THE COURT: Call your first witness, please.

MR. OCCHIOGROSSO: Call Detective Charles Platt.

COURT OFFICER: Watch your step, detective. Step right up.

THE CLERK: Good afternoon, sir.

**C H A R L E S P L A T T,**

called as a witness, having been first duly sworn by the clerk of the court, was examined and testified as follows:

THE WITNESS: Yes, I do.

THE CLERK: Please have a seat. State your name, shield and command.

THE WITNESS: Detective Charles Platt, P-L-A-T-T, shield number 1404, command is the 70th Precinct detective squad.

THE CLERK: Thank you.

THE COURT: Good afternoon, detective.

THE WITNESS: Good afternoon.

THE COURT: Could we have some water in case he would like some?

You may inquire, counsel.

MR. OCCHIOGROSSO: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. OCCHIOGROSSO:

Q Detective, how long have you been with the police department?

A 24 and a half years.

Q And how long have you held the rank of detective?

A Sixteen and a half years.

Q And presently what rank of detective do you hold?
A Detective first grade.
Q How long have you been a first grade detective?
A Three years.
Q I want to call your attention to April 2 of 2003. Were you assigned to the 70th Precinct detective squad on this date?
A Yes, I was.
Q On this date did you become involved in the investigation of the shooting death of Alonzo Mack?
A Yes.
Q And in particular were you called to respond to the location of the shooting 92 Woodruff Avenue?
A Yes, I was.
Q Do you recall where you were when you got the call to respond to 92 Woodruff Avenue?
A Yeah. I was in the dean's office at Edward R. Murrow High School, 1600 Avenue L when I received the call from my lieutenant requesting that I respond to a shooting at that location.
Q And rough estimate, how far a drive would you say it was from the high school to 92 Woodruff?
A Um, it's about two miles, uh, maybe took about five minutes or so, five to ten minutes.
Q Now while -- withdrawn.

Were you driving the car or was somebody else?
A I was driving.
Q Okay. While you were on your way to 92 Woodruff did you see anyone you recognized?
A Yes.
Q And who was that?
A Um, I saw Glenn Cummins accompanied by four other males, um, turning on to St. Paul's Place from Woodruff Avenue.
Q Okay. And how far where you -- first of all you see the same person in the court today?
A Yes, I do. He is sitting over there in the white shirt.
THE COURT: Indicating the defendant.
Q How far away were you from 92 Woodruff Avenue when you saw the defendant?
A Um, down the block maybe two hundred feet.
Q Okay. Do you remember anything about the defendant's attire?
A Um, he was just wearing a hooded sweat shirt that day.
Q Okay. Do you remember color or if it was light or dark?
A No, I can't remember the color. I believe it might have been dark gray but I'm not really sure.

Q Okay. And after you saw the defendant did you then go to 92 Woodruff?

A Yes, I did.

Q Okay. When you were there did you have occasion to speak to, for the purposes of the hearing I ask we could designate as witness number one?

A Yes, I did.

Q Okay. And what, if anything, did you learn at that time from witness number one?

A Um, I learned that, uh, the entire family was home, uh, there was a bang at the door, uh, witness number one answered the door. When she opened the door she observed a male with a gun pointing towards her. Uh, she described the gun as a black automatic, uh, similar to the one that I carry.

Uh, she stated that, uh, the male had a hooded sweat shirt up on his head, he was wearing a black bandana covering his face, uh, below his eyes, the bridge of the nose. She described the person as a male black about five-six, five-seven, a dark brown complexion and stated he had a stocky build.

Q Okay. Now how if at all did, did the witness's description of the individual, how did that compare to the defendant's appearance on that day from when you saw him?

A Um, well there was -- I saw him he had no bandana

when I saw the, Glenn Cummins walking around the corner. I saw him with a hooded sweat shirt on. His build and his height, weight is similar to as described by the witness number one to me.

Q Fair to say that you were familiar with the defendant from before that day?

A Yes. I had known the defendant, uh, probably more than half his life.

Q Okay. Now, I want to call your attention to July 16 of 2003. Uh, on this day what, if anything, did you do with the information you had learned from witness number one?

A Um, I went to where the witness was staying and I brought a photo array which included a photograph of Glenn Cummins.

Q Okay. Now what, if any, steps did you take prior to showing witness number one that photo array to ensure a uniformed appearance of the six photographs in the array?

A Um, the only photograph we had on file of Glenn Cummins was a photograph with the, a Band-Aid covering an injury over one of his eyes. To make the photo array uniform I made a, scratch that Band-Aid out with a black Magic Marker. I made a similar mark on all six photographs.

Q Okay.

MR. OCCHIOGROSSO: Your Honor, I ask if the, mark this People's 1 for identification.

THE COURT: It will be deemed People's 1 for identification.

Q Detective, I am going to ask you to take a look at People's 1 for identification. Do you recognize that, sir?

A Yes.

Q What do you recognize that to be?

A Um, this is... the photo array that I showed the complainant, witness number one.

Q Okay.

A On this date.

Q And other than the fact that a name has been redacted off of that, is it in the same or substantially the same condition as it was when you showed it to witness number one on July 16, 2003?

A Yes.

MR. OCCHIOGROSSO: Okay. And I would ask if we could move that into evidence as People's 1, Your Honor.

THE COURT: It will be People's 1 in evidence. May I see it, please.

MR. SHEINBERG: There's no objection.

Q Now, when you showed witness number one that photo array, um, did she identify anybody in the photo array?

A Yes. Um, photograph number two, that of Glenn Cummins.

Q And what, if anything, did she say in terms of what she had seen the person do, the person she identified?

A Um, that this was the person with the black gun and that came in the residence and shot Freedom who she knew to be Alonzo Mack.

Q Okay. And what, if anything, else did you learn from witness number one or witness number two about any actions the defendant took in the days subsequent to the shooting death of Alonzo Mack?

A Um, in the days afterwards, um, Glenn Cummins, she told, he approached her outside her building and asked her first if she had said anything to the police about what happened that day. Then the following day he told her make sure she kept her mouth quiet.

Q Okay. And did she inform you this also when she identified the defendant in the photo array?

A Um, yes.

Q Okay. Now I want to call your attention to May 14 of 2004. Do you recall if you did any work on the investigation of the shooting death of Alonzo Mack on this day?

A Yes.

Q And what did you do?

A Um, I arranged lineups at the 70th Precinct.
Q Okay. Was there a target in those lineups?
A Yes, Glenn Cummins.
Q Okay. And was witness number one one of the people that viewed the lineup?
A Yes.
Q All right. Do you have your reports from the lineups with you?
A Yes, I do.
Q Okay. All right.
Now referring to witness number one, you testified earlier that witness number one informed you the person she later identified as the defendant came in with a bandana over his face and a hood up carrying a gun; is that right?
A That's correct.
Q All right. Now what, if any, steps did you take in the lineup viewed by witness number one to ensure a uniform appearance of the target of the lineup, the defendant as well as the five fillers?
A We did not have hooded sweat shirts, we used shower caps to cover their hairstyles so it would appear all six persons would have the same hairstyle.
Then we went out and purchased six black bandanas, we made all six persons wear black bandanas sitting on the bridge of their nose showing a similar look to what witness

number one saw on the date that the shooting murder occurred.

Q Okay. And did you memorialize the appearance of the defendant and the fillers in that lineup?

A Yes, I did.

Q And do you have the report with the photographs with you today?

A Yes, I do.

Q All right.

MR. OCCHIOGROSSO: Ask if we could deem that People's 2 for identification.

MR. SHEINBERG: May I see it?

THE COURT: It will be deemed People's 2 -- show it to defense counsel, please.

(Whereupon, there was a pause in the proceedings.)

MR. SHEINBERG: Thank you, officer.

Q Do you recognize People's 2 for identification, detective?

A Yes. These are the photographs that I took of the lineup as seen by the witness number one.

Q And is it in the same or substantially the same condition as the lineup appeared on that date?

A Yes.

Q And do those photographs fairly and accurately

depict that lineup as it was arranged and prior to being viewed by witness number one?
A Yes.
MR. OCCHIOGROSSO: Ask that could be moved in as People's 2.
THE COURT: It will be moved into evidence as People's 2. Let me see it, please.
Thank you.
THE WITNESS: You are welcome.
THE COURT: Please continue.
MR. OCCHIOGROSSO: Thank you.
Q And did witness number one identify anyone in that lineup?
A Yes. She identified number three.
Q And who was in position number three?
A Glenn Cummins.
Q And how did he come to be in position number three?
A He chose that spot, that chair with the corresponding number.
Q And was there a witness number two who was to also view a lineup where the defendant would be the target?
A Yes.
Q All right. And what, if any, steps did you take to ensure that both witness number one and witness number

two would not see either the defendant or the fillers prior to their viewing the lineup?

A The entire time the two witnesses were in the 70th Precinct they were under guard by a detective Maureen Dunn. They were kept in an enclosed office on the second floor. The lineup was arranged, Detective Dunn would not let them leave this room.

As witness number one was escorted into the viewing room, after she viewed she was taken down a side hallway to a back office where she would not pass witness number one.

Q Witness number two.

A Witness number two.

Q So there would have been no opportunities for witness number one to speak to witness number two in between the two lineups?

A That's correct.

Q And what, were you in the viewing room when witness number one and witness number two viewed their respective lineups?

A Yes.

Q What, if anything, did you say to first witness number one prior to her viewing the lineup?

A I explained that they were going to see six males sitting down holding cards one through six. If they

recognized anybody they would tell me what number that person was wearing, holding. I also told them if for some reason they had trouble seeing the lineup or a particular person in a lineup we would step them in front one at a time.

Q And you gave the same instructions to witness number one and witness number two prior to their respective viewings?

A That's correct.

Q Okay. And when witness number one identified the defendant what, if anything, did she say she recognized the defendant from having done?

A Um, witness number one while they were still seated immediately identify the subject Glenn Cummins stating that he had, he was the one who came in the apartment and shot Freedom.

Q Okay. Now the lineup that was seen by witness number two, did you similarly memorialize that lineup with a Polaroid photograph and a report?

A Yes, I did.

Q Okay. Now witness number two, what had she told you she was a witness to regarding the defendant?

A Um, she explained to me she was outside her apartment building several days after the shooting when Glenn Cummins approached her sister and had a conversation

with her, and her sister later told her what that conversation was.

Q Okay. And her sister would be witness number one?

A Yes.

Q Okay. And when she said a conversation, is that the conversation that you already testified witness number one told you where Glenn Cummins told her she better not mention his name or words to that effect?

A Yes.

Q Okay. And these conversations took place within days after the shooting death of Alonzo Mack?

A I believe two and three days afterwards.

Q Okay. Now, the witness number two, did she ever tell you that she had seen the person come in the door that way with the bandana over their face?

A No. She was in the rear of the apartment when that happened.

Q Okay. So, um, what was the difference in terms of preserving uniform appearance in the second lineup as compared to the first lineup?

A Because she never saw the subject enter the apartment with the bandana, we removed the bandanas from the second lineup, we just kept the shower caps. The date that they saw the lineup he was wearing no bandana.

Q What position if you remember was the defendant in

for the second lineup?

A He remained in his seat.

Q Okay. Did he make a request to change positions in between lineups?

A No.

THE COURT: What number was he?

THE WITNESS: Number three, again.

MR. OCCHIOGROSSO: And I would ask if that report could be deemed People's 3 for identification.

THE COURT: Show it to defense counsel, please.

Q While that's going on let me just backtrack a second, detective.

What, if anything, did you say to witness number one on July 16, 2003 prior to showing her the photo array that is now People's 1 in evidence?

A Um, I showed her the array alone with her in a bedroom in an apartment where she was staying at on Saratoga Avenue. I explained to her, asked her if she recognized anybody in this array she was to tell me who he was. You will --

Q Okay. Now looking at People's 3 for identification, do you recognize that?

A Yes.

Q What do you recognize -- I am sorry?

A The photographs that I took of the lineup just prior to viewing by witness number two.

Q And those photographs fairly and accurately depict the way the lineup looked when witness number two viewed it on May 14 of 2004?

A Yes.

Q Okay.

MR. OCCHIOGROSSO: I ask that be entered into evidence as People's 3.

MR. SHEINBERG: No objection.

THE COURT: It will be People's 3 in evidence after the Court looks at it. Please continue.

Q Did you in the course of your investigation have any conversations with witness number one and/or witness number two pertaining to any prior familiarity that they may have had with the defendant prior to the incidents of April 2, 2003?

A Yes. Um, he was someone who lived in their neighborhood. I guess they saw him frequently almost every day.

Q Okay. And did they know him by a name?

A Yes, by a nickname of Cooley.

Q Okay. And you testified earlier that you knew the defendant for roughly half his life, if not more. In the course of your familiarity with the defendant did you learn

him to go by a nickname?

A Yes, Cooley also.

Q Okay.

MR. OCCHIOGROSSO: I have no fu... questions. Thank you.

THE COURT: You may inquire, counsel.

MR. SHEINBERG: Thank you. Thank you.

CROSS EXAMINATION

BY MR. SHEINBERG:

Q Going to the time where you first received a call from the high school to respond to 92 Woodruff Avenue, where was that high school located with respect to the place that you responded to?

A Probably about two miles away.

Q Okay. And you got into your car and you drove there; is that correct?

A That's correct.

Q And during that drive there you testified on direct examination that you saw the defendant and about four other males walking on the street; is that correct?

A That's correct.

Q Were they running or just walking?

A Casually walking.

Q Okay. And you drove by, you fleetingly observed the defendant; is that correct?

A That's correct.

Q And nothing came to your mind that the defendant had anything to do with the radio run which you were going to; is that correct?

A The only thing came into my mind was the fact he didn't say hello.

Q That's the only thing. But you were in a car and he was walking; is that correct?

A That's correct.

Q Was he talking to the other people he is walking with?

A I believe so.

Q And he is wearing a gray or some colored hoody; is that right?

A That's correct.

Q And you recognized him because you know him?

A Yes.

Q Okay. Now when you arrived at --

THE COURT: How do you know him?

THE WITNESS: Um, I have worked in the same precinct my entire career, Your Honor. Most of the kids on the street I know. Glenn is just someone who stands on the corner. Um, I had once prior, actually two other times I believe involved in arrest situations with him.

THE COURT: Okay.

Q So you knew the defendant; is that correct?

THE DEFENDANT: Yeah.

A Yes.

Q And nothing particularly came to your mind as you drove by except he didn't wave to you or say hello; is that correct?

A That's correct.

Q Would it be fair to say he was engrossed in conversation with the other four individuals or just strolling with them?

A At the time we passed, uh, he more or less seemed to just look down but they all seem to be talking.

Q Okay. They were talking about something?

A Yes.

Q Now you arrived at 92 Woodruff; is that right?

A Yes.

Q And you interviewed witness number one?

A Yes, I did.

Q And she was an individual who told you that a person came into the apartment holding a gun and wearing some sort of a bandana; is that correct?

A Yes.

Q Okay. Did you ask her who that person was?

A I asked her if she knew who he was, yes.

Q And what did she say?
A No.
Q She didn't know him; is that correct?
Did you mention anything about the defendant -- withdrawn.
Did you mention anything to her as to whether or not she had any idea who that person was?
A I asked her if she knew.
Q Yeah.
A She stated no.
Q She stated no; is that correct?
A Yes.
Q What about witness number two, did you interview her that particular day, April 2, 2003?
A I believe so.
Q And did she, you ask her if she knew the perpetrator of this shooting?
A Yes.
Q And what did she say?
A No.
Q In effect both of these individuals told you they didn't know who he was; is that right?
A That's correct.
Q And I assume from your experience as a detective you spent some time at 92 Woodruff Avenue interviewing and

questioning the people who were in the apartment?

A Yes.

Q And it was a homicide in that apartment; is that correct?

A That's correct.

Q And I assume that you were concerned about a description of the individual who may have perpetrated that homicide; is that right?

A Yes.

Q And I assume that witness number one who was the actual person who saw the perpetrator, gave you a description as, general description as to what that individual looked like; is that right?

A Yes.

Q Stocky, dark skinned; is that correct?

A Yes.

Q Anything particular?

MR. OCCHIOGROSSO: Objection.

Q -- withdrawn.

Did that witness number one tell you anything specific other than the general build, general, general description of the perpetrator?

A She was able to supply me what I thought was a pretty detailed description considering that, you know, the person was wearing a bandana.

Q Okay. What is the detailed description she gave you?

A She gave me each article of clothing; his shoes, his pants, his jacket.

Q Let's start with the shoes. What color shoes?

THE WITNESS: Um, may I refresh, Your Honor?

THE COURT: Yes.

(Whereupon, there was a pause in the proceedings.)

Q Tell us what you refreshing your recollection from so we --

A Yes.

Q -- would have it.

(Whereupon, there was a pause in the proceedings.)

A Here it is, could be a DD5 that I --

Q What number, sir?

A It's not numbered, it's an interview of witness number one, it would have been.

Q And you are refreshing your recollection from that DD5; is that correct?

A That's correct.

Q And what description of the shoes did she give you?

(Whereupon, there was a pause in the

proceedings.)
A Black sneakers.
Q All right. And when you passed Mr. Cummins on the street that time did you notice what shoes he was wearing?
A No, I could not see them.
Q Okay. What other description did she give you with respect to the perpetrator?
A Black sweat pants.
Q When you passed Mr. Cummins on the way to this 92 Woodruff did you notice what kind of pants he was wearing?
A No, I did not.
Q What other description did she give you?
A A blue hooded sweat shirt.
Q And when you passed Mr. Cummins on the way to 92 Woodruff he was wearing a gray hooded sweat shirt; is that right?
A Gray or dark. I was pretty sure it was gray though but.
Q Okay. Your testimony it was gray or dark gray?
A Gray or dark color but I believe it was gray.
Q Okay. What other description did she give you?
A Five-six, five-seven, stocky build with a dark brown complexion.
Q And Mr. Cummins is about five-six, five-seven?
A Five-six, five-eight.

Q He has a dark complexion?
A Yes.
Q How many people do you know of that similar description?
A Um, many.
Q Okay. Did she tell you at the time that you interviewed witness number one that Cooley was involved in the homicide?
A No, she did not.
Q Now you tell us that several days after this incident occurred that witness number one told you she was threatened by the defendant?
A Um, it might have been several months before I found that information out.
Q Oh, I am sorry. Several months after the incident you mean?
A Yes.
Q Okay. That you found out that information?
A Yes, that's correct.
Q That information did you find out, I wasn't quite clear on direct examination?
A Um, I believe it was the beginning of July, um, I had learned that --
Q 2003?
A Yes.

Q Yes?

A That the entire family lived at 92 Woodruff Avenue had moved and were staying in a shelter on Saratoga Avenue.

Q Yes.

A I went there, uh, and re-interviewed the family there and at that point I was informed that I believe it was two days after the incident that the defendant, he approached, was actually passing witness number one on the street and made a comment to her to the effect of you didn't say my name, did you? And she said, no.

Q And did she indicate at that time that she knew the defendant?

A Yes.

Q So she told you that the defendant, she mentioned the defendant's name and nickname; is that correct?

A By his nickname, yes.

Q Did she tell you how long she had known the defendant? How long she had known the defendant, period?

A Several years I believe.

Q And she knew the defendant several years and prior to this incident; is that correct?

A Yes.

Q And yet at the time of the shooting and at the time that you interviewed her on April 2, she never gave you the name or anything with respect to the defendant was

named Cooley or that gave you the defendant's name as Cummins?

A That's correct.

Q You also told us that witness number two was present at the time that my client allegedly threatened witness number one; is that correct?

A Yes. She was standing nearby.

Q And when you say nearby what does that mean?

A Um, closer than me and the stenographer.

Q Okay. And did she --

THE COURT: Indicating approximately --

MR. SHEINBERG: Five feet.

THE COURT: Five feet.

Q Okay. And did she tell you she overheard this conversation?

A Um, I'm not sure if she overheard the exact conversation but she noticed a conversation and, um, she was aware that something happened. Then she had a conversation, uh, with her sister regarding what had just been said and the sister told her what he said.

Q So to be very clear, your testimony would be that witness number two was not privy to what was said between, allegedly said between the defendant and witness number one?

A Not the entire conversation.

MR. OCCHIOGROSSO: Objection. Objection. He characterized what he heard from, he doesn't need Mr. Sheinberg to further characterize it.

THE COURT: Overruled.

Q Based upon your conversation with the people who were at 92 Woodruff on July 16, excuse me, yeah July 16, 2003 what did you do with respect to the information you received?

A Um, you talking the conversation where they told me Cooley was the one that came in?

Q That's right.

A At that time I notified the D.A.'s office that a witness had given me new information. The witness was brought down to the D.A.'s office and spoken to by a, an assistant district attorney from the Kings County District Attorney's Office. Shortly thereafter I put photo arrays together of the subject and I returned.

Q And when was that, sir?

A That was on the 16th that I returned with the photo arrays.

Q 16th of July, 2003; is that correct?

A Yes.

Q And after this, and when the photo array was shown to witness, to number one, after she identified Mr. Cooley, Mr., excuse me, Mr. Cummins, what did you do then?

A Uh, after she identified the photo array?
Q Yeah.
A Um, I returned to my office and notified the D.A.'s office of what happened.
Q And when did you place Mr. Cummins in a lineup?
A Um, that was on, in May of 2004.
Q So many months after; is that correct?
A That's correct.
Q Did you know where Mr. Cummins lived during this period of time?
A Yes, I did.
Q Did you attempt to communicate with him?
A Um, I probably would have seen him, you know, on the street, uh, at times during that, you know, ten month period.
Q Did you arrest him?
A Uh, no, I did not.
Q Did you do anything to facilitate the identification in the lineup by witness number one and witness number two for that, during that ten month period?
A No.
MR. OCCHIOGROSSO: Objection to the form. Facilitate the identification?
THE COURT: Overruled.
MR. OCCHIOGROSSO: Judge, I don't know what

that means, did you do anything to facilitate the identification?

MR. SHEINBERG: May I rephrase the question?

THE COURT: Go ahead.

MR. SHEINBERG: Okay.

Q Between the time that the photo I.D. was shown to witness number one, and the actual lineups of, in May of 2004, did you take Mr. Cummins into custody?

A No, I did not.

Q Did you attempt to prepare a lineup to have witness number one and witness number two view that lineup?

A No.

Q Why did you have a lineup in May 2004?

A A decision was made to charge the defendant with this case.

Q You made that decision?

A Um, no. That decision is made in conjunction between my superiors in the police department and the senior members of the D.A.'s office.

Q That's ten months after the photo I.D. by witness number one and witness number two?

A Yes.

Q During the actual lineup in May of 2004, May 14, 2004 you told us that witness number one was brought to the precinct?

A Prior to the lineup, yes.
Q Yeah. And with what, who brought her to the precinct?
A I did.
Q Where did you, where did you pick her up to bring her to the precinct?
A Um, she is staying at a shelter in the Bronx.
Q You drove to the shelter?
A Yes.
Q Did you call her before you drove there?
A Yes, I called. I believe I spoke with witness number one's mother.
Q And what did you tell witness number one's mother?
A That I needed witness number one and witness number two, they needed to speak with someone from the D.A.'s office regarding what happened in the apartment in 2002.
Q 2003?
A 2003.
Q And did you at any time tell the mother or even witness number one or two prior to the lineup that they were going to view a lineup?
A Yes, once I had them in the car.
Q You told them they were going to view a lineup with respect to the shooting incident; is that correct?

A Yes.
Q And did you tell them they were going to view a lineup with respect to the, I will call it the threatening of their person?
(Whereupon, there was a pause in the proceedings.)
A I don't recall if I, you know, both cases were more or less together at that point. I don't know if I would have separated by that. I just told them I'm sure they were going to see a lineup regarding what happened inside of the apartment.
Q What happened of the apartment and what happened several days after; is that correct?
A Yes.
Q So basically when they were coming to see a lineup where they knew that Mr. Cummins would be part of that lineup?
MR. OCCHIOGROSSO: Objection. Calls for speculation.
THE COURT: Sustained.
Q Did you tell them that Mr. Cummins would be part of that lineup?
(Whereupon, there was a pause in the proceedings.)
A I didn't mention him by name, no.

Q Did you tell them Cooley would be part of that lineup?
A No.
Q Did you tell them that the person who threatened them would be part of that lineup?
A Not outright, no.
Q What did you tell them, let's get it out here.
A Well I told them they would see a lineup regarding what happened inside, um --
Q 92 Woodruff?
A 92 Woodruff.
Q And what happened the next several days after; is that correct?
A Well, no, I didn't mention that at that point. Um, but the girls made an exclamation as we were driving. I remember, uh, 'cause they were very nervous in the car, scared. Um, trying to think of the exact words, um... something to the effect, I can't believe we're going to see Cooley.
Q So they knew they would see the defendant?
A Uh, based on their own, you know, knowledge, yes.
Q Okay. And when they viewed, when witness number two viewed the lineup did, the defendant was there with the shower cap but no bandana; is that correct?
A That's correct.

Q And she pointed out Cooley who she knew?

A Yes.

Q The other, by the way, the other fillers or the other five individuals in the lineup, were they from the neighborhood where the witnesses lived?

A No. They were selected from a men's shelter.

Q You took them from a shelter; is that correct?

A That's correct.

Q Okay. And with respect to the lineup that witness number one viewed, the one with the, had the bandanas on their face People's Exhibit Number 2?

A Yes.

Q All right. That was viewed by witness number one and witness number two or just one?

A Just witness number one.

Q When witness number one looked at this lineup what did she say?

A Um, her exact words to, to me was, number three kicked in the door.

Q Number three kicked in the door?

A Yes.

Q And did she mention the name of number three at that time?

(Whereupon, there was a pause in the proceedings.)

A She might have mentioned him by the nickname Cooley.
Q But you have no indication of in your notes or memorandum?
A No. Might have been as we were walking away from the door if I remember correctly.
Q Did you make notes or memorandum of what witnesses say when they view a lineup?
A Um, their direct quote after they said the number, yes.
Q That was not noted by you; is that correct?
A No. Only was noted was kicked in the door.
Q Okay.
THE COURT: Counsel, you are going to have -- we are off the record.
(Whereupon, there was a discussion held off the record.)
MR. SHEINBERG: Judge, basically you are right. I have no other questions.
THE COURT: Anything else?
MR. OCCHIOGROSSO: I just have a couple real quick.
THE COURT: Okay.

REDIRECT EXAMINATION
BY MR. OCCHIOGROSSO:
Q Detective, in addition to memorializing the lineup and as you just testified the remarks made immediately upon the viewing, by the viewing witness, did you also prepare a DD5 in connection with the lineups?
A Yes.
Q All right. And did you in the DD5, did you record what the viewing witnesses would have said when they viewed the lineups?
A Um, yes. There is a mention of that witness number one stated number, Cooley.
Q Okay. And what else does it say she said?
A He came in to our apartment with a gun and shot Freedom.
Q Is there anything in there about what witness number two said?
(Whereupon, there was a pause in the proceedings.)
A Uh, it was the person that threatened her sister two days after the murder in her apartment.
Q You also testified that initially on April 2, 2003 witness number one did not identify by name or nickname the defendant at any point subsequent to April 2.
Did you have a conversation with witness number

one about that subject, about why she didn't name the defendant initially?

A Yes.

Q What did she say?

A She stated her father told her not to say that it was Cooley, that he would kill them all.

MR. OCCHIOGROSSO: Thank you. I have nothing further, Judge.

RECROSS EXAMINATION

BY MR. SHEINBERG:

Q Did you memorialize that in the DD5?

A Yes.

Q What number is that?

(Whereupon, there was a pause in the proceedings.)

A That's a DD5 number 41. We interviewed a Brenda Jones.

Q When was that done?

A 7/16/03.

Q 7/16/03?

A Yes.

Q That's --

A At 10:30 in the morning.

Q How many months after the incident?

A Two a little over two months.

Q After the incident?
A Yes. And it was again when I interviewed the witness's mother.
Q Okay. And when was that done?
A That was done at 12:30 on the same day.
Q Several months after the incident?
A Yes.
MR. SHEINBERG: I have no other questions.
THE COURT: Okay. People rest?
MR. OCCHIOGROSSO: Yes.
THE COURT: Defense rests?
MR. SHEINBERG: Yes.
THE COURT: You want to say anything?
I heard all the testimony, reserve decision. Okay.
MR. SHEINBERG: Okay.
THE COURT: You want me to send it back or stay here, it's your choice. I'm not here in August. We have to put it over for September.
(Whereupon, the witness was excused from the stand.)
MR. SHEINBERG: Can we approach?
THE COURT: Yes.
(Whereupon, there was a discussion held at the bench off the record.)

MR. SHEINBERG: Can I get the minutes? I'm 18B on this case.

THE COURT: Yes. I also need the minutes on this case.

MR. OCCHIOGROSSO: Me, too.

(Whereupon, there was a discussion held at the bench off the record.)

THE COURT: September 20.

MR. SHEINBERG: We are coming to this court?

THE COURT: Yes. Counsel, if, make sure it's reassigned then counsel, okay?

MR. OCCHIOGROSSO: Yes.

THE COURT: So we have a D.A. that's prepared to move ahead.

MR. OCCHIOGROSSO: Yes.

MR. SHEINBERG: When do you think you will have a decision on this?

THE COURT: When am I going to have a decision?

MR. SHEINBERG: Just out of curiosity.

THE COURT: Is there a reason?

MR. SHEINBERG: Actually no, no. If I want to submit a letter or some memorandum I just thinking about on the Dunaway issue. Only thing that's bothering me in this case.

THE COURT: When was the arrest made?

MR. SHEINBERG: Arrest was made over a year.

MR. OCCHIOGROSSO: Yes, it's in May of 2004.

THE COURT: We're off the record now.

(Whereupon, there was a discussion held off the record.)

* * * * * * * *

**(Whereupon, proceedings adjourned to 9/20/05.)**

* * * * * * * *

It is hereby certified that the foregoing is a true and accurate transcript of the proceedings.

***VANESSA PICCIRILLO***
Senior Court Reporter

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM, PART 17
---------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

Ind. No. 3066/04

-against-

Decision

GLEN CUMMINS,

Defendant.
---------------------------------------X

September 20, 2005
Kings Supreme Court
320 Jay Street
Brooklyn, New York 11201

B E F O R E :

THE HONORABLE ABRAHAM GERGES,

Justice, Supreme Court

A P P E A R A N C E S :

For the People:
THE HONORABLE CHARLES J. HYNES,
District Attorney, Kings County,
By: SUSAN MILLUS,
Assistant District Attorney

For the Defendant:
GEORGE SCHEINBERG, ESQ.

THERESA SANTILLI, RPR, CSR
Senior Court Reporter

THE CLERK: This is number 2 on the trial calendar, Indictment number 3066 of 2004, Glen Cummins.

The defendant is on his way up.

Counsel, may we have your appearances, please?

MR. SCHEINBERG: Good morning, your Honor.

George Scheinberg, 50 Court Street, Brooklyn, New York, representing Mr. Cummins.

MS. MILLUS: Susan Millus for the Office of the District Attorney.

Good morning.

THE COURT: Are you the district attorney that will be on this case?

MS. MILLUS: I will be.

MR. SCHEINBERG: And I'll be defense counsel on this case.

THE COURT: We're going to wait until the defendant is up, all right. This matter is going to be adjourned to October 17th for trial. Both sides are directed not to take any other case that would interfere with this case.

MR. SCHEINBERG: That's correct, your Honor.

In the event that any other Judge wants my appearance, I'll have him call you.

THE COURT: Have them call me.

MR. SCHEINBERG: I understand you made a decision on the motion.

THE COURT: Yes. I'm going to wait for the defendant to come in and we'll read it on the record.

MR. SCHEINBERG: Very good.

(Pause in proceedings.)

THE CLERK: This is a recall of Indictment 03066 of 2004, Glen Cummins.

MR. SCHEINBERG: Again, my appearance, George Scheinberg, 50 Court Street, Brooklyn, New York, representing Mr. Cummins.

MS. MILLUS: Susan Millus for the Office of the District Attorney.

Good morning, your Honor.

THE COURT: Good morning.

THE COURT: All right, we're going to adjourn this case to October 17th for trial. Both sides are directed not to take any other case. If I'm busy on that day, I might send it out to someone else.

MR. SCHEINBERG: Very good.

THE COURT: Now, the defendant moves to suppress for various reasons. A Wade/Dunaway hearing was held before this Court on July 20th, 2005. Detective Platt testified in a straightforward and credible manner. His testimony is credited in its

entirety.

Based on the information from an eyewitness, the police had probable cause to arrest the defendant. He had been identified as the shooter in a homicide. The identification procedures, including the photo array and lineups, were in no way impermissibly suggestive.

The defendant's motion to suppress is hereby denied in all respects.

This constitutes the decision and order of the Court.

MR. SCHEINBERG: My exception to the ruling for the record.

THE COURT: Thank you. Same bail conditions.

MR. SCHEINBERG: We'll see you then.

THE COURT: 10/17.

A COURT OFFICER: Same bail?

THE COURT: Yes.

CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPTION OF MY STENOGRAPHIC NOTES.

Theresa Santilli

THERESA SANTILLI
SENIOR COURT REPORTER