SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS - CRIMINAL TERM - PART: 17

---------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

- against -

GLEN CUMMINS

Defendant

---------------------------------------------------X

Indict. No. 3066-04

360 Adams Street
Brooklyn, New York
January 24, 2006

B E F O R E:

HONORABLE ABRAHAM GERGES, Justice

A P P E A R A N C E S:

CHARLES J. HYNES, ESQ.
District Attorney, Kings County
BY: JOHN MARRONE, ESQ.
SUSAN MILLUS, ESQ.
Assistant District Attorneys

GEORGE SHEINBERG, ESQ.
Attorney for Defendant
50 Court Street
Brooklyn, New York

JACQUELYN E. ARCE
WALTER EGIELSKI
Official Court Reporters

Preliminary Instructions

COURT CLERK: Case on trial, indictment 3066/04 Glen Cummins.

MR. SHEINBERG: George Scheinberg 50 Court Street, Brooklyn, New York.

MS. MILLUS: Susan Millus office of the District Attorney, also Assistant District Attorney John Marone..

THE COURT: Bring the jury in please.

COURT OFFICER: Jury entering.

THE COURT: All jurors being present both sides waive the roll?

MR. SHEINBERG: Yes, Your Honor.

MS. MILLUS: So waive.

THE COURT: Everyone please rise, swear in the complete jury.

(jury sworn)

THE COURT: Members of the jury, now that you have been sworn will give you some preliminary instructions to guide you in your participation in trial. It will be your duty to find from the evidence what the facts are. You and you alone are the judges of the facts. You will then have to apply those facts to the law as the Court will give it to you. You must follow that law whether You agree or not but nothing the Court may say or do

during the course of this trial should be taken by you as any indication as to what your verdict should be. The evidence which will find, the facts, will consist of testimony, documents, Exhibits if any facts the lawyers agree or stipulate to or that the Court may instruct you to find.

Certain things are not evidence and must not be considered by you. I will list them now; statements, arguments, questions by lawyers are not evidence. Objections to questions are not evidence. Lawyers have an obligation to their client to make any objection. Whenever you believe evidence being offered is improper, under our rules of evidence you should not be influenced by the objection or by the Court's ruling of it. If the objection is sustained that means that the witness is not to answer the question, ignore the question.

Questions are never evidence. If it is overruled that means that the witness is to answer the question, treat the answer like any other.

You are further instructed that some item of evidence is received for a limited purpose only. You must follow that instruction.

Testimony the Court has excluded or told

you to disregard is not evidence and must not be considered. anything you might have seen or heard outside of the courtroom is not evidence. It must be disregarded. You are to decide this case solely on the evidence appropriated here in the courtroom. It will be up to you to decide which witnesses to believe, which witnesses not to believe and how much of any witness' testimony to accept or reject.

I will give you some guidelines for this purpose at the end of the case. As you know this is a criminal case and there are three basic rules about a criminal case you must keep in mind. First the defendant is proven innocent until proven guilty. The indictment against the defendant is only an accusation, nothing more. It is not proof of guilt or anything else. The defendant therefore starts out with a clean slate.

Second, the burden of proof is on the People. The defendant has no burden to prove his innocence.

Third, the People must prove the defendant's guilt beyond a reasonable doubt. I will give you further instructions on this point later.

Now in this case, the defendant is

charged with murder in the second degree, burglary, intimidating a witness and criminal possession of a weapon. And I will give you detailed instructions of the law at the end of the trial and those instructions will control your deliberations and your decision.

Now for a few words as far as your conduct is concerned. As jurors first I instruct you that you're not to discuss this case or anything about it with each other or anyone else until you retire to the juryroom at the end of the case to deliberate on your verdict. You simply must not talk about this case.

Second, do not read or listen to anything touching this case in anyway. If anybody should try to talk to you about it bring to the Court's attention promptly.

Third, do not visit the scene of the alleged crime or any other place mentioned during the trial.

Fourth, do not do any research or make any investigation about the case on your own. Also, please do not take any notes during the trial.

Finally, do not form any opinion until

1E

all the evidence is in. Keep an open mind until you start your deliberations at the end of the case.

The sequence of the trial will be as follows: First the People will make opening statement which is simply an outline to help you understand the evidence as it comes in.

Next the defendant's attorney may but does not have to make an opening statement. Opening statements are not evidence nor arguments.

The People will then present its witnesses and counsel for the defendant may cross-examine them.

Following the People's case the defendant may present witnesses who the People may cross examine.

After all the evidence is in the attorneys will present their closing argument to summarize and interpret the evidence for you and the Court will instruct you on the law.

After that you will retire to deliberate on your verdict. Bear in mind nothing counsel may say in their opening statement, in their closing arguments or for matter counsel may say at any time during the trial will be evidence in this case.

Now you are further charged that prior to discharge from jury service, you're not to request, accept, agree to accept or discuss with any person receiving or accepting any payment or benefit in consideration for supplying any information concerning the trial.

Now to conduct your deliberation in an orderly fashion you must have a foreperson. Of course, his vote is entitled to no greater weight than anyone else's vote. Under the law the jurors whose name was first drawn, juror number one, will act as your foreperson and report your verdict to the Court.

Now last thing I would like to talk to you about is something that's probably more appropriate. When you start your deliberations this building is a non smoking building. However during deliberations if anyone does have to smoke what you have to do is call a Court Officer. All deliberations must stop at that point for people smoking as well as the people who remain in the juryroom. The Court Officer will take that person or persons outside the building. Once that is completed everybody is back in the room together you can continue deliberate. That's the same

7
1-6

thing. If you deliberate at any time once deliberations start you cannot deliberate until twelve people are in the room jointly, together.

Ladies and gentlemen of the jury I had expected that we would start now but there are some legal issues that have come up at the last minute which sometimes do, which is going to take awhile to discuss. I am going to send you out for an extended lunch period. Thank goodness it's not raining outside now. It's pretty nice. For people who have not been down here if you walk straight down Montague Street you have the promenade there. It's a beautiful view of the city. You can buy food, probably sit on benches. Probably on a day like today I am going to send you out to 2:15. Admonition; do not discuss this case among yourselves. Do not come to conclusion until all the evidence is in and I charge you on the law. I expect to start 2:15.

(jury exits)

THE COURT: Both sides want to approach.

(off the record discussion.ecl)

(whereupon the case on trial adjourned for lunch after which court reporter Jackie Arce

8
1-H

continued recording the trial proceedings)

* * * *

Certified to be a true and accurate transcript of the stenographic minutes taken within.

WALTER EGIELSKI
Senior Court Reporter

THE CLERK: Case on trial continued, People vs. Glen Cummins, Indictment 3066-04. All parties are present. Defendant is present.

THE COURT: Please bring the jury in.

THE COURT OFFICER: Jury entering.

(Whereupon, the jury enters and is seated.)

THE CLERK: Case on trial continued, all parties are present. Defendant is present. All jurors are present.

Counsel waive the reading of the roll?

MR. MARRONE: Yes.

MR. SHEINBERG: Yes, your Honor.

THE COURT: Good afternoon, ladies and gentlemen.

Ladies and gentlemen, you will first hear the opening statement by the District Attorney and then possibly by the defense counsel and we will hear some witnesses.

Counsel.

MS. MILLUS: Thank you, your Honor.

April 2nd, 2003, Alonzo Mack lied in the bed at his friend's house going to sleep at 92 Woodruff Avenue, apartment 1B, here in the County of Kings. This defendant, Glen Cummins came into that

apartment and pointed a gun and executed the victim.

The People intend to prove that this defendant, Glen Cummins, is the one who murdered Alonzo Mack, he is the one who took this young man's life. You are going to learn what happened during Alonzo Mack's final hours.

You are going to learn earlier in the day there was police activity at the apartment at 92 Woodruff Avenue in apartment 1B, nothing related to this, nothing related to Alonzo Mack.

You will hear from the sergeant who actually saw Alonzo Mack outside of 92 Woodruff on the street and had a conversation with him and that Alonzo Mack told that sergeant he was going back to his friend's house at 92 Woodruff, apartment 1B, to go back to sleep.

That sergeant is going to tell you that that is the last time he saw Alonzo Mack alive. You are going to learn that prior to the defendant shooting Alonzo Mack, an associate, a known associate came in several hours prior to the shooting and that that associate went into the bedroom and knew exactly where Alonzo Mack was and that he left the location.

You will also learn that then at another

point in time after that but prior to the shooting another known associate of the defendant, Glen Cummins, came into that apartment and tried to take the kids out of the apartment, tried to take them to breakfast to try to safeguard them.

Then you will learn about seconds before this defendant killed Alonzo Mack that there was a banging at the door, that the defendant came with a gun pointed and forced his way into the apartment and where did he go, he went into the exact bedroom where Alonzo Mack was.

He went into that bedroom and shots erupted and you will learn that he shot the victim, Alonzo Mack, numerous times, he executed him in the bed.

You are going to learn that Brenda Jones knew exactly at that moment when the defendant came into that apartment who he was but you will also learn that when the police arrived she gave a description, a description that fit his description but didn't put a name and you will also learn why that happened because two days after this incident this defendant approached the witness, Brenda Jones, outside her building and threatened her and then you will learn that by the time EMS got to the location

Alonzo Mack, who also goes by the name of "Freedom" and this defendant goes by the name of "Coolie," you will learn that Alonzo Mack, Freedom, was dead at the scene.

This is what the People must prove, that this defendant, in fact, intentionally came in and broke into that apartment and killed the defendant -- killed the victim but you will also learn this wasn't an isolated incident, this defendant for months has been planning this, has been planning this.

You are going to learn about the feud between these two individuals and that he wanted him dead long before April 2nd of 2003.

You are going to learn that he talked about it, that he told his close friends all about his plan to do it and after he did it that he was bragging, he was the big man how he shot and killed Alonzo Mack, how he killed Freedom.

At the end of the case you will learn, after you hear all the evidence over the next several days, you will hear that evidence and at the end of this case the People are going to ask you to hold Glen Cummins responsible, hold him responsible for the crimes he committed, thank you.

THE COURT: Thank you.

Counsel?

MR. SHEINBERG: Yes, if I may.

THE COURT: Yes.

MR. SHEINBERG: Ladies and gentlemen of the jury, for the last ten minutes we had a very dramatic opening statement by the People.

There is one thing I would like to remind you, what Ms. Millus says is not evidence, folks, the evidence comes from that witness stand and I will ask you to listen to the entire case before you make any decision.

You have to you listen to all of the evidence. Listen to all of the testimony. Listen to the direct examination, the cross examination and what is most important I think in this case, I want you to listen to the charge and the instruction on the law before you make any decision.

Folks, what Ms. Millus says in her opening statement, what I say in my opening statement is not evidence. You people are going to sit here for the next couple of days and you will be looking at this, (Indicating), that witness stand, and you will hear people testifying and it will be your function to size them up and determine whether they are telling

the truth and whether the People from the District Attorney's Office have proven anything that she said here today.

So, ladies and gentlemen, you are going to embark for the next few days, to listen and listen carefully and don't make any decisions until you hear the entire case from beginning to end.

Thank you.

THE COURT: Thank you, Mr. Sheinberg.

Please call your first witness.

MR. MARRONE: Thank you, your Honor.

People at this time call Ms. Brenda Jones to the stand.

MR. MARONE: May we approach?

THE COURT: Yes.

(Whereupon, a sidebar discussion was held off the record.)

THE COURT: Why don't you wait in the jury room and as soon as the witness gets here we will call you right out.

(Whereupon, the jury is excused.)

(Pause in proceeding)

THE COURT: All right, bring the jury in.

THE COURT OFFICER: Jury entering.

(Whereupon, the jury enters and is

seated.)

THE CLERK: Case on trial continued, all parties are present. Defendant is present. All jurors are present.

Counsel waive the reading of the roll?

MR. MARRONE: So waived.

MR. SHEINBERG: So waived by defense.

THE COURT: Please call your first witness.

MR. MARRONE: Your Honor, at this time the People call Ms. Brenda Jones.

B R E N D A J O N E S , called as a witness by the People, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please have a seat and state your full name for the record.

THE WITNESS: Brenda Jones.

THE CLERK: Thank you.

THE COURT: Ms. Jones, there is some water there in case you would like it.

Move your chair all the way forward and the microphone there will make it easy for you, you have a low voice, move yourself forward.

You may inquire.

MR. MARRONE: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. MARRONE:

Q Good afternoon, Ms. Jones.

A Good afternoon.

Q Ms. Jones, are you here voluntarily this afternoon?

MR. SHEINBERG: Objection.

A No.

THE COURT: Overruled.

Q Were you served with a subpoena to appear here today?

A Yes.

Q And how did you arrive here today?

A Detectives came to my house.

Q And where did they bring you to?

A Here, to the District Attorney's Office.

Q And how did you arrive at the courtroom?

A The detective took me here.

Q Okay, and do you want to be here today?

A No.

Q How old are you, Ms. Jones?

A Seventeen.

Q And are you presently in school?

A Yes.

Q And I would like to ask you about the year 2003 specifically, I would like to ask you about April?
A Okay.
Q Did you live in Brooklyn at that time?
A Yes.
Q And where did you live?
A 92 Woodruff.
Q What apartment did you live in.
A 1B.
Q And who did you live with?
A My mother, my father, my five brothers and my sister.
Q I am going to ask you about April 2nd of 2003.
A Okay.
Q Were you home at that time?
A Yes.
Q And I am going to ask you about the morning, who was home with you?
A My mother, my father, my five brothers and my sister.
Q What is the first thing that you recall occurring as you woke up.
A The squat team was in my house.
Q And what did the squat team do while they were at your house?

A They took my two older brothers out.
Q When you say "two older brothers," which brothers are those?
A Harvey and Lavar (ph.).
Q Please, did the police do any damage to your apartment?
A They broke the door, the front door.
Q Now I will ask you about an individual, do you know someone by the name of "Alonzo Mack?"
A Yes.
Q How do you know Mr. Mack?
A He is a friend of the family.
Q And on that day, let me back up, how long has he been a friend of the family?
A Years.
Q And when you say "years," five years?
A About fourteen, fifteen years.
Q On April 2nd of 2003 did you see Alonzo Mack on that day?
A Yes.
Q And was he present in your apartment?
A Yes.
Q What was he doing in your apartment?
A He was sleeping.
Q Where was he sleeping?

A In my brother's room.

Q And in your brother's room, where would that be located as to the front door in your apartment?

A To the left, second door to the left.

Q And once you pass -- What is the first door to the left?

A Bathroom.

Q And in that room how many beds are there?

A Two.

Q And could you explain how those beds are set up in the room?

A There are two bunk beds.

Q Two bunk beds?

A Yes.

Q And which bunk bed did Mr. Mack go to sleep on?

A The first one when you come in the room, it is right in front of the front door.

Q You walk in the door and the bed would be right in front of it?

A Yes.

Q And did he sleep on the top bunk or on the lower bunk?

A He slept on the lower bunk.

Q I am also going to ask you about an individual

Derrick Ulett, are you familiar with that name.

A Yes.

Q And how do you know Mr. Ulett?

A We went to the same school.

Q And on April 2nd of 2003 did you see Mr. Ulett?

A Yes.

Q And where did you see Mr. Ulett?

A He was in my house.

Q He came into your house, how much after, how much after Mr. Mack arrived, how much longer was it before Mr. Ulett got there?

A About twenty minutes.

Q And what did Mr. Ulett do when he arrived at your house?

A He came in the house and went to the room that Alonzo Mack was in and got his book bag.

Q And what did he do after he got his book bag?

A He left.

Q And does Mr. Ulett have any brothers?

A Yes.

Q Do you know his brothers?

A Adonis.

Q Adonis?

A Yes.

Q Does he have the same last name.
A Yes.
Q And do you happen to know who their friends are?
A Yes.
Q Who would they be friends with?
A The defendant.
Q Now I am going to ask you if you know an individual -- Excuse me for one moment, your Honor.
Do you know an individual known to you as "Lucky?"
A Yes.
Q And did you see Lucky on that day?
A Yes.
Q And where did you see Lucky?
A He was in the house.
Q Your house?
A Yes.
Q And about how much after Mr. Ulett left did Lucky arrive?
A Ten minutes.
Q And what did Lucky do when he got to your house?
A He came to the house and he offered to take me and my brothers and sisters --

MR. SHEINBERG: I am sorry, I can't hear.

THE COURT: Speak up.

A He offered to take my brothers and sisters to McDonalds.

Q And was that a normal practice, did he often take you to McDonalds?

A No.

Q And do you know who this person Lucky is friends with?

A Yes.

Q And who is he friends with?

A The defendant.

Q Did this person Lucky, did he stay or did he leave?

A He stayed.

Q And where was he?

A He was in the back room.

Q Was he in the back room by himself.

A No.

Q Who was in the back room with him.

A My mother and my father and my three brothers.

Q When you say your three brothers, how old are those three brothers?

A At the time?

Q At the time?

A Ten, nine and eight.
Q At that time how old were you?
A Fourteen.
Q And while they were in the back, where were you?
A In the living room.
Q And were you alone or?
A No, I was with my sister.
Q Okay, and what were you doing in the living room?
A Watching TV.
Q And at that time when you were watching TV did there come a time when there was a knock upon the door?
A Yes.
Q And what occurred after that?
A I went to the door because the door was broken slightly, it was slightly open.
I opened the door and there is a man pointing a gun at me so I walked backwards. He was in front of me and he went to the second door which is my brothers' door and shot Alonzo Mack.
Q Let me slow you up for a bit, Ms. Jones.
When you say there was a man at the door, do you recall how he was dressed?
A Yes.

Q And how was he dressed?

A He had on black sweats, black hoody and a bandana above the eyes.

Q Above the eyes?

A No, under the eyes.

Q Under the eyes, I am sorry, I misunderstood you.

So he had a black bandana up here? (Indicating)

A Yes.

Q Was the hoody up or down?

A Up.

Q And you can make out --

A His eyes.

Q Did you recognize that individual?

A Yes.

Q How did you recognize that individual?

A The body structure.

Q And do you see that individual here in the courtroom?

A Yes.

Q And could you point to that individual and describe an article of clothing?

A A brown suit.

THE COURT: Indicating the defendant.

Q Now you said when he was at the door he had a gun in his hands?

A Yes.

Q And right after you opened the door and you saw him standing there, what happened next?

A I backed up slowly, I was in shell shock and he went to the left to my brothers' room and shot Alonzo Mack.

Q How long do you know the defendant for?

A A couple of years.

Q And does he live in your neighborhood?

A Yes.

Q On a weekly basis, how often would you see him?

A About two or three times out of the week.

Q And how would you describe your relationship with the defendant?

A I knew him from around the neighborhood, we didn't really have a relationship. I just know him from seeing him, he played with my little brothers.

Q Had he ever been to your house before?

A No.

Q Now I will take you back, we will have to go step by step, okay?

A Yes.

Q He walked in?
A Uh-huh.
Q He being the defendant?
A Uh-huh.
Q Pointed a gun at you.
MR. SHEINBERG: Objection.
THE COURT: Sustained.
Q What was the next thing you did after the defendant pointed a gun at you?
MR. SHEINBERG: Objection.
THE COURT: Sustained.
A I ran to the back.
MR. SHEINBERG: Objection, Judge.
THE COURT: Sustained, you don't have to answer that question.
THE WITNESS: Okay.
THE COURT: Asked and answered.
MR. MARRONE: Sorry, your Honor.
Q You ran to the back room?
A Yes.
Q As you were running did you see what the defendant did?
A He shot -- No, I saw when he was at the foot of the door, that is when I ran to the back room.
Q When you say you saw him at the foot of the

door, at the foot of what door?
A My brother's door.
Q And what was he doing at the foot of your brother's door?
A He was shooting.
Q Can you show me with your hands what he was doing?
A This, like the gun like that. (Indicating)
THE COURT: Indicating with two hands forward.
A Like this. (Indicating)
MR. MARRONE: Thank you, your Honor.
Q At that time who was in your brothers' room?
A Alonzo.
Q Had anyone else gone into that room?
A No.
Q When you were running to the back of the apartment and you got to the back, did you say anything when you got there?
A Yes.
Q What did you say?
A I said, "Oh shit, Coolie just shot Alonzo."
Q And do you know any other individual named "Coolie" aside from the defendant?
A No.

Q Did you ever see Alonzo Mack alive again?
A No.
Q How long were you in the back of the apartment for?
A Like for like ten minutes.
Q And what made you come out of the back of the apartment?
A My father told me go call the cops.
Q And did you call the police?
A Yes.
Q And did the police arrive then?
A Yes.
Q And what occurred after the police arrived?
A What?
Q Did the police talk to you?
A Yes.
Q And did you give them a description of the defendant.
A Yes.
Q And did you tell them the defendant's name?
A No.
Q Why didn't you tell them the defendant's name?
A Because I was under the influence of my father.
Q What had your father told you?

A My father said "Don't say nothing."
Q When was the next time you saw the defendant.
A About two days later.
Q And where did you see him?
A Outside of my building.
Q And whom was he with?
A He was with Adonis and two other people.
Q Adonis, that is Derrick Ulett's brother?
A Yes.
Q Who were you with?
A My sister.
Q And that would be Georgina Jones?
A Yes.
Q Did you talk to the defendant?
A No.
Q Did the defendant talk to you?
A Yes.
Q And what did the defendant say to you?
A He said "Don't be snitching.
Q What did you take that to mean?
A As a threat.
MR. SHEINBERG: Objection.
THE COURT: Overruled.
Q A threat in regard to what?
A That he would try to kill me or something.

Q And why do you think he would try to kill you?
A Because he killed Alonzo.
Q Alonzo, after that meeting did you see the defendant again?
A Yes.
Q When?
A The next day.
Q And who was the defendant with on that day?
A Abdul.
Q And who were you with?
A My sister and my mother.
Q And where was this?
A It was at the corner of Woodruff.
Q Corner of Woodruff?
A Yes.
Q And did you stop to talk to the defendant again?
A No.
Q Did the defendant stop to talk to you?
A Yes.
Q And what did the defendant say to you on that day?
A He said that he was in the hospital because he got stabbed and that he didn't have nothing to do with it, the killing.

Q When he said that to you, what did you take that to mean?

A As a threat.

Q And what killing do you think he was referring to?

A Alonzo's killing.

Q I am now going to May 14th of 2004, I will ask you to remember?

A All right.

Q Do you remember going to the 70 Police Station with the detective by the name of Charles Platt?

A Yes.

Q And did you go there to view a lineup?

A Yes.

Q And did you, in fact, view that lineup?

A Yes.

Q Do you recall how many people were in that lineup?

A Yes, six.

Q And do you recall how those people were dressed?

A Yes, they had on black clothes and a thing covering their nose.

Q I am sorry, Ms. Jones?

A They had a thing covering their nose and their

mouth.

Q Could you describe what they had?

A Like a bandana covering this part. (Indicating)

Q From here down? (Indicating)

A Yes.

Q It was a bandana?

A Yes.

Q So the lower part of the face of all six in the lineup were covered?

A Yes.

Q Did they have anything on top of their head?

A Yes, like scrubs, like shower caps and stuff.

Q Would it be fair to say all you could see was this large -- (Indicating)

MR. SHEINBERG: Objection.

THE COURT: Sustained.

Q Did you recognize anyone in that lineup?

A Yes.

Q Who did you recognize?

A Defendant.

Q This defendant?

A Yes.

Q Where did you recognize him from?

A From the shooting.

Q On April 2nd, 2003?
A Yes.
Q As well as being the same person who threatened you on two occasions thereafter.
MR. SHEINBERG: Objection.
A Yes.
THE COURT: Sustained.
MR. MARRONE: One moment, your Honor.
Q Ms. Jones, I will take you back to April 2nd of 2003 when you stated that the defendant was at your brothers' room shooting Alonzo Mack, did he say anything?
A Yes, before he kicked the door open he stated that, "What's up now, Harve." Harve is my older brother.
Q And Alonzo, Mr. Mack, do you know him by any other name?
A "Freedom."
Q And also when you had gone to the police to tell them about the defendant, had you moved out of 92 Woodruff, apartment 1B by then?
A No.
MR. SHEINBERG: Can we find out when this took place?
THE COURT: Yes, I am sustaining,

objection sustained.

Q By the time you viewed the lineup which occurred in 2004 --

A Yes.

Q -- were you living at 92 Woodruff anymore?

A No.

MR. MARRONE: No further questions.

THE COURT: Just the one question for clarification.

Do you remember what number you picked out of the lineup?

THE WITNESS: No.

THE COURT: You may inquire, counsel.

CROSS EXAMINATION

BY MR. SHEINBERG:

Q Good afternoon, Ms. Jones.

A Good afternoon.

Q Just taking you back for a moment to some of the questions asked by the Assistant District Attorney.

How long did you live at 92 Woodruff, apartment 1B before, I guess it was April 2nd, 2003?

A About fifteen years.

Q So you lived there most of your life, is that right?

A Yes.

Q And you lived there with your brothers?
A Yes.
Q And you told us something about a squat team arriving at your apartment or the apartment you lived in on April 2nd, 2003, what was that all about?
A I don't know.
Q When you say a squat team, that is police, right?
A Yes.
MR. MARRONE: Objection.
THE COURT: Overruled.
Q And they entered the apartment by kicking down the door, is that right?
A Yes.
Q Were you in the apartment at that time?
A Yes.
Q And your whole family was there?
A Yes.
Q And do you recollect or remember or did they have a search warrant or anything of that nature?
A No, they didn't have a search warrant.
Q How many police officers came in?
A About ten.
Q And about what time is that?
A About 9:30.

Q 9:30 in the morning?
A Yes.
Q And did they arrest anybody in the apartment?
A They took my two brothers.
Q Your two brothers?
A My two older brothers.
Q I can't hear you, if you can possibly speak louder in the microphone?
A My two older brothers.
Q Those two older brothers were arrested and taken to the precinct?
A Yes.
Q And were they arrested for possession of guns, if you know?
MR. MARRONE: Objection.
A I don't know.
THE COURT: Overruled.
Q Do you know?
A I don't know, no.
Q Did you see any guns in the apartment.
A No.
Q Did you see any drugs in the apartment?
A No.
Q But they were arrested and taken away?
A Yes.

Q And I think you told us the door was broken down?
A Yes.
Q Now there came a time later on that morning, I guess about 11 o'clock or so when this incident, this shooting happened, is that right?
A Yes.
Q Now Alonzo Mack is a friend of yours, a friend of your family, I think fourteen or fifteen years.
A Yes.
Q You say he is a friend of your family, he is a good friend of the family?
A Yes.
Q He visited with you and your, well, you and your family often?
A Yes.
Q He is there often?
A Yes.
Q And you have this good feeling for him?
A Yes.
Q And now when he came to that apartment, does he come there often and sleep in the apartment?
A No.
Q Was this the first time he ever slept in the apartment?

A No, but he don't come often.

Q But he has been there before and he slept there before, is that correct?

A Yes.

Q And he sleeps in your brother Harve's room.

A Yes.

Q Now going back to the time when you were in the apartment and this occurred, let's take it step by step, if we can.

You were where the first time this person entered the apartment?

A Yes.

Q Where were you?

A I was in the living room.

Q And were you with anybody else.

A My sister.

Q That is Georgina?

A Yes.

Q And you both were in the same room when this person entered, is that right.

A Yes.

Q Now when the person entered the apartment you told us that he was wearing, he or she was wearing something over his, over their face?

A Yes.

Q What was that?
A A bandana.
Q And that bandana covered the bridge of the person's nose, is that right?
A Yes.
Q And so would it be fair to say, I am going to use my hand to show where and tell me to stop where the bandana ended, was it up to here? (Indicating)
A Yes, it was up to here, to here. (Indicating)
Q You just pointed to the top of the bridge of your nose?
THE COURT: Just below the eyes.
THE WITNESS: Yes. (Indicating)
Q And that would be below the chin?
A Yes.
Q So basically that person's whole face was covered except for the forehead and the eyes?
A Yes.
Q You also told us that that person was wearing a hoody, is that right?
A Yes.
Q And that hoody was up?
A Yes.
Q And now can you describe for the jury and for us how the hoody was up, was it over his forehead?

A It was over his forehead, yeah. (Indicating)
Q It was, I am using my hands, stop me if I am incorrect, it was up to here or --
A It was above, up to here. (Indicating)
Q Showing me just below the hairline, would that be fair to say?
A Yes.
Q And the hoody is a hood that comes over the head, is that right?
A It was like tight. (Indicating)
Q You mean drawstring tight?
A Yes.
Q So it was along the face?
A Yes.
Q Show the jury where the hoody stopped?
A It stopped, it stops from here to here. (Indicating)
Q Around here. (Indicating)
A Yes.
Q So actually the hoody covered any exposed part of that person's face that may not have been covered by the bandana, is that right?
A Yes.
Q Except for the forehead and the eyes?
A The eyes, yes.

Q And the person that came in, you told us he was stocky, you mentioned his build.
A Yes.
Q I took some notes, let me see if I can be correct, "body structure," you used that expression?
A Yes.
Q What do that mean?
A He was muscular I noticed and I recognized his body structure.
Q Because of his body structure, about how much weight would you say?
A 238.
Q 238 and stocky?
A Yes.
Q And that is about all you noticed, is that right?
A Yes, and his height.
Q Sorry?
A His height.
Q I am sorry, how tall?
A About five, eight.
Q And five, eight and about 238?
A Yes.
Q And that person, that was all you noticed, is that right, other than clothing?

A Yes, and a voice.
Q Voice?
A Yes.
Q And what did the voice say?
A "What's up now, Harve?"
Q That's later on?
A Yes.
Q When the person first entered the apartment did the person say anything?
A No.
Q He came in with the gun and you saw right away the mask and the eyes and the build, is that right?
A Yes.
Q And when you saw the gun, what did you do?
A I backed up.
Q Where did you go?
A I backed up, gradually backed up and when I got behind my brother's door I ran to the back.
Q You ran into another room.
A Yes, I ran to the back, the last room.
Q Another room?
A Yes.
Q So would it be fair to say when the person came in with the gun, the gun was pointed, you were scared, I assume?

A Yes.
Q People don't point guns at people, you got frightened, is that correct?
A Yes.
Q And you ran or you backed up into another room.
A Yes.
Q About how long would you say that took?
A A matter of seconds.
Q Pretty fast?
A Yes.
Q You see a guy with a gun and how far away from this person were you when you first saw him with the gun?
A About as far as I am from this lady. (Indicating)

MR. SHEINBERG: Meaning the court reporter.

THE COURT: About four feet.

Q And you backed up right away and went into another room?
A Yes.
Q And is it fair to say the only thing you saw again --

MR. MARRONE: Objection, your Honor.

THE COURT: Overruled.

Q The only thing that you saw was what you described before, this person is standing there?

A Yes.

Q And you didn't see the person do the shooting, did you or did you?

A I did see him turn to the room and shoot.

Q That is while you were backing up and then you ran into another room.

A Yes.

Q And you said this took "a matter of seconds," would that be fair to say?

A Yes.

Q And by the way, this apartment that you live in, I know it was during the morning but are there windows in the area where you were standing when you first saw this person?

A No.

Q And the light is on?

A Yes.

Q Where are the lights?

A The light is when you first walk in the house, it is on the right side.

Q When you say, is that a lamp or light?

A No, a light.

Q In the house or in the building?
A In the house.
Q In your apartment?
A Yes, in the apartment.
Q And in the living room where you were standing, where was that light?
A The light is on the side.
Q Like a sconce on the side?
A Yes.
Q And was that on?
A Yes.
Q And any other lights?
A No.
Q So that is the only light that was on?
A Yes.
Q And that light, well, let me ask you this, the living room, the area, it wasn't brightly lit, it was just one bulb there, one light, it was kind of dim, would that be fair to say?
A No, it was pretty bright.
Q Very bright?
A Yes.
Q And that is the only light that was on?
A Yes.
Q And now the person came in and you told us

already that you saw his body structure -- By the way, have you ever seen anybody who weighed 238 pounds and was the same height as the person that came in?

A No.

Q Never saw anyone with that weight, never in your life?

A Yes, but not around that neighborhood.

Q In the neighborhood where you live, you have never, stop me if I am incorrect, you never seen a person who you described as being 238 pounds and how tall did you mention?

A Five, eight.

Q Never saw anyone?

A No.

Q In your whole life?

MR. MARRONE: Objection.

THE COURT: Overruled.

Q Is that what you are telling this jury?

A Yes.

Q And it is the only person you seen, you said was him in that description?

A Yes.

Q And you saw his eyes?

A Yes.

Q Anything special about that person's eyes?

A No.

Q Just eyes, right?

A Yes.

Q Any special color?

A No.

Q So you recognized the eyes and you said that was the person?

A Yes.

Q And by the way, your brother Harve, do he have any problems, did he have any problems with the defendant?

A I don't know.

Q How about Mr. Mack, the deceased?

A I don't know.

Q And you say you saw the defendant in the neighborhood once or twice a week for --

A Yes.

Q -- for about a year?

A Yes.

Q Before this incident, did you ever talk to him?

A No.

Q So you never had any conversation with the defendant before April, I guess April 2nd?

A No.

Q 2003?
A No.
Q Did he ever visit your house?
A No.
Q When you saw him these two, three times a week, where did you see him?
A All through the streets.
Q In the street, in the neighborhood, is that right?
A Yes.
Q And walking with other people?
A Yes.
Q And he never stopped to talk to you?
A No.
Q And you never stopped to talk to him.
A No.
Q And you really never got very close to him?
A I got pretty close to him.
Q When I stay pretty close, you never talked to him?
A He played with my little brother.
Q Who is your little brother?
A I have three.
Q He played with them?
A He played with them.

Q Like catch or baseball or something?
A Yeah.
Q And he was friendly to your family, is that right?
A Yes.
Q And now you also told us, I think pretty directly after the incident occurred you ran into your father and you said something like, "Oh shit, Coolie just shot somebody," is that right?
A Yes.
Q And do you still live with your father?
A Yes.
Q And he still lives with you at the same address where ever you live?
A Yes.
Q And when you said that, what did your father do?
A Nothing.
Q He called the police then?
A No, he told me and my sister to go.
Q Sorry?
A He told me and my sister to go outside and call the police.
Q Did you call the police?
A Yes.

Q And they arrived, is that right?
A Yes.
Q And when the police arrived, a police officer in uniform arrived?
A Yes.
Q And then a detective eventually arrived, do you remember that?
A Yes.
Q And the detective asked you what happened?
A Yes.
Q And what did you tell him?
A What you mean what happened?
Q He asked you about the shooting?
A Yes.
Q And you were the only witness to the shooting, is that right?
A Yes.
Q And what did you tell the detective?
A He asked me what was the description of the person that came in and I gave it to him.
Q You refreshed your recollection telling him.
A Yes.
Q What did you tell the detective?
A I can't hear you?
Q I am sorry, what did you tell the detective?

A I told him the description five, six or five, seven, about two --
Q 220?
A Yes.
Q Because that is what you remember?
A Yes.
Q And did you tell the description -- Withdrawn.
Did you tell him that person was pointing a gun?
A Yes.
Q And you told him about the bedroom situation, is that right?
A Yes.
Q And what did you tell him?
A About the bedroom situation?
Q Yes?
A What you mean?
Q Maybe I am inarticulate but you told him, you told us moment ago that this person went to the bedroom, I guess you demonstrated with your hands, he said "What's up, Harve," something like that?
A Yes.
Q Use the words that he said?
A "What's up now, Harve."
Q You are certain of those words?

A Yes, I am certain, I am positive.
Q Sorry?
A I am positive.
Q You told that to the detective?
A Yes.
Q Do recollect telling the detective that interviewed you that he went, the perpetrator went directly to the first bedroom, pushed the door open and said "What's up nigger," do you remember saying that to the detective, yes or no?"
A No.
Q So if the detective said that he would be wrong?
A Yes, probably.
Q But you don't remember saying that?
A No.
Q Put it this way, you did not say that?
MS. MILLUS: Objection.
THE COURT: Overruled.
A No.
Q You also told us things such as some people coming to the apartment before the shooting, do you remember that?
A Uh-huh.
Q You told us a fellow by the name of "Ulett" to

get his bookbag?
A Yes.
Q Is that the name "Ulett?"
A Derrick.
Q He went to get his book bag?
A Yes.
Q His book bag was in the apartment?
A Yes.
Q He left it there and went to retrieve it?
A Yes.
Q Nothing strange about that?
A No.
Q And then you said another person by the name of Lucky, do you remember him.
A Yes.
Q What is his real name?
A I don't know.
Q Lucky came in and offered to take the children to McDonalds?
A Yes.
Q He didn't take them?
A He tried to get us out of the house.
Q When you say "tried to get us out of the house, tried to take us to McDonalds," but you didn't go?

A No.
Q Did Lucky stay in the apartment?
A Yes.
Q So Lucky never left the apartment, is that right?
A No.
Q In fact, Lucky was in the apartment when the shooting took place?
A Yes.
Q And, in fact, Lucky was in the same, I guess in the back room when the shooting took place?
A Yes.
Q And he never left the apartment?
A No, after.
Q After the shooting he left the apartment?
A Yes.
Q So it would be fair to say that the first person who came in, his name eludes me now, Derrick Ulett came in to get his book bag which he left there and nothing wrong with that?
A No.
Q And Lucky came in to take the kids to dinner or take them to McDonalds and they didn't want to go?
A No.
Q So he stayed?

A Yeah.
Q Did he go anyplace?
A No.
Q Did he go outside?
A He went out once.
Q After the shooting?
A No, he went out and came back in.
Q When was that?
A Before the shooting occurred.
Q After when he went down --
A No, he went out and then he came back in.
Q And he stayed in the apartment?
A Yes.
Q And he is friends with the defendant?
A Yes.
Q And so is Derrick friends with the defendant?
A Yes.
Q And so is Harve friends, is he friends with your brother?
A I don't know if they are friends.
Q They know each other?
A Right.
Q And, in fact, Lucky and Derrick have a lot of friends, is that right?
A I guess.

Q And one of them is the defendant?

A Yeah.

Q And I think you told us that some of your brothers are friendly with the defendant?

A My little brothers.

Q So they are friendly with him?

A Yes.

Q So it is nothing strange that Derrick and Lucky are friends with the defendant, nothing strange about that?

A No.

Q Now just going back a little, you never told any of the detectives on the day of the shooting who you thought the perpetrator was, is that right?

A No.

Q Sorry?

A No, I didn't tell.

Q And you didn't say anything?

A No.

Q And in your mind you felt the perpetrator or the shooter was the defendant, is that right?

A Yes.

Q And the only reason you felt that way is because of the build, is that right?

A Build and his voice.

Q Build and the voice and what did the voice say?

A "What's up now Harve."

Q That is all you heard?

A Yes.

Q And when you heard that you said that was the defendant?

A Yes.

Q And basically you heard the defendant's voice before?

A Yes.

Q And you kind of were guessing at it and it was pretty much an educated guess, would that be fair to say?

MR. MARRONE: Objection.

THE COURT: Sustained as to form.

Q Would it be fair to say that when you heard the voice and when you saw the build -- Withdrawn.

Do you know whether or not anybody in your family had any problems with the defendant?

MR. MARRONE: Objection, your Honor.

THE COURT: Overruled.

A No.

Q And you knew that -- I will rephrase that.

When you first saw the person come into that

apartment, what made you think it was the defendant other than the fact that, the build and the voice, anything else?

A No.

Q You can't point to anything else, is that right?

A His eyes, I saw his eyes.

Q But it could have been the eyes of anybody else?

A No, his eyes is shaped differently.

Q How are they shaped, tell the jury how?

A Like oval shape.

Q You just told us a moment ago the eyes of that person that did the shooting were like anybody else's eyes, isn't that what you told us a moment ago?

A Yes, I did.

Q And so there is no difference in the defendant's eyes, the perpetrator's eyes or anybody else's eyes that you recognized, is that right?

A Yes.

Q You also told us that the day after the incident occurred, remember that you were in the street and I think you said the defendant was with a friend of his and he said something to you?

What did he say?

A The day after?
Q The first day, yes?
A "You better not be snitching."
Q "You better not be snitching."
A Yes.
Q That is all he said?
A Yes.
Q He didn't say anything about the shooting?
A No.
Q Did he say anything about being in your apartment?
A No.
Q And you took that to mean you better not be telling on him?
A Yes.
Q And do you think it could have meant you better not be telling on somebody else?
MR. MARRONE: Objection.
THE COURT: Overruled.
A No.
Q You didn't take that to mean that but it could have meant that?
A It could of.
Q It could have meant don't be snitching on the people that really did the shooting, is that right?

A No.
Q Could it have meant that?
A I don't think so.
Q You didn't think so, you think it meant him?
A Yes.
Q The second day, the second time, what happened when you saw him, what happened?
A He said he was in the hospital.
Q Sorry?
A He said --
Q Say it loud so everybody can hear you?
A He said he was in the hospital because he got stabbed and that he said he was in the hospital and he said that he had nothing to do with it, about the killing.
Q That is what he told you?
A Yes.
Q He said "I was in the hospital, I was cut or stabbed" and he even showed you, he picked up his shirt?
A Yes.
Q And he showed you a cut with a bandaid?
A Like a bandage.
Q He showed you he was cut and he had nothing to do with the shooting or the killing, is that right?
A Yes.

Q That is all he told you?
A Yes.
Q Did he threaten you?
A No.
Q He just told you that and he walked away?
A Yes.
Q And did you ever call the police and tell them that he threatened you the day after the shooting?
A No.
Q You never called the police?
A No.
Q You never said anything to anybody?
A I said something to Mr. Platt.
Q The detective?
A The Detective Platt.
Q When was that?
A When I went in the lineup.
Q And that was when, sometime in May?
A Yes.
Q The latter part of May?
A Yes.
Q And what year, do you remember, what year was the lineup, May what?
A I think it was May, '04.
Q A year, more than a year later?

A Yeah, I think so.

Q I see, more than a year later but between the time of the killing, that was April 2nd of 2003, and the time of the lineup which was a year later, did you see the defendant in the street?

A No.

Q Did you see him around the neighborhood?

A No.

Q You never saw him?

A We moved away.

Q Oh, you moved away, I see, so you don't know if the defendant was in the street, you moved away right away.

A Yes.

Q By the way, you can't shake your head, the lady has to take down the words.

A Okay.

Q So when was the first time you told any detective with respect to the fact that the defendant said these words to you and that "you better not be snitching and I didn't do the shooting or the killing?"

A Can you restate that?

Q When was the first time you told the Detective Platt, yeah, Detective Platt, that the defendant said to you the day after the shooting that "You better not be

snitching" and a day later said to you, "I didn't do the shooting because I was cut," when did you first tell him that?

A I think it was, I don't remember.

Q Would it refresh your recollection if I told you that you told him that on July 16th, 2003, a couple of months or several months after the shooting?

A Probably.

Q You don't know?

A I don't remember.

Q What possessed you to tell him that, why did you tell him that?

A Why did I tell him he made threats?

Q Yes?

A I felt like I had to tell him.

Q Months after?

A I couldn't get in contact with him.

Q You couldn't get in contact with who?

A Detective Platt.

Q Detective Platt?

A Yes.

Q You are telling this jury that Detective Platt was unavailable?

A No, we was moving around, that is why we wasn't stable.

Q When you say "moving around," what do you mean moving around, place to place?

A Yes.

Q But you knew Detective Platt was in -- Excuse me a moment.

Detective Platt was in the 70th Precinct command, did you not?

A Yeah, I know that.

Q Did you call the precinct?

A No.

Q Did you go down to the precinct?

A No.

Q Ms. Jones, you just told us, you told this jury that you witnessed a killing, a shooting.

You are identifying, you are telling us that this man did it, Mr. Cummins, and you are telling us that he threatened you, you just told us and you didn't go the police until April, May, June, July, four months later?

A Yeah, I couldn't, I was unstable.

Q I know you were moving around, we know that but you knew where the precinct was?

MR. MARRONE: Objection, your Honor.

THE COURT: Overruled.

Q You knew where the precinct was, you knew that

detective's name, is that right?

A Yeah, but I didn't want to go all the way back to Brooklyn.

Q Did you ever hear of a telephone?

A I didn't have a police number.

MR. MARRONE: Objection.

THE COURT: Overruled.

Q I know you didn't have his number, the point is, you could have gotten in touch with him if you wanted to, isn't that correct?

A No, I didn't have his number.

Q How about your father, did you tell your father about the threats?

A Yes.

Q And did you ask your father to call the precinct?

A No.

Q How about your mother, did you tell your mother about the threats?

MR. MARRONE: Objection.

THE COURT: Overruled.

A Yes, I told her, she was with me when one of the threats was taken.

Q When was she with you?

A When he said he was in the hospital.

Q She was with you?
A Yes.
Q You and her together?
A And my sister.
Q Georgina?
A Yes.
Q The three of you were together?
A Yes.
Q And your mother heard this and was with you when this was said?
A She was far away from us, she wasn't close.
Q What do you mean far away?
A We was like right here and she was over by the side.
Q Tell us where?
A She wasn't close, she was like over there with the lady with the green shirt.
THE COURT: About twenty feet.
Q Who has a blue shirt?
THE COURT: Green shirt.
A She was there. (Indicating)
Q Did you tell your mother right then and there, "Hey mom, this man threatened me," did you?
A No, I waited until we got home and then I told her.

Q Did she call the police?
A No.
Q Are you still living with your mother?
A Yes.
Q And she never called the police?
A No.
Q Do you know why?
A No, I don't know.
Q Do you know why your father never called the police?
A No.
MR. MARRONE: Objection.
THE COURT: Overruled.
Q But they knew about this, these threats, you told them that?
A Yes.
Q Did you also tell your father and your mother about what happened in the apartment on April 2nd of 2003?
A Yes.
Q And did you tell them that a person came in that you say was the defendant?
A Yes.
Q And did they call the police?
A No, I went to go call the police.

Q Did they go to the police and talk to the police?

A Yes, they talked to the police when I went to talk to the police.

Q Sorry?

A They went to the police when I went to talk to the police.

Q Same day?

A Yes.

Q Do you know, do you know whether or not they went to talk to the police also in July of 2003.

MR. MARRONE: Objection, your Honor.

THE COURT: Overruled.

A No.

Q Do you know if they ever went to the police after the incident?

A No.

MR. SHEINBERG: Excuse me a moment, Judge.

Give me a moment please, Judge, I am looking for something, I can't find it.

Q By the way, you told us pretty clearly that the person that did the shooting had both hands and shot, I guess it was Alonzo, right?

A Yes.

Q How many shots did he fire, do you remember?
A No.
Q You don't remember?
A No.
Q Did you count or anything like that?
A No, I didn't count, it was a lot of shots.
Q A lot of shots, you don't remember how many?
A No.
Q You did testify before the Grand Jury, do you remember that?
A Yes, I did.
Q And do you remember when you testified?
A No.
Q Can we have the date of the testimony?
Would it refresh your recollection if I told you you testified before the Grand Jury on May 17th, 2004, over a year after this incident?
A Yes.
Q Would that refresh your memory?
A Yes.
Q Refresh your memory?
A Yes.
Q And at that time your memory was better or worse?
A Better.

Q Of course it is better a year later of what happened?

A Yes, I still remember everything.

Q What?

A I still remember every detail.

Q How many shots were fired?

A About nine or so.

Q About nine, now you recollect it was about nine shots?

A Yes.

Q You are sure, you are certain of that?

MR. MARRONE: Objection.

A Yeah.

THE COURT: Overruled.

Q But a moment ago you didn't remember?

A You refreshed my recollection, you refreshed my memory.

Q I am refreshing your memory because you testified in the Grand Jury over a year --

THE COURT: Objection sustained.

Q Do you remember what color hoody the person who did the shooting was wearing?

A Black.

Q It wasn't blue?

A Black and blue are very close.

Q And but you don't remember if it was black or blue?
MR. MARRONE: Objection.
THE COURT: Overruled.
Q Did you ever tell the Grand Jury it was blue?
THE COURT: Objection sustained.
A I don't remember.
THE COURT: You don't have to answer that.
Q Again, when you spoke to the detective the day of the shooting --
A Yes.
Q -- and you told them what the person was wearing, the person that did the shooting, do you recall telling them that they had a black bandana over their nose like you told us?
A Yes.
Q And he was wearing certain sweat pants?
A Yes, sweats.
Q What color, black?
A I think black.
Q And you told me he was wearing a blue hooded sweat shirt with the hood up, do you remember telling that to the detective right after the incident?
A No.
Q You don't remember that?

A No.

Q And by the way, do you remember Detective Platt or the detective taking the statement from you, writing it down on his notebook?

A Yes, he was writing it down.

Q Everything you told him he was writing down?

A Yes.

Q And as you were talking to him.

A Yes.

Q Also you say the second time the defendant approached you in the street he was with another person, who was he with?

A Abdul.

Q Who is Abdul?

A His friend.

Q And is Abdul a friend of your family also?

A No.

Q Has he ever been to your home?

A No.

Q Basically what you are telling us, what you told us today is that this shooting took place on April 2nd, 2003?

A Yes.

Q And the person that did the shooting was masked all the way up to his eyes?

A Yes.
Q And he was wearing a hoody over his face?
A Yes.
Q And the only way you recognized him when you say it was the defendant is because --
MR. MARRONE: Objection.
THE COURT: Objection sustained, you have a question.
Q I will put it in a question.
The way you tell us that you say it was the defendant is because that person weighed about --
MR. MARRONE: Objection, your Honor.
THE COURT: Overruled.
Q -- weighed about 238 pounds and was five foot six or seven, period, is that right?
A Can you restate that?
MR. SHEINBERG: I will ask the court reporter if she would do that for me?
THE COURT: Objection sustained as to form.
Q That is the only reason you said it was the defendant, is that correct, just the size?
A The size.
Q And the voice?
A The size and the body.

MR. MARRONE: Objection.
A Body structure.
Q Body structure?
A And the voice.
Q That's it?
A Yeah.
Q By the way, when he said "I am going to shoot you, what's up, Harve" or "What's up nigger," you heard him?
A Yes.
Q And he was shooting?
A Yes, he said it very loud.
Q And fired right after?
A He said it first and then he shot, yes.
Q Nine times?
A Yes.
Q Which you remember now?
A Yeah.
THE COURT: Counsel.
Q Just one more question, I want to make sure I have this correct.
When you first spoke to the detective and you told him about the shooting, you said that, did the person kick in the bedroom door or push open the bedroom door?

A Kicked.
Q What?
A Kicked.
Q He kicked in the bedroom door?
A Kicked, he kicked the bedroom door to get in the bedroom.
Q Sorry?
A He kicked the bedroom door to get in the bedroom.
Q And when you spoke to the detective, you didn't tell him that he pushed the door open and said "What's up nigger?"
A I don't remember.
Q You don't remember that?
A I don't remember.
Q But the detective was taking notes as you were telling him?
MR. MARRONE: Objection.
THE COURT: Overruled.
A Yes.
MR. SHEINBERG: Judge, I don't have any further questions.
THE COURT: Any questions?
MR. MARRONE: Yes, your Honor.

REDIRECT EXAMINATION

BY MR. MARRONE:

Q Ms. Jones, on April 2nd, 2003 --

A Yes.

Q -- Derrick Ulett came to your apartment, correct?

A Yes.

Q And did you answer the door when he came to the apartment?

MR. SHEINBERG: I can't hear that?

THE COURT: Please speak a little louder.

Q Did you answer the door when he came to the apartment?

A No.

Q I will go back to what Mr. Sheinberg was asking you about by the front door of your apartment?

A Yes.

Q Was there a light in that area?

A No, the light is in the middle of the hallway. The light switch is by the front door.

Q Okay.

THE COURT: Was it daylight, by the way, when this occurred?

THE WITNESS: Yes.

THE COURT: Was the apartment light or dark?

THE WITNESS: It was light because the bathroom door was open and there is a window so the light was coming in.

Q When you answered the door, have you ever had a problem recognizing or seeing anybody when they come to that door?

A No.

Q Is it the same viewpoint you had with the defendant when he came to the door?

A Yes.

Q When this defendant threatened you, where were you living the first time?

A 92 Woodruff.

Q When he threatened you the second time, where were you living?

A 92 Woodruff.

Q When you came forward to the police to tell them that this defendant had shot Alonzo Mack on April 2nd of 2003 --

A Yeah.

Q -- had you moved?

A I think so.

MR. SHEINBERG: Can we get a date?

THE COURT: What date did you move, ma'am?

THE WITNESS: I think the 7th or the 8th.

THE COURT: Of what?

THE WITNESS: April.

MR. SHEINBERG: Judge, I missed it.

THE COURT: 7th or 8th of April, of what year?

THE WITNESS: 2003.

THE COURT: You moved from that apartment?

THE WITNESS: Yes.

Q So after you moved you felt comfortable to talk to the police about this incident?

MR. SHEINBERG: Objection.

THE COURT: Sustained.

Q In regard to the incident of 2003 on April 2nd, why did you now feel comfortable to talk to the police?

MR. SHEINBERG: Objection.

THE COURT: Sustained.

Q Why did you have to move?

MR. SHEINBERG: Objection.

THE COURT: Overruled.

A We had to move because it felt like we were in danger living there.

Q Mr. Sheinberg asked you about your father and asked you did your father call the police?

A Yes.

Q What did your father tell you on April 2nd of 2003?
A He told me and my sister to go outside and call the police.
Q And what did he tell you about naming the defendant when the police arrived.
A He said "Don't do it because you can get killed."
Q And did he ever tell you that again?
A Yes.
Q And do you recall the time when Miss Rodriguez and I came to your apartment?
A Yes.
Q And did your father want you to testify?
MR. SHEINBERG: Objection.
THE COURT: Sustained, objection sustained.
Q After you moved and you began to talk to the Detective Platt --
A Yes.
Q -- did you tell him who shot Alonzo Mack?
A Yes, after we moved.
Q Did your parents see the defendant come into the apartment on that day?
MR. SHEINBERG: Objection.

A No.

THE COURT: Objection sustained.

Q Where were your parents on the day of April 2nd, 2003 at the time this defendant came in your apartment?

A In the back room.

Q Is there any possible way to see from the back room to the front door?

A No.

MR. SHEINBERG: Objection.

THE COURT: Objection sustained.

MR. MARRONE: No further questions.

THE COURT: Anything else, counsel?

MR. SHEINBERG: I have some questions just in response.

THE COURT: Just ask your question.

RECROSS EXAMINATION

BY MR. SHEINBERG:

Q The District Attorney asked you about how many people you seen walk in the front door that you recognized, you recognize a lot of people that walked in the front door of your apartment?

A Yes.

Q Do all the people that walk in the front door of the apartment wear a bandana over their face and a

hoody over their head?

A No.

Q So that's the first time you ever in your life seen a person come in your apartment, on April 2nd, wearing a mask over his face or bandana over his face, is that right?

A Yes.

Q First time you ever seen that?

A Yes.

Q And you also told us a moment ago that you moved from 92 Woodruff sometime in April, April 7th?

A 7th or 8th.

Q Of 2003?

A Yes.

Q And isn't it a fact that you were still living at the Woodruff address on July 7, 2003, yes or no?

A No.

Q Did you ever speak to the Detective Platt, did he come to your home or speak to you at 92 Woodruff Avenue on July 7, 2003, yes or no?

A No.

Q Well, did he speak to anybody with respect to the shooting at that address while you were present, yes or no?

A No.

MR. SHEINBERG: I have no other questions, your Honor.

THE COURT: Anything else?

MR. MARRONE: Nothing else.

THE COURT: You are excused, ma'am.

(Whereupon, the witness is excused.)

THE COURT: Call your next witness.

MR. MARRONE: May we approach?

THE COURT: Yes.

(Whereupon, a sidebar discussion was held off the record.)

THE COURT: We are going to take a short break. Do not discuss the case among yourselves or with anyone else and we will have you back shortly.

(Whereupon, the jury is excused.)

(At this time Jacquelyn Arce is excused and Walter Egielski is the official court reporter)

THE COURT: Bring the jury in.

THE COURT: All jurors being present, both sides waive reading of the roll call?

MR. SHEINBERG: Yes, waive by defense.

MR. MARRONE: So waive.

THE COURT: When a jury comes in I like everybody to stand because you're the judges of the facts just like when I come in they stand for the same reason. I am the judge of the law.

Sometimes you don't know what's happening. Also by the way if per chance anybody has to use the facilities kindly let me know or the officer know. People call your next witness.

MR. MARRONE: At this time People call Georgina Jones.

G E O R G I N A J O N E S , after having first been duly sworn was examined and testified as follows:

Q State your name?
A Ms. Jones.

THE COURT: You may inquire.

DIRECT EXAMINATION
BY MR. MARRONE:

Q Good afternoon. Are you here voluntarily?
A No.
Q When you say, no, did you come because we served

wse

you with a subpoena?
A Yes.
Q What did you take that subpoena to mean?
A If I didn't come I would have to go to jail.
Q How were you brought to the District Attorney's office?
A By a detective.
Q How were you brought to this courthouse?
A By a Detective.
Q How old are you Miss Jones?
A Sixteen.
Q Are you presently in school?
A Yes.
Q Going to ask you about the year 2003 specifically in April, where were you living at that time?
A 92 Woodruff, apartment 1B.
Q Who lived with you?
A My siblings; my mother and father.
Q When you say your siblings who do you mean?
A My three brothers and my sister and my mother and father.
Q Directing your attention to April second 2003, that morning who was at your home?
A My brothers my sister and my mother and father?
Q What's the first thing you recall upon waking up

that morning?
A The SWAT Team came to my house for my two oldest brothers and they took my two brothers out the house.
THE COURT: You have to speak louder maam.
Q You lived at 92 Woodruff, apartment 1B?
A Yes.
Q You said the SWAT Team came earlier that morning?
A Uh-huh.
Q Who was present at your home when the SWAT Team came?
A My brother Horace, my brother Lavar, three little brothers Brian, Fuquan.
Q Was anyone aside from family present when the SWAT Team came?
A No.
Q Did the SWAT Team do any damage to your home?
A Yes.
Q What did they do?
A They knocked down a lot of stuff the door was dented.
Q When you say the door was dented which door are you referring to?
A Front door.
Q When they left strike that. What did they do when they got there; the SWAT Team what did they do?

A When they came in they bust in my brothers room took my brother out.
Q When you say your brothers; which brothers?
A Horace and Lavar.
Q Going to ask you about an individual Alonzo Mack. Are you familiar with that individual?
A Yes.
Q On April second 2003 did you see Alonzo Mack?
A Yes.
Q Where did you see Alonzo Mack?
A He was in front of our building in front of. When the SWAT Team was there he was standing out side our building.
Q When the SWAT Team was there Alonzo Mack was standing outside the building?
A Yes.
Q When did Mr. Alonzo Mack arrive at your apartment?
A After the SWAT Team left.
Q So they had left?
A Yes.
Q And how long well strike that. How long do you know Alonzo Mack?
A Some years.
Q How do you know Alonzo Mack?

A By my brother.
Q When you say by your brother which brother are you referring to?
A Horace.
Q What did Alonzo Mack do when he arrived at your apartment?
A He sat down talked for a couple of moments. He asked my mother could he go sleep in my brothers room?
Q Did he in fact go sleep in your brothers room?
A Yes.
Q Had he done that before?
A Yes.
Q After he went to sleep do you know an individual by the name of Derrick Ulett?
A Yes.
Q How do you know Mr. Ulett?
A By my brother.
Q Did you see Mr. Ulett on that day?
A Yes.
Q Where did you see Mr. Ulett?
A He came to my house, he borrowed a book bag. He came to the house for a book bag.
Q Where was that book bag?
A In my brothers room.
Q Did Mr. Ulett himself retrieve that book bag?

A Yes.
Q Was anyone in that room when he went to get that book bag?
A Yes.
Q Who was in that room?
A Alonzo Mack.
Q Again you said Alonzo was sleeping in that room?
A Yes.
Q How many beds do you have in that room?
A Four; two bunkbeds and one on the side.
Q Would you say that again?
A Four beds; two bunkbeds and one as soon as you get in the room. The one is on the other side.
Q Do you recall which bed Mr. Alonzo Mack was in?
A Yes the first bunkbeds as soon as you entered the room.
Q As soon as you exited the room?
A Yes bunkbeds.
Q You mean as soon as you enter the room?
A Yes as soon as you enter.
Q Was he sleeping on the top or bottom bunk?
A Bottom.
Q He was in that room when Derrick Ulett went to get into bed?
A Yes.

Q Does Mr. Ulett have any brothers that you know of?
A Yes.
Q And do you know the brothers name?
A Adonis.
Q Do you know Adonis is friends with?
A Yes.
Q Who is Adonis friends with?
A Coolie.
Q When you say, Coolie, do you see that individual here in the room today?
A Yes.
Q Could you point to that individual describe something that person has on?
A Brown beige brown jacket.
THE COURT: Indicating defendant.
Q Do you know anybody else by the name of Coolie, you personally?
A No only him.
Q Only the defendant.
Again after Mr. Ulett retrieved the bag he left the apartment?
A Yes.
Q Is Mr. Mack still sleeping in the bed?
A Yes.

Q After that did another person come to your apartment?
A Yes.
Q What was that persons name?
A Lucky.
Q Do you know is that his name or is that a nick-name?
A Yes, it's a nick-name.
Q Do you know his real name?
A Carl?
Q And do you recall what Lucky wanted when he came to your house?
A He came in to take me and my sister and my brothers to go out for breakfast.
Q He wanted to take you out for breakfast?
A Basically.
Q Had he taken you out for breakfast before?
A No.
Q This would be the first time he wanted to take the family out for breakfast?
A Uh-huh.
Q This individual Lucky do you know any of his friends?
A Coolie.
Q Again, when you say Coolie you mean the

defendant?
A Yes.
Q Okay. During your testimony you have been referring to Mr. Alonzo Mack as Alonzo?
A Uh-huh.
Q Do you also know him as Alonzo Mack?
A On the papers I had saw it.
Q Let me ask you. Do you know this individual by a nick-name?
A Yes.
Q What would that nick-name be?
A Freeto.
Q Again, this is the person, Mr. Alonzo Mack was sleeping in your brothers room?
A Correct.
Q Again on April second '03 after Lucky's in your apartment, did there come a time when you heard a knock upon the door?
A Yes.
Q When that knock came upon the door where were you?
A In the living room.
Q Were you alone or was someone in the living room with you?
A Brenda was in the living room, my sister.

Q Was anyone else in the apartment?
A My mother, father and three little brothers.
Q Where were they at that time?
A Mother and father, three little brothers was in the back room. Me an Brenda went in the living room.
Q When that knock came upon the door did you answer the door?
A No.
Q Who answered the door?
A Brenda.
Q What happened when Brenda went to answer the door?
A When she came she said it was a gun pointing to her head. They kicked open the door had a gun to her head.
Q Did you see the gun pointed to her head?
A No.
Q What do you recall when Brenda went to answer the door?
A I recall her running back past the living room saying, oh shit, Coolie just shot at Alonzo Mack.
Q When she said Coolie, who did you take that to mean?
A Coolie.
Q Again, the defendant?
A Yes.

Q When she said Alonzo would that be Mr. Alonzo Mack?
A Yes.
Q The person you know as Frito?
A Yes.
Q The person that was sleeping in the bedroom?
A Uh-huh.
Q Did you hear anything?
A Gun shots.
Q You heard gun shots?
A Yes.
Q After Brenda ran past you and you heard the gun shots what did you do?
A We went into our father and our father entered the room.
THE COURT: You're going to have to speak louder because I have to hear you.
A I ran to the back room. Brenda was already in the back room. I went to the back room. My father said that Alonzo was dead. We had to go and call an ambulance.
Q Do you recall where the individual you know as Lucky was during this time?
A He had already left the house.
Q At what time did he leave the house?
A Like when the shots was going off. He ran out

the window, the back window by my mother's room. He left out the window

Q Did he ever come back into the apartment?
A No.
Q When the police arrived after they were called what happened then?
A The cops came. He saw the dead body laying there. So he called the cops to get all of us out of the house. They had like all of us leave the house and the cops came.
Q From that date April second 2003 have you seen Alonzo Mack since that day?
A No.
Q When was the next time you saw the defendant?
A About two days ago.
Q After that happened?
A Was me and my sister and we was walking and Coolie was with Adonis. Then he say he better not be snitching?
Q What did you take that to mean?
MR. SHEINBERG: Objecting to that.
THE COURT: Overruled.
Q Go ahead, Ms. Jones?
A I was scared.
Q You said he was, the defendant was with Adonis?

A Uh-huh.

Q Do you know Adonis's last name?

A No.

Q Does Adonis have a brother?

A Yes.

Q Do you know Adonis's brother's name?

A Uh-huh.

Q What's his brother's name?

A Derrick.

Q Is that the same Derrick that was at your apartment April second, '03?

A Yes.

Q To retrieve his book bag?

A Uh-huh.

Q Going back to day first day you saw the defendant after the shooting who were you with?

A My sister.

Q Who was the defendant with?

A Adonis.

Q What did the defendant say?

A You better not be snitching.

Q What did you take that to mean?

THE COURT: Objection is sustained.

Q Did you know what the defendant was referring to?

MR. SHEINBERG: Objection.

THE COURT: Sustained asked and answered.
Q When was the next time you saw the defendant?
A About two days after that.
Q Who was the defendant with?
A Abdul.
Q Do you know Abdul's last name?
A No.
Q Who were you with?
A My mother and my sister.
Q Where was this?
A Where?
Q Yes?
A On the corner Woodruff, corner of Woodruff.
Q Did you speak with the defendant?
A Yes.
Q Did you say anything to the defendant?
A No he was talking, just listening.
Q What was he saying?
A He said he didn't have anything to do with what occurred in our apartment.
Q When he said that what did you take that to mean?
A As being guilty.
Q Guilty of what?
A Killing.
Q Who was with you when he said that?

A My mother and sister.
Q Did there come a time that you were at the 70th Precinct with Detective Platt?
A Yes.
Q Did you view a line-up?
A Yes.
Q How many people were in that line-up?
A Six.
Q Did you recognize anyone in that line-up?
A Yes.
Q Who did you recognize?
A Coolie.
Q Where do you recognize him from?
A Excuse me?
Q Was the person you recognized in the line-up was that the same person who threatened you and your sister?
A Yes.
Q On both occasions?
A Yes.
THE COURT: Did they all have numbers when you were looking at the line-up?
THE WITNESS: Yes.
THE COURT: Do you remember what number Coolie had?
THE WITNESS: I don't remember.

THE COURT: You don't remember, okay.

MR. SHEINBERG: She doesn't remember the number?

THE COURT: No.

Q Ms. Jones, when you view the line-up the individuals in the line-up were their faces covered in any fashion?

A No.

Q No further questions?

THE COURT: You may inquire.

CROSS-EXAMINATION

BY MR. SHEINBERG

Q Good afternoon. Just quickly, you knew Glen Cummins from the neighborhood where you lived; is that right?

A Right.

Q You'd seen him before; isn't that right?

A Yes.

Q About how many times have you seen him?

A Saw him all the time.

Q When you went to the line-up again was in the line-up you picked him out; is that right?

A Yes.

Q The other five people in the line-up you didn't know where they were?

A No.
Q You didn't know where they came from?
A No I didn't know.
Q But you knew again you said that's Glen Cummins, Coolie or whatever the nick-name was?
A Right.
Q Let's go back for a moment to the day of this shooting.
I think you mentioned in the morning police SWAT Team came to your apartment. They broke the door down, did some damage to the house?
A Yes.
Q They arrested your brothers?
A Yes.
Q Do you know why they arrested him?
A Because they had guns in the house.
Q How many guns did they have in the house?
A I am not really sure.
Q Several guns?
MR. MARRONE: Objection.
THE COURT: Overruled.
Q Several guns, would that be fair?
A Yes.
Q Do you know what kind of guns they were?
MR. MARRONE: Objection.

THE COURT: Overruled.
A No.
Q You don't know. But there were guns they arrested them for the guns?
A Yes.
Q You told us about a Derrick Ulett you remember that?
A Uh-huh.
Q Derrick Ulett came to the apartment looking for his book bag?
A Uh-huh.
Q Did he have his book bag in his apartment?
A Yes.
Q He took it out of his apartment?
A Uh-huh.
Q He left it there, took it out, is that right?
A Yes, he did.
Q Derrick Ulett knows Glenn, right?
A Yes.
Q He knows other people?
A Yes.
Q In fact he is friends with your brother?
A Yes.
Q Derrick is friends with Horace?
A Yes.

Q He is friends with a lot of people?
A Yes.
Q This other fellow Lucky do you know his real name?
A Carl.
Q He came to the apartment to take you out for lunch; is that right?
A Breakfast.
Q I am sorry to McDonalds for breakfast. When he came there he had never asked to take you out for breakfast before; is that correct?
A Yes.
Q You didn't go with him did you?
A No.
Q He stayed in the apartment?
A Yes.
Q In fact Lucky stayed in the bedroom or back room of that apartment?
A Excuse me.
Q Lucky stayed in the back room of that apartment?
A He stayed in the living room.
Q Where?
A In the living room.
Q So he was in the living room with you and with Brenda when this person came into the apartment?

A Excuse me?
Q Was he in the living room with you and Brenda when the person came in the apartment?
A No he ran out the window because he heard the shooting.
Q Before the shooting maybe I jumped the gun. Before the shooting, lucky came in wanted to take you to breakfast you said no?
A Yes.
Q Then where did Lucky go at that time?
A At that time he was sitting in the living room.
Q Sitting in the living room?
A Yes.
Q And you were in the living room also?
A Yes.
Q So was Brenda?
A Yes.
Q Was there anyone else in the living room?
A No.
Q When this man came in the person who did the shooting where were you?
A I was in the living room.
Q Where was Lucky?
A After the shooting?
Q No, no before?

A Before the shooting he was in the living room.

Q So you saw this person come in, the man who did the shooting?

A No, I didn't.

Q Is the door to the living room excuse me, is the door to the apartment when you enter the apartment do you go into the living room?

A No.

Q Where did you go?

A First the bathroom then the bedroom.

Q When you enter the apartment through the front door you go into a hallway?

A Yes.

Q The hallway leads to the living room?

A Yes.

Q The hallway passes the bedroom where this person was shot?

A Does it pass it?

Q Yes?

A Yes.

Q Living room is further back, back in the apartment, living room is far, first the bathroom then the bedroom then the living room. Living room is the second room in the back?

A No third room.

Q Third room in the back?
A Yes.
Q You, Lucky, Brenda were in the living room all the way back?
A Right.
Q When the person came into the apartment, the person who did the shooting and before the shooting where was Brenda do you know?
A Before the shooting; in the living room with me and Carl.
Q With you and Lucky?
A Yes.
Q Did she hear a knock on the door?
A She heard a knock, went to the door.
Q She alone went to the door; is that correct?
A Yes.
Q She passed the bedroom went to the door?
A Right.
Q At that time you were still in the living room with Lucky?
A Yes.
Q Then you heard shots?
A Yes.
Q You didn't see who did the shooting?
A No.

Q You didn't see who entered the apartment?
A No.
Q You were still with Lucky in the living room?
A Yes.
Q After the shooting where was Lucky?
A After the shooting he went out my mother's room out the back window, jumped out the window.
Q Did he come back into the apartment?
A No.
Q That you know?
A No.
Q You remember you told us a few moments ago about what happened after the shooting. I guess it was the next day when you met the defendant Glenn Cummins?
A Uh-huh, yes.
Q Where was that maam?
A That was when me and my sister was coming out the building?
Q That was I guess April third?
A April four.
Q Mr. Cummins came up to you or came up to your sister?
A He was walking past him.
Q What did he say to you?
A Better not be snitching.

Q That's all he said?
A Yes.
Q You took it to mean you better not be saying about what happened in the apartment?
A Yes.
Q That's all he said? He didn't say I am going to kill you anything like that?
A No.
Q Second time you say you had an opportunity Mr. Cummins spoke to you again couple of days later, later, you remember that?
A Right.
Q He was with a friend of his by the name of Abdul?
A Right.
Q What happened; what did he say?
A He was talking to my mother. He was like he didn't have anything to do with it.
Q He was talking to your mother or to Brenda?
A To basically all three of us like he didn't have anything to do with it.
Q When you say basically all three of you all three of you were standing together?
A Yes.
Q Was you Georgina and Brenda I guess was next to you?

A Uh-huh.
Q Where was your mom?
A We were all three walking.
Q Go ahead.
A We were all three walking. We stopped at the corner because he stopped us and we was all standing next to each other. He said he didn't have anything to do with it.
Q He is standing next to you, Brenda, your mother. He said he didn't have anything to do with this?
A Yes.
Q Did he show you any cut that he had?
A On his stomach.
Q He showed you a cut?
A Yes.
Q You took that as a threat?
A Did I take it as a threat?
Q Yes.
A That's like guilty. Why would you come up to us tell us you don't have anything to do with it?
Q I understand that. But this was several days after the shooting. I assume the police, police were on the block and the shooting wasn't secret. People knew about it isn't that right?
A Right.
Q If Glenn came up to you and said I had nothing to

do with it, fair to say he was just saying I had nothing to do with it. He never threatened you?

A Still why would you walk up to a person?

Q Why, I don't know. Point is he never said I am going to kill you, keep your mouth shut?

MR. MARRONE: Objection.

THE COURT: Overruled.

Q He never said I am going to kill you, keep your mouth shut; nothing of that nature?

A No.

Q He never threatened you in anyway?

MR. MARRONE: Objection.

THE COURT: Overruled.

Q Other to say I had nothing to do with this; isn't that correct?

A Yes.

Q First time he said to Brenda you better not be snitching. You don't know what he meant. You were guessing weren't you?

A Was guessing?

Q Yes. You were guessing at what he meant?

A Why would you tell a person, don't be snitching?

Q Why? But you were guessing; isn't that right would that be a fair comment?

A I wasn't guessing. Like why would you tell a

person you better not be snitching. You must be guilty.

Q Must be, better not be guilty, because maybe somebody else shot this guy, would that be fair?

A Why would you say that if you are not?

Q Would that be fair to say?

A Would it be fair to say?

Q Yes.

A Yes it's fair to say.

Q You never saw the person who did the shooting?

A No.

Q You never saw what he was dressed like did you?

A No.

Q Speak to your father about the so called threats that were made to you?

MR. MARRONE: Objection.

THE COURT: Overruled.

Q These threats that were made to you?

THE COURT: Did you speak to your father about the threats made to you?

THE WITNESS: Yes.

Q Your father still living with you?

A No.

Q Do you know where your father is?

A No.

Q Is he living with Brenda?

A Pardon me?
Q Is your --
MR. MARRONE: Objection.
THE COURT: Overruled.
A Brenda lives with me.
Q And Brenda doesn't know where your father is?
A No.
Q How about your mother?
MR. MARRONE: Objection.
THE COURT: Overruled.
A I don't think so.
Q Your mother's living with you?
A Yes.
Q Your mother's living with Brenda?
A Yes.
Q After this incident occurred did you speak to the police?
A After the incident?
Q Yes, after the shooting?
A Yes.
Q Did you speak to the police that day or you spoke to the police in July of 2003?
A In July.
Q That's the first time you spoke to the police?
A Uh-huh.

Q You didn't speak to any detectives or police officers after the shooting day after the shooting or two days after the shooting?
A They took us to the precinct.
Q But you didn't speak to anybody?
A No.
Q So fair to say that on July sixteen '03, about five months after the incident was the very first time you spoke to a detective about this; fair to say?
A No, it's not.
Q When was the first time you spoke to the detective?
A They took us after the shooting occurred. We didn't say anything because my father said don't say anything.
Q You didn't say anything?
A No.
Q When was the first time you gave a statement to the detective; do you remember?
A I don't remember.
Q Would July sixteen '03 refresh your recollection?
A Yes.
Q You're telling the detectives that you were in a rear bedroom with your mother, father, three younger brothers, another male named Lucky who was visiting when

Brenda went to answer the door.

Do you remember telling that to the detectives July sixteen '03?

A I don't remember.

Q You don't remember?

A No.

Q Do you remember talking to a Detective Platt?

A Yes.

Q That was a detective taking the statement from you on July sixteen '03. You remember that?

MR. MARRONE: Can I see the DD5? Thank you?

MR. SHEINBERG: So the record is correct I am showing --

THE COURT: You don't have to tell me what it was.

MR. SHEINBERG: Assistant District Attorney she asked me so I showed her.

THE COURT: Please continue, sir.

Q You remember talking to Detective Platt is that right?

A Right.

Q You talked to him July sixteen '03?

A Uh-huh, yes.

Q When you spoke to him was he writing what you were saying down on a piece of paper?

A I think so.
Q He was asking you questions you were giving him answers?
A Right?
Q As best you remember; is that right?
A Right.
Q You remember being in the bedroom at least you told him you were in the rear bedroom with your mother, father three younger brothers and Lucky. You remember?
A I don't remember.
Q You don't remember it okay. Also remember telling the Detective Platte that Lucky jumped out of the window?
A Yes I did.
Q You told him that right?
A Yes.
Q Do you remember telling Detective Platte that he jumped out the window then he climbed back to leave through the front door?
A I don't remember.
Q But you just told us moments ago that Lucky did not come back into the apartment?
A He didn't come back into the apartment.
Q You remember that clearly?
A Yes.

Q If you told the detective that he came back into the apartment that would have been a mistake?

MR. MARRONE: Objection.

THE COURT: Overruled.

A Yes.

Q If you told the Detective that you were in the rear bedroom with your mother, father and three younger brothers that's not what you told us before, that would have been a mistake?

MR. MARRONE: Objection.

THE COURT: Overruled.

A Right.

If you told this to detectives that either several months after the incident you were mistaken?

MR. MARRONE: Objection.

THE COURT: Sustained.

Q You never told detectives that you were in the living room with your sister, and with Lucky?

A Did I ever tell them that?

Q Yes.

A I was in the room, living room with my sister.

Q And Lucky?

A Yes.

Q And your mother was there too?

A No.

Q Your father?

A No.

Q Your three brothers also?

A No they were in the back room.

Q They were in the back room but not with you?

A No.

Q That's all I am asking. If you told that to detectives you were making a mistake?

A If I said that I would be making a mistake.

Q By the way just one other question. I may have asked you this, bear with me.

You never saw the person who came into the apartment did you?

A No.

Q You never saw what that person was wearing?

A No.

Q At all. And when you testified in the Grand Jury what date did she testify?

MR. MARRONE: That is the seventeenth.

Q May seventeen, two thousand four, year later when you were asked this question and you gave this answer, on page sixteen.

Just one second. Now at the time when your sister said that, oh shit Coolie is in here something like

wse

that. At that time did you see the person who came into the apartment?

Your answer: I saw the scarf. That's all I saw?

THE COURT: Remember being asked that question giving that answer?

THE WITNESS: No.

MR. SHEINBERG: Can I have a stipulation from the District Attorney's office I am reading from a true, accurate and correct statement of the Grand Jury testimony?

MR. MARRONE: I am going to have to have the question read back.

MR. SHEINBERG: I will read it back. Let me show you the page.

Q Starting on the bottom of page sixteen going to the top of seventeen.

MS. MILLUS: No, I'd like the question read back?

THE COURT: Will the reporter please read the last question back. (question read back)

MR. MARRONE: People stipulate that it's accurate.

MR. SHEINBERG: That's a true accurate transcription of this witness's testimony under oath in front of the Grand Jury.

THE COURT: Anything else?

REDIRECT EXAMINATION

BY MR. MARRONE:

MR. MARRONE: People change their minds. We will not be asking Miss Jones any further questions.

THE COURT: Thank you Ms. Jones, you're excused.

THE COURT: Any other witness for today?

MR. MARRONE: No, Your Honor.

THE COURT: Ladies and Gentlemen of the Jury we are going to adjourn until tomorrow morning. Please be here 10:30. Do not discuss this case among yourselves until all the evidence is in and I charge you on the law and you have heard all the evidence.

(jury exiting)

THE COURT: Tomorrow I want a full schedule from early in the morning to 5:00.

CERTIFIED TO BE A TRUE AND CORRECT TRANSCRIPT OF THE FOREGOING MATTER

Walter Egielski

WALTER EGIELSKI, SR. COURT REPORTER