SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS CRIMINAL TERM : PART 17

____________________________________________x

THE PEOPLE OF THE STATE OF NEW YORK

Against- Trial

GLEN CUMMINS

Defendants

____________________________________________x

INDICTMENT # 3066-04

January 25, 2006
320 Jay Street
Brooklyn, New York

B E F O R E: HON. ABRAHAM GERGES, JUSTICE

A P P E A R A N C E S: (AS PREVIOUSLY NOTED)

Walter Egielski
Official Court Reporter

COURT CLERK: Case on trial 3066 '04 Glen Cummins.

MR. SHEINBERG: George Sheinberg, 50 Court street.

MR. MARRONE: John Marrone District Attorney's office.

MS. MILLUS: Susan Millus, Assistant District Attorney. This morning I provided Mr. Sheinberg copy of ATR, Sprint record which is nine pages of

Discovery.

In addition, we provided Mr. Sheinberg one page which was the search warrant, the property return. Can we approach?

MR. SHEINBERG: That's the inventory?

THE COURT: Yes, acknowledge receipt?

MR. SHEINBERG: Yes.

THE COURT: Bring the jury in.

(jury entering)

MR. MARRONE: People call Officer Dubroski.

P.O. P A U L D U B R O S K Y , after having first been duly sworn was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MILLUS:

Q State your name, shield, command for the record?

A Officer Dubrosky, 292, 70 precinct.

Q Good morning.

Going to ask you to keep your voice up, speak into the microphone so everyone can hear you.

By whom are you employed?

A New York City Police Department.

Q What capacity?

A I am a police officer.

Q How long have you been a police officer with the

wse

New York City Police Department?
A Approximately three and a half years.
Q As a police officer what command are you in?
A 70 precinct.
Q What are your duties, responsibilities as a police officer in the 70?
A Primarily answer radio runs, 911 calls.
Q Okay. Direct your attention to April second '03 at approximately 11:30 were you working 11:30 a.m; were you working on that date and time?
A Yes, I was.
Q What if anything happened on that date, time?
A There was a shooting on Woodruff Avenue.
Q Where did you go upon hearing the information?
A 92 Woodruff Avenue apartment one boy.
Q What county is that in?
A That's Kings county.
Q When you arrived at that location where did you go?
A I went to apartment 1B on the first floor.
Q Describe 92 Woodruff Avenue, what type, is that a building?
A It's a residential apartment building.
Q Many apartments?
A Yes, about three floors.

Q When you went to apartment 1B where did you go?

A To the, down a hallway on the first bedroom on the left.

Q When you went to the first bedroom on the left you went inside that bedroom?

A Yes I did.

Q When you went inside that bedroom what if anything did you observe?

A Observed a man lying face down that was shot several times.

Q Could you see those wounds?

A No I could see the blood on the clothes.

Q What was his condition this man when you saw him?

A He was unconscious, lying face down.

Q You said that you saw, you could see blood, see anything else on him?

A Just the blood soaked clothes that he was wearing.

Q How was that man, how was the body positioned when you first observed the man?

A He was lying down on his stomach.

Q What did you do upon, did you withdrawn.

Did you try to wake the person?

A At that time EMS was already called to the scene.

Q Did you administer any aid to him?

A No.
Q Did you know who he was when you first saw him lying there?
A No.
Q Did you later learn this person who he was?
A Yes I did.
Q Who did you learn him to be?
A Alonzo Mack.
Q How did you learn him to be Alonzo Mack?
A There was I.D. in his left pocket.
Q How did you obtain that I.D.?
A I was instructed by the supervisor on the scene to search the identification on the victim.
Q Did you personally do that?
A Yes.
Q Where did you get that from?
A His left pants pocket.
Q Other than that did you move Alonzo Mack in anyway?
A No.
Q When you arrived at that location what was going to be your job responsibilities that day?
A I was going to be to secure the crime scene as well as voucher some items.
Q When you say secured the crime scene can you

explain to the Members of the Jury what do you have to do when you secured a crime scene?

A Allow a uniform member of the service to come in, other units as well as keep out civilians. Basically secure the integrity of the scene so no one disrupts it.

Q Are you familiar with the term EMS?

A Yes.

Q What does that stand for?

A Emergency Medical Service.

Q Did there come a time when EMS arrived at the location?

A Yes.

Q Approximately how long after you first arrived at that location did EMS come?

A Shortly after came within minutes.

Q Were you present when EMS arrived?

A Yes.

Q Did you observe EMS go over to Alonzo Mack?

A Yes.

Q Did you see, were you present, did they do anything?

A They turned him over to look for I guess you know to take his blood pressure stuff like that.

Q Did you learn anything after that?

A That he was deceased.

Q Are you familiar with the Crime Scene Unit?
A Yes.
Q Did there come a time when they arrived?
A Yes.
Q Can you tell us to your knowledge what does crime scene do?
MR. SHEINBERG: I am going to object.
THE COURT: Sustained.
Q So you're familiar with crime scenes. Crime scene did at some point come, correct?
A Yes, they did.
Q Officer, you don't take any of the photos. Do you take any photos?
A No.
Q You said that you don't actually recover any property; is that correct?
A No I don't recover any property no.
Q You're given property?
A Yes.
Q Who were you given property by?
A Detective Forte.
Q Did you receive any property in relation in this case as to Ballistic Evidence?
A Yes.
Q Who were you given that by?

A Detective Forte.

Q What was the Ballistics evidence that Detective Forte gave you?

A Shell casings.

Q Once you received that Ballistics evidence what do you do with it?

A It's placed in a bag. It's sealed, also itemized on a voucher.

Q It's vouchered?

A Uh-huh.

Q What was the voucher number that was assigned?

THE COURT: You need something to refresh your recollection?

THE WITNESS: Yes.

THE COURT: You can look.

Q Do you have it with you?

A No I don't have it with me. I believe you have it.

MR. SHEINBERG: You can give it to him.

MR. MARRONE: Showing what's pre-marked People's Exhibit three for purpose of identification.

A Thank you.

Voucher number was L 785388.

Q You're showing People's Exhibit number three can

wse

you tell me do you recognize that?

A It's in a different packaging.

Q Before. But do you know what is that?

A It's the shell casings that were found in 92 Woodruff.

Q Do you recognize the packaging?

A The packaging, no, I don't recognize it.

Q Is it different than when you vouchered it on April second, '03?

A Yes.

Q What is different?

A It's wrapped in a another package I am not familiar with.

MS. MILLUS: With the Court's permission ask that the witness open it what's inside it?

THE COURT: Yes.

Q Now that you have opened that envelope People's Exhibit number three for identification do you recognize what's inside that envelope?

A Yes.

Q How do you recognize them?

A It's the shell casings that were found and a bullet.

Q Tell me how many shell casings are inside there?

A Four.

Q You said there was also a bullet?
A There are several bullets here.
Q Are they all into one?
A Yes all into one sealed envelope.
Q That the same property you vouchered back in September 7, '03?
A Yes.

MS. MILLUS: At this time what's previously marked as People's Exhibit number three as identification I would like moved into evidence as People's Exhibit number three?

MR. SHEINBERG: No objection.

THE COURT: Be People's Exhibit three in evidence.

Q On April third, 2003 did you have an opportunity to go to Kings County Morgue on that day?
A Yes.
Q Approximately what time did you arrive there?
A Approximately 8 a.m.
Q Why were you at Kings county morgue?
A To identify the body found at 92 Woodruff.
Q What did you see when you went to the Kings county morgue?
A I saw the victim Alonzo Mack.
Q Was that the same person that you saw on the

floor of 92 Woodruff Avenue apartment 1B the day before?

A Yes.

MS. MILLUS: I would like the witness shown People's Exhibit premarked People's Exhibit one for identification.

Q You testified earlier that Ballistics that you recovered and you vouchered what do you do after you do that?

A I am sorry.

Q After you recover the Ballistics and you voucher where did it go?

A After I was given the Ballistics they go to lab analysis, the Ballistics evidence.

Q Thank you.

Officer you're shown People's Exhibit number one for identification. Do you recognize that?

A Yes.

Q What do you recognize that to be?

A Diagram of apartment 1B, 92 Woodruff Avenue.

Q That diagram; does that fairly and accurately represent the layout of apartment 1B as it appeared on April second, '03?

A Yes.

MS. MILLUS: At this time what has been previously pre-marked People's Exhibit 1 for

identification I would like marked moved into evidence as People's Exhibit 1.

MR. SHEINBERG: I have no objection but subject to connection. He didn't do that.

THE COURT: That is not to scale is it?

MR. SHEINBERG: No.

THE WITNESS: No.

THE COURT: Okay. Does that fairly, accurately represent the way the apartment looked on that date?

THE WITNESS: Yes, it's the layout of the apartment.

MR. SHEINBERG: I have no objection.

THE COURT: Be People's Exhibit 1 in evidence.

MR. SHEINBERG: Fine.

MS. MILLUS: With the Court's permission ask the witness to approach the diagram?

THE COURT: Yes.

Q You said that you entered apartment 1B. Could you please point where you enter at?

A The entrance to the apartment is right here.

Q That is the entrance way. Then you described that you walk down a hallway. Could you please point to that?

(witness complies)

Q That the direction that you went back on April second '03?

A Yes.

Q You said you entered, you walked down you went to a bedroom; is that correct?

A That's correct.

Q Could you please tell us show us where that bedroom is? (witness complies)

Is that bedroom there where you found the deceased Alonzo Mack?

A Yes.

Q On that diagram that's indicated by looks like a figure inside that room lying down?

A Yes.

Q You can have a seat.

I would like to show the witness what has been previously deemed People's Exhibit two for identification.

Officer Dubrosky, you have been shown People's Exhibit two for identification. Do you recognize that?

A Yes.

Q And what do you recognize that to be?

A It's the body of Alonzo Mack.

Q Is the surrounding area you recognize that as well?

A It's the bedroom that he was found in.

Q Does that fairly, accurately represent the way Alonzo Mack looked on April 7, '03?

A Not quite.

Q Could you please tell me what is different?

A When I went there his body was flipped over on his stomach, shown here that his body is facing up.

Q Other than moved over, does it fairly, accurately represent the way Alonzo Mack looked on that day?

A Yes.

Q But you testified earlier you were present when EMS entered?

A Yes.

Q You actually observed them roll the body over?

A Yes.

Q You actually saw Alonzo Mack body at that time?

A Yes.

MS. MILLUS: At this time what is previously deemed People's Exhibit two for identification I would like moved into evidence as People's Exhibit two.

MR. SHEINBERG: No problem.

THE COURT: No objection. People's Exhibit two will be marked in evidence.

MS. MILLUS: Ask that be posted.

(Photo shown on overhead projector.)

Q Officer, People's Exhibit number two you're looking at, you said that was a picture of Alonzo Mack's body, correct?

A Yes.

Q When you first saw it was turned over. Could you please by looking at the photo he was turned over in the opposite direction towards maybe, we can use number two as a point of reference. He was turned that way?

A Yes, he was turned over, correct.

Q That room can you just describe when you first walk into that room can you describe what you see how many beds?

A There is a couple of bunkbeds and a bookcase completely disheveled.

Q When you walk in the room do you remember where the bunkbeds are in relation to when you first walk in the door?

A You walk in. There is one directly to the front and another one to the side.

Q Alonzo Mack was closest to the one where?

A The one in back.

Q On the side to the left?

A On the side to the left, uh-huh.

MS. MILLUS: I have no further questions for

wse

this witness.

CROSS-EXAMINATION

BY MR. SHEINBERG:

THE COURT: You may inquire.

Q When you first arrived at 92 Woodruff you arrived because of a radio run?

A Correct.

Q Were you by yourself; Do you have another partner with you?

A I was foot post at the time, several other foot posts I went with.

Q You mean walk there?

A Yes.

Q Who did you walk there with?

A Officer Cunningham.

Q When you got to the building, 92 Woodruff someone directed you to 1B?

A Yes there were already other Officers on the scene.

Q You're considered the first officer at the scene is that right?

A Considered, yes.

Q Basically that's your function. That's why you're testifying you're first officer at the scene even though there may have been other personnel there, you're

considered that?

A I am considered that, yes.

Q When you arrived at the scene there were other police officers there you entered apartment 1B; is that correct?

A That is correct.

Q I think you showed us in the diagram how you enter you walked down a hallway?

A Yes.

Q You didn't draw that diagram?

A No.

Q The photograph marked People's Exhibit three I think it was. You didn't take that?

A No.

THE COURT: That's photo number two.

MR. SHEINBERG: Two, I am sorry.

Q But the diagram it represents what that apartment looked like?

A Yes.

Q You entered the apartment. Was there anybody in the hallway?

A Was there anybody in the hallway meaning other Officers?

Q I am sorry, I wasn't clear.

Were there any other civilians from that

apartment in the hall?
A Yes, there is a family.
Q They were in the hallway?
A They were more than in the back toward the kitchen when I got there. The kids were walked in the hallway too.
Q There were several children in the apartment?
A Yes.
Q How many children were there?
A I don't recall assuming two or three were there, adults there also, yes?
Q Did you speak to the adults?
A No.
Q When you arrive there as first officer you arrived because of shooting, correct?
A Yes.
Q That was the purpose of going there, is that right?
A Yes.
Q When you enter the apartment you say what happened?
A There were already Officers that asked that question.
Q You were the first officer. You were the one responding there. Did you ask them what happened?

A No.

Q Did you say anything to the people who were in the apartment?

A No.

Q Did you talk to anyone there?

A In the apartment?

Q Yes, civilians.

MR. MARRONE: Objection, asked and answered.

THE COURT: Overruled.

Q Did you --

A No.

Q Did you talk to anyone?

MR. MARRONE: Objection.

THE COURT: Overruled.

Q After you were in the apartment for a while a detective came?

A Yes.

Q A Detective Platt came. Do you recollect his name?

A Yes.

Q Did Detective Platt speak to you?

A Yes.

Q You made a statement to him; isn't that correct? Let me put it this way, do you remember saying to Detective Platt that you spoke to Barbara Jones?

A Barbara Jones?
Q Yes or no?
A I don't remember.
Q Do you remember telling Detective Platte that you spoke to someone and she told him it was male shot in the apartment?
A No.
Q Do you remember telling Detective Platte that you found five children and two adults and one girl Brenda Jones in the apartment?
A I don't remember.
Q You don't remember or you didn't tell him that?
A I don't remember telling him that.
Q Do you remember telling Detective Platte that Brenda Jones said a masked gun man banging on the door when he answered just walked in shot the victim?
A I don't remember telling that.
Q As a police officer you're required to make notes aren't you; memobook?
A Yes, uh-huh.
Q Tell the jury what a memobook is?
A Memobook is just basically an account of the day explains what happened, certain jobs you go to, being this one. You know shooting or shot that come over you write it down.

Q When you go to the scene of shooting, you're the first officer. You make notes, what you did at the scene?

A I make notes what I saw.

Q Who you spoke to right?

A Sometimes, yes.

Q In this case did you make notes who you spoke to?

A No.

Q You testified that you collected certain evidence; is that correct?

A I was given evidence I didn't collect any.

Q Did you make notes about that?

A No.

Q Did you make any notes at all?

A Yes.

Q What notes did you make?

A What the victim was wearing.

Q That's it?

A Yes, and his name and date of birth.

Q Nothing else with respect to who was in the apartment, what you asked in the apartment?

A No.

Q You also told us when you entered the apartment, please look at that diagram that you went in. You were there for a period of time I think you said you secured the area?

A Yes.
Q What does secured the area mean; tell the jury?
A Basically only allow uniform members of the service into the bedroom, basically to secure the crime scene?
Q Tape it off?
A I didn't tape it off.
Q No civilian other than police personnel; is that correct?
A Yes.
Q How long were you in the apartment that particular day apartment, 1B?
A Approximately four hours.
Q During that period of time you walked around the apartment; is that correct?
A Just in the hallway.
Q When you say the hallway can you step down point to where you were?
A Uh-huh. The hallway and the bedroom.
Q That's the only area of the apartment that you were in during that four hour period?
A I might have been in the other rooms. I don't recall. Majority of my time is spent in the hallway right here.
Q You have no recollection of any other room that

wse

you went to at this time?
A No.
Q While you were there for the four hours I assume you had opportunity to observe what the apartment looked like that particular area of the hallway looked like?
A Yes.
Q Any lights in that hallway?
A Were there lights?
Q Yes?
A I don't remember.
Q Were there any lamps in the hallway?
A I don't remember a lamp, no.
Q Was the hallway dark or well lit; do you remember?
A I remember the actual bedroom being dark.
Q The bedroom where you found the deceased?
A Yes.
Q You say it was dark. There were no lights in there when you entered?
A I don't believe so.
Q You have no recollection of any lights in that hallway?
A No.
Q You obviously have no notes or memorandum what was in that hallway regarding lighting?

A No.
Q You were there four hours?
A Approximately.
Q You can have a seat?
MR. SHEINBERG: Judge, I have no other questions of this witness.
THE COURT: Any questions?
MS. MILLUS: Nothing further.
THE COURT: I have one. Was the hallway light or dark?
THE WITNESS: The actual hallway?
THE COURT: Yes.
THE WITNESS: Was light, was 11:00 in the morning.
MR. SHEINBERG: May I continue.
Q Are there windows in that hallway?
A No.
Q You say it was light. Where was the light coming from?
A The light was coming from the lobby, like a small lobby, came through the front door through the sun.
Q When you were in that apartment and the front door was closed there is no light in that hallway?
A I don't know. The front door was open all the time I was there.

Q Any light in that hallway came from the lobby is that correct?

A Possibly.

Q You were there four hours. You just told the judge when he asked you it was well lit; where did that lighting come from?

A I believe from outside.

Q From the lobby, is that right?

A I believe so.

Q May I approach the diagram?

THE COURT: Yes.

Q This is, would be entrance to the apartment; is that correct?

A Correct.

Q This is the lobby; is that correct?

A Correct.

Q Indicating above the doorway.

When that door is closed no light can get into that hallway; is that right?

A I don't know.

Q You were in the apartment. Was the door open at all times?

A The door was always open.

Q That's where the light came from in the lobby?

A Maybe.

Q You don't know?

A I really don't know. There was light in the apartment when I was there. Of course the doorway was open, I don't know.

Q In response to the judge's question it was well lit?

A It was when I was there.

Q With the door open?

A The door was open, yes.

MR. SHEINBERG: Nothing further.

THE COURT: Please call your next witness. You're excused.

MR. MARRONE: At this time People call Detective Thomas Forte.

DET. T H O M A S F O R T E , after having first been duly sworn was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MARRONE:

Q State your name, shield, command for the record?

A Det. Thomas J, Forte, shield number 6467 NYPD Crime Scene Unit.

Q Detective, how long have you been a member of the New York City Police Department?

A Eighteen and a half years.

Q How long have you held rank of Detective?

A Three years now.
Q Your current assignment.
A NYPD Crime Scene Unit.
Q How long have you been in the Crime Scene Unit?
A Four and a half years.
Q To become a member of the crime scene unit did you go to any special training or education?
A Yes, I did.
Q Can you tell us the member of the --
A I have one day latent print class given by NYPD, three day evidence collection class given by New York City Police Department, three day evidence collection class given by FBI, three day DNA class, one week crime scene class, three day crime scene reconstruction class, three day blood spatter class, two week homicide course, one week sex crime course, photography classes and numerous classes in weapons of mass destruction.
Q Specifically, what are your duties in the crime scene unit?
A We respond to all five boroughs in the city of New York, respond to all murders, all assaults, where a person is likely to die all rapes, sodomys, all department investigations which also include police shootings, all terrorist threats; anything of a high profile nature. Once at the scene we process the scene.

Q Directing your attention to April second of '03 were you working on that day?

A Yes, I was.

Q Did you respond to a call on that day?

A Yes I did.

Q Where was that call; what address did you respond to?

A 92 Woodruff Avenue.

Q Do you recall approximately what time it was that you responded?

A I left my office was approximately 1:30 p.m. and we arrived approximately 2:15 p.m.

Q When you arrived at the location what was the first action you took?

A I had a conversation with detectives at the scene then did a walk-through of the location.

Q What exactly is a walk-through?

A We walked through the location to look for evidence that was discovered prior to my arrival just to get the layout of the apartment.

Q What type of evidence did you proffer at the scene at that location?

A We recovered Ballistics evidence, recovered Serology,, recovered a knife at the location, was also a police radio at the location.

Q Regarding the Ballistics, what type of Ballistics did you recover at the location?

A I recovered four, four caliber discharged shells, deformed bullet and six cartridges.

Q What exactly is a discharged shell?

A Discharged shell. I will explain what a cartridge is or a live round.

Most people think of it as a bullet; consists of casing, bottom of the casing is a primer. Top of the casing is a bullet. Inside the casing is gun powder. When a firing pin on a gun hits the primer, sets off a small explosion inside the casing, sends a bullet down the range of the barrel of the gun.

In a semiautomatic pistol the shell is discharged from the gun. We call that a discharged shell.

Q Those discharged shells you recovered are you capable of telling what caliber they were?

A Yes, I was.

Q How are you able to accomplish that?

A Right on the head stamped of the discharged shells says four caliber on it.

MR. MARRONE: Your Honor may detective approach the map?

THE COURT: Yes.

Q Could you please tell us, show the members of the

wse

jury where you recovered those discharged shells from?

A The discharged shells were recovered in the front bedroom on the sketch. It's marked F one, F two, F three, and F five.

Q You also made reference to a deformed bullet?

A Yes I did.

Q Where was that recovered, detective?

A That was recovered in the front bedroom, recovered after I moved the bunkbeds. Was underneath the bunkbed.

Q You can sit down detective.

Subsequently, what did you do with that Ballistics evidence?

A I documented it. I packaged it then handed it over to police officer Dubrosky.

Q Who's police officer Dubrosky in this investigation?

A He was the safe guarding and vouchering officer.

Q You also mentioned Serology. What exactly would that entail?

A Serology is blood, saliva, DNA evidence.

Q And exactly what type of Serology did you recover at the scene?

A I recovered two blood samples from outside the front entrance to apartment 1B.

Q Again may the detective approach the map?
THE COURT: Yes.
Q Could you please tell us point out where you recovered the blood samples?
A Serology evidence is marked as F nine and F 10 just outside apartment 1B front entrance door.
Q Detective, do you have anyway to determine how old that blood was?
A No. Only thing I know it was dried, so was more than a couple of hours old.
Q What time did you arrive at the scene?
A I arrived two fifteen p.m.
Q You also mentioned that you had recovered a knife?
A Yes I did?
Q Where did you recover that knife?
A In the front bedroom of apartment 1B was marked as F four.
Q Did you come to learn whose knife that was?
A No, I didn't.
Q Detective, I would at this time I would like to discuss the police evidence again.
Aside from the cartridging and deformed bullets you recovered you said you recovered additional Ballistic Evidence?

A Yes, there was six cartridges in the location.
Q Where were those six cartridgings?
A Front bedroom on the shelf on the north wall of the front bedroom.
Q Had they been fired from a gun?
A No, they hadn't.
Q What caliber were they Detective?
A Twenty-two caliber those were.
MR. MARRONE: At this time with the Court's permission I would like to show you what's previously deem marked People's Exhibit four A through G, has been shown to defense counsel.
Thank you. Sergeant.
I thought they had been previously marked a through G. Ask detective to display them?
MR. SHEINBERG: I have no objection.
THE COURT: Okay.
Q Detective, do you recognize those pictures?
A Yes, I do.
Q What do recognize those to be?
A These are photos I took of the evidence of the front bedroom.
Q Is there any type of marking on them on the back of the photo?
A Yes they do.

Q Does it have the date of the crime scene?

A Yes, it's got Crime Scene Unit, got the run number that I respond, got the date, my name, what photo number was taken.

Q You're capable of identifying those photos?

A Yes.

MR. MARRONE: At this time People would ask what's previously marked People's Exhibit four for identification be moved into evidence collectively as People's Exhibit four?

THE COURT: Well I think we will mark them A four, A through G so we are able to --

MR. SHEINBERG: Defense has no objection to it going in.

MR. MARRONE: At this time may the witness approach the overhead projector. He may display them on the projector.

THE COURT: Let's mark them first. Why don't we have the detective sit here. You put them on one at a time. He will be able to explain it.

COURT OFFICER: These are received?

THE COURT: Yes four A through G in evidence. Identify the one that we are using.

MR. MARRONE: Going to be A, we are going to put them in order from A through G.

Q Looking at that picture could you please explain what that depicts?

A That's a close-up photo of the ballistic evidence. It's a four caliber discharged shell. It's got in the picture, it's got a number one. Also got a scale in the photo that depicts it as F one.

Q Detective, can you describe what photo B shows?

A This is a close-up photo of forty caliber discharged shells, also recovered in the front bedroom. It's got a number two, also got a scale stating that it's F two.

Q Using the number two can you describe where the cartridge is, please?

A Inside the front bedroom.

Q Using what you use as identifying the cartridge, could you please describe where the cartridge is in relationship to that number two?

A You will see the scale, scale's got an arrow on it. The arrow is pointing right to the cartridge. Excuse me, right to the discharged shell.

Q When you say a discharged shell that would be the shell casing?

A Yes, it is.

Q Thank you, sergeant.

If you can describe what is in People's Exhibit

number 3?

A This is a close-up photo of fort caliber discharged shells, also recovered in the front bedroom, got a scale stating F three. It's got a number three and the discharged shell is just above the scale where the arrow is pointing to.

Q That will be a shell casing?

A Yes.

Q Detective, you're now looking at People's Exhibit four, letter D. What is in that picture?

A This is a close-up photo of a folding knife recovered in the front bedroom. The knife blade was open. The knife blade was three inches long. It's also got a number four. It's got a scale which states it's F-four and the arrow is pointing towards it.

Q Detective, in the lower right hand portion of that photo what is that?

A You got, there's a black shoe and also got Alonzo Mack's sock, or foot.

Q So the foot is in close approximately of that shoe?

A Yes, it's right above the shoe.

Q Thank you, Detective.

What does that photo depict?

A This is a close-up photo of another forty caliber

discharged shell in the photo. It's got a scale which states that it's F-five. The arrow is pointing to the discharged shell. This shell was recovered after Alonzo Mack was moved. The shell was underneath.

Q That will be referred to also as a shell casing?

A Yes.

Q Looking at this photo, Detective, what does this depict at the crime scene?

A This is a view of other ballistic evidence that I recovered, was a deformed bullet that was recovered, when the bunkbeds was moved. It's got a number six in the photo. Also got a scale that states it's F-six and the arrow is pointing to the deformed bullets.

Q That would be right to the left of the number six correct?

A Yes, it is.

Q Again Detective, what does this picture of the crime scene depict?

A This is a close-up photo of the deformed bullet which was previously shown. It's got a number six in the photo, also got the scale F six and the arrow is pointing toward the deformed bullet.

MR. MARRONE: At this time also like to show the witness People's Exhibit number two already in evidence.

THE COURT: Let's open the lights please.

MR. MARRONE: It's going to be on the projector.

THE COURT: Never mind.

Q Detective, in People's Exhibit number two what does this photo depict?

A This is an overall photo of evidence that I recovered. This is the front bedroom. I was standing on the north wall of bedroom, facing south, shows Alonzo Mack's lower left torso. It's got evidence which is marked with a number one. That was a forty caliber discharged shell. It's got number two which is the forty caliber discharged shell. Number three, is a forty caliber discharged shell and number four is where the knife was recovered.

Q Detective, upon entering that bedroom where was Alonzo Mack's body in relation to the door of the bedroom?

A It was right in front of the door. His head was facing toward the north and his feet was facing toward the south east.

Q Okay, excuse now one moment Your Honor. Detective instead of using north and south when you walk in using left and right when you first walked into the bedroom can you again describe the positioning of the both, using left and right?

A When you first walk into the door his head was to

wse

the left and his feet was to the right.

Q Thank you Detective.

MR. MARRONE: If the witness may approach the scale of the apartment, please.

THE COURT: Yes.

Q Detective, using the diagram, can you describe again the placement of the body, please to clarify.

A This is the interior hallway but walk into the bedroom and his head was to the left and his feet was to the right as far as the diagram, north is facing up on this diagram.

Q Thank you Detective. Again JUST for time clarification the way you drew the body that is where you observed the body to be?

A Yes, it is.

MR. MARRONE: No further questions.

THE COURT: Counsel.

CROSS-EXAMINATION

BY MR. SHEINBERG:

Q Just to go back, when you talked about your qualifications as a crime scene officer you told us about responding to certain major crime scenes?

A Yes, I do.

Q Obviously, this is a major crime scene is that correct?

A Yes.
Q Homicide?
A Yes.
Q What time did you get there?
A Approximately 2:15 p.m.
Q When you got to the crime scene at the apartment 1B did you speak to any detectives or any police officers?
A Yes, there was detective there. I don't recall his name and was Police Officer Dubrosky was there.
Q Actually, you prepared a Crime Scene Unit report; is that correct?
A Yes, I do.
Q Tell the jury what a Crime Scene Unit report is?
A Crime Scene Unit report is everything I did at the location; evidence I recovered, the photos that I had taken, also got a smaller size of the sketch on it.
Q It also reflects what was told to you by the first officer at the scene and various witnesses; is that correct?
A Yes, I just get a, I do a preliminary investigation.
Q That preliminary investigation is rather important so you know where to take photos. Basically you know what happened?
A Yes.

Q And in this particular case did you prepare what they call I guess a Crime Scene Unit report?
A Yes I did.
Q When you prepared that who did you speak to aid you in preparing that?
A Was either the Detective or Police Officer Dubrosky.
Q But there were police officers you spoke to?
A Yes.
Q How about civilians?
A No.
Q You don't interview civilians. You get your information from police officers?
A Yes, I do.
Q In this particular case when you prepared the Crime Scene Unit report you actually, you have a summary is that right?
A Yes, I do.
Q That summary was given to you by detectives and police officer Dubrosky is that right?
A Yes, it was either one or the other.
Q Assists you in taking photographs and view the crime scene?
A Yes.
Q Did you receive information that and note the

information that a preliminary investigation revealed that two unknown males wearing masks entered above apartment?

A Yes, that was the preliminary investigation yes.

Q Two unknown males?

A Yes.

Q That the two unknown males produced fire arms and shot the victim multi times. You can review it, sure. Take a look at it.

A Yes, that's what it has.

Q That's your preliminary investigation which was given to you by detectives which was given to you by police officers, two people --?

MR. MARRONE: Objection.

THE COURT: Overruled.

Q That two people wearing masks came into the apartment shot the deceased; is that right?

A Yes but a preliminary investigation is before the full investigation is under way.

Q Of course. But that's right at the scene right when it's fresh in everybody's mind; is that right?

A Yes, I guess.

Q You guess it's right. April second, you went to the scene. April second you were the crime scene investigator. April second you did all this work?

A Yes, it is.

Q Fair to say after April second you really had nothing to do with this case?
A Yes.
Q That's correct?
A Yes, it is.
Q After you learned all that information you proceeded to I think you told us take photographs and collect evidence; is that correct?
A Yes.
Q Let's start with photographs. What did you photograph?
A I photographed exterior of 92 Woodruff.
Q Meaning out side?
A Yes. Just the front, the interior hallway of 92 Woodruff, and the apartment.
Q The interior hallway; meaning the lobby area?
A Yes.
Q And the apartment itself; is that correct?
A Yes.
Q And you took photographs. In your diagram you took photographs of this lobby area; is that correct?
A Yes I did.
Q I am pointing to the northern side of the entrance to the apartment so the record is clear; this area?
A What did you call it?

Q The lobby area?
A Yes.
Q That's the lobby area I have to where the record says where it is. It's north to the entrance of the apartment?
A Yes, it is.
Q You took pictures of the hallway of the apartment is that correct?
A Yes.
Q What did you take pictures; the floor, walls, things like that?
A I took a photo from the entrance door, one facing south. Then I went to the middle bedroom. I took one facing north.
Q Any lights in your photographs, any lighting?
A Yes, there was. I believe there was. See my photograph.
Q Take a look. That's the hallway? Tell us what you're looking at?
THE COURT: Don't tell us. Just look at it.
A Yes.
Q I meant for the exhibit. That one of your Exhibits?
THE COURT: That in evidence?
MR. SHEINBERG: No, it's not.

Q You have photographs of the lighting conditions of that area?
A Yes, I do.
Q How many lights were there?
A One, one overhead light.
Q When you say overhead ceiling fixture?
A Yes it had one bulb.
Q Nothing on the walls?
A No.
Q When you were in that apartment are there any windows in that hallway area?
A In the hallway area, no.
Q You also told us about Serology that you then found some blood, dried blood in the hallway in the lobby of the apartment building. Is that correct?
A Yes.
Q Where was that?
A That was just north of the front entrance to apartment 1B on the east wall.
Q So it was outside the apartment?
A Yes, it is.
Q You told us it was kind of dried?
A Yes, it was dry.
Q So you don't know if it was fresh blood or been there for a couple of hours?

A I don't know.
Q How big was the blood area?
A It was small, appeared to be two smudges.
Q Did you do anything with the Serology?
A Yes I did. I collected it.
Q What did you do with it?
A I handed it over to Police Officer Dubrosky.
Q For DNA testing fair to say?
A Yes.
Q You know the results of the DNA test; if you know?
A No I don't.
Q But it was sent to DNA testing with respect to the victim's blood?
A Restate that question?
Q I am sorry. Was it sent for DNA testing with respect to the victim's blood if you know?
A Yes, they just do DNA testing on it.
Q But you have no idea?
A They have the victim's blood.
Q How long were you at the apartment doing your particular crime-scene work?
A I was there from approximately 2:15 p.m. to approximately 6:15 p.m.
Q 6:15?

A Yes.

Q During this particular time your function was just to take photographs and collect evidence and draw that diagram?

A Yes.

Q And speak to the Officer at the scene?

A Yes.

MR. SHEINBERG: I have no other questions.

THE COURT: Anything else.

MR. MARRONE: Yes, Your Honor we.

MR. SHEINBERG: Judge can I have one more question?

THE COURT: Yes.

Q Detective, all of your work at the scene; photographs, diagram, and your interviews with various people. That's all noted in official police documents; is that correct?

A Who I interviewed I don't have down.

Q Okay. But in any of your crime scene report that's in your official police document?

A Crime scene report, yes.

MR. SHEINBERG: Thank you. I am sorry.

THE COURT: Yes, counsel redirect examination.

REDIRECT EXAMINATION

BY MR. MARRONE

Q Detective, can you take a look at the photographs you have in evidence please?

A That are in evidence?

Q The photo you have in evidence People's Exhibit number four?

A Okay.

Q I am sorry. I would like you to look at the additional photos, photo you have detective.

A All right.

Q Do you have one photo of the crime scene that you had taken that depicted --

THE COURT: Do you want to mark something. Mark it, mark it.

MR. SHEINBERG: You can mark it.

Q Detective, defense counsel asked you about a photograph of the lighting conditions.

Do you have that in your possession?

A Yes, I do.

MR. MARRONE: With the Court's permission that would be the photo People would like to have marked.

MR. SHEINBERG: What number?

THE COURT: People's Exhibit five.

THE COURT: Will be deemed People's Exhibit

five for identification.

Q Detective, do you recognize that photo?

A Yes, I do.

Q What is that a photo of?

A Of the interior front hallway of apartment 1B. This photo was taken from the front entrance door facing towards the middle bedroom.

Q Does that fairly and accurately represent what you just described?

A Yes, it does.

MR. MARRONE: People previously ask that be moved into evidence as People's Exhibit five.

MR. SHEINBERG: No objection.

THE COURT: People's Exhibit five in evidence.

MR. SHEINBERG: At this time I would ask that photo be People's Exhibit five be published to the jury please?

THE COURT: Publish it to the jury please.

(So published.)

Q Detective --

THE COURT: Hold on a second people are looking at it. Would you look at it two at a time please. Make it a little faster. Please continue.

Q Detective, in regard to People's Exhibit number five that a light on the ceiling in the hallway?
A Yes, it is.
Q That light provide enough lighting for you when you were at the scene with the door closed, if it was closed?
MR. MARRONE: I am going to object to that.
THE COURT: Sustained.
Q Could you describe it using that light?
A Yes, I can.
Q With respect to, with respect to the summary you had prepared, Do you have any idea where the information came from that states two unknown males with masks?
A I just got it from either Police Officer Dubrosky or Detective at the scene.
Q Do you know if it's accurate?
A No I don't know if it's accurate or not.
Q Did you yourself ever speak with Ms. Brenda Jones?
A No, I didn't.
Q Did you yourself ever speak with anyone who ever spoke with Brenda Jones?
A Not that I know of.
Q Regarding the blood that you mentioned earlier in the hallway --

A Yes.
Q Could that blood have been there a day?
A Yes, it could have.
Q Could it have been there a week?
A Yes, it could have.
Q Could it have been there a month?
A Yes, it could have.
Q Could have been there an hour or two hours?
A All depends how long it takes to dry.
Q What you're doing you're guessing how long that blood was there?
A Yes, all I know it was dry so it would have been there awhile.

RECROSS

Q I am going back to what you were asked by the District Attorney with respect to your crime scene unit report.
When you indicated on that report that two unknown males wearing masks entered the apartment you recollect that you have that report in front of you?
A Yes, I do.
Q You didn't make that up, obviously?
A No.
Q You must have received that information from official police personnel; is that correct?
A Yes, like I said it's a preliminary

investigation.

Q Which is fine. Those police personnel were at the scene prior to you arriving?

A Yes they were.

Q That police personnel was a Detective and uniform officer; is that right?

A Yes.

Q And the Detective as being police personnel did the investigation prior to you arriving; is that right?

A Yes, they did.

Q That investigation was communicated to you; isn't that correct?

A Yes, the preliminary investigation.

Q Whatever; the preliminary investigation was that you noted on your crime scene report you note it because someone told you, is that right?

A Yes.

Q You wouldn't put something down that wasn't true; is that correct?

A No I would put what I heard.

Q What you were told?

A Yes.

Q You wouldn't make that up?

MR. MARRONE: Objection.

THE COURT: Overruled.

Q Obviously, you wouldn't; is that right?
A Correct.
Q So what you put down on an official police document I assume that's an official police document you were told by police personnel who did an investigation?
A Yes who did a preliminary investigation.
Q Call it preliminary, call it whatever you want. You wouldn't put it down unless it was told by someone who did a preliminary or full investigation?
MR. MARRONE: Objection asked and answered.
THE COURT: Overruled.
Q Isn't that correct?
A Yes.
Q It's an official police document that you prepare is that right?
A Yes.
MR. SHEINBERG: No other questions.
THE COURT: Anything else?
MR. MARRONE: No, Your Honor.
THE COURT: You're excused.
THE COURT: We are going to take a short recess. Be back in a while. Do not discuss this case among yourselves. Do not come to a conclusion until all the evidence has been presented to you and I charge you on the law.

(jury exiting).

THE COURT: Can I get both sides up here please.

(Off the record.)

(the following Hearing was conducted outside the presence of the jury:)

DET. C H A R L E S P L A T T , after having first been duly sworn was examined and testified as follows:

THE COURT: Please give your name, shield, command?

THE WITNESS: Detective Charles Platt, 14104, Command is 70 Precinct Detective Squad.

THE COURT: You may inquire counsel.

DIRECT EXAMINATION

BY MR. MILLUS:

Q Detective Platte, how long have you been a member of the New York City Police Department?

A 25 years on Friday.

Q Where is your current assignment?

A 70 precinct, Detective squad.

Q In the 70, not just being a Detective but a police officer, how long have you been in the 70?

A Almost twenty-four years.

Q What areas does that cover?

A Flatbush section of Midwood.

Q Flatbush, does that include 92 Woodruff Avenue?
A Yes.
Q How long have you been a Detective in the 70?
A About seventeen years.
Q What is your title?
A Detective first grade.
Q Now detective, as you have been in the 70 for a long period twenty four years, are you familiar you're very familiar with the area of the 70, correct?
A Yes.
Q What about the people in the 70?
A I know a lot of them.
Q Why is that?
A I spent my entire career there most of the time up until the last two years. I have been a Detective assigned to the street more or less. I have a lot of contacts with the people who live there. I handle cases every day. If I don't meet them from driving around I meet them as victim of crime.
Q You consider yourself very hands-on Detective, you're out in the street a lot?
A Yes.
Q You know an individual named Glenn Cummins?
A Yes.
Q How long have you known Glen Cummins?

A Twelve, fifteen years.
Q How would you describe your relationship with Glenn?
A Cordial.
Q You see him often in the area within the 70?
A Yes.
Q How much would you say you see him?
A If it was a day I was out on the street I might see him three or four times a day, weekly, you know I will definitely see him weekly for years.
Q Would you have any interaction with him?
A Many times he stopped me on the street.
Q I am sorry. You said he stopped you?
A Yes if he seen me driving around with my partner. He also knew my partner. I had the same partner for twenty years. He would stop us. We will talk a lot of time. He will go out of his way to wave us down. We will stop, have a brief conversation with him. Our relationship was pretty cordial.
Q You're talking about a long time relationship correct?
A Yes.
Q Are you also familiar with the different types of gangs in that particular area?
A Yes.

Q What gangs are in that particular area?
A Predominantly either Crips, non-aligned or associates of Crips. There are some small areas of Bloods. But it's really a Blood Precinct.
Q But there are areas of Blood and definitely areas of Crips; is that correct?
A Yes.
Q From your knowledge of Glenn over the fourteen years to your personal knowledge that Mr. Cummins is a member of the Crips?
A Yes.
Q Tell me how do you know that?
A He has admitted to being a member of the Crips.
THE COURT: Admitted to who?
THE WITNESS: To myself and two others.
Q So you know that?
THE COURT: When were these admissions made?
THE WITNESS: I have many conversation over the years with Glen.
THE COURT: Not over the years. Give us approximate dates. I am talking about in April two thousand and three. Let's use that as when the incident occurred, prior to that period of time, give us an approximate time as to when you were told by the defendant that he was a member

of a gang.

THE WITNESS: Just in the days prior to April second, '03 when this occurred the defendant Cummins was stabbed in a street fight outside a club at Church Avenue and Flatbush. I had a conversation in the days between that stabbing when this incident occurred where he had described how the stabbing had occurred.

THE COURT: Did he discuss his GANG affiliation at that time?

THE WITNESS: You know Your Honor I don't know if I had discussed gang affiliation on that particular day.

THE COURT: When prior to that?

THE WITNESS: Approximately? I had some contact with the defendant in this case.

THE COURT: Did it come up dozens of times during the year 2003 or years prior, or did it come up once?

THE WITNESS: I will say multi times in the years from you know when he was young?

THE COURT: When you say young.

THE WITNESS: I have known him since he was probably twelve to fourteen years old.

THE COURT: I am talking around the time of

the incident.

THE WITNESS: I can't give a specific conversation, a date. There was many transactions between us in the year prior to this incident, many times that I spoke with him within a year or two prior to this incident.

THE COURT: Did you ever observe him with gang colors. First, do the Crips have gang colors?

THE WITNESS: They wear blue mostly, some black. Those are common colors so you can't say.

THE COURT: Please continue.

Q Detective, when was the first time you knew, you said your relationship since twelve fourteen years old that Glen Cummins to your knowledge was part of this gang?

A I guess it had to be in his early twenties.

Q Early twenties. Correct to say that the defendant is thirty-one now approximately?

MR. SHEINBERG: Thirty.

Q Approximately thirty?

A I will say, yes.

Q During that period of time more than eight years over the years that you have known him to be a member of the Crips?

A I would say five or six. Five I would be

comfortable with.
Q So for five years you have known he has been a member of Crips?
A Yes.
Q You know an individual by the name of Alonzo Mack?
A Yes.
Q How do you know that individual?
A Also from the neighborhood. I had arrested him when he was younger, was someone I knew on the street. He hung out in an area, little bit different but close by where the defendant Mr. Cummins was known to hang out.
Q That's in the vicinity of the 70 where you're very familiar?
A Yes, only talking separation of two or three blocks.
Q Do you know if Alonzo Mack was a member of any gang?
A Yes, he was a member of the Bloods.
Q How did you know that?
A From department records, police department records and from New York City Corrections Department records. They identified him as a member of Blood.
Q The relationship between you said Alonzo Mack was member of the Bloods. Glenn was a member of the Crips. Can
wse

you describe the relationship between those two different gangs, Bloods versus Crips. How would you describe that?

MR. SHEINBERG: Objection.

THE COURT: There is no jury here.

MR. SHEINBERG: I am withdrawing the objection for the record.

THE COURT: You can answer.

A They were hostile.

Q Do you have personal knowledge that Alonzo Mack was a member of the Bloods?

A My personal knowledge is from defendant's department of records that I read. I hadn't had a conversation with Alonzo Mack in quite some time.

Q But you have had dealings in the 70. He has been identified in the 70 precinct identified as member of the Bloods?

MR. SHEINBERG: Objection. That's not what he said.

Q I will withdraw. Has he been identified, Alonzo Mack through the 70 precinct as member of the Bloods?

A Yes.

MS. MILLUS: I have nothing further?

MR. SHEINBERG: Cross-examination.

CROSS-EXAMINATION

BY MR. SHEINBERG:

Q That record that you reviewed with respect to Alonzo Mack, I will rephrase the question.
You told us that you have reviewed departmental records and New York Correction records with respect to Alonzo Mack?
A That's correct.
Q That's the way that you determine he was a member of a Blood Gang; is that right?
A Also from people in the neighborhood.
Q But you never spoke to Alonzo Mack who told you he was a member of Bloods?
A I never personally spoke to Alonzo Mack.
MR. SHEINBERG: I have no further questions.
MS. MILLUS: Just one more.

REDIRECT EXAMINATION

BY MS. MILLUS

Q Detective, you said about the relationship between the Bloods and Crips do you have any personal knowledge of the relationship between the defendant Glenn Cummins and Alonzo Mack?
A Yes.
Q How would you describe that relationship?
A Was my understanding they were at war.
MR. SHEINBERG: Objection.
THE COURT: When you say at war what do you

mean by that.

MR. SHEINBERG: Understanding? I think we should have direct testimony, not understanding.

MS. MILLUS: I am going to ask him to explain what he meant by war.

A There were a series of shootings that occurred in 2002 in the 70 precinct in the area where the defendant hung around and where Alonzo Mack hung around. These shootings there was a number of them culminated in some arrests which seemed to calm things down for a period of time.

A trial occurred in Supreme Court here in the winter of 2003 in which a defendant was acquitted of any charges and they were let out of jail.

Based on that acquittal we learned that the war that had gone on in 2002 was starting up again. We learned that basically in April of '03, March 2003 area we were told by sources on the street, informants that the war that occurred last year was going to start up again.

THE COURT: Who was the war between?

THE WITNESS: Between Alonzo Mack his Bloods friends, friends associated with him who were dealing drugs in the vicinity of Woodruff Avenue and Ocean Avenue and the defendant Glen Cummins and his associates who stayed in the area of Throop Avenue and St. Paul's Place.

THE COURT: Who was the individual acquitted on trial?

THE WITNESS: Dwayne Smith I believe was his name.

THE COURT: Yes, counsel?

MS. MILLUS: Nothing further.

THE COURT: Counsel?

RECROSS-EXAMINATION

BY MR. SHEINBERG:

Q You talked about this war between the Bloods and the Crips. This was told to you by people on the street?

A Yes debriefings and informants that various detectives have.

Q Was anything said to you about the relationship between Mr. Cummins and Mr. Alonzo Mack?

A Well, it was understood.

Q No. Was anything said to you forgetting understood?

A Their names were mentioned prominently, yes.

Q Their names were mentioned, yes, but no one told you that they were at war; Mack and Cummins; is that correct?

A No --

Q Yes or no, simple question?

A Yes.

Q Who?
A People on the street were telling us that they were both leaders of their different factions, was more or less understood if these two groups were going to war they were going to be prominently involved in it.
Q Detective, you said it was understood. Did anyone tell you specifically, defendant Glenn Cummins and defendant Alonzo Mack were at war with each other. That's really easy to answer?
A You can't give a yes or no answer because both were known to be leaders of their groups. Their groups were going to be at war. You take for granted they were going to be.
Q You keep saying leaders of their groups, take for granted. You're a Detective. Can you determine whether or not they were at war with each other; Mr. Cummins and Mr. Alonzo Mack. You don't know that do you?
A I just know their separate groups were.
Q Okay. But you don't know if these two individuals were at war with each other; isn't that correct?
A It's not correct, counselor. Because if they are both leaders of their groups and if their groups are going to be at war with each other, of course they are not going to stand on the side lines and watch their friends get involved in stuff.

wse

Q You're guessing?
A It's twenty five years of experience. I think I can make a pretty good educated guess.
Q Educated guess?
A Yes.
Q Do you have any reports or memorandums with respect to this war?
A I would not.
Q Why wouldn't you?
A The people who are speaking to us giving this information they are basically -- lot of it is done on debriefings. People get arrested. We speak to them in confidential manner. We don't take notes down.
Q You take no notes down?
A Very rarely.
Q You are telling us you have no police notes, any memorandum, any, regarding this war, any affiliation between the Crips and Bloods or between Alonzo Mack and Cummins?
A There might be Police Department records.
Q I am talking about you?
A Did I fill out any notes, No, I did not.
Q What you're testifying to is what you hear on the street, what you make educated guesses about fair to say?
A Yes.
MR. SHEINBERG: Judge, I have no further

questions.

THE COURT: You're excused sir. For the District Attorney, what evidence do you expect to introduce and why and how so forth; what are you looking to do? Who's going to be testifying as to what specifically?

MS. MILLUS: Then I ask to approach?

THE COURT: No, no, this is going on the record. I don't care about the individual people who will be testifying. But what are you seeking to introduce?

MS. MILLUS: I am seeking to introduce that part of this murder wasn't a random act. He didn't go in there AND just kill the victim. That was a long standing battle. I would expect it's going to come out in testimony when the judge rules on it, when that witness takes the stand about this. There is going to be evidence this was a long standing feud. Part of that feud is because the defendant is a member of the Crips and victim is a member of the Bloods.

This is going to take place months prior to this. This didn't just happen on that date. The motive behind is these two individuals are victim and defendant did not like each other.

THE COURT: You want to be able to show motive and background information to complete the narrative?

MS. MILLUS: Correct.

THE COURT: What we are going to do. Let's bring the jury in. I am going to let the jury go out to lunch, continue the conversation when they go out to lunch.

(jurors present)

THE COURT: All jurors being present both sides waive reading of the roll call?

MS. MILLUS: So waive.

MR. SHEINBERG: Yes.

THE COURT: Your going to break for lunch. Please be back 2:30. Do not discuss the case among yourselves. Do not draw any conclusions until you have heard all the evidence and at the end of the case I charge you on the law.

(jury exiting).

THE COURT: Could both sides approach?

THE COURT: Off the record.

(Off the record.)

THE COURT: Counsel, you wanted to say something, some argument.

MR. SHEINBERG: Argument that I have I think

you basically alleviated my concerns is that the only questioning they will ask of the detective is whether he knows my client. He does know him many years. He will testify to that. Whether my client ever told him he is a member of a gang which is fine. That's as far as it goes. They are not going to ask him what he testified to today out of the presence of jury regarding wars?

THE COURT: No, I am not going to permit that second thing. He is also going to testify about the deceased that he was a member?

MS. MILLUS: That's correct.

MR. SHEINBERG: That's a different situation. He doesn't know that. He knows that only from records that he reviewed. He doesn't know that from any personal knowledge. I think his testimony is quite clear. He doesn't know Alonzo Mack. He has never been told by Alonzo Mack that he is a member of any gang. He has reviewed various police records which is fine. I don't think he can testify to Mack's affiliation with any kind of gang.

MS. MILLUS: I know what the Detective told you. He doesn't know personally. But he has been a Detective in that 70th Precinct

twenty-five years collectively. With all his investigation through his fellow police officers and fellow Detectives reviewing records. He has information telling that he is a member of Bloods. I don't see prejudice to the defendant. I am going to ask that he testify to the fact that he has knowledge he is a member of Bloods gang.

THE COURT: Want to come up.

(Off the record.)

THE COURT: I am going to grant the defendant's application that the detective will not be permitted to indicate the gang's affiliation of the deceased okay?

And we are going to limit the D.A. will be permitted to elicit testimony the defendant was a member of the Crips and testimony is highly irrelevant to show motive and/or back ground information to complete the narrative.

MR. SHEINBERG: I have no objection to that.

THE COURT: He is not to go into the war, all that other testimony that came forth. What I will do is permit you to lead the witness so that we don't get a response that that opens the door to some of these other things; any objection?

MR. SHEINBERG: No. The leading is fine. I think the detective knows what to say.

THE COURT: And the officer is not permitted to testify about any other bad acts with reference to this defendant.

MS. MILLUS: Understood. So I am clear he can testify that IN his back ground in the 70 that he HAS known this person many years.

THE COURT: Right. 2:30 folks.

(Whereupon, a luncheon recess was taken at this time after which court reporter Jacqueline Arce continued).)

A F T E R N O O N S E S S I O N

THE CLERK: Case on trial continued, People vs. Glen Cummins, Indictment number 3066-04. All parties are present. Defendant is present.

THE COURT: Bring the jury in please.

THE COURT OFFICER: Jury entering.

(Whereupon, the jury enters and is seated.)

THE COURT: Counsel waive the reading of the roll?

MR. MARRONE: Yes, your Honor.

MR. SHEINBERG: Waived by defense.

THE COURT: Good afternoon.

Please call your next witness.

MS. MILLUS: The People call Sergeant Frank Guarino to the stand.

THE CLERK: State your name, shield and command for the record.

THE WITNESS: Sergeant Frank Guarino, shield 0275, assigned to Brooklyn Gang Squad.

THE COURT: You may inquire.

MS. MILLUS: Thank you.

DIRECT EXAMINATION

BY MS. MILLUS:

Q Good afternoon, Sergeant.

A Good afternoon.

Q How long have you been a member of the Brooklyn Gang Squad?

A I been there six years.

Q And in what capacity?

A As a sergeant.

Q And prior to being a sergeant, what was your title?

A I was a police officer.

Q And so in total how long have you been a member of the New York City Police Department.

A Fourteen years.

Q And I would like to direct your attention to April 2nd of 2003, approximately 6 a.m., were you working on that date and time.

A Yes, I was.

Q And where were you at approximately that date and time?

A I was at 92 Woodruff Avenue in the 70th Precinct.

Q And do you remember what apartment number?

A Apartment 1B.

Q And what county is that in?

A Kings county.

Q And what were you doing there?

A We were executing a search warrant at that location.
Q And who was the subject of that search warrant?
A It was a male named "Harvey."
Q And what happened when you arrived at the location of 92 Woodruff Avenue?
A When we arrived there the emergency service team, the team that executed the warrant for us was going into the location.
When they went inside the location I stayed at the front door. They said there was a male inside the hallway knocking on the door, they put that male down on the ground and moved him forward to me and I secured that male outside the building in front of the door.
Q That male, did you have a conversation with him?
A Yes, I did.
Q And had you known him prior to that day?
A No.
Q And did you later learn his name?
A Yes, I did.
Q Who was the male?
A Alonzo Mack.
Q And did you search Mr. Mack at that time?

A Yes, I did.

Q Did you recover anything from Mr. Mack?

A No.

Q Now did you have a conversation with Mr. Mack at that time?

A Yes, I did.

Q And what was the substance of that conversation?

MR. SHEINBERG: Objection.

THE COURT: Sustained.

Q When you did you learn whether Mr. --

MR. SHEINBERG: Objection.

THE COURT: I didn't hear the question.

Q Did you learn whether Mr. Mack lived at that location?

A Yes.

Q Okay, and did he live at that location?

A He told me that he stays at that location.

He had nowhere to stay, he sleeps there and they let him stay there.

Q And did you place Mr. Mack under arrest at that time?

A No.

Q What did you do, do you know where Mr. Mack went?

A We told him he would have to leave the location until we were finished executing the search warrant.

He told us he was going to wait across the street, he had nowhere else to go and we said that would be okay.

Q Did you see him across the street?

A Yes, I did.

Q After your conversation with Mr. Mack, did you go back into the apartment 1B and execute that search warrant?

A Yes, I did.

Q And did you recover any property in relation to that search warrant?

A Yes, we recovered a nine millimeter handgun with some ammunition inside the location.

Q Where was that recovered from?

A The first bedroom on the left hand side.

Q And did you arrest anyone at that time?

A Yes, we did.

Q And who was that?

A We arrested two individuals Horace Jones and I think Lamar Jones.

Q Would that be, is the first name "Lavar?"

A "Lavar," I am sorry.

Q And they lived in that location?
A Yes, they did.
Q Can you describe when you entered the location, the apartment 1B, can you describe the location how you entered it?
A I go in the front door, you stay to the left going down the hallway and there was an apartment door on the left hand side which was the target location.
Q Okay, talking about when you entered the actual apartment door, 1B, describe what the location looked like inside of that?
A As soon as you go in the door, it was a long hallway. I believe there was a bathroom, a bedroom and then there was a kitchen and like another room, a converted room and then another bedroom in the back.
Q You said there is another room, you called that a converted room, what do you mean by that?
A It looked like it was supposed to be a living room, it had a bed in there, a couch bed, I think one of the children might have been sleeping in that room.
Q And the gun you recovered, where was that recovered from?
A In the first bedroom on the left hand side.
Q And that hallway, can you describe what the lighting conditions are like in that hallway?

A There was one light overhead that was working and it was on.

Q Now, Sergeant, after executing that search warrant or actually -- Withdrawn.

During the time that you were executing the search warrant, did you have an opportunity to go in and outside of the apartment, meaning outside of 92 Woodruff?

A Yes, I did.

Q And did you see Alonzo Mack outside that location?

A Yes, I did.

Q And where did you see him?

A Right where he said he would be, right across on the sidewalk standing there waiting for us to finish.

Q Approximately how long did that take you to execute that search warrant?

A It was probably an hour or so.

Q After executing the search warrant you left 92 Woodruff, did you have an opportunity to see Alonzo Mack again?

A Yes, I had a conversation with him.

Q Okay, and do you know after you had that conversation with him where Alonzo Mack went?

A Yes, he went into the apartment.

Q And when you say he went into the apartment, what do you mean?

A He went into the building after we told him we were done, he can go into the building.

He went into the building, I believe the mother or the father of the building was at the door in the hallway. He went with them and went into the building.

Q And prior to once you were trying to determine who Alonzo Mack was, did you have a conversation with the mother and father?

A Yes, I did.

Q And did they inform you that he could come into the apartment?

MR. SHEINBERG: Objection.

THE COURT: Sustained.

Q Did they, you had a conversation with them about Alonzo Mack, right?

A Yes.

Q And then you said after you executed the search warrant you saw Alonzo Mack go inside with the parents into 92 Woodruff?

A Yes.

MS. MILLUS: I would like to show you, with the Court's permission show the sergeant

People's Number One in evidence.

THE COURT: Yes.

THE COURT OFFICER: (Handing)

Q Sergeant, I just want you to look at what has been marked in evidence as People's number one, do you recognize that?

A Yes, I do.

Q And what is that?

A This is a layout to the hallway of the apartment in the target location.

Q I want you to show us and you can use your finger and point, how did you enter the apartment 1B?

A Came down the hallway through this door here and executed our search warrant, entered through this door here and we came into the apartment and we searched the entire apartment.

Q Where it says apartment 1B on that diagram, although it doesn't show there is a door there, is that correct?

A Yes, it would be the front door to the apartment.

Q And then you said you walked down the hallway and can you use your finger to trace that and where do you walk to?

A We come into the apartment, secure the

apartment because there are people inside the apartment and then we start our search and our search started from this room and we worked our way back in this room. (Indicating)

Q Meaning you start from the bathroom and work your way down?

A Yes.

Q And you said that you recovered a gun, nine millimeter, is that correct?

A That's correct.

Q And that was from where you pointed on the diagram?

A From this bedroom, somewhere in this area on top of a book case or some type of shelving. (Indicating)

Q On the diagram that would be the first bedroom on the left hand side?

A Yes, it would be.

Q And notice on the diagram top, below that room there is something that is labeled "middle bedroom?"

A Yes.

Q And that middle bedroom, is that what you referred to before as the room which looked like it was converted from a living space to a bedroom?

A This room, it appeared to be that this was a

living room but they had a couch bed and somebody was sleeping on it.

Q That is designated on that diagram as "middle bedroom?"

A Yes.

MR. SHEINBERG: Okay, you may have a seat and now I will ask if the witness can be shown what is in evidence as People's Number Five?

THE COURT OFFICER: (Handing)

Q Sergeant, you have been shown People's Number Five in evidence, I want to know, do you recognize that?

A Yes, I do.

Q And what do you recognize that to be?

A The hallway of the apartment.

Q And when you say the hallway of the apartment, you are referring to the hallway of the apartment of 1B at 92 Woodruff?

A Yes, I am.

Q And now, Detective, did you come to learn after the execution of the search warrant, sometime after that that there was a homicide at 92 Woodruff Avenue, apartment the 1B.

A Yes, I did.

Q And have you subsequently seen a photo of the victim of that homicide?

A Yes, I did.

Q And did you recognize that photo?

A Yes, I did.

Q And who was that photo of?

A Alonzo Mack.

Q And when you say "Alonzo Mack," is that the same person you referred to earlier as the person you saw when you entered that apartment for the search warrant and who later you let go back into apartment 1B?

A Yes, that is the same person.

MR. MARRONE: Thank you, I have no questions.

MR. SHEINBERG: No questions.

THE COURT: Thank you, you are excused.

(Whereupon, the witness is excused.)

THE COURT: Call your next witness.

MS. MILLUS: May we approach?

THE COURT: Yes.

(Whereupon, a sidebar discussion was held off the record.)

THE COURT: We are going to take a short recess. Do not discuss the case among yourselves or with anyone else and we will have you back shortly.

(Whereupon, the jury is excused)

(Pause in proceeding)

THE COURT: Bring the jury in please.

THE COURT OFFICER: Jury entering.

(Whereupon, the jury enters and is seated.)

THE COURT: All jurors are present, counsel waive the reading of the roll?

MR. SHEINBERG: So waived by defense.

MR. MARRONE: So waived.

THE COURT: Please call your next witness.

MR. MARRONE: Your Honor, at this time the People call Detective Robert Freese.

R O B E R T F R E E S E, called as a witness by the People, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please have a seat and state your name, shield and command for the record.

THE WITNESS: My name is Robert Freese, F-R-E-E-S-E.

I am retired from the Firearms Analysis Section which is part of the police department laboratory.

THE COURT: There is some water there in case you would like some.

THE WITNESS: Thank you, your Honor.

THE COURT: You may inquire.

MR. MARRONE: Thank you.

DIRECT EXAMINATION

BY MR. MARRONE:

Q How long had you formally been a member of the New York City Police Department?

A For twenty years.

Q And how long had you been a detective?

A Fifteen years.

Q And how long had you been a detective in the Firearm Analysis Unit?

A I was assigned to the firearm analysis section for seven years.

Q And what exactly was your assignment in the Firearms Analysis Unit?

A When I retired I was assigned as a microscopic examiner or microscopist.

Q And what are the duties and responsibilities of a microscopic examiner?

A Our primary duty is actually classifying ballistic evidence received from crime scenes such as bullets, bullet fragments and cartridge casings, classifying that evidence and doing comparisons of the evidence, trying to establish how many firearms were used at a particular crime scene or in cases if we have

a firearm, we try to determine if that firearm was the one used in the crime.

Q Approximately how many firearms have you tested?

A During my time in the unit I personally tested more than 1,500 firearm casings and I worked on thousands of other cases with other examiners.

Q And how many microscopic cases have you been involved in?

A I personally been assigned more than a thousand cases and we technically review each other's case work.

Another examiner will actually review your case after you are finished and I did thousands of technical reviews also.

Q And what training did you receive in ballistics or have you received?

A When I was initially assigned to the unit I received about a week of classroom orientation where I was taught about the different types of firearms and ammunition that I would be working on and testing in the unit.

I was also trained on the different types of tests that I would be conducting.

At the completion of the week's orientation,

each day I was teamed with a senior firearm examiner and I worked along side this examiner while he taught me about the different types of weapons he was testing, the tests he was conducting regarding microscopic examination.

My training started with about eight months of classroom training and training with a consultant hired by the police department to actually train a number of us in microscopic examination and that training included doing comparisons, working on mock cases and at the completion of the training being competent tested.

Q Detective, what is the difference between a semi automatic and revolver?

A Your primary difference between a semi-automatic and revolver is that in a semi-automatic, one, when the gun is fired the cartridge casings actually eject from the gun or leave the firearm.

In a revolver the cartridge casing will remain in the gun and have to be manually ejected by the shooter or another person later on.

Q What is a shell casing or cartridge casing?

A A cartridge casing or shell casing, two different terms meaning the same thing. It is part of ammunition for a firearm and ammunition for a firearm, a handgun, consists of four components.

You have a cartridge casing which holds the other three components. You have gun powder inside of the cartridge casing. You have a bullet that is seated in the mouth of the cartridge casing.

The bullet is the actual projectile, that is what comes out of the barrel of the gun and you have something called a primer at the base of the cartridge casing and a primer is made up of an explosive material which it is crushed.

When a firing pin of a gun crushes that primer, it creates a spark. The spark ignites the gun powder. The gun powder burning rapidly and that is what pushes the bullet out of the barrel of the gun.

Q In the case of a semi automatic, the shell casings are ejected from the gun when it is being fired.

A Yes.

Q And based on your expertise, where would shell casings be ejected when a semi automatic is fired?

MR. SHEINBERG: Objection.

THE COURT: Objection sustained at this point.

He has to be qualified.

MR. MARRONE: Your Honor, based on the witness's expertise, I would ask that he be qualified as an expert in handguns through his

training.

THE COURT: So noted.

MR. MARRONE: Thank you, your Honor.

Q Based on your expertise, where would a shell casing be ejected when a semi-automatic is fired?

A Most semi-automatic pistols will eject cartridge casing to the right and to the rear, the majority of semi-automatics.

Q Detective, Mr. Freese, you had earlier mentioned microscopic comparisons, what is it exactly you are looking for when you perform a microscopic comparison?

A When a gun is manufactured, the tools that are used in the manufacturing process that actually cut and grind and polish the metal of the firearm, they leave behind imperfections in the metal of the gun.

Each gun is left with its own pattern, unique pattern or marking inside the metal of the gun.

When a gun is discharged and a bullet passes through the barrel, the bullet will actually pick up these patterns, these unique patterns unique to one gun and only one gun.

When the firing pin strikes the primer, part of the ammunition, the firing pin will leave markings that are unique to that gun.

When I do a microscopic analysis, what I do, I use an instrument called a comparison microscope, it is actually two microscopes that are optically bridged together with one eye piece and that allows me to look at two pieces of evidence at the same time.

I can take one piece of evidence from the scene and put it on one side of the microscope. I can put a second piece on the other side and look at the two pieces at the same time and I can compare these individual characteristics or these markings that have been transferred from the firearm to the ammunition or to the bullets and the casings and see if they are the same.

Q Mr. Freese, based on your expertise, have you ever seen two guns that have identical markings?

A No.

Q Mr. Freese, I would like to direct you to a report, a firearms analysis report that is marked FAS number 03-2242?

A Yes.

Q Are you familiar with that?

A Yes.

Q And what is that, sir?

A It is a firearm analysis section case that I was the primary detective working on.

Q And what analysis did you do on that case?

A I compared four cartridge casings, four caliber cartridge casings and I compared a total of five bullets.

Q And are you aware where those cartridge casings came from?

A Yes, I believe they were related to Alonzo Mack's homicide.

Q And the bullets, where did those come from?

A Four of those bullets came from the Medical Examiners Office and one of them came from the scene, the crime scene.

Q And the bullets that you examined, could you tell if they were fired from the same gun?

A Yes.

Q And were they fired from the same gun?

A Yes, the four from the morgue and the one from the crime scene all had the same characteristics or the same markings and they were fired from one gun, in my opinion.

Q And in regard to the casings that you examined, was it possible for you to determine if they were fired from the same gun?

A Yes.

Q And were they, in fact, fired from the same

gun?

A Yes.

Q And could you determine what type of gun they were fired from?

A I did not determine that at that time, no, only that it is a 40 caliber gun, 40 caliber.

Q Detective, were you aware of the voucher numbers regarding the shell casings?

A If I can look at my notes.

THE COURT: Sure.

MR. MARRONE: With the court's permission.

A Yes.

Q What is the voucher number for the shell casings?

A The four shell casings, cartridge casings, L785388.

Q And what would be the voucher number for the bullet from the crime scene?

A The bullet from the crime scene was the same voucher number.

Q And the bullets from the morgue?

A The bullets from the morgue were L740362.

Q And you previously said that those bullets were fired from a 40 millimeter?

A A 40 caliber.

Q Forty caliber, I am sorry.

Would it be possible to fire those bullets from a nine millimeter?

A No.

Q Why is that?

A The diameter of 40 caliber is larger than the diameter of a nine-millimeter, the bullet wouldn't fit through the barrel.

MR. MARRONE: No further questions.

THE COURT: Any questions?

MR. SHEINBERG: No questions.

THE COURT: You are excused, sir.

(Whereupon, the witness is excused.)

THE COURT: Call your next witness.

MS. MILLUS: People call Detective Charles Platt.

THE COURT: Ladies and gentlemen, I think that probably, I always say, "Man plans and God smiles."

I expect we will probably be finished tomorrow on this case if everything goes the way it is supposed to go, sometimes it just isn't perfect.

If that occurs, you will not be coming in on Friday, you will be coming in on Monday morning and we will have summations and charge and you go

into your deliberations.

As I see it now that is probably what is going to happen but as I said, we will find out tomorrow. I would like to share those things with you so you get an idea.

All right, the witness is here.

C H A R L E S P L A T T , called as a witness by the People, having been first duly sworn, was examined and testified as follows:

THE CLERK: State your name, shield and command for the record.

THE WITNESS: Detective Charles Platt. My shield number is 1404, my command is the 70th Precinct Detectives Squad.

THE COURT: There will be some water there for you.

THE WITNESS: Thank you, your Honor.

THE COURT: You may inquire.

DIRECT EXAMINATION

BY MS. MILLUS:

Q Good afternoon, Detective.

A Good afternoon.

Q How long have you been a member of the New York City Police Department?

A It will be 25 years on Friday.
Q And in what precinct have you served your time in the police department?
A Of the 24 years, approximately 24 in the 70th Precinct.
Q And what is your current assignment?
A I am with the detectives squad, I am an investigator.
Q And what is your title?
A Detective, I am a first grade, most senior.
Q And how long have you been a detective with the 70th Precinct?
A I been a detective in the lower ranks for seventeen years and prior to that I was an investigator, white shield.
Prior to that I was an Anti-Crime cop and narcotics investigator in the 70 and spent two years in uniform.
Q And let me ask you this, what area does the 70th Precinct encompass in Brooklyn?
A The area of Flatbush and Midwood.
Q And does that encompass 92 Woodruff Avenue?
A Yes.
Q That would be in Flatbush?
A Yes.

Q And what are your duties and responsibilities as a detective?

A My current assignment is I investigate all serious shootings, homicides and all old, cold case homicides that have occurred in the past years.

Q And do you spend a lot of time on the street of the 70th Precinct, by that I mean you are out investigating and you are outside a lot in the confines of the 70th Precinct?

A Up until about two years ago I probably spent about eighty percent of my time on the street. I dress down, dungarees only.

The last two years I have been required to wear a suit in my investigation.

Q Do you know an individual by the name of "Glen Cummins?"

A Yes.

Q And how do you know Glen Cummins?

A I know him from the neighborhood he grew up in, he lives in Flatbush.

He was someone who I would pass on the street frequently who I got to know.

Q And how long have you known him?

A Approximately fifteen years.

Q And when you say you saw him a lot, how often

would you say you seen him outside, out on the street, out in the neighborhood?

A I would say almost everyday.

Q And would you have conversations when you saw him.

A Yes, we got to know each other, it got to a point where if he saw me he would walk into the street and stop my car and say "hello."

The conversations were never long, just short brief conversations. They went on for many years.

Q In other words, when you saw him, was it fair to say when you saw him you would always have some type of conversation with him, say hello?

A Yes.

Q The person you called Glen Cummins, do you see him in the courtroom today?

A Yes.

Q Can you please point to him and name an article of clothing he is wearing?

A Sitting over there in the green khaki suit. (Indicating)

THE COURT: Indicating the defendant.

Q Let me ask you, you said that you are very familiar with the area.

Do you know an individual by the name of

Derrick Ulett?

A I know of him, I never personally had a conversation with him although I do know his older brother, Adonis Ulett.

Q And Adonis Ulett, do you know, you said you know him, is that correct?

A I had conversations with Adonis Ulett.

Q Do you know if he has any relationship to the defendant?

A He is a close associate with the defendant.

Q And what about an individual by the name of Curlain Charles?

A Yes, I had conversations with Curlain Charles also.

Q Do you know if he has any relationship with the defendant?

A I believe he is also a close associate of the defendant.

Q And do you know if Curlain Charles has a nickname that you know?

A Yes, "Lucky."

Q And what about an individual by the name of Abdul Mohammed, do you know him.

A Yes, I do.

Q And do you know if he has any relationship

with the defendant?

A Yes, he also grew up with him and is a close associate.

Q You said that you have known the defendant for a long period of time, correct?

A Yes.

Q And do you know if he is member of any gang?

A Yes.

Q And what member, what gang do you know him to be a member of?

A The Crips.

Q I would like to direct your attention to April 2nd, 2003 at approximately 11:30 a.m., were you working on that day in time.

A Yes, I was.

Q And did you prior to 11:30, a half hour, 11 o'clock say, did you receive any radio communication at that time?

A I didn't receive a radio communication, I received a telephone call from my lieutenant, my squad commander, he informed me that there was a shooting at 92 Woodruff Avenue.

He requested that I respond to it.

Q When you received that call, where exactly were you?

A I was in the dean's office at Edward R. Murrow High School down on Avenue L and East 16th Street.

Q And if you know, how far is Edward R. Murrow High School to 92 Woodruff Avenue?

A About two miles.

Q And when you received that phone call, did you immediately leave that location Murrow High School to 92 Woodruff?

A I didn't just drop and leave, I told the dean I had something I had to handle more important than what I was doing right there and within a minute or two I left.

Q And so then how did you get from Murrow High School to 92 Woodruff?

A I drove in an unmarked car with lights and sirens.

Q And on the way to 92 Woodruff did you see anyone at that time?

A As I approached Woodruff Avenue I saw a group of males turn the corner on Woodruff Avenue heading south on St. Pauls Place.

I was coming north on St. Pauls Place and I saw four or five males, one I recognized to be the defendant.

Q And when you saw the defendant, did you have

any type of conversation with him?

A No, he didn't stop me, he did not wave which I was more accustomed to and I was busy myself and I made the turn on to Woodruff Avenue.

I guess he continued south away from where I was going.

Q But you said, did you find that, you said you found that a little odd?

MR. SHEINBERG: Objection.

THE COURT: Sustained.

Q Well, when you saw him he didn't stop you like he previously had stopped you on other occasions, is that correct?

A That's correct.

Q Now tell me where you saw, where you saw the defendant, where he was, how far was that in relation to 92 Woodruff where you were on your way to?

A I guess a half a block, two or three hundred feet.

Q And do you remember when you saw the defendant what he was wearing?

A I believe it was a gray hooded sweat shirt.

Q And from approximately, you said approximately when you received the call, from the time you received the call originally at Murrow High School to go to the

location to the time you actually saw the defendant, how much time had elapsed?

A I would say approximately 25 minutes.

From the time that the first call was made, from the time that I received the call from my lieutenant, probably would have been maybe five, seven minutes.

Q And but when you first received the call, could you just tell me what time was it that you approximately received the call?

A I am going to say about 11:25 to 11:30 I received a call from my lieutenant.

Q That is when you actually received the call, okay, and from that point, so say 11:25, 11:30, how long, how much time passed to the time you actually see Glen Cummins?

A Maybe another five or seven minutes, five to ten the most.

Q And the call that you received is not a radio transmission, is that correct?

A No, it is a call on a cell phone.

Q From a superior?

A Yes.

Q Now I have to ask you, if I asked you already I apologize, what was the defendant wearing when you saw

him?

A I believe it was a gray hooded sweat shirt.

Q And he was with other people?

A Yes, four or five.

Q Did you recognize anyone there?

A There were kids in the neighborhood, I for some reason looked at his face.

Q Now on April 2nd, so approximately you say about 11:40 is when you saw the defendant, right?

A Approximately, yes.

Q And prior to April the 3rd, 11:40 a.m. do you remember the last time you saw the defendant?

MR. SHEINBERG: April third or second?

MS. MILLUS: I am sorry, if I said April 3rd, April 2nd, the day you see him on April 2nd, prior to April 2nd, 2003, do you when was the last time you saw the defendant?

A Probably the day or two days before that I had a conversation with him.

Q And at that time did you learn that he had been in the hospital?

A Yes, he had been treated, he had been stabbed.

Q And but when you saw him he was out, did he show you the wound?

A If I remember correctly, yes, I have a vague

memory of him showing me an injury.

I was the detective who handled the case, was assigned the actual stabbing when it occurred outside a club, he had told me about it.

MR. SHEINBERG: Judge, objection.

THE COURT: Sustained, it is stricken and the jury is to disregard it.

Q Now I do want to make it clear, prior to April 2nd, 2003 one or two days before you had seen the defendant out in public, out in the confines of the, where, in the area in the 70th Precinct, correct?

A Yes.

Q And after you saw the defendant, Glen Cummins, in the vicinity of 92 Woodruff, where did you go?

A I went directly to the building, 92 Woodruff, I parked in front.

Q Sorry?

A I parked in front.

Q What apartment?

A Apartment 1B.

Q And please describe the location when you entered apartment 1B?

A As you enter it is a long straight hallway and has two doors on your left hand side, if I remember correctly, a bathroom and then a bedroom and you walk

past the bedroom and there is a living room and through the living room goes into a kitchen and a small bedroom and some more bedrooms.

Q Once you are inside the apartment 1B, where did you go specifically?

A I went to the first bedroom which was next to the bathroom and when I went inside, the deceased, Alonzo Mack, was laying on the floor.

Q And when you arrived at that location, was EMS already there, were they already there?

A EMS had left already.

Q And do you remember when you saw the deceased, his position, can you tell me how you observed him?

A He was almost, he was rolled over three quarters of the way on his back it appeared.

Q Now at the time there was a securing officer there, correct?

A Yes.

Q And after that did you interview Brenda Jones at that time?

A I interviewed her late back at the 70th Precinct.

Q So did you interview anyone at that time?

A Besides the officer who initially responded, no.

Q Did there come a time later on that you did interview Brenda Jones?

A Yes.

Q And where was that?

A At the 70th Precinct.

Q And when you interviewed her, you had a conversation with her, correct.

A Yes.

Q And did she give you a description of the individual at that time?

A Yes.

Q At that time did she actually give you a name of the individual?

A No.

Q And what was her demeanor when you interviewed her?

A She was very nervous, scared.

Q On that day did you have any suspect for the murder that took place at 92 Woodruff?

A No.

Q Now you said that you, going back to when you saw the body there, did you at that time know who that individual was?

A Yes.

Q And how did you know that individual?

A I had known him from the neighborhood also.

Q And what was the individual's name?

A Alphonso Mack.

Q Do you know if Alphonso Mack also goes by the name "Alonzo?"

A Yes.

Q And do you know if Alphonso Mack has a nickname.

A Yes.

Q Do you know if the defendant has any nicknames?

A Yes.

Q And what is the nickname that you know?

A "Coolie."

Q Now after, back in April, 2003, you said you had no suspect at that time, is that correct?

A Yes.

Q And did you continue your investigation?

A Yes.

Q Tell me as you are continuing that investigation, does there come a time later on that you attempt to speak to the family of Brenda Jones, the Jones family?

A Yes.

Q And can you tell me, did you make those

attempts.

A Yes, we made some attempts and we learned that they had moved.

Q And when you say "we," you learned that they had moved, that you tried to locate them too?

A That's correct.

Q Okay, now back to some time, maybe May or June of 2003, June, 2003, did you ever speak with the father of Brenda Jones?

A Yes.

Q And when approximately was that?

A I believe it was actually July 7th, I have of 2003, I had a conversation with him on the street.

A lieutenant in an adjoining precinct knew I was looking for --

MR. SHEINBERG: Objection.

THE COURT: Sustained.

Q Sir, without going into that, you did meet up with, you met up with --

A Horace Jones.

Q That would be Brenda Jones' father, is that correct?

A Yes.

Q And at this point your investigation was still continuing, correct?

A Yes.
Q And now directing your attention to July 16th of 2003, did you continue your investigation into the death of Alonzo Mack?
A Yes.
Q And on that day specifically did you meet with anyone?
A Yes, I met up with the Jones family.
Q So by this point it is fair to say you were able to locate the Jones family?
A Yes.
Q And did you reinterview Brenda Jones on that day?
A Yes, I did.
Q And did you reinterview her regarding the murder of a Alonzo Mack?
A Yes.
Q And at that time did she provide additional information to you?
A Yes.
Q And now after that, after July of 2003, did your investigation continue into the death of Alonzo Mack?
A Yes, it did.
Q And now on May 14th of 2004, were you working

in regard to the investigation of the murder of Alonzo Mack back on April 3rd of 2003?

A Yes.

Q And did you conduct any lineups that day?

A Yes, I did.

Q How many lineups did you conduct?

A Two.

Q Approximately what time were those lineups?

A 11:30 p.m.

Q 11:30 p.m. would be the first lineup?

A Yes.

Q And let's talk about the first lineup then.

You conducted a lineup, who was the subject of that lineup?

A The defendant, Glen Cummins.

Q And who was going to view that lineup?

A The two Jones sisters, Brenda and Gina.

Q You say you conducted two, I want to take you back to the 11:30 lineup, who specifically viewed that lineup?

A Brenda Jones.

Q Now let me ask you, when you conduct a lineup, if you can just tell me, tell me what a lineup is?

A It is an identification procedure.

Q Tell me how many, how do you form the lineup?

A Usually it is one suspect, one subject of the lineup and there are five other persons we call fillers.

The fillers bear the same physical characteristics as the subject of the lineup.

In most cases, lineups are usually, we make them sitting down. It is easier to get the general build, sometimes it is harder to get the height. We usually have people sitting down.

The defendant, the subject of the lineup gets to choose the seat and corresponding card number, one through six for the lineup.

They are placed in a room. In some cases we add clothing to them for the sake of uniformity. If there is a mustache or beard, we will have people shave if they need to shave and hair styles, we use different covers, surgical caps, baseball caps to hide hair or if the crime occurred when someone's head was not viewed, we might use the hats or the caps to hide that part of the head.

In this particular case we used surgical caps on their heads and a black bandana covering their faces.

Q Detective, why did you do that?

A When Brenda Jones was interviewed, she told us that the perpetrator came to the door and he had a hooded sweat shirt up and he was wearing a black bandana

that was covering his face partially from the bridge of the nose down.

Q So you made that to keep it uniform with that?

A Yes.

Q Now you said that the defendant got to choose a number.

A Yes, he chose number three.

Q And did Brenda Jones view that lineup?

A Yes.

Q And now do you memorialize that lineup in any way?

A Yes.

Q And tell me how you do that?

A Just prior to viewing by the witness, a polaroid would be taken of the lineup.

MS. MILLUS: With the Court's permission I ask to show the detective what has been premarked as People's Number 6 A B C for purposes of identification.

THE COURT OFFICER: (Handing)

Q Detective, you are looking at People's 6 A B C for purposes of identification, can you please tell me, do you recognize what that is?

A Yes, these are the color polaroidS I took of the lineup that Brenda Jones saw.

Q And how many polaroidS are you looking at?
A Three polaroids.
Q And those three polaroid picture, does that fairly and accurately represent the way the lineup looked on May 14th of 2004?
A Yes.
MS. MILLUS: At this time I ask what has been previously deemed People's 6 A B C for purposes of identification, I would like marked and moved into evidence as People's 6 A B C.
MR. SHEINBERG: Can I see it?
THE COURT: Show it to counsel, please.
THE COURT OFFICER: (Handing)
MS. MILLUS: And after it is shown to counsel I would like it published to the jury.
THE COURT: 6 A B C in evidence, publish it to the jury please.
(At this time exhibits 6 A B C are published to the jury.)
THE COURT: Would two of you look at it at the same time.
THE COURT: Please continue.
Q Okay, Detective, so now we are on to, you said you conducted a second lineup that day?
A Yes.

Q What time was that lineup done?
A 11:32.
Q Who was the subject of that lineup?
A Also the defendant, Glen Cummins.
Q Who was to view that lineup?
A Gina Jones.
Q And did the defendant pick a number?
A Yes, he requested to remain seat number three holding the corresponding card number three.
Q And did you follow the same procedure that you previously spoke about getting the fillers and the characteristics as you did with the first lineup with Brenda Jones?
A The same fillers were used, the only difference in this lineup, there was no bandana placed on his face, the faces of the entire lineup.
Q Okay, now did Gina Jones view that lineup?
A Yes.
Q And did you memorialize that lineup in any way?
A Yes, photographs were also taken.
MS. MILLUS: With the Court's permission I will show the witness People's A B C for identification.
THE COURT OFFICER: (Handing)

THE COURT: Yes, counsel.

Q Do you recognize People's 7 A B C for purposes of identification?

A Yes, these are the color polaroids I took of the lineup just prior to viewing by Gina Jones.

Q And those pictures are the same or substantially in the same condition as when you took them back on May 14th of 2004?

A Yes.

MS. MILLUS: At this time I ask what has been previously deemed 7 A B C for purposes of identification, I would like marked and moved into evidence as People's 7 A B C.

THE COURT: Show it to defense counsel please.

THE COURT OFFICER: (Handing)

MS. MILLUS: After they are shown to defense counsel, I would like them published to the jury.

THE COURT: Publish them to the jury please.

Once again, would you look at it two at a time please.

(At this time exhibits 7 A B C are published to the jury.)

THE COURT: Please continue.

Q Detective, on May 14th, 2004 after Brenda and Gina Jones viewed these lineups, did you take any official action as to the murder of Alonzo Mack and threats to a witness?

MR. SHEINBERG: Objection.

THE COURT: Overruled.

MR. SHEINBERG: Can we approach?

THE COURT: Yes.

(Whereupon, a sidebar discussion was held off the record.)

MR. SHEINBERG: Judge, I withdraw the objection.

THE COURT: Okay.

Q Detective, again, I will ask you on May 14th of 2004 after the two witnesses viewed the lineup, did you take any official police action as to the murder of Alonzo Mack back on April 3rd, 2003 and threats to Brenda Jones?

A Yes.

Q What was that action that you took?

A The defendant was placed under arrest and charged.

Q Now I would like the witness shown what has been premarked People's 8 for purposes of

identification.

THE COURT OFFICER: (Handing)

Q Detective, do you recognize what has been shown to you as People's 8 for purposes of identification?

A Yes.

Q And what is People's number 8?

A It is a photograph of the defendant Glen Cummins, it would have been taken on the day of his arrest.

Q Does that picture fairly and accurately represent the way Glen Cummins looked on the day of his arrest, May 14th, 2004?

A Yes.

MS. MILLUS: At this time I request what has been previously deemed People's number 8 for purposes of identification, I would like marked and moved into evidence as People's number 8.

THE COURT: Show it to defense counsel please.

MS. MILLUS: And after that I would like it published to the jury.

THE COURT OFFICER: (Handing)

THE COURT: All right, publish it to the jury.

(At this time People's exhibit 8 is published to the jury.)

MS. MILLUS: I have no further questions for this witness.

MR. SHEINBERG: I do.

THE COURT: You may examine.

CROSS EXAMINATION

BY MR. SHEINBERG:

Q Good afternoon.
A Good afternoon.
Q Detective Platt, a moment ago you told us that you have known Mr. Cummins for about fifteen years or so?
A Approximately, yes.
Q And your relationship was cordial with him, is that correct?
A Yes.
Q He would speak to you on the street or when he saw you?
A Yes.
Q And, in fact, when you mentioned this gang affiliation, he told you he was a member of the gang?
A Yes.
Q And there are other people in the area that are members of gangs also?

A Yes, that's correct, yes.

Q Going back to what you were asked regarding the incident that occurred on April 2nd, if I may.

You told us that you were at Edward R. Murrow High School when you received a phone call from the lieutenant?

A Yes.

Q And you responded to 92 Woodruff Avenue?

A Yes.

Q Now the phone call you received, that was from your lieutenant who had given you information to go to 92 Woodruff to investigate a homicide, is that right?

A He didn't even know it was a homicide, he told me it was a shooting.

Q All right, he told you it was a shooting, did he tell you when the original call came in?

MS. MILLUS: Objection.

THE COURT: Sustained.

Q Did you then respond to 92 Woodruff Avenue?

A Yes.

Q And when you responded, I think you told us that you drove, you were in a car?

A Yes.

Q And you drove and you saw Mr. Cummins and four or five of these people, friends walking, is that right?

A Yes.

Q And they weren't running, were they?

A No, just walking.

Q Casually walking, would that be fair to say.

A Yes.

Q And Mr. Cummins didn't acknowledge you, is that right?

A No.

Q You didn't blow the horn to wave to him?

A No.

Q So it would be possible that he didn't see you, is that right?

Let me put it to you this way, you were not in a car that had a siren going?

A Yes, I had siren and lights.

Q It was a marked police car or private car?

A It was an unmarked police car.

Q And as you were driving by, would it be fair to say you were going fairly rapidly to the scene of the shooting?

A I am approaching a stop sign intersection, I would have slowed down substantially.

I might have went but not very fast, no.

Q And when you went by you saw the defendant, Mr. Cummins walking with some friends at that time.

A Yes.

Q And he didn't acknowledge you but you don't know if he saw you or didn't see you, would that be fair to say?

You don't know?

A I don't know.

Q And he just continued walking?

A I think so, yes.

Q And this was about a half block from 92 Woodruff?

A Yes.

Q It was a half a block from where the shooting took place?

A Yes.

Q And now continuing on you also told us on direct that you know an individual by the name of Derrick Ulett, is that right?

A I know his brother.

Q Adonis Ulett?

A Yes.

Q And you know a person by the name of Charles, I think you gave us his nickname as "Lucky?"

A Yes.

Q And you used an interesting word, you said they were associates of Mr. Cummins, they were friends

of Mr. Cummins, is that right?

A Friends, associates, the same.

Q Friends, the same thing, they are buddies?

A Yes, they grew up together.

Q That would be fair to say, wouldn't it?

A Yes.

Q And, in fact, as far as you know, Mr. Cummins had many friends?

A Yes, he does.

Q And you seen him in the neighborhood, is that right?

A Yes.

Q And when you arrived at the scene of this shooting, I think you also told us that you didn't speak to anybody in the apartment, is that right?

A Any civilians.

MS. MILLUS: Objection.

THE COURT: Overruled.

A When I arrived at scene the civilian witnesses were all in front of the building, I had them placed in police cars and brought to the precinct.

Q When you say "civilian witnesses," that would be Brenda Jones?

A Brenda Jones, Gina Jones, her mother and father and some little kids too.

Q And they were all taken to the precinct?

A Yes.

Q So you had no real opportunity to talk to them at the scene of the incident, is that correct?

A No.

Q You spoke to them later on?

A Yes.

Q We will get to that in a moment but you did have an opportunity to speak to the officers who were in the apartment, the first arriving officers and the other detective, is that correct?

A Not other detectives, the police officers who first arrived.

Q How many police officers did you speak to?

A I spoke with an Anti-Crime team.

Q "Anti-Crime," what does that mean?

A Civilian clothes officer.

Q They are not detectives?

A No, and I spoke with uniform police officers, Police Officer Dubrosky.

Q Did you stay there for a period of time until the crime scene people arrived?

A I was there an hour, a little over an hour.

Q That's it, you weren't there at 2 o'clock in the afternoon?

A No, no, by that time I was back in the precinct.
Q So it would be fair to say, again, that you were not there when crime scene arrived, Detective Forte?
A If he arrived at 2 o'clock, I wasn't there.
Q Do you have any notes or memorandum indicating whether you were there or what time you left the area of 92 Woodruff?
A All I have is times that I did interview at the precinct.
Q That would be the same day?
A Yes.
Q And so, again, what time did you first interview Brenda Jones?
Take a look?
A I only have in my notes that I interviewed, I don't have a time.
Q When you say notes, handwritten notes?
A Yes.
Q That has been redacted?
A I interviewed Horace Jones at approximately 1:30.
Q I am interested in Brenda Jones?
A It would have been somewhere around 1:00,

1:30.

Q And you interviewed her and she told you what she had seen, is that correct?

A Yes.

Q And, in fact, you made some handwritten notes in your spiral notebook as to the interview?

A Yes.

Q And after you finished that, you then, what do you do with the interview notes, did you keep them?

A Yes.

Q And you transferred what was said on to a DD5?

A Yes.

Q Tell the jury, I don't know if they know what a DD5 is?

A It is a regular police report, it is typewritten.

It is best to show, I guess a copy of it. (Indicating)

Q Just hold one up.

MS. MILLUS: Objection, your Honor, he doesn't need to show it.

Q All right, it is an official police document?

A Yes.

Q You are required to keep it?

A Yes.

Q As detective, you were the assigned detective in this case, you are required to prepare it, is that correct?
A Yes.
Q Pertinent information goes on there?
A Yes.
Q And now in your first interview of Brenda Jones, as you indicated to us you took it down on a spiral note pad, so you wrote down what she told you?
A Yes.
Q And as you indicated she was very, very nervous and upset, would that be fair to say?
She was just involved in the middle of a shooting, would that be fair to say?
A Yes.
Q And when you interviewed her you asked her what happened?
A Yes.
Q And did she tell you that?
MS. MILLUS: Objection.
THE COURT: Overruled.
Q Did she tell you that when this happened somebody was banging on the door and she went to open the door?
You can refresh your recollection.

MS. MILLUS: Objection.

THE COURT: Objection sustained as to that.

Q All right, did she tell you the person that was involved in the shooting was wearing a blue hooded sweat shirt with the hood up?

MS. MILLUS: Objection.

THE COURT: Overruled.

A Yes.

Q And did she tell you that the person who had entered the apartment and did the shooting said prior to the shooting, "What's up nigger?"

A Yes.

Q She didn't tell you "What's up," he said "What's up Harve," did she?

MS. MILLUS: Objection.

THE COURT: Overruled.

A No.

Q She never gave you the name of the individual, did she?

A Name of the person that did the shooting?

Q Yes?

A No, not at that point.

Q And she was pretty clear in her description of the individual?

A Yes.
Q Did she tell you how the individual was built?
A Stocky.
Q Five, six; five, seven?
A Yes.
Q And 220 pounds?
A Approximately, yes.
Q And you been in that neighborhood for 25 years?
A Yes.
Q Approximately?
A Yes.
Q How many people have you seen fitting that description?
MS. MILLUS: Objection.
THE COURT: Overruled
A Many.
Q Many, is that correct?
A Many.
Q Near 92 Woodruff and in the area, is that correct?
A Yes.
Q And did she give you any other description of the individual who was involved in the shooting?
A Black sneakers, bandana covering the face.

Q What about clothing?
A Clothing, sweat pants, black.
Q By the way, when you were driving by going to the 92 Woodruff and you saw Glen Cummins and his friends walking down the street, did you notice if he was wearing black pants or black shoes?
A No, I just --
Q You were just passing by?
A I just noticed the sweat shirt.
Q Gray sweat shirt?
A I believe it was gray.
Q And that had a hood?
A Yes, the hood was up.
Q The hood was up?
A I believe so.
Q Well, you have to be clear about it, are you certain or you don't know?
A No.
Q Would it be fair to say you passed by rather quickly?
A I am trying to think now, I can't testify for sure whether the hood was up.
Q Up or down?
A That's right.
Q But you can tell us that the hood was gray?

A Yes.

Q Now after you spoke to Miss Brenda Jones, did you also speak to Gina Jones?

A Very briefly.

Q Gina, when you say "very briefly," what do you mean by that?

A I asked her if she recognized, could recognize anybody and she told me "No."

Q When you spoke to her you had more of a conversation with respect to what happened in the apartment, is that right?

A Are we speaking about Gina?

Q Yes, Georgina, that's her name.

A Yes.

Q About what happened in the apartment, that is what the thrust of your questioning her was, is that right?

A My thrust of questioning to her was whether or not she went to the door and she told me she didn't.

I didn't go much further with her.

Q But she told you where she was in the apartment when this incident occurred, am I correct?

A She was more towards the back of the apartment.

Q In fact, later on sometime in July of 2003 you

re-interviewed Georgina Jones, is that right?

A Did I speak to her again, yes.

Q That was the second time you spoke to her?

A Yes.

Q And at that time you were directing your attention to where she was in the apartment and who she was with at the time of the shooting, is that right?

A Yes.

Q And do you recollect or do you remember when you interviewed her, do you recollect her telling you that she was in the rear bedroom with her mother, father and three younger brothers and another male named Lucky, and if you want to refresh your recollection, look at your DD5 of July 16th, 2003?

(At this time Jacquelyn Arce is excused and Walter Egielski is the official court reporter)

CROSS-EXAMINATION

BY MR. SHEINBERG:

A That's correct.

Q She told you, is that right?

A Yes.

Q Also tell you at that time that this fellow Lucky jumped out of the rear window into the backyard?

A Yes.

Q Did she tell you Lucky came back into the apartment?

A Yes.

Q Why did he come back into the apartment?

MS. MILLUS: Objection.

THE COURT: Sustained.

Q Did she tell you why he came back into the apartment?

MR. SHEINBERG: Objection.

THE COURT: Sustained.

Q Did he tell you there was no access or did you determine there was no access from the backyard into the street?

MS. MILLUS: Objection.

THE COURT: Overruled.

Q You may answer. Did you learn that there?

A I believe I was told that there was.

THE COURT: Please, did you determine, did you? Please answer the question.

A Yes.

Q She told you Lucky came back into the apartment is that right?

A Yes.

Q When you had the line-up with Georgina Jones whatever exhibit that is, you told us that you did not put bandanas over the faces of the individuals; is that right?

A That's correct.

Q The five fillers in that lineup, they come from a shelter; is that correct?

A Yes.

Q Did you determine at that time that Georgina Yes knew Mr. Cummins; is that correct prior to the line-up?

A Yes.

Q So when she picked him out of the line-up she picked out a person that she knew isn't that right?

MS. MILLUS: Objection.

THE COURT: Overruled.

A Yes.

Q The other people were people from a shelter; is that right?

A Yes.

Q By the way as the investigating detective in this

case do you coordinate all of the information received regarding this particular homicide?

A I was not the case officer for this.

Q Who was?

A Detective Mahoney. I am on assisting.

Q You were assisting him?

A Yes.

Q All the investigation done in this case doesn't filter through you. It goes to through Detective Mahoney?

A It filters through both of us.

Q You basically do some of the work, Detective Mahoney does the other work?

A Yes both of us share.

Q Fair to say that Detective Mahoney interviewed the first officer at the scene and interviewed the Detective Forte, the individual who did the crime scene?

A I interviewed the first officer well, I interviewed the anti-crime Officer.

Q That's right. But you didn't interview the first officer?

A That's correct.

Q Fair to say Detective Mahoney, since you share the work, interviewed the first officer Dubrosky and interviewed the crime scene officer; is that correct?

A I believe Detective Mahoney might have been

present when crime-scene was there.

Q Do you know whether he was present for a period of time at the scene of the homicide speaking to other police officers, if you know?

A Yes Detective Mahoney was there after I left.

Q He was there for a period of time?

A Yes.

Q Fair to say again that he was, he wasn't the case Detective. But he was doing all the investigation and all the interviews of police personnel?

A He is the case Detective.

Q He is the case Detective?

A Yes.

Q He was actually coordinating everything with this investigation?

A Yes.

Q So all information from police personnel, all information from civilians would go through him; is that right?

A Yes.

Q It was his responsibility to coordinate everything and do a preliminary investigation and do a complete investigation; is that correct?

A Yes.

Q You don't know what form he fills out; what DD5s

he fills out?

MS. MILLUS: Objection.

THE COURT: Overruled.

A I read all his paper work.

Q You have?

A Yes.

Q In reading all his paper work --

THE COURT: No the objection is sustained.

MR. SHEINBERG: All right. I am sorry I didn't understand your ruling?

Q When you arrested Mr. Cummins on May 14 '04, did you take his pedigree meaning height, weight items of that nature?

A Yes.

Q How much did he weight?

A 240 pounds.

Q That's when you arrested him May fourteen; is that right?

A Yes.

Q Prior to that when you first saw him or when you saw him in April of 2003, was there any change in his physical appearance that you realized or recognized. He looked the same?

A He looked the same.

Q You also told us you reinterviewed Georgina Jones

and Brenda Jones sometime after the incident; is that right?

MS. MILLUS: Objection.

THE COURT: Overruled.

A Yes.

Q When would that be?

A That was on July sixteen.

Q On July sixteen when you interviewed them, did Brenda tell you, Brenda Jones tell you she knew the person who did the shooting?

A Yes.

Q She told you it was Coolie or Mr. Cummins; is that right?

A Yes.

Q Did you see Mr. Cummins between July sixteen '03 and May fourteen, '04?

A Yes.

Q You saw him?

A Yes.

Q Where did you see him on the street?

A Yes.

Q Did you arrest him?

A No.

Q You were told he did the shooting, did you stop him, arrest him?

A No.

Q Is it because you didn't believe Ms. Jones?
A No.
Q You just didn't do it?
A The investigation was continuing.
Q The investigation continued even though you were told that Miss Jones had indicated to you that she was threatened, indicated to you that she knew the person who did the shooting. You didn't do anything?
MS. MILLUS: Objection.
THE COURT: Overruled.
A Regarding --
Q Yes or no regarding arresting Mr. Cummins?
A No.
Q Your testimony is between July sixteen, 2003 and May fourteen, '04 you did nothing to arrest Mr. Cummins?
A We were still investigating the case.
Q You received no further information or you didn't reinterview Ms. Brenda Jones between July sixteen '03 and May fourteen '04?
A I had many contacts with Brenda and Georgina Jones and their family during that eight or ten month period.
Q Did they give you other information other than what they told you on July sixteen?
A No.

Q You told us the family had moved. When did the Jones family move from 92 Woodruff from where they lived to some other address?
A I am not sure. Would either have been the end of April or the end of May.
THE COURT: What year?
THE WITNESS: Of 2003.
Q You were still able to contact them in July of '03; is that correct?
A They were in the shelter system. It took some time tracking them down to the proper family shelter they were in. I was finally able to do it July sixteen.
Q That's when you reinterviewed them and they gave you this information?
A Yes.
Q Between July sixteen and May 14th '04 to July sixteen '03 to May fourteen '04, were you able to contact the Jones family?
A Yes I was able to trace them someplace else.
Q You also spoke to them?
A Yes.
Q You told us they gave you no added information?
A They added no other information, no.
Q During the line-up you conducted May fourteen '03 the one with Brenda Jones I think you indicated that there

is a photograph, indicates there is scarf was across the individual's faces. You put shower caps on their heads?

A Yes, surgical caps.

Q But you knew that the perp of the homicide was wearing a hoody over his head; is that correct?

A Yes.

Q The hoody covered a portion of his face; isn't that correct?

A I guess the hoody would have covered part of the top of their head.

Q Top of the head and the side because as you were told by Brenda the hoody was over the head covering part of his face?

A I guess the sides, his ears might have been covered.

Q Did you think of putting hoodies on the individuals in the line-up?

A No.

MR. SHEINBERG: I have no other questions.

THE COURT: Ms. Millus?

MS. MILLUS: No further questions.

THE COURT: You're excused sir.

THE COURT: Any additional witnesses today?

MS. MILLUS: No we do not.

THE COURT: Tomorrow, just in case just in

case it's necessary. It may not be necessary I would like to be able to work a little later even past 5:00, if necessary not later than 6:00. But I don't like to tell people the last minute because making arrangements if in case it's necessary. Please come in tomorrow. I expect a full day.

Please do not discuss this case among yourselves. Do not come to any conclusions until all the evidence is completed and I charge you on the law. If one of you is late we all have to wait.

(jury exiting)

(whereupon the case on trial adjourned to January 26, 2006)

CERTIFIED TO BE A TRUE AND CORRECT
TRANSCRIPT OF THE FOREGOING MATTER

___________________________________
WALTER EGIELSKI, SR. COURT REPORTER

CERTIFIED TO BE A TRUE AND CORRECT
TRANSCRIPT OF THE FOREGOING MATTER

___________________________________
JACQUELYN ARCE, SR. COURT REPORTER