SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF KINGS CRIMINAL TERM : PART 17

______________________________________x

THE PEOPLE OF THE STATE OF NEW YORK

Against- Trial

GLEN CUMMINS

Defendants

______________________________________x

INDICTMENT # 3066-04

January 26, 2006
320 Jay Street
Brooklyn, New York

B E F O R E: HON. ABRAHAM GERGES, JUSTICE

A P P E A R A N C E S: (as previously noted)

Walter Egielski
Official Court Reporter

COURT CLERK: Case on trial. Indictment 3066 '04, Glen Cummins.

MR. SHEINBERG: George Sheinberg, 50 Court St. representing Mr. Cummins, who's not before the Court.

MR. MARRONE: John Marrone office of the District Attorney.

MS. MILLUS: Susan Millus.

THE COURT: Off the record.

MS. MILLUS: At this time the People are handing up until today although defense had had all paper work for our witness, Abdul Mohammad I am giving him today the plea allocution minutes with the understanding when my client appears today since that witness will be testifying that witness is at our office, People consent to having his client review the paper work. As I stated earlier the Medical Examiner is coming today. She is here. She will testify first. Matthew Myers is the attorney for Mr. Mohammed. He has been on trial. He needs to speak to him. After medical examiner People ask for approximately half hour recess so that he can speak to his client as well as defendant can review paper work.

THE COURT: Acknowledge receipt?

MR. SHEINBERG: Yes.

THE COURT: I think plea minutes also?

MS. MILLUS: I handed over plea minutes. I do. We did hand over RAP sheet to Mr. Sheinberg last week. So we are clear that the arrest in Binghamton was on that RAP sheet and he is aware of that; is that correct?

MR. SHEINBERG: That's right that was in '88?

MS. MILLUS: Binghamton of '05.

MR. SHEINBERG: No, I didn't have that.

MS. MILLUS: I am making defense counsel aware I don't have an extra copy with me. It's case 2005 dash 88663. The Binghamton city court. He was arrested for possession in the third degree of control substance, narcotic drug with intent to sell. That case is an open case.

THE COURT: All jurors being present both sides waive reading of roll call?

MR. SHEINBERG: Waived by defense.

MS. MILLUS: So waived.

THE COURT: Please call your next witness.

MS. MILLUS: People call Doctor Persechino.

DIRECT EXAMINATION

BY MS. MILLUS

DR. F L O R I A N A P E R S E C H I N O, M.D. , after having first been duly sworn was examined and testified as follows:

Q State your name?

A Floriana Persechino.

Q Doctor, could you please describe for the jury your educational background?

A I graduated from University of Rome in Italy. Following my medical school training I did four years of

residency training in anatomical and clinical Pathology; branch of medicine that deals with the lab aspects of medicine as well as performance of autopsies.

Following that I did one year fellowship in surgical Pathology and one year fellowship in Forensic Pathology.

Forensic Pathology being the sub specialty of Pathology that deals with sudden or expected violent death.

Q Did you specialize in any particular field of medicine?

A Yes, my specialty is Anatomical Pathology and my subspecialty is Forensic Pathology.

Q Can you please explain to the jury what those two specializations; what does that mean?

A Anatomical Pathology deals, again, with the laboratory aspect of medicine of the analysis of tissue samples, biopsy samples taken from patients.

Forensic Pathology deals with the investigation of sudden death.

Q Forensic Pathology?

A Sudden death investigation.

Q Are you licensed to practice medicine in New York?

A Yes.

Q Are you currently employed?

A Yes.
Q By whom?
A By the office of Chief Medical Examiner in the New York City independent agency within the Department of Health?
Q How long have you been a Medical Examiner?
A I have been a Medical Examiner for the city since July '98.
Q As Medical Examiner Do you have occasion to perform autopsies?
A Yes.
Q Could you please tell the jury what exactly autopsy is?
A An autopsy consists of external and internal examination of a body with documentation of natural diseases, injuries, therapeutic intervention both external and internal.
Q As the Medical Examiner approximately how many autopsies have you performed?
A About seventeen hundred.
Q In addition to the autopsies you perform by yourself have you also witnessed autopsies being performed by other medical associates?
A Yes.
Q Doctor, as Medical Examiner have you ever

testified in court before?

A Yes.

Q How many times?

A About 90 times.

Q Which Court?

A I have testified in the Supreme Court, Federal Court, Family Court within the boroughs of Brooklyn, Bronx, Staten Island, Manhattan.

Q Have you ever been declared expert in the field of Forensic Pathology?

A Yes.

Q Have you ever been denied status as expert witness?

A No.

MS. MILLUS: At this time I would like to offer Dr. Persechino as expert in Forensic Pathology?

THE COURT: So noted.

MR. SHEINBERG: I have no objection.

Q Draw your attention to April third, '03 did you have occasion to perform an autopsy on a man identified to you as Alonzo Mack?

A Yes.

Q Where was that autopsy performed?

A An autopsy was performed within the Brooklyn

office of Medical Examiner's Office.

Q Any other doctors present?

A Yes.

Q Explain the role of those doctors?

A Other doctors maybe present in the autopsy room. When other colleagues are present we sometimes, we discuss cases. We can get opinions of the other doctors on anything we find during external and internal examination.

Q Did you conduct an external examination in this case?

A Yes.

Q Can you describe how Alonzo Mack appeared on that day?

A The body was received clothed when we got the body at the Medical Examiner's Office.

Following removal of clothing there were gun shot injuries to the body as well as scrapes. There were several different gun shot wound tracks and scrapes on the face, back of the left hand.

Q Was there any signs of medical intervention?

A No.

Q What does that mean?

A Medical intervention could be various things. It could be puncture sites. EMS could attempt to resuscitate individuals. You could find electrocardiographing patches

on the body even surgical intervention if decedent makes it to the hospital and resuscitation is attempted there.

Q How do you examine gun shot wounds?

A When looking at a gunshot wound, you're looking at it to determine whether or not it's an entrance or exit gun shot wound. You want to look at characteristics of the wound surrounding the wound to see if you can make estimate as to range of fire.

You're looking for what we call fowling or stipling surround gun shot wounds. Fowling would be the deposition of gray powder soot. Soot around the gun shot wound. Stipling are small abrasions that surround gun shots that are due to particles emitted when the firearm is discharged. These deposits can cause small abrasions or scrapes.

Q I would like to show you what's been premarked People's Exhibit number nine for identification as well as ten which is premarked.

Doctor, you're being shown what is pre-marked People's Exhibit nine for identification. Do you recognize that?

A Yes.

Q What is that?

A It's a copy of autopsy file.

Q And that copy of the file is that in the same or

substantially same condition when you made that report?
A Yes.
Q When was that report made?
A This report was dictated shortly after the autopsy and it was signed out on May eight '03.
Q Is that report normally made in the normal course of business?
A Yes.
Q That report is made by you; correct.
A Yes.
MS. MILLUS: At this time what is previously deemed People's Exhibit nine for identification I would like mark, moved into evidence as People's Exhibit nine.
MR. SHEINBERG: I have no objection. May I have one --
THE COURT: Show to defense counsel, be People's Exhibit nine in evidence.
MR. SHEINBERG: No objection.
COURT OFFICER: People's nine in evidence.
Q Now Doctor, you also have in front of you what is pre-marked People's Exhibit 10 for identification. Do you recognize that?
A Yes.
Q What do you recognize it to be?

A It's photocopy, actually blow up of the autopsy diagram that I generated at autopsy.

Q Again, that was made by you?

A Yes.

Q Is that in the same or substantially same condition as when you made it?

A Yes.

MS. MILLUS: At this time what is previously deemed People's Exhibit 10 I asked that be marked, moved into evidence as People's Exhibit 10.

MR. SHEINBERG: No objection.

THE COURT: People's Exhibit 10 in evidence.

COURT OFFICER: So noted.

MS. MILLUS: I am going to ask that People's Exhibit 10 be posted.

THE COURT: Will you please post it.

Q You previously testified there were nine gun shot wounds; is that correct?

A No.

Q Could you please tell us, repeat how many gun shot wounds were there?

A I said there were seven gun shot wounds tracks.

Q I am going to ask you now so we can go over each of those wounds. What gun shot, starting with the first one

did you notice about the body?

A Certainly. Do you want me to approach?

MS. MILLUS: With the Court's permission if as the doctor is testifying she can be using the diagram?

THE COURT: Certainly.

A At autopsy, I noted an entrance gun shot wound to the right side of the neck. The entrance gunshot wound is over here on the diagram. The entrance gunshot wound is of the right side of the neck wound. Track was through the soft tissue of the right side of the track wound. Track went toward the back and bullet itself was found in the back of the right side of the neck. The bullet on this diagram is this triangle here on the back of the neck, okay?

The bullet was labeled. I retrieved at autopsy. I labeled it with the letter, a, subsequently submitted to evidence as it's done normally in these cases I am going to mark --

THE COURT: Don't mark, just tell us.

A So it's, a.

MS. MILLUS: I am going to ask if the doctor as she is describing to mark the diagram.

THE COURT: Okay.

A So I will mark it "A" where the entrance wound is and "a" where the bullet was found because they correspond.

The second gunshot wound track which I described at autopsy is an entrance gunshot wound was to the right chest wall, to the side of the breast plate. And it would be this injury over here. This bullet went through the soft tissue of the right chest. Then upward toward the left, through the soft tissue of the left shoulder area severing the bloodvessels in this area. It nicked the left scapular which is the wing bone.

The bullet itself was found in the back of left shoulder, slashed the upper back region. That would be this bullet over here. The bullet I retrieved at autopsy I labeled it with letter b. I submitted to evidence.

Q You said you put the exit and entrance both for the entrance. Can you put say EMT so we know the plain a is the exit wound. If you can put on the entrance wound on each of them you discussed or next to it just, entrance, or just short write it so we know the entrance and plain letter corresponding for that. It would go for the exit wounds.

A That was the bullet in this case.

MS. MILLUS: Oh, the bullet.

A Same for B.

Q Same thing throughout.

A Complies.

Q If you can continue.

A Next gun shot wound that I described at autopsy

is a gunshot wound track, was entrance wound to the right chest area. It was above and to the right of the right nipple. It's this injury here. This bullet went through the soft tissue of the right chest wall, went through the right second rib, the right lung. Then it went through the left lung through the back of the left fourth rib.

The bullet I found it within the back left upper back. This is the bullet for C.

The next entrance gunshot wound track which I will describe is gunshot wound track D with an entrance wound above the left nipple. This gunshot wound went through the soft tissue of the front of the left chest wall, went through the front of the left fourth rib, went through the heart. It went through the aorta. Aorta is major blood vessel, distributes blood to the heart, various organs, went through the spinal column, injured the spinal column. I found the bullet one within the spinal canal on this, both diagrams. I indicated bullet here at D. But it's not back of the spinal canal, okay?

The next gunshot wound track is track E. This is a track or path through the right shoulder. The bullet entered the lateral aspect of the right shoulder and exited the top of the right shoulder. So it's a through and through gun shot wound of the right shoulder. That would be the track.

Next gunshot wound track that I observed was a grazed gunshot wound to the front of the right arm which is indicated here. Basically, it's a wound due to the bullet passing on the surface of the skin. I indicated that as F all right?

The last gunshot wound track that I observed at autopsy was a through an through gunshot wound track of the left arm. It entered the left arm on the medial aspect, inner aspect of left arm. We are going to indicate that as G as the entrance. This would be the exit just on the lateral aspect of left arm. So through and through gunshot wound of the left arm.

Q You may have a seat doctor. Did you notice anything as to Alonzo's Mack's cheek area?

A There was a scrape or otherwise known as abrasion to the left cheek area.

Q What about to Alonzo's Mack's hand?

A There was also small, one quarter inch abrasions or scrapes on the back of left hand.

Q Doctor, can you tell us with a reasonable degree of scientific certainty what the cause of death was in this case?

A The cause of death as certified on the date of autopsy was penetrating gun shot wound of neck and torso.

Q You also certify the manner of desk is that

right?

A Yes.

Q Could you please tell us, describe the manner of death?

A Manner of death describes the circumstance surrounding the death. There are various manners of death; could be natural death, could be accidental death, could be the death at one's own hand. For example, suicide death or death at the hands of another; homicide.

In this case I certified the manner of death as homicide.

Q I have a few more questions. Are any of the gun shot wounds consistent with Alonzo Mack being in a lying down position and the shooter standing up?

A Yes, they are consistent with it.

Q And are any of those, any of those wounds consistent with any type of movement?

A Well the gunshot wounds they enter, they have different paths within the body, okay. Some are oriented from right to left. Others enter the body on the left side, go toward the right. So there is some type of movement between the movement here or other change in positioning, between the muzzle of the gun and the decedent.

Q Would any of the gunshot wounds be consistent with a Alonzo Mack's attempting to get out of bed?

A Some of them could be, would be consistent with it, can be consistent with it.

Q Is the abrasions, are they consistent with the victim in this case holding his hand. Let the record reflect holding my hand in a manner around my face up to my face.

A I am sorry I don't understand which abrasions you're referring to.

Q You said he had some abrasions or withdrawn.

The gunshot wounds to his arm, let me rephrase the question, withdrawn.

The gunshot wounds you described to his neck and right shoulder is that consistent with one bullet having caused those injuries?

A Yes, the two different wound tracks that I described, one to the top of the right shoulder, one to the right side of the neck they could have been caused by one single bullet. A bullet could have entered the right shoulder exited the top of the right shoulder. Then reentered the right side of the neck.

Q Now ask the question, if Alonzo was positioned with his arms in a cross manner, let the record reflect in cross manner around his face would that be consistent with one bullet causing those injuries?

MR. SHEINBERG: Object to her usage.

THE COURT: Overruled.

A If his shoulder is up or his arm is up you're saying protecting his face. That still could have been caused by one single bullet, yes, one bullet could have caused those injuries.

MS. MILLUS: No further questions.

MR. SHEINBERG: I have no questions.

THE COURT: We are going to take a short recess.

(jury exiting).

THE COURT: Are the parties here? How much time is? Needed.

(whereupon there was a brief recess after which the case on trial was recalled)

MS. MILLUS: Judge, may we approach?

THE COURT: Off the record.

(Whereupon, a discussion was held at the bench, off the record.)

(Whereupon, the discussion off the record concluded and the following occurred:)

THE COURT: Let's get the jury please.

(jury entering)

THE COURT: All jurors being present both sides waive jury roll call?

MR. SHEINBERG: So waive.

MS. MILLUS: So waive.
THE COURT: Please call your next witness.
MS. MILLUS: People call Abdul Mohammad.

DIRECT EXAMINATION
BY MS. MILLUS

A B D U L M O H A M M E D , after having first been duly sworn was examined and testified as follows:

Q State your name?
A Abdul Mohammad.
Q Mr. Mohammed how old are you?
A Twenty-five.
Q Did you live in Brooklyn at one time?
A Correct.
Q What area did you live in?
A Flatbush, Brooklyn.
Q How long did you live in Flatbush?
A Total of 10 years.
Q Did you know an individual named Glen Cummins?
A Correct.
Q How do you know him?
A We was friends.
Q Could you describe your relationship?
A We were cool for like four or five years.
Q When you say, cool, how often would you see Glen?
A Like on a daily basis.

Q You were buddies with him, you hung out with him?
A Yes.
Q Did you confide in one another?
A Correct.
Q Do you know if he goes by nick names?
A Coolly.
Q Do you see the individual you talk about as Glen Cummins in the courtroom today?
A Right there.
Q Point, indicate an article of clothing?
A Suit white.
THE COURT: Indicating defendant.
Q Would you say you were good friends?
A Correct.
Q That was about four or five years?
A Correct.
Q Do you know if the defendant was involved affiliated with any gangs?
A Correct.
Q What gang was that?
A Crips.
Q Did you also know an individual by the name of Alonzo Mack?
A Correct.
Q What was your relationship with him?

A Just knew him from the neighborhood?
Q How long did you know him from the neighborhood?
A Longer than Glen.
Q When you say, longer, approximately how long?
A Probably same amount of time that I moved into the neighborhood.
Q You wouldn't consider yourself friends with him like you were with Glen?
A No.
Q You would see him around the neighborhood withdrawn. You would see him around the neighborhood?
A Correct.
Q Do you know if he was affiliated with any gangs?
A Blood.
Q Now back in April of, I am sorry withdrawn. Back in January of 2003, what was your relationship with Glen?
A We was cool.
Q Then from that time until say beginning of December of '03 during that entire period from January of '03 to December '03 what was your relationship with him?
A Was cool until December our relationship soured after that.
Q When you say your relationship soured were you any longer hanging out with him?
A No.

Q When you say your relationship soured what do you mean by that?

A He threatened to kill me.

MR. SHEINBERG: Objection.

THE COURT: Sustained. Jury to disregard.

Q You stated that your friendship is now over. At that time, at that time, did you contact anyone?

A Yes.

Q Who did you contact?

A My lawyer.

Q Why did you contact withdrawn.

After you contacted the lawyer did there come a time when you contacted, when you met with the District Attorney's office?

A Correct.

Q Was that when you met with the District Attorney's office was that some time in March of two thousand four?

A March -- correct.

Q At that time did you talk to the District Attorney's office about any information that you had regarding the death of Alonzo Mack and any other criminal activity that was going on?

A Correct.

Q April nineteen, '04 did you enter into an

cooperation agreement with District Attorney's office?
A Correct.
Q At that time you had an open case; is that correct?
A Correct.
Q By entering into the agreement with the District Attorney's office did you agree to provide information, correct?
A Correct.
Q You agreed to testify before the Grand Jury in May 2004?
A Correct.
Q Today you're here to testify regarding your knowledge of the incident that took place April third '03 the death of Alonzo Mack, is that correct?
A Correct maam.
Q Did you understand the terms of the agreement?
A Yes maam.
Q Can you tell us what exactly in relation to this cooperation agreement what was your open case?
A Criminal possession of weapon.
Q What exactly did you do in that case?
A Fired a weapon, loaded firearm.
Q Did you plead guilty to the criminal possession of weapon in the second degree?

A Correct, maam.

Q Did you also plead guilty on that same case to reckless endangerment in the first?

A Yes.

Q Did you also plead guilty to criminal possession of a weapon in the fourth degree?

A Correct.

Q You fled and you admitted your guilt to these crimes, correct?

A Absolutely.

Q Have you been sentenced in connection with to your plea of guilty on that case?

A No, maam.

Q Did you also understand is it true as part of the cooperation agreement if you do not satisfy the terms of that agreement you can be sentenced to three and a half to five years; is that correct?

A Yes, maam.

Q So you don't know what your sentence is going to be; is that correct?

A No.

Q When were you arrested on that case?

A July twelve, '03.

Q Let me ask you; you're here today. Do you know what happens if you don't tell the truth?

A Go to jail.
Q So you know there are consequences; is that correct?
A Correct, maam.
Q You also, you recently have been arrested in Binghamton; is that correct?
A Correct.
Q When was that?
A December second, '05.
Q Tell me what that case is about. What did you get arrested for?
A Criminal possession of controlled substance.
Q Tell me what happened on that case?
A Got ROR'd on that case.
Q I want to take you back.
Was it true as part of your agreement you were not to leave New York?
A Correct.
Q You said that you were arrested up in Binghamton so you did leave New York?
A Correct.
Q Did you contact the District Attorney before leaving?
A Correct.
Q After contacting them then you went to

Binghamton?
A December first, '05 right.
Q So when you went on December first '05 let me ask you again, when was it that you were arrested up there would that be on the second of '05?
A Correct, next day.
Q Where was it that you were arrested?
A One Fifty-two Chapin St. Binghamton New York.
Q I just want to ask you it's not your house correct?
A No.
Q It was a friend house?
A Yes, maam.
Q Were the drugs that were recovered were they on you?
A Not on our possession.
Q Where were they found?
A Another room, like the living room.
Q You said on that case you went before a judge, correct?
A Correct.
Q You said you were released on that case?
A Yes.
Q Because you were in Binghamton on that date you missed a Court date here; correct?

A Correct.
Q That was on the cooperation agreement we spoke about earlier on that case the criminal possession of a weapon case?
A December seven.
Q You were brought back before a judge here, is that correct?
A Correct.
Q What happened when you were here?
A I got remanded to Riker's Island.
Q Did there come a time went you were released from there?
A Correct.
Q Approximately how long after?
A Like about a week.
Q Were you violated by the Kings County District Attorney's on that arrest?
A Not yet.
Q Was anything promised to you about the Binghamton case?
A Not at all.
Q Nobody made any promises to you on the pending case correct?
A No.
Q Do you understand that you haven't been, you

still do face being sentenced because of the Binghamton arrest?

A Correct.

Q If you are convicted, is that correct?

A Correct, maam.

Q Do you know what happened withdrawn. Was anyone else arrested with you in Binghamton?

A Correct.

Q Do you know what happened to that individual?

A He is my co-defendant.

Q Right. Do you know what happened to his case?

A He got indicted on his case.

Q On your case have you been indicted on that case?

A No.

Q Do you withdrawn. Do you have any future date for that case?

A No.

Q Were you told a time to come back?

A No.

Q Were you told anything about that case?

A Just told my private attorney he will contact me if I have another court date.

Q You said if you have another court date?

A Right.

Q Right now, there is no other court date is that

correct?

A Correct.

Q Prior to pleading guilty on this case that we talked about, that you haven't been sentenced, did you plead guilty to attempted possession of burglary tools?

A Correct, back in '98.

Q That was in '98. Other than those two cases where you plead guilty did you plead guilty to any other cases?

A No.

Q I want to direct your attention to February '03 say the first week of February '03, at that time did you have a good relationship with the defendant Glen Cummins?

A Correct.

Q That was a friendly relationship like you spoke about?

A Yes.

Q This conversation you had with him was this a face to face conversation?

A Correct.

Q Was the conversation regarding Alonzo Mack?

A Yes.

Q What if anything did the defendant say to you?

A He said he got the information on slob, means a term of Blood.

Q When he said you got the information on slob let me ask you first of all, what is the word you used slob. Does that mean anything to you?
A Yes.
Q What does it mean?
A Term of slob which means it's a Blood.
Q Do you know what he was referring to when he said Do you have the information on slob?
A Yes.
Q What was he referring to?
A Free.
Q When you say Free what was he referring to or what was that referring to?
A Alonzo Mack.
Q Did he say anything else; did he say anything further?
A Yes. He got the date when he was supposed to be released from the internet.
Q He said he got the information on slob. What did that mean to you the information?
A His release date.
Q When you say his release date, you're referring to Alonzo Mack; is that correct?
A Yes, he is currently incarcerated.
Q You're testifying, that meant I got the

information on slob that that was, he was referring to the release date of Alonzo Mack?
A Correct.
Q Did you say anything to him when he said that he had the information on slob?
A Yes.
Q What did you say?
A I said what you talking about really like?
Q Did he respond?
A Yes.
Q What did he say?
A He said he got the date February eighteen. He is February eighteen, 187.
Q Prior to him saying 187, what was the phrase that he used prior to the 187?
A He explained that.
Q Prior to him saying 187, did he use another phrase at first before the 187 came up?
A He's going to handle that.
Q What did you take I am going to handle that to mean?
A That means I am going to deal with the issue. That's a wrap.
Q Just tell us, what does that mean when he says he is going to deal with the issue, that's a wrap?

A Send him home, good-bye.
Q What does that mean to you?
A To me it means you know kill him.
MR. SHEINBERG: objection.
THE COURT: Overruled.
Q You said that he used the term 187; what does the term 187 mean to you?
A In Crip Gang that's a sign of murder.
Q That a specific sign in the Crip Gang?
A Correct.
Q Now after that from February, early February, first week of February '03 till about February eighteen 2003 how would you describe your relationship between you and the defendant at this time?
A We were cool.
Q You were still friends correct?
A Right.
Q On February eighteen '03 did you have a conversation with the defendant on that date?
A Correct.
Q How did this conversation take place?
A He called my cell phone.
Q Did you speak to him at that time on the phone?
A Yes, maam.
Q Did you have a conversation?

A Yes.
Q What if anything did he say?
A He said he got Free right here with me.
Q When he said he got Free right here, what did you take that to mean?
A I got puzzled. I was like what's going on? You dig what I am saying?
Q Why were you puzzled?
A Because they did have problems.
Q You earlier testified that defendant was a member of the Crips. Alonzo Mack was a member of Bloods. Could you describe the relationship between these two gangs?
A They don't like each other.
Q When you say, they don't like each other, they are on opposite sides?
A Correct.
Q You said that he said I am with Free. Again, again is Free the same person you said earlier; Alonzo Mack?
A Correct, maam.
Q After he told you that what happened?
A He put him on the phone.
Q When you say, he, who did he put on the phone?
A Glen Cummins right there.
Q I just want to be clear. You were on the phone with Glen Cummins; is that correct?

A At first.
Q Then what happened?
A He put Free on the phone.
Q Meaning Glen Cummins put Freedom, Alonzo Mack on the phone?
A Right.
Q Did you speak to Alonzo Mack?
A Yes.
Q What did you say?
A Real brief. I was still shocked what's going on. I was puzzled.
Q After that conversation did there come a time when you met up with Glen Cummins later on?
A That date?
Q Yes?
A Correct.
Q Approximately how long after the phone call?
A Like hour and a half.
Q You met up with Glen Cummins; is that correct?
A Yes.
Q Who was he with?
A Free.
Q When you say Free, is that Alonzo Mack?
A Right.
Q When you were there did you have a conversation

with Free, Alonzo Mack and the defendant?
A Yes.
Q What was that conversation about?
A Was like real brief. He was just trying to ask me questions, all that.
Q Did you specifically talk about something when you had that conversation?
A Yes.
Q What was that?
A He was talking about the time he had got shot.
Q I just want to ask you about, let me ask you another question.
When you met up with Glen Cummins and Alonzo Mack was Alonzo Mack holding anything in his hand?
A Correct.
Q What was he holding?
A A Timberland box.
Q Now did you have a conversation regarding that Timberland box with those two individuals?
A After Alonzo Mack left.
Q But prior to Alonzo Mack leaving, did you talk about the Timberland boots?
A Yes.
Q What did you say?
A What did he say?

Q Okay. Withdrawn, did you have a conversation with either Alonzo Mack or the defendant about the Timberland boots?
A Correct.
Q Tell me what that conversation was?
THE COURT: And with who?
Q Who that conversation was with Alonzo or Glen Cummins?
A Glen Cummins.
Q It was Glen Cummins you had the conversation with?
A Correct.
Q What was that conversation?
A I took him to the store which is Rag-a-Muffin brought him a pair of Timberlands.
Q Prior to him telling you that, did you see withdrawn. What did you see Alonzo Mack wearing on his feet?
A Timberland.
Q Can you please describe those Timberlands?
A Black pair with gray, three studs on it.
Q After that did Alonzo Mack leave?
A Correct.
Q After Alonzo was it only you and Glen Cummins together?

A Correct.
Q At that time did you have the conversation with Glen Cummins?
A Correct.
Q Tell me what was the substance of that conversation?
A He said he got him. He is going to rock him.
Q He said to you I got him I am going to going to rock him. Did he say anything further?
A That means you know he got a plan like let's go after him. That's why he took him to buy the pair of Timberlands, you know.
Q When the defendant said to you he was going to rock him, what did that mean to you?
A Again send him home like.
Q When you say send him home what does that mean?
A Dead, kill him.

MS. MILLUS: I would like the witness shown what has been marked in evidence as I believe People's Exhibit two if I can see it before it's shown to the witness.

Q Mr. Mohammed, you're being shown what has been already introduced into evidence as People's Exhibit two.

I want to take you to that picture. There are a pair of boots in that picture; is that correct?

A Yes.
Q Can you describe what you're looking at?
A Black, gray, Timberlands with three studs on it.
Q Are those Timberlands in there do they look like the same type of Timberlands that you saw Alonzo Mack having?
A This is correct, pair.
Q That would be the same pair that this defendant, looks like the same pair that this defendant bought Alonzo Mack; is that correct?
A Correct.
MS. MILLUS: I have nothing further with that exhibit.
Q Now, I want to bring you to April second, '03. What is your relationship at this point with the defendant Glen Cummins?
A We still friends.
Q Again, just to again from say from the time in February to April are you still hanging out basically on a daily basis?
A Correct.
Q Did there come a time in the morning of April second '03 that you saw the defendant?
A Correct.
Q Where was it that you saw him?

A Woodruff and St. Pauls.
Q That's here in Kings county?
A Correct.
Q What was he wearing when you saw him?
A Black hoody.
Q Who was he with?
A He was with lucky and Naftali.
Q You say Lucky. Do you know lucky?
A Absolutely.
Q Is that a nick-name?
A Correct.
Q Would you know his real name?
A Kurlin.
Q Kurlin?
A Correct.
Q How do you know Lucky?
A Mutual friend for a long time.
Q Is Lucky mutual friends with the defendant?
A Right.
Q Who else was he with?
A Naftali.
Q Did you have a conversation with him at that time?
A Correct.
Q What if anything did the defendant say to you at

that time?
A Said, it's hot don't go over there.
Q When he said, it's hot don't go over there what did you take that to mean?
A Means he just did something.
Q Did he say anything else at that time?
A Yes, he said I just put that in.
Q What does, I just put that in mean to you?
A That means somebody just got shot, killed.
Q What else did he say to you?
A He's like don't go over there. Basically we walked back to the building.
Q Did he say anything else to you. Did he use any other language, terminology?
MR. SHEINBERG: Asked and answered, objection.
THE COURT: Overruled.
Q Specifically, at this time did he say anything else?
A That 187 is done.
Q Did the defendant say I did slob --
MR. SHEINBERG: Objection.
THE COURT: Sustained.
Q Did he say anything else?
MR. SHEINBERG: I am going to object to the

line of questioning.

THE COURT: Do you have an objection; it's sustained at this point.

MR. SHEINBERG: Thank you.

Q What else did he say to you?

MR. SHEINBERG: Objection.

THE COURT: Overruled.

A He said he just put that in. He just sent Free home. That's basically what it was.

Q I want to know what the exact words are, what he told you?

A He told me did what he had to do, basically regular talking.

Q At that time did he show you anything?

A Correct.

Q What exactly did he show you?

A The weapon .40 caliber.

Q How did you know it was a .40 caliber?

A I was around guns before. I know what kind of gun it is.

Q When you say that he said that he took care of it. Did you know what he was referring to; did he specifically say who he took care of?

A Free.

MR. SHEINBERG: Objection

THE COURT: Sustained, leading.

MR. SHEINBERG: Thank you.

Q What did you take it to mean when he said I took care of that?

A Talking about Free.

Q Did he specifically use the name Free?

A Correct.

Q Is Free, what did you take that to mean; who's Free?

A Alonzo Mack.

Q After that conversation did you see where the defendant went?

A He went upstairs in the building; 48 St. Pauls.

Q Did you leave that location?

A Correct.

Q Did there come a time later on that you saw Glen Cummins again?

A He was right there during the whole crime scene, everything. Like I seen him an hour after that.

Q Again, was it in the same vicinity you said before; 48 Saint Pauls?

A Cook Avenue and St. Pauls?

Q That the same vicinity as 98 Woodruff?

A Like around the corner, down the block, not too far.

Q Now you see him. Now who is he with?
A Just me and him standing on the corner.
Q Do you notice anything about him that's different than it was earlier that day?
A He changed from his black hoody.
Q Do you remember what he is wearing at that time?
A Like purple foot ball jersey, something like that.
Q Now at that time Do you have another conversation with him?
A Yes.
Q Now, what does he say to you at that time?
A He told me he hit him up four times.
Q When he said he hit him up four times, did you know who he was referring to?
A Alonzo Mack.
Q What did it mean when he says he hit him up four times. What does that mean to you?
A He means that he did it.
MS. MILLUS: I have no further questions.
THE COURT: You may inquire.

CROSS-EXAMINATION
BY MR. SHEINBERG:

Q Mr. Mohammed you're doing fine. Is that right, you're at liberty now?

A I am doing all right.
Q You're not in jail are you?
A No, I am not.
Q Even though you violated your agreement with the District Attorney's office by being arrested in Binghamton. You're still at liberty is that right?
A No.
Q You're in jail?
A I face sentencing soon.
Q But you're walking around the street; is that right?
A Correct.
Q In fact at one time you weren't on the street you were in jail?
A Correct.
Q I think in July of 2004?
A 2003.
Q Just let me get to that. July twelve '03 that's when you were arrested had been found with the gun?
A Correct.
Q Tell us about that part?
A I was guilty of everything they said.
Q You were guilty of possessing a gun?
A Correct.
Q What kind of gun?

A Nine millimeter, loaded firearm.
Q You fired that firearm?
A Correct.
Q In fact I think you fired that firearm in an area of thirty people?
A Correct.
Q You didn't know those people did you?
A Not at all.
Q Could have been children, right?
A It wasn't children was late.
Q Could have been there. Were their people there?
A Was like two, 3:00 in the morning.
Q But you shot at thirty people, two, 3:00 in the morning?
A Never shot at anyone.
Q July twelve, '03 at about 3:03 am near Snyder Avenue, Brooklyn that you fired a gun in the vicinity where there were thirty people in that location?

MS. MILLUS: Objection, Objection asked and answered?

THE COURT: Overruled.

A That's what happened.
Q At thirty people?
A Not at thirty people.
Q You shot at a number of people?

A No, I didn't.
Q When you were arrested on July twelve '03 you went before a court you were read a complaint, weren't you?
A Rephrase that.
Q You went before a court?
A Correct.
Q You had a lawyer at that time?
A Yes.
Q He told you what you were charged with?
A Correct.
Q Did he tell you on or about July twelve '03 approximately 3:08 at or near Flatbush and Snyder Avenue county of Kings New York that you possessed a firearm that you caused that firearm to be fired and in the vicinity where there were, if I may, a number of people, thirty people to be exact.
Did he read that to you?
A Felony complaint, correct.
Q Did he tell you that?
A He didn't say at people.
Q But the felony complaint says at thirty people. But you didn't care. You just fired the gun.
MS. MILLUS: Objection.
THE COURT: Sustained, don't answer.
Q You just fired that gun?

THE COURT: Overruled.

Q You just fired that gun at people right?

A I wasn't charged with attempted murder if that's what you're getting at.

Q I didn't say that. But you fired that gun at people; is that right?

MS. MILLUS: Objection.

THE COURT: Overruled.

A I fired a weapon. I was guilty. That was it.

Q At people.

A No.

Q Where did you fire it?

A I just fired it in the air.

Q So when the complaint says, I fired at thirty people that complaint is wrong; is that right?

A Correct.

Q You pled to everything you told us the circumstances about?

A I pled guilty, yes I did.

Q One of the guilty pleas was to reckless endangerment in the first degree; is that right?

A Correct.

Q You recklessly engaged people by firing a gun at them?

THE COURT: Sustained.

Q Did you recklessly engage a group of people by firing a gun yes or no?

MS. MILLUS: Objection.

A Correct. If that's what you're saying.

Q That's what you did, is that right?

A If I had a weapon.

Q When you were arrested you were held without bail?

MS. MILLUS: Objection.

THE COURT: Overruled.

A No, I wasn't.

Q How much bail did they hold you on?

A Five hundred.

Q Five hundred or fifty thousand dollars?

A Five hundred.

MR. SHEINBERG: Can we approach.

THE COURT: Off the record.

Q You say you were held on five hundred bail?

A Yes after I got arraigned.

Q You were released?

A Correct.

Q You never spent any time in jail?

A Overnight.

Q Then you were released?

A Right.

Q After that when was the first time you spoke to the District Attorney's office regarding this case?
A March.
Q March, what year?
A Two thousand four.
Q That would be approximately number of months after you were released on this case?
A Correct.
Q You say you fired a gun; do you carry a gun?
A No I don't.
Q Where did you get this particular gun that you had in July '03?
MS. MILLUS: Objection.
THE COURT: Overruled.
A That night my life was in danger. I took IT from my friend. I fired the gun.
Q Which friend?
A Kurlin.
Q You took the gun; he gave it to you?
A No I took it out of his hand.
Q Was a nine millimeter?
A Correct.
Q Before you entered into this agreement with District Attorney's office you spoke to detectives; is that correct?

A Correct.
Q In fact kind of debriefed you. You gave them all the information?
A Can you rephrase?
Q Please answer my question. It's easier. You spoke to detectives; is that right?
A Correct.
Q You know the name of the detectives?
A No I don't.
Q Did you speak to a District Attorney?
A No, I didn't.
Q You never spoke?
A In March 2004.
Q Before you gave the cooperation agreement; is that right?
A That's the time it was in process.
Q And before you entered into an agreement you spoke to a District Attorney or a detective; is that right?
A Correct.
Q They took a history of your relationship with Freedom, your relationship with Glen Cummins, Glen Cummins, is that correct?
A Not at all.
Q Never asked you about that?
A Not at all.

Q By the way you a gang member?
A No.
Q Never been?
A No.
Q You ever tell an Assistant District Attorney or detective in this case before you entered that agreement that Freedom came back a Blood from jail. His friends were going to get at Abdul. Freedom got shot and said Abdul did it. Do you remember shooting Freedom?
A I don't remember shooting Freedom.
MS. MILLUS: Objection.
THE COURT: Overruled.
Q Did you ever point a gun at Freedom?
A Never.
Q Did you tell the police or District Attorney's office you did that?
A What are you talking about?
MS. MILLUS: Objection.
THE COURT: Overruled.
Q Did you tell the District Attorney or the police that you did that?
A That I did what?
Q That you shot Freedom?
MS. MILLUS: Objection. May we approach?
THE COURT: No, continue.

Q Did you tell them that?
A I never told them I shot at Freedom.
Q If they took this down, wrote it down, it would be incorrect; is that right?
A Correct.
Q Let's go to the time when you talked about I think is the early part of '03. When you say you were friends with Glen Cummins; remember that?
A Correct.
Q Remember talking to us about February two thousand three where Glen Cummins, Glen Cummins and Alonzo Mack or Freedom and you were together. Remember that?
A Correct.
Q You told us that Freedom or Mr. Alonzo Mack was a member of a rival gang Blood, I think you mentioned?
A Right.
Q And that the defendant was a member of Crips?
A Correct.
Q They are at odds, don't like each other?
A Correct.
Q But yet they were together, him and the defendant, is that right?
A That was the plan.
Q Plan. But they were still talking to each other?
A Right.

Q This plan you had you found out about that when?
A He told me that first week of February.
Q But when they met up after he got out of jail they were talking to each other?
A Correct.
Q And you were there?
A Correct. I approached hour and a half after, after he had called me.
Q You came there. Glen Cummins said he had bought a pair of sneakers?
A Both similar.
Q Timberlands, Timberlands boots for Freedom or Mack?
A Yes.
Q They were cordial, friendly?
A No, they wasn't.
Q They were talking to each other?
A That didn't mean anything.
Q To you it didn't mean anything?
A Because I already knew.
Q Did you ever hear Glen Cummins say I am going to kill this man?
A Yes.
Q You talked about 8187, you talk about all kinds of nonsense. Ever hear I am going to shoot, kill this man?

A Correct.
Q What did he say, when?
A He said what I said.
Q Say it again?
A Listen --
THE COURT: Please answer the question.
A He told me.
Q When?
A February.
Q Of what year?
A Two thousand --
Q What did he say?
A That he got him.
Q What did he say?
A He is going to get him when he came home. He has got the information on slob?
Q What did he say?
A He is going to kill him.
Q In those words not, 187?
A All that.
Q All that. That's what you took it to mean; is that right?
A Exactly.
Q Never said I am going to shoot him, kill him. He said I am going to 187, that nonsense?

A In the sense of murder.
Q What it means to you?
A It means to everybody.
MS. MILLUS: Objection.
THE COURT: Overruled.
Q Doesn't mean that to me.
MS. MILLUS: Objection.
THE COURT: Objection is sustained.
Q Mr. Mohammed, you have committed many crimes haven't you?
MS. MILLUS: Objection.
THE COURT: Overruled.
A No.
Q You committed a shooting as we discussed before in July of '03, remember that?
A Correct.
Q You have committed crime on February, December second '05. Remember that?
A Correct.
MS. MILLUS: Objection.
THE COURT: Overruled.
Q You committed sale of narcotics; is that right?
A Incorrect.
MS. MILLUS: Objection.
THE COURT: Overruled.

Q What were you arrested for in Binghamton?
A Criminal possession of control substance.
Q With intent to sell?
A That's what the felony complaint said.
Q B felony?
A Correct.
Q How many years are you facing on a B felony?
MS. MILLUS: Objection.
THE COURT: Overruled.
A I don't know.
Q Twenty-five years; is that right?
A You tell me.
Q You have a lawyer, he told you?
MS. MILLUS: Objection.
THE COURT: Overruled.
Q Didn't your lawyer also tell you that when you plead guilty to possession of a weapon in the second degree, a C felony that you were facing three and a half to fifteen years, not three and a half to five years. Am I correct on that?
MS. MILLUS: Objection.
THE COURT: Overruled.
A No.
Q Your lawyer never told you that?
A Never said three and a half to fifteen, three and

a half to seven?
Q Never told you three and a half to fifteen?
MS. MILLUS: Objection.
THE COURT: Overruled.
A Three and a half to seven.
Q You know three and a half to seven means you're a predicate second felony offender. That's not what you are you?
A By the law, yes.
Q What was your first felony?
A Criminal possession of a weapon. That's what they charged me with.
Q That's the July two thousand three arrest?
A Right.
Q Prior to that, before that, were you ever convicted of a felony?
A No.
Q Therefore you were a first felony offender in July, '03?
A Correct.
Q Did your lawyer tell you that a C felony carries a sentence, violent C felony carries a sentence three and a half to fifteen years?
A No, three and a half to seven.
Q Three and a half to fifteen years?

A Three and a half to seven.

MS. MILLUS: Objection.

THE COURT: Overruled.

MR. SHEINBERG: Can we have an instruction what a C felony is.

THE COURT: No, just continue.

Q Continuing on. You told me, you told the District Attorney that you entered into this agreement and you testified; is that right?

A Correct.

Q You testified truthfully?

A Correct.

Q You also entered into agreement with District Attorney's office that you were not to commit any other crimes?

A Correct.

Q If you committed any other crimes what would happen?

A I will be sent to jail.

Q All right. Sent to jail on which charge, the first gunshot?

A Correct.

Q And the second charge, obviously?

A Correct.

Q But yet you did commit a crime?

A Correct.
Q Right after basically, you entered into that agreement with the District Attorney's you went to Binghamton?
A Correct.
Q You possessed drugs with intent to sell?
MS. MILLUS: Objection.
THE COURT: Overruled.
A No.
Q That's what you were charged with?
A Charged?
Q Yes, charged with possession of narcotics with intent to sell. What kind of narcotic?
A Crack-cocaine.
Q So you dealt cocaine. Were you in possession of cocaine?
MS. MILLUS: Objection.
THE COURT: Overruled.
A No.
Q You were not guilty of that charge; is that right?
A They ROR'd me on that.
Q Doesn't mean you were not guilty, they released you?
MS. MILLUS: Objection.

THE COURT: Overruled, ROR'd me, release on my own recognizance.
Q They released you after you were arraigned?
A No they sent me to the county. I waited to pay the lawyer.
Q Your lawyer came?
A He came.
Q Had you released?
A No went before the judge then the judge ROR'd me.
Q He released you?
A Exactly.
Q And the case is still pending?
A Not to my knowledge.
Q You weren't dismissed on that case?
A I don't have a court date.
Q Doesn't matter --
MS. MILLUS: Objection.
THE COURT: Sustained.
Q Was that case dismissed?
A No.
MS. MILLUS: Objection asked and answered.
THE COURT: Overruled.
Q Still pending?
A Until the judge notifies my lawyer.
Q Still an open case?

A Correct.
Q You're still facing a B felony?,
A Correct, if you are putting it like that.
Q You're still facing twenty-five years in jail?
MS. MILLUS: Objection.
THE COURT: Overruled.
Q Isn't that correct; you know that, you have been around?
MS. MILLUS: Objection.
THE COURT: Objection is sustained.
Q You know you're facing twenty-five years in jail?
THE COURT: Objection is sustained at this point.
Q Where are you from?
A Flatbush, Brooklyn. If that's what you talking about.
Q Where were you born?
A Trinidad.
Q Are you a citizen?
MS. MILLUS: Objection.
THE COURT: Overruled.
Q Are you lawfully admitted permanent resident?
A Correct.
Q You realize you face deportation?
A Correct.

Q Was that part of a deal with the D.A?
A No.
Q Part of the deal with D.A. was that you testify and You're going to get a deal on your gun case; is that right?
A Never was promised to me.
Q How about the gun case; nothing was promised?
A Nothing was promised.
Q But you're on the street now?
A Correct.
Q You expect to say on the street?
A No.
MS. MILLUS: Objection.
THE COURT: Overruled.
Q You expect to go to jail?
A I expect that.
Q How many years do you expect to be in jail?
A That's on court decision.
Q Let's go to the time when you were talking April, second or April third of 2003.
You told us on that day that you met Mr. Glen Cummins?
A Second or third; which one you stating?
Q Let's take the second or third that you met?
A Second.

Q April second you met Glen Cummins. April second '03, where did you meet him?
A On the corner Saint Paul and Woodruff.
Q What time?
A Little before noon.
Q Who was he with?
A Kurlin and Naftali.
Q Two other people?
A Correct.
Q Did you have a conversation with him?
A Yes.
Q What did he say?
A It's hot over there.
Q Meaning police were on the street?
A Police were not present but he said it's hot.
Q Something happened over there?
A Exactly.
Q He didn't tell you what happened?
A Yes said he just put that work in.
Q What does that mean?
A That means 187.
Q Did he say, I shot Alonzo, I shot Freedom?
A Yes he told me.
Q Let me hear the words.
A He just said I rocked him to sleep, the whole

term. 187 means you're dead.

Q That's what it means to you. But nobody else in this world?

A That's incorrect.

MS. MILLUS: Objection.

THE COURT: Sustained.

Q Did he use the words, I shot him?

A Correct.

Q What did he say?

A Down the line he told me that he shot him four times.

Q He said those words, I shot him, not I rocked him?

A After that he went through it, after the whole incident happened.

Q When?

A Like an hour after.

Q Who was present?

A Me and him.

Q Just you and him?

A Exactly.

Q Before it was him and two other people?

A Exactly.

Q What you're telling us is when you were only present is when he says he rocked or shot him?

A Exactly.
Q When he said it's hot, officers there on the street, there were other people present?
A They was walking on the side of him. But they were not like in our conversation.
Q What about in February of 2003 when Mr. Freedom or Alonzo Mack was with the defendant you were the only other person there, right?
A Correct but I had people on the block but they were not in the --.
Q Who else was there?
A Just us three.
Q You want us to believe when anything incriminatory was said you were there alone. Nobody else was there that could corroborate what you said; is that right?
A Correct.
Q Anything that was said that involves Glen Cummins, Glen Cummins in this particular activity you were the only person present?
A Correct.
Q After this happened or you talked about rocking or shooting in April second, '03 did you have any other conversation with the defendant about this?
A Later on that day, like nothing after two

thousand.
Q Nothing after April second?
A Nothing after that.
Q You were still friends?
A Yes we were still friends.
Q Did there come a time went you decided to talk to the District Attorney as you told us after you were arrested on the gun charge?
A Yes, down the line.
Q Reason you decided to tell the District Attorney all this stuff that you're telling us is to save yourself some time?
A Not at all.
Q You're doing this out of charity of your heart?
A Not at all like I say I was in danger.
Q You were in danger?
A I was incarcerated. He was sending messages.
Q Sending messages to you. How was he calling you?
A No through his ex-girlfriend.
Q Who is his ex-girlfriend.
A Teisha Wallace.
Q When was he staying with you, were you staying with him?
A No.
Q Why would she come to be visiting you?

A Because she was close friend.
Q You were getting all these messages?
A No.
Q Glen Cummins gave you all these messages?
A No, he is not going to talk about it.
Q You told us he was talking so freely about this?
A No, why he going to tell me?
Q You say you were in Riker's Island. What were you doing there?
MS. MILLUS: Objection.
THE COURT: Overruled.
A I was locked up.
Q When?
A 2003, July twelve.
Q How long are you locked up?
A Approximately eight months.
Q Now I am confused. Please unconfuse me. You told us before earlier in my examination that when you were arrested in July for this gun and shooting that you made five hundred bail, remember?
A Correct.
Q Then you made bail. Meantime you go out on bail?
A Exactly. I was out on the street to October 7th because I reach the jail late judge remanded me.
Q October seven?

A Until October seven.
Q You were out all this time?
A All this time?
Q Then the judge put you back in jail?
A Remand without bail.
Q Why?
A Because I reach the court late.
Q Just because you reached late he put you in jail?
A Right.
MS. MILLUS: Objection.
THE COURT: Overruled.
Q No other reason?
A No other reason.
Q You spent eight months in jail?
A Right.
Q You were released because you made a deal with the D.A?
A Right.
Q In fact District Attorney's office permitted you be released without bail, just ROR'd?
MS. MILLUS: Objection.
THE COURT: Overruled.
A Right.
Q When did you hit the street after your eight months in jail?

A June third, 2004.
Q June third, 2004.
Did you speak, did you make a deal with the District Attorney's office?
A I already had.
Q You had the deal already?
A Yes.
Q When was that deal made?
A Final deal was in April.
Q Of 2004?
A Exactly.
Q You were still in jail or released?
A Still in jail.
Q They eventually released you?
A Yes.
Q You have been out ever since doing selling drugs?
MS. MILLUS: Objection.
THE COURT: Sustained.
A No, I work.
Q What other crimes have you committed since being out you can tell us?
A Just the one that I talked about in Binghamton.
MS. MILLUS: Objection.
THE COURT: Sustained.
Q That's the only one you --

MS. MILLUS: Objection.

THE COURT: Overruled.

Q That's the only crime you committed?

A That's the one you said in Binghamton about. That's it.

Q Do you work?

A Yes, all around construction.

Q Who do you work for?

A I work for a company, moving company all that.

Q You paid on the books?

A Off the books.

MS. MILLUS: Objection.

THE COURT: Overruled.

A Off the books.

Q How often do you work?

A Seven days, sometimes six.

Q Still living in the same area where you live?

A Correct.

Q Are you a member of a gang yet?

A No.

Q Have you ever been a member of a gang?

A No.

Q How long did you know Alonzo Mack?

A I said before same time I moved into the neighborhood.

Q Do you know a person Harv (sic)?
A Correct.
Q Who's Harv?
A That's his friend.
Q Who's friend?
A The person that he shot in his house.
Q Whose friend?
A Alonzo's friend.
Q I see. Person that he shot in his house?
A That's where the murder happened, at his house.
Q How do you know this?
A 92 Woodruff, that's the scene of the crime.
Q Who told you this?
A Was all over.
Q What was all over?
A He told me himself.
Q He said you were in the house?
A He was in the house? How could I possibly be in the house?
Q You had nothing to do with the shootings?
A When he met me down the block there --
Q Did you have anything to do with the shootings?
A Not at all.
Q In the year 2002 you never shot Freedom?
A No.

Q Certain of that?
MS. MILLUS: Objection.
THE COURT: Overruled.
A No.
Q You never ever told the police or District Attorney's that you shot Freedom; yes or no?
A Never shot Freedom.
MS. MILLUS: Objection. May we approach?
THE COURT: No.
Q Yes or no?
A Never shot Freedom.
Q Did you ever tell that to the District Attorney or did you go to anybody in law enforcement, yes or no?
MS. MILLUS: Objection.
A No.
MR. SHEINBERG: Judge, I would like to speak to the District Attorneys for one moment before I continue.
THE COURT: Let's do A side bar.
(Whereupon, an on the record conference was held between all counsel and the Court at the side-bar.)
MR. SHEINBERG: I am reading history. Freedom came back a Blood from jail. His friends were going to get at Abdul. Freedom got shot

said Abdul did it.

MS. MILLUS: Freedom is saying Abdul did it.

MR. SHEINBERG: Yes. But I have notes here. I am asking him if he did it.

MS. MILLUS: You have been insinuating that he is saying it.

THE COURT: You can't mislead the jury.

MS. MILLUS: You're misleading.

THE COURT: One at a time.

THE COURT: I permitted you to ask a question. If there is a good faith basis in asking a question.

MR. SHEINBERG: Freedom got shot, said Abdul did it. I asked him; did you shoot Abdul?

MS. MILLUS: You keep saying isn't it true?

MR. SHEINBERG: Where did he get this stuff?

MR. MARRONE: You have to ask that person not him.

MR. SHEINBERG: Who do I ask?

THE COURT: You have to ask the question if he said it you've got to ask him. Then you've got to bring in the D.A that's the process you use.

MS. MILLUS: Right. We can do that but that's not what you're saying.

THE COURT: Says Freedom got shot, said Abdul did it.

MR. SHEINBERG: I asked him; did you shoot Freedom? Did you tell anybody you shot Freedom?

THE COURT: Who's this a record of?

MS. MILLUS: These were the hand written notes that were taking during the proffer section with witness Abdul Mohammed.

I want to be clear on the record what Mr. Sheinberg says, I am going to ask to look back at the minutes. What I am hearing, he keeps saying; isn't it true that you shot him? Meaning Abdul shot him. It's not saying that Abdul said he shot him. It's saying Alonzo Mack is accusing him. If he asked that one question; did you ask him? That's not what I am asking. I think the jury is confused. What I believe he is saying is that he said he shot Freedom.

MR. SHEINBERG: All he has to do is say, no.

MS. MILLUS: But you're looking at a statement just like the complaint before when you're saying you said you shot at thirty people. That's not the words. He said he shot at thirty people present in the vicinity of thirty people.

THE COURT: In your redirect say that, isn't

is it a fact that the complaint says blah, blah, blah? But this says there is a history. He is entitled. He is stuck with the answer.

In order for him to be able to show anything he has to bring in this person who ever this person is to indicate that he said you know that Abdul did it. Freedom got shot. Abdul did it.

MS. MILLUS: His statement --

THE COURT: You're not listening. A history would mean I am writing down what the man is saying to me. The man is saying to me, Freedom got shot. And he is saying to me, Abdul did it. That's the way I am reading.

MR. SHEINBERG: That's the way I am reading it.

MS. MILLUS: This is a proffer. Abdul is giving a history of the gang affiliation. He is saying Freedom got shot and said Abdul did it. Freedom is accusing Abdul of doing it.

THE COURT: If you want to correct something you can correct it.

MS. MILLUS: The set is referring to Freedom. Freedom got shot saying Abdul did it.

THE COURT: That's what you're saying. This is a history written by a third person.

MS. MILLUS: Then I am going to have to call a rebuttal.

THE COURT: This is a history written by a third person. It's written by a third person.

At this point it's only a question. He said no.

MR. SHEINBERG: That's all he said, no.

THE COURT: He has already said no.

MS. MILLUS: Right. Did he shoot him? Then it's over, can't be asked again.

THE COURT: This is cross examination. he gets more latitude than you get in direct in leading, okay?

(the following occurred in open court:)

THE COURT: We are going to break for lunch. Please be back two fifteen. Do not discuss this case among yourselves. Do not come to any conclusions until you have heard all the evidence and I charge you on the law. See you back here two-fifteen.

(jury exiting)

(whereupon the court adjourned for lunch after which court reporter Jacqueline Arce continued recording)

A F T E R N O O N S E S S I O N

THE CLERK: Case on trial continued, People vs. Glen Cummins, Indictment 3066-04.

MS. MILLUS: May we approach quickly before the jury comes in?

THE COURT: Yes.

(Whereupon, a sidebar discussion was held off the record.)

THE COURT: Bring the witness in.

(Whereupon, the witness, Abdul Mohammed, resumes the witness stand.

THE COURT: Bring the jury in.

THE COURT OFFICER: Jury entering.

(Whereupon, the jury enters and is seated.)

THE COURT: Case on trial continued, all parties are present. Defendant is present. All jurors are present.

Counsel waive the reading of the roll?

MR. MARRONE: So waived.

MR. SHEINBERG: Defense waives.

THE COURT: Please be seated, folks.

Sir, I want to remind you, you are still under oath.

THE WITNESS: Okay.

THE COURT: You may inquire.

CROSS EXAMINATION continued

BY MR. SHEINBERG:

Q Mr. Mohammed, we talked this morning about the fact that before you entered into this agreement, this cooperation agreement with the District Attorney's Office, you had spoken to a District Attorney or some detectives, is that correct?

A A detective.

Q Detective?

A At first.

Q And that was the same day that you entered into the cooperation agreement or before that?

A It was before that.

Q About how long ago?

A Like a month or two.

Q Sorry?

A About like a month or two.

Q Before the cooperation agreement?

A Correct.

Q And now do you remember the detective's name?

A Platt, Charlie Platt.

Q Judge Platt -- not Judge Platt, "Platt" was his name?

A Correct.

Q And when you spoke to him he was in effect asking you what happened, is that right?

A Correct.

Q And you gave him a history of your relationship with Mr. Cummins and your relationship with Freedom or Mr. Alonzo, is that correct?

A Correct.

Q And when you spoke to him you talked to him about that February meeting, remember that thing you told us about when you met February 13th or February 18th?

A You are talking about which one?

Q February, where you talked about the meeting with Mr. Cummins and with Alonzo?

A You are talking about February 18th?

Q The 18th?

A Correct.

Q You were there with Alonzo and you were there with Mr. Cummins, is that correct?

A Correct.

Q And did you tell Detective Platt about this, the sneaker thing?

A I don't recall, I can't remember that.

Q Did you tell Detective Platt that you saw Freedom and Coolie together?

A Correct.
Q Right?
A I think.
Q Sorry?
A I think so.
Q I mean you were talking to them pretty straight forward?
A Right.
Q And you weren't making things up?
A Not at all.
Q And you never mentioned the Timberland symbol?
A I remember the Timberland, I had to come clean about everything, right.
Q Yes.
A Exactly.
Q Did you mention to him that Freedom confronted Abdul about the shooting and everything was squashed?
A Everything was squashed about what?
Q The shooting, that you shot Freedom, remember that?
A No.
Q You don't remember saying that to the detective.
A No, I did not talk to him about that.
Q Did you mention to the detective that Freedom

confronted Abdul, re: the shooting and everything is squashed?

A It wasn't squashed on my behalf.

Q May not have been squashed but the shooting when you shot Freedom --

MS. MILLUS: Objection.

A I didn't shoot nobody.

MS. MILLUS: There is no evidence.

THE COURT: Overruled.

Q Sir, what you are telling us today, this whole testimony today, you want us to believe is the truth, right?

A Right.

Q And you want us to believe you are pretty truthful, you do the right thing?

A Correct.

Q And when you asked the District Attorney's Office in December, on December 1st if you can or the police on December 1st, if you can leave Brooklyn and go to Binghamton, you asked them to do that?

A Correct, on December 1st.

Q You asked if you can leave and they gave you permission?

A Correct.

Q Obviously you didn't tell the police you were

going to sell drugs?

MS. MILLUS: Objection.

A I was not selling no drugs.

MS. MILLUS: Objection.

THE COURT: Sustained.

Q You didn't tell the police that you were going to Binghamton to possess drugs, were you?

MS. MILLUS: Objection.

A How can I tell the police when you just said the Assistant District Attorney?

THE COURT: Sustained.

Q Did you tell the police?

MS. MILLUS: Objection, I ask that the response be stricken.

THE COURT: Counsel, please finish.

MR. SHEINBERG: Thank you.

Q You actually went to Binghamton that same day, is that right?

A No, on the second.

Q And when you got to Binghamton you committed a crime?

A I got arrested, I was charged with a crime, not --

Q You were charged with a crime and that was in direct violation of your agreement, is that right?

A Correct.

Q And you didn't live up to the terms of your agreement, is that right?

A It is not decided yet.

Q You didn't live to up to the terms of your agreement?

MS. MILLUS: Objection.

A I didn't say I was in, you can say that I was in police contact, you can say that.

Q Okay, and you if you didn't live up to the agreement with the District Attorneys Office, you, in fact, were, you just didn't care, is that right?

MS. MILLUS: Objection.

THE COURT: Sustained.

Q You didn't care whether or not you lived up to the terms of your agreement with the District Attorney's Office, is that correct?

MS. MILLUS: Objection.

THE COURT: Overruled.

A Impossible.

Q What?

A That is impossible.

Q You didn't care?

A I got three and a half to seven.

Q When you went to Binghamton you asked

permission, they gave you permission to go to Binghamton and in Binghamton the very next day, December 2nd you were arrested for the commission of a crime, is that right?

MS. MILLUS: Objection, asked and answered.

THE COURT: Overruled.

A Correct.

Q Right, and that commission of a crime was a class B felony, a very severe crime?

MS. MILLUS: Objection.

THE COURT: Overruled.

A Since I violated, whatever the consequences are I am going to take it.

Q And that commission of a crime was possession of crack cocaine with the intent to sell it, is that right?

MS. MILLUS: Objection.

THE COURT: Overruled.

A Right.

MR. SHEINBERG: I have no other questions.

THE COURT: Thank you.

Anything else?

MS. MILLUS: Yes, your Honor.

REDIRECT EXAMINATION

BY MS. MILLUS:

Q Mr. Mohammed, on cross examination defense counsel asked you about your criminal possession of a weapon charge, is that correct?

A Correct.

Q And that was on July 12th, 2003, in the vicinity of Flatbush and Snyder, right?

A Correct.

Q And isn't it true that you said before that you didn't fire at anybody specifically, correct?

A Right, correct.

Q And that reading from the complaint in that part where Mr. Sheinberg said earlier, "that the defendant was in possession of a loaded handgun in that informant observed defendant fire a handgun northbound at the above location, where there were over thirty people in and around said location," is that correct?

A Right.

Q It was in the vicinity but not directly at someone, is that correct?

A Correct.

Q Mr. Sheinberg also asked you on cross examination about the term 187, is that correct?

A Correct.

Q And 187 isn't a term you made up, is it?

A No.

Q 187 was not a term that you used, right?

A No.

Q It was the defendant, that is the one who told you, that is the term he used to you, is that correct?

A Correct.

Q And you didn't make up that term, correct?

A No.

Q Mr. Sheinberg on cross examination also asked you about that April 2nd of 2003 is the last time that you spoke to the defendant, that you spoke to the defendant about the shooting, is that what he asked you?

A Correct.

Q And is that correct?

A April 2nd, correct.

Q Weren't you with the defendant the following day?

MR. SHEINBERG: Objection.

A Not to my knowledge, no.

Q You weren't with the defendant two days later when you approached Brenda Jones?

MR. SHEINBERG: Two days later?

Q On the day later?

A Correct.

Q So you did, so you were with the defendant

after April 2nd, correct?

A Correct.

MR. SHEINBERG: Judge, I object to this impeaching her own witness.

THE COURT: Well, the objection is overruled at this point on timing.

Q On April 3rd when you were with the defendant, what happened that day?

A I wasn't, I --

MR. SHEINBERG: I object on the grounds it is improper redirect.

Q Do you remember being with the defendant the next day when he approached Brenda Jones?

A I remember being approached, we was walking down Woodruff and she and her daughter was coming up the block and he approached her.

Q And "he" being the defendant, correct?

A Correct.

Q And do you remember what the defendant said to Brenda?

A He was trying to say it wasn't him.

MS. MILLUS: I am going to ask that this be shown to the witness and marked for identification as People's number ten -- eleven?

THE COURT: Show it to defense counsel

please.

THE COURT OFFICER: (Handing)

THE COURT: Mark it People's 11 for identification please.

MR. SHEINBERG: Just for identification.

THE COURT: Yes.

MS. MILLUS: I am just going to direct your attention to the first line, if you can read that to yourself.

Did you read it?

A Yes.

MS. MILLUS: If I can have it back please?

THE COURT OFFICER: (Handing)

Q Mr. Mohammed, you did meet at the District Attorney's Office and did you have a conversation where you said that Detective Platt was there and another, you were there and you talked about information that you have, evidence, correct?

A Correct.

Q Do you remember, do you remember telling the Detective Platt that Alonzo Mack accused you, says that you shot him back in 2002, is that something he accused you of?

A Correct.

Q So that is correct?

A Correct.

Q And let me ask you, do you remember, do you remember when exactly it was, the time that Alonzo Mack accused you of shooting him back for something when he got shot in 2002?

A Right after like January 5th.

Q After January 5th, was anyone else present when Alonzo Mack had confronted you about saying that he thought you shot him back in 2002?

A Yes.

Q And who was that?

A Glen.

Q Okay, and would you be talking about, earlier you said there was a time that on, I believe, February 18th when you met up with the defendant, Alonzo Mack, is that the same day this happened?

A Rephrase that for me please.

THE COURT: Will the court reporter please repeat the question?

(Whereupon the last question was read back by the reporter.)

A Correct.

Q I want to be clear, you testified earlier that Alonzo Mack leaves and you and the defendant Coolie are together, is that correct?

A Correct.

Q And once Alonzo Mack leaves after he has that conversation with you, does the defendant say anything?

A Said "I got that, I got that, I am gonna rock him to sleep."

THE COURT: Anything else, counsel?

MR. SHEINBERG: No.

THE COURT: Thank you, you are excused.

(Whereupon, the witness is excused.)

THE COURT: We are going to take a short recess. We will be right back, I will give you exercise.

Do not discuss the case among yourselves or come to any conclusions until all the evidence is in and I charge you on the law.

(Whereupon, the jury is excused.)

THE COURT: I will hear you on the issue of bringing an expert in.

MS. MILLUS: Yes, your Honor, the People would like to call an expert as to the meaning of the terminology of what this witness testified, specifically "187" as well as some other words.

The People had no intention of calling an expert on that until Mr. Sheinberg brought up the fact, kept asking repeatedly asking the witness in

this case about what 187 means and consistently when the witness would testify what 187 means. Mr. Sheinberg is saying basically that it doesn't mean "kill."

I think that in any other expert situation an expert is used to enlighten the jury. The terminology we are using here is not for the average person, that a lot of people don't know what these terms mean.

THE COURT: There were other terms.

MS. MILLUS: Also the term "slob," "putting in work" and I would ask that if I be allowed to call the expert, I ask him based on his experience once he is deemed an expert if he is deemed an expert that he would be able to talk about the words.

THE COURT: The expert that you are talking about would be one that has knowledge of the language of the gangs, is that correct?

MS. MILLUS: That's correct, your Honor.

THE COURT: I will hear you.

MR. SHEINBERG: Firstly, Judge, starting from the beginning this witness told you in direct and cross examination that he is not a gang member.

He was not a member of the Bloods, the

Crips or any other gang, we know that.

Secondly, I beg to differ with counsel, I never asked him and I never would ask him what 187 meant.

All I asked was did the defendant ever say "I am going to kill this man." We never went into the fact what 187 meant or some other statements such as slob or slop, whatever that is or "putting in the work," I never mentioned that.

In fact, it was only mentioned on direct and it was objected because it is meaningless to me. I think it is meaningless to anybody.

The point is, if I opened the door and asked those types of questions, I think I would be precluded from asking this argument but I never asked him that and plus most important, the fact that this witness said he is not a gang member.

Now to bring in a gang expert to tell this jury about gangs and things like that, all it does is prejudice this jury. We heard nothing in this case, zip, in this case with respect to why this defendant, if he ever was involved, nothing regarding gangs, nothing regarding gun running, nothing regarding drugs.

The People want to expand this case into

something which it isn't. If you want to do it, Judge, I object very strenuously.

All I am saying to you and just you, I will finish in one moment, this case so far seams to be a simple case as to whether or not the People say that my client had anything to do with the shooting.

They don't say what this guy Freedom was all about. They don't say what the guns were about that they found in the apartment, they say nothing.

Now because they put on a witness who says he is not a gang member, who says he is all sorts of things, now starts talking about 187, I didn't ask him that.

All I want to know is did Glen Cummins say "I killed this guy," period.

THE COURT: Counsel, the issue that seems to be before the jury, first of all, the witness testified what the defendant said.

MR. SHEINBERG: Okay.

THE COURT: Those words, forgetting about whether he is a gang member or not is not the issue at this point.

The issue is what do those words mean for the jury to understand something that is not within understanding of the average person, okay, and I

think you have to say during your examination, you can say it during cross examination, I don't know what it means.

MR. SHEINBERG: So what.

THE COURT: Let me finish, what that expert would be doing is interpreting almost like if the person said something in a different language and you called in an interpreter to interpret what the meaning of the language is.

However, certainly the District Attorney would first have to be able to show through their expert that, one, the person is an expert in the language of the gangs, okay, and there is testimony that the defendant is a member of a gang, whether the witness is a member of a gang or not is not material to the issues that are before us.

The question is, the witness testified that the defendant said certain words, allegedly said certain words and what I heard from the District Attorney is that the District Attorney wants to put on an expert that will enlighten the jury as to the meaning of those words.

MR. SHEINBERG: Judge, I think I am going to direct --

THE COURT: There will not be any general

testimony on gangs?

MS. MILLUS: No, I am just going to declare him as an expert, what he does in gangs and the language of it.

THE COURT: Also you have to understand that somebody can be an expert on gangs, he has to be an expert on language.

MS. MILLUS: That's correct.

THE COURT: As it relates to the Crips, very, very specific in this neighborhood.

He has to be an expert that can understand these specific gangs in these specific neighborhoods with this specific language.

We are not going on a fishing trip where he is talking about all of his work with gangs.

MS. MILLUS: All I --

THE COURT: All I am telling you is make sure that that expert is an expert in language between these various gangs.

MR. SHEINBERG: Judge, I am going to enter my most vigorous, my most strenuous objection, this is irrelevant, it is immaterial and it is prejudicing the jury.

No matter what, Judge, when you bring something in like this which has nothing to do with

this type of testimony, all we have here is someone came into an apartment and shot a man dead, that is all the testimony.

THE COURT: I think there has been additional testimony, there has been testimony that has been tempered down based upon your request when originally the witness was going to say that there was a war between the parties, that was tempered down and it was tempered down to say --

MR. SHEINBERG: They weren't happy.

MS. MILLUS: I don't remember the exact words.

THE COURT: We tempered it down but it was clear that there was argument between the two groups and that testimony is part of the record and in part of the record there is testimony that the deceased and the defendant were members of opposite gangs, that is part of the record here.

So there are these things in the record already, so I am going to give you an opportunity, you said the person is here?

MS. MILLUS: That's correct.

THE COURT: All right, go outside and talk to the person and see if, in fact, they are expert in this field and then we will continue.

MR. SHEINBERG: Just note my objection.

THE COURT: This is, by the way, this is the direct case, the District Attorney has a right to put on the direct case.

MR. SHEINBERG: If it is relevant, material.

MS. MILLUS: And the People believe it is.

THE COURT: And the issue here is that the defendant made a threat and not only made a threat but also indicated through language which is not normal language that he allegedly killed the deceased so I think that is certainly evidence that the jury is entitled to hear.

MR. SHEINBERG: You have my exception and objection on the record and I think it is quite clear the reasons for it.

THE COURT: Sure, certainly.

Why don't you speak to whoever it is.

MS. MILLUS: Thank you, your Honor.

(Pause in proceeding)

MS. MILLUS: We are ready.

THE COURT: Okay, let's get the jury please.

THE COURT OFFICER: Jury entering.

(Whereupon, the jury enters and is

seated.)

THE COURT: Case on trial continued, all parties are present. Defendant is present. All jurors are present.

Counsel waive the reading of the roll?

MR. MARRONE: So waived.

MR. SHEINBERG: Waived by defense.

THE COURT: Please call your next witness.

MS. MILLUS: Your Honor, the People call Detective Phillip O'Rourke.

P H I L L I P O ' R O U R K E , called as a witness by the People, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please state your name, shield and command for the record.

THE WITNESS: Phillip J. O'Rourke, shield 712, Kings County District Attorney's Office, Gang Bureau.

THE COURT: Be seated, there is some water there if you would like some.

THE WITNESS: Thank you.

THE COURT: You may inquire.

DIRECT EXAMINATION

BY MS. MILLUS:

Q Good afternoon, Detective.
A Good afternoon.
Q By whom are you employed?
A Kings County District Attorney's Office.
Q And how long have you been so employed by the Kings County District Attorney's Office?
A Since February 22nd, 2005.
Q And in what capacity are you so employed?
A I am a detective assigned to the Gang Bureau of the District Attorney's Office.
Q And what are your duties and responsibilities at the Kings County District Attorneys Office Gang Bureau?
A Conduct investigations into gangs in the Brooklyn area, borough of Kings, interview known gang members, associates, and train other members of law enforcement in gangs.
Q And prior to your employment at the Kings County District Attorney's Office, what did you do?
A My last command was 2003, I was assigned to the New York City Police Department Gang Division, Major Case Squad from the year 2000 to 2003.
Between 1998 to 2000 I was assigned to Organized Crime Control Bureau of the New York City Police Department investigating narcotics, gangs.

In 1997 and 1998 I was employed with the New York City Department of Gangs Intelligence Unit as an investigator investigating gangs.

Prior to that I worked in the Brooklyn House of Detention monitoring gangs, narcotics groups and essentially monitoring cases.

Q All the time you spoke about, is that fair to say that is over 20 years of experience.

A Yes, ma'am.

Q And in over your 20 years of experience in your various gang related assignments, what were your primary duties?

A Interviewing gang members, interpreting their kites (ph.) if you will, their coded letters, arresting gang members, conducting long term investigations, conducting electronic surveillance of gang members, debriefing numerous members of gang associates and family members of gangs.

Q In the course of your duties dealing with these gang related cases, did you receive training?

A Yes.

Q And did you receive during that training, did you specifically -- Withdrawn.

What type of training did you receive?

A I received training on gang identification, so

you know the code they use, the written code, the verbal code, graffiti, things of this nature.

Basically gang identifiers, gang language, things of this nature.

Q Did you receive training specifically related to the language used by the gangs?

A Yes.

Q And what did that language consist of?

A Most of it was power point presentations showing the different codes, audio tapes of coded conversations and a lot of it was in-service training and conducting the interviews but the training itself was mostly power point and audio tape.

Q What about the language specifically used by Crips in Brooklyn and the New York City area?

A Yes, I have training there, I have training there.

Q You talked about that you interviewed various gang members, could you tell me, have you interviewed people that were members of the Crips.

A Yes.

Q And approximately how many have you interviewed?

A Hundreds, hundreds of Crips over the years.

MR. SHEINBERG: That is not the question,

I am objecting.

THE COURT: Overruled.

MR. SHEINBERG: Judge, that wasn't a question.

MS. MILLUS: Can we read it back.

THE COURT: Please go on.

Q And part of your debriefing of these Crips, was talking to them about them and determining, determining --

A Can you repeat that?

Q Part of your, when you said, you previously testified that you debriefed, that you talked to them, you debriefed these individuals and what is part of the debriefing process when you are debriefing the members, say of the Crips?

A You would ask them about their code, about tattoos, about graffiti, you ask, again, looking basically for specific intelligence on that gang as well as their rival gang.

If they had any code with them, written code.

Q And that language would be specific to the Crips gang?

A Yes.

Q Detective O'Rourke, have you previously been qualified as an expert in gang terminology and gang

intelligence?

A Yes.

Q Approximately how many times?

A Approximately 25 times.

Q And in what jurisdictions?

A Bronx County and the Kings County.

Q And in what courts did you testify?

A Grand Jury in both counties and Supreme Court.

Q And have you ever been denied admission as an expert in the field of gang terminology, gang identification?

A No, I never been denied.

MS. MILLUS: Your Honor, at this time I am going to ask that the court declare Detective Phillip O'Rourke expert in the area of gang terminology.

MR. SHEINBERG: Can I ask a couple of questions

THE COURT: Yes.

VOIR DIRE

BY MR. SHEINBERG:

MR. SHEINBERG: How many times have you testified in a court other than Grand Jury?

THE WITNESS: Supreme Court?

MR. SHEINBERG: Yes?

THE WITNESS: Approximately thirteen times, twelve, thirteen times.

MR. SHEINBERG: And the times, the other times were the Grand Jury?

THE WITNESS: Yes, sir.

MR. SHEINBERG: I have nothing else, objection.

THE COURT: So noted.

Q Detective O'Rourke, are you familiar with the term 187?

A Yes.

Q And what does term "187," what does "187" mean?

A It is the state of California's Penal Law section for homicide, it is code for homicide.

Q And how does that term 187 relate to Cripping gangs?

A It is used by the Crips to identify a homicide. It is written on the wall next to somebody's tag to label them for a homicide.

It is a code they don't want anybody to know they are targeting that person for homicide.

It is used during conversation to talk about a homicide. It is used in the, heard in their coded letters particularly anything out of prison, these

things, again, to represent a homicide.

Q Is that term 187 specifically only used in Brooklyn?

A No.

Q And what do you mean by that?

A It originated, again, it is the state of California's penal law.

It originated with the Crips in California and like everything else has moved its way to the east coast.

Q So the term is, would it be fair to say that term in the Crips language, that that is universal in all of Brooklyn and outside of Brooklyn?

A Yes.

Q And, Detective, are you also familiar with the term "Slob?"

A Yes.

Q And can you please --

MR. SHEINBERG: What was that term again?

MS. MILLUS: "Slob."

Q And that term, is that term specifically used by Crips in your expertise and experience?

A Yes.

Q And what does that term mean?

A That is a derogatory term used by the Crips

towards the Bloods, it is a derogatory term to identify a Blood.

Q And does that terminology "Slob," is that used in Brooklyn?

A Yes.

Q And as well as other places?

A Yes.

Q What about the term "Put in work," the phrase "Put in work," are you familiar with that phrase?

A Yes.

Q And is that a phrase that a Crip member would use, is that a phrase that is within that language as well?

A Crips and other gangs in New York City, yes.

Q And "put in work," what does that mean?

A They use it, "Put in work" or "Putting in work" or "Putting in work for the set," it is going out and committing assault, robbery, homicide, stabbing, things of this nature and it is basic going out and doing, committing crimes.

They "put in work," it is the physical aspect, assault and things of that nature.

Q Is there a difference between "Put in work" and "Putting in work?"

A If you are putting in work, it is an on going

thing, you are putting in work, you are representing, you said "Putting in work," you are representing a neighborhood.

If you do it and you said "Put in work," that is something you already done, that is past tense.

Q And, Detective, are you familiar with, again, the phrase "Rock to sleep?"

A Yes.

Q And that phrase, are you familiar, is that a phrase that would be used by members of the Crips?

A Crips and other gangs in New York City.

Q And based on your training and expertise, what does the term "Rock to sleep" mean?

A It is basically when you are going to lull somebody in a false sense of security, get them to drop their guard around you, make them think you are their friend, camaraderie, buddy, whatever basically makes them drop their guard, they feel comfortable around you.

MS. MILLUS: I have no further questions.

THE COURT: Counsel.

MR. SHEINBERG: Just a few.

CROSS EXAMINATION

BY MR. SHEINBERG:

Q You say 187 is used by the Crips to mean something, do other gangs use 187 also?

A My experience, it has been used by the Crips. It is actually --

Q And as far as non gang members, do they use that expression?

A I don't know anybody in my dealings with, other gang members that use the term 187.

Q If a gang member speaks to somebody who is not a gang member and used expressions like "187" or "slob" which you told us or "putting in the work" or "rock to sleep," would that person understand this?

A Again, if you listen to the music and if you are out in the neighborhood hanging out or on the street, you would understand that surely the same way I understand it from hearing it.

Q Now I understand from you telling us but if it is a non gang member, do non gang members talk to non gang members in that type of thing?

A If they are friends, yeah.

Q They do?

A They talk to me like that so.

Q Are you their friend also?

A You know what I mean, they talk to me, people, that is the terminology they use.

Q That is used by gang members, Bloods and Crips basically?

A The 187 in my experience is not so much for the Bloods.

Q What about "slob" and "putting work in," like you said, and "rock to sleep?"

A Slob is used by the Crips as a derogatory term to the Bloods and the other two are used by other gangs also "putting in work."

Q What do the Bloods call the Crips.

A "Erickets."

Q The don't call them crabs?

A I heard crabs used also.

Q But words used by gang members and non gang members?

A Just the terminology to disrespect that person, you know.

MR. SHEINBERG: Get the action going.

Thank you very much, I have nothing else.

THE COURT: Anything else?

MS. MILLUS: No, your Honor.

THE COURT: You are excused.

(Whereupon, the witness is excused.)

THE COURT: Approach please.

(Whereupon, the witness is excused.)

THE COURT: Ladies and gentlemen, we are going to take another short break. Don't talk

about the case and we will bring back very soon.

(Pause in proceeding)

MS. MILLUS: May we approach.

THE COURT: Yes.

(Whereupon, a sidebar discussion was held off the record.)

THE COURT: Bring the jury back.

THE COURT OFFICER: Jury entering.

(Whereupon, the jury enters and is seated.)

THE COURT: All jurors are present.

Counsel waive the reading of the roll?

MR. SHEINBERG: Defense waives.

MR. MARRONE: So waived.

THE COURT: We are going to break at this point until Monday morning.

As I indicated to you I expect that on Monday we will complete the case, have summations and charge and you will go into your deliberations. So I would like to get everybody here nice and early, 10 o'clock.

Once, again, I want to remind you if one of you is not here, we all have to wait. So I expect it will be a long day on Monday, so please make sure that you are here on time and also it is a

long week end, you are not coming in tomorrow.

I am sure that when you go home somebody is going to say to you "what is going on, you are on trial, you are a juror, what is the case about, what is the testimony about, what is this, what is that?"

You just can't talk about the case until it is over. When it is over you will be able to talk to whoever you want but while the case is pending, in fairness to both the District Attorney and to the defense, you are here, you have listened to all the testimony and that is the distinction, that is why you can't talk to anybody else because other people get their own impressions and ideas but they haven't heard all the testimony that is involved.

That is why we don't discuss it until you hear everything, you have heard everything and then you start your deliberations.

So have a wonderful weekend and we will see everybody here at 10 o'clock on Monday morning.

(Whereupon, the jury is excused and this matter is adjourned to Monday, January 30th, 10 a.m.)