UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

GLEN CUMMINS,

                              Petitioner,

              v.

WILLIAM LEE,

                              Respondent.

**MEMORANDUM AND ORDER**

10-CV-01026 (LDH)

---

LaSHANN DeARCY HALL, United States District Judge:

    Petitioner Glen Cummins, proceeding pro se, petitions pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus on the grounds that he was denied effective assistance of counsel, the prosecutor engaged in misconduct, the trial court improperly charged the jury, and the evidence was insufficient to support his conviction. (Pet. 4, ECF No. 1.)

### BACKGROUND[1]

    This petition arises out of a judgment of conviction entered against Petitioner in New York Supreme Court, Kings County, on charges of second-degree murder, first-degree burglary, and third-degree witness tampering.

    At Petitioner's trial, Brenda Jones testified that, on the morning of April 2, 2003, when she was fourteen years old, she heard a knock at her family's apartment door and opened it to find a man pointing a gun at her. (Aff. Opp. Pet. Writ Habeas Corpus Ex. C ("Trial Tr.") 16:2–19.) The man was wearing black sweatpants, a black sweatshirt with the hood pulled up, and a bandana covering his face below the eyes. (*Id.* at 16:23–17:12.) Nonetheless, Jones recognized him from his "body structure" and "voice" as Petitioner, whom Jones had seen "around the neighborhood" and playing with her little brothers during the past "couple of years." (*Id.* at

---

[1] Unless otherwise indicated, the following facts are taken from the state-court record, which was filed with the Court in hard copy on April 27, 2010. (*See* ECF No. 4.)

17:15–18, 18:9–20, 34:4–35:3, 66:21–67:6.) The man entered the apartment, proceeded to the bedroom where Alonzo Mack was sleeping, and shot him. (*Id.* at 11:8–12:1, 16:18–21, 114:7–10.) Jones ran to the back of the apartment and, using a nickname for Petitioner, said to her father, "Coolie just shot Alonzo." (*Id.* at 20:17–25.) Mack suffered seven gunshot wounds and died as a result. (*Id.* at 260:21–23, 264:20–24.)

When police arrived, Jones described the shooter but did not identify by name him "because [she] was under the influence of [her] father," who told her "don't say nothing" and warned that if she identified Petitioner "[she] [could] get killed." (*Id.* at 21:17–22:1, 72:1–8.) Approximately two days later, outside of her apartment building, Jones encountered Petitioner, who said, "Don't be snitching." (*Id.* at 22:2–19.) Jones understood the statement as a "threat" that Petitioner "would try to kill [her] or something." (*Id.* at 22:20–25.) The next day, Jones again encountered Petitioner, who said that, on the day Mack was killed, he had been in the hospital and "didn't have nothing to do with it, the killing." (*Id.* at 23:3–25.) Again, Jones understood the statement as a "threat." (*Id.* at 24:1–3.) Less than one week after the shooting, the Jones family moved out of their Brooklyn apartment "because it felt like [they] were in danger living there." (*Id.* at 70:24–25, 71:18–22.)

In July 2003, Jones informed a police detective, Charles Platt, that it was Petitioner who had shot Mack and subsequently threatened her. (*Id.* at 55:18–56:8, 246:7–13.) On May 14, 2004, Jones picked Petitioner out of a police lineup of six men and identified him as Mack's shooter. (*Id.* at 24:7–26:2.) Petitioner was placed under arrest and charged with one count of murder in the second degree, four counts of burglary in the first degree, one count of criminal possession of a weapon in the second degree, and one count of intimidating a witness in the third degree. (*See id.* at 225:15–23; Aff. Opp. Pet. Writ Habeas Corpus ¶ 5.)

Trial commenced on January 24, 2006. (Trial Tr. 1.) In addition to Jones and other witnesses, the People called Abdul Mohammed, who testified that Petitioner was a member of the Crips gang and Mack had been a member of the Bloods gang. (*Id.* at 269:17–270:14.) Mohammed further testified that, in early February 2003, Petitioner had shared with Mohammed his plan to kill Mack. (*Id.* at 278:11–281:6.) Specifically, Mohammed testified that Petitioner had told Mohammed he would "handle" Mack "187" and "rock him," which Mohammed understood to mean "kill him." (*Id.* at 280:12–281:6, 286:7–17.) Mohammed further testified that, on April 2, 2003, he encountered Petitioner, who was wearing a "[b]lack hoodie." (*Id.* at 287:22–288:5.) According to Mohammed, Petitioner said that "he [had] just put that work in" and "rocked [Mack] to sleep" and that the "187 [was] done." (*Id.* at 312:18–313:1.) Petitioner then showed Mohammed a .40-caliber handgun. (*Id.* at 290:14–17.) On cross-examination, defense counsel insisted that Mohammed had "talked about []187 . . . [and] all kinds of nonsense" but had never actually heard Petitioner say "I am going to shoot, kill this man." (*Id.* at 302:24–25.) Defense counsel further questioned Mohammed's motivations for cooperating with the district attorney's office. (*Id.* at 315:6–14.) Mohammed testified that he had received threatening messages from Petitioner and was "in danger." (*Id.* at 315:15–19.)

The People subsequently called Detective Phillip O'Rourke of the Kings County District Attorney's Office Gang Bureau as an expert on the gang terminology Mohammed had used in his testimony. (*Id.* at 339:19–22, 347:17–19.) Defense counsel entered a "most vigorous, . . . most strenuous objection" to O'Rourke's testimony on the grounds that it was irrelevant, immaterial, and prejudicial. (*Id.* at 344:20–23.) The trial court overruled the objection, reasoning that there was evidence in the record that Petitioner "not only made a threat but also indicated through language which is not normal language that he allegedly killed the deceased so

3

. . . that [was] certainly evidence the jury [was] entitled to hear." (*Id.* at 346:8–13.) O'Rourke testified that the term "187," which originated out of California in reference to its penal law, is "used [nationally] by the Crips to identify a homicide." (*Id.* at 353:16–19, 354:2–14.) O'Rourke further testified that the phrase "put in work" is used by the Crips to mean "going out and committing assault, robbery, homicide, stabbing, things of this nature." (*Id.* at 355:15–20.) In addition, O'Rourke testified that the phrase "rock to sleep" is used by the Crips and other gangs to mean lulling someone into a "false sense of security." (*Id.* at 356:12–18.)

In summation, defense counsel questioned the reliability of Jones's testimony on the grounds that she was a "young girl traumatized by . . . living in [a] dysfunctional household" and had initially told the police she did not know the identity of Mack's shooter. (*Id.* at 368:16–369:22.) Defense counsel further urged the jury to discount Jones's testimony because the police had initially doubted Jones's statements. (*Id.* at 370:17–371:6.) The People argued that Jones always knew Petitioner was the shooter but was reluctant to immediately identify him out of fear for her safety and based on her youth and her father's instruction not to come forward. (*Id.* at 382:11–15, 394:4–14, 399:6–14.) The People further argued that Detective Platt "never once doubted" Jones's identification. (*Id.* at 400:3–12.)

On January 30, 2006, the court instructed the jury on three counts: murder in the second degree, burglary in the first degree, and tampering with a witness in the third degree. (*Id.* at 429:24–435:12.) On January 31, the jury returned a guilty verdict as to each count. (*Id.* at 447:4–12.) On April 28, Petitioner was sentenced to a prison term of twenty-five years to life for the murder count, a concurrent term of twenty-five years for the burglary count, and a consecutive term of two to four years for the witness intimidation count. (Ex. C Sentence Tr. 7:24–8:10.)

On direct appeal, Petitioner challenged his conviction on three grounds: (1) ineffective assistance of trial counsel for eliciting damaging testimony from two witnesses, opening the door to prejudicial testimony from the gang expert, and failing to ask for a limiting instruction with respect to the expert; (2) prosecutorial misconduct for eliciting prejudicial testimony from Jones that she was afraid of Petitioner and making improper remarks during the People's summation; and (3) insufficient evidence to satisfy the witness-tampering charge or, in the alternative, failure to properly charge the jury on witness intimidation. (Aff. Opp. Pet. Writ Habeas Corpus Ex. A, Br. Def.-Appellant ("Br.") 38–67.) The Appellate Division affirmed the conviction, holding that Petitioner's trial counsel had provided meaningful representation and that his remaining challenges were unpreserved for appellate review. *People v. Cummins*, 872 N.Y.S.2d 532, 533 (N.Y. App. Div. 2009). The court nonetheless noted that the People's "challenged remarks were either fair response to the defense summation or fair comment on the evidence." *Id*. The Court of Appeals denied leave to appeal. *People v. Cummins*, 908 N.E.2d 930 (N.Y. 2009).

Petitioner timely filed the instant petition on the same grounds as his appeal and relying entirely on his appeal brief. (Pet. 6.)

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, a petition for a writ of habeas corpus by a person in custody pursuant to a state-court judgment may only be brought on the grounds that his custody is "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A petitioner is required to show that the state-court decision, having been adjudicated on the merits, was either "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the

5

State court proceeding." 28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013).

For the purpose of federal habeas review, "clearly established Federal law" is defined as "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state-court decision is "contrary to," or an "unreasonable application of," clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law, (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts, or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412–13. Factual determinations made by the state court are presumed to be correct, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

## DISCUSSION

### I. Ineffective Assistance of Counsel

The Sixth Amendment guarantees a criminal defendant's right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In *Strickland*, the Supreme Court held that a claim for ineffective assistance sufficient to overturn a criminal conviction on direct appeal requires two showings: (1) "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant" and (2) "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 684, 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. On federal habeas review, "the question is not whether counsel's actions were reasonable," but

6

"whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 89 (2011).

A.  **O'Rourke's Expert Testimony**

Petitioner first argues that his trial counsel, while cross-examining Mohammed, improperly "open[ed] the door" to O'Rourke's expert testimony regarding gangs by choosing "to attack the *meaning* of the terms testified to by Mohammed, implicitly crediting the *truth* of Mohammed's claims." (Br. 42–43 (emphasis in original).)

As a threshold matter, the premise of Petitioner's argument—that his counsel alone opened the door to O'Rourke's testimony—is mistaken. Although the People indicated that its request to call O'Rourke resulted from defense counsel's questions on cross-examination (Trial Tr. 339:23–340:4), the trial court's decision to permit O'Rourke to testify arose out of the entirety of Mohammed's testimony, not simply his cross-examination. As the trial judge noted prior to O'Rourke's testimony, "it was clear that there was argument between the two groups and that testimony is part of the record and in part of the record there is testimony that [Mack] and [Petitioner] were members of opposite gangs." (*Id.* at 345:13–17.) Moreover, the trial judge noted that there was evidence in the record that Petitioner had "indicated through language which is not normal language that he allegedly killed [Mack]." (*Id.* at 346:8–13.)

Turning to the merits of Petitioner's argument, "[d]ecisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim." *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)). Having reviewed the transcript of Mohammed's cross-examination, the Court is satisfied that defense counsel's conduct fell within the wide range of reasonable professional assistance. (*See generally* Trial Tr. 292–333.)

7

Even if defense counsel's inadequacy were established, Petitioner would fail to establish the requisite prejudice. On this point, Petitioner argues that, from O'Rourke's testimony, "a jury which had heard nothing about gang activity up to this point, was now inundated with prejudicial information about 'rival gangs,' targeting someone for murder through the term '187,' . . . and that common gang activity included 'assault, robbery, homicide,' and stabbings." (Br. 45.) This is an overstatement. The jury had already heard much of the allegedly prejudicial information when Mohammed testified on direct examination that Petitioner and Mack were members of rival gangs and that the term "187" was used by the Crips as code for murder. (*Id.* at 269:17–270:14, 281:6–8, 282:10–16.)

Petitioner's further argument that defense counsel unreasonably failed to request limiting instructions regarding his gang affiliation and O'Rourke's testimony is also meritless. (*See* Br. 41, 45.) New York courts have held that evidence of a defendant's gang affiliation is admissible to establish motive or explain the relationship between a defendant and a victim. *See People v. Scott*, 897 N.Y.S.2d 138, 139 (N.Y. App. Div. 2010) (collecting cases); *accord People v. Murray*, 984 N.Y.S.2d 417, 418 (N.Y. App. Div. 2014). An express limiting instruction is not necessarily required. Instead, appellate courts have noted that a trial court's "thorough instructions" may serve to minimize any prejudicial effect. *See People v. Avila*, 754 N.Y.S.2d 885 (N.Y. App. Div. 2003) ("The court properly exercised its discretion in admitting expert testimony regarding gang customs and rituals. This testimony was explanatory of defendant's actions and unusual statements at the time of the crime and was relevant to his motive. The court's thorough instructions minimized any prejudicial effect." (internal citations omitted)); *People v. Edwards*, 743 N.Y.S.2d 872 (N.Y. App. Div. 2002) ("The court properly exercised its discretion in admitting evidence of defendant's gang membership. . . . The court's thorough

8

instructions minimized any prejudicial effect."). "As the Supreme Court has often emphasized: 'A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" *Gupta v. United States*, 913 F.3d 81, 86 (2d Cir. 2019) (quoting *United States v. Frady*, 456 U.S. 152, 169 (1982) (alterations omitted)).

Here, although the trial court did not specifically instruct the jury to limit its consideration of O'Rourke's testimony to motive, the overall charge was nothing less than thorough. (*See generally* Trial Tr. 404–41.) And the trial court properly instructed jurors as to the appropriate consideration of O'Rourke's opinion testimony and properly distinguished between intent and motive evidence.[2] (*Id.* at 420:6–421:5, 421:25–423:1.) In short, Petitioner fails to demonstrate ineffective assistance by defense counsel with respect to O'Rourke's testimony.

### B. Jones's and Mohammed's Fact Testimony

Next, Petitioner argues that defense counsel unreasonably elicited prejudicial testimony from Jones and Mohammed. (Br. 46–48.) However, the trial record displays strategic and

---

[2] As to O'Rourke's and other expert testimony, the trial court instructed the jury to

> evaluate the testimony of any such witness just as [the jury] would the testimony of any other witness. [The jury] may accept or reject such testimony in whole or in part just as [it] might with respect to the testimony of any other witness. In deciding whether or not to accept such testimony [the jury] should consider the following: The qualifications and believability[] of the witnesses[,] the facts or circumstances upon which the witness's opinion was based[,] [t]he accuracy or inaccuracy of any assumed hypothetical or fact upon which the opinion was based, the reason given for the witness'[s] opinion, [and] whether the witness'[s] opinion is consistent or inconsistent with other evidence in the case.

(Trial Tr. 420:16–421:5.) The trial court further instructed:

> Intent means conscious objective or purpose. . . . Motive[,] on the other hand, is the reason why a person chooses to engage in criminal conduct. If intent is an element of the crime charged[,] that element must be proved by the People beyond a reasonable doubt in this case. Intent is as I explained an element of the crime of murder in the second degree. Motive, however, is not an element of the crimes charged. Nevertheless, evidence of a motive or . . . a lack of motive [may be] considered by the jury.

(*Id.* at 422:1–18.)

9

tactical justifications for defense counsel's cross-examination of each witness. *See Dunham*, 313 F.3d at 732.

As to Jones, Petitioner contends that defense counsel's elicitation of inculpatory testimony regarding Petitioner's physical build and Jones's recognition of his voice was improper. (Br. 46.) Not so. Defense counsel reasonably attempted to undermine the reliability of Jones's identification of Petitioner as the shooter, who wore a bandana and a hooded sweatshirt covering most of his face. (Trial Tr. 32:3–33:25.) Given Jones's testimony on direct examination that she had recognized Petitioner based on his "body structure," it was reasonable for defense counsel to probe what was unique about Petitioner's build to support such identification. (*See id.* at 34:4–35:7.) That Jones bolstered the reliability of her identification with her recognition of Petitioner's voice does not render the questioning unreasonable. This is not at all analogous to the case Petitioner cites, *People v. Karamanites*, in which defense counsel "reve[aled] to the jury that his client had been arrested for armed robbery 10 days prior to the crime for which he was being tried," a "damning" piece of evidence that "the People could not have brought out . . . on its own initiative." 480 N.Y.S.2d 395, 396 (N.Y. App. Div. 1984). By contrast, defense counsel here reasonably attempted to undermine the reliability of Jones's identification of Petitioner on direct examination.

Next, Petitioner claims that he was prejudiced by Mohammed's testimony on cross-examination that Petitioner had threatened him. (Br. 46–47.) Specifically, after defense counsel questioned whether Mohammed was testifying pursuant to a cooperation agreement in order "to save [him]self some time" or "out of the charity of [his] heart," Mohammed responded, "Not at all like I say I was in danger." (Trial Tr. 315:10–15.) Mohammed testified that Petitioner "was sending messages" to him in jail and that he was "released without bail" as a result of his

10

cooperation agreement. (*Id.* at 315:17–317:23.) Cross-examining a cooperating witness as to his agreement with the government is eminently reasonable advocacy geared toward impeaching his credibility. Indeed, the Second Circuit has looked to such cross-examination to support a finding that counsel was effective. *United States v. Celi*, 99 F.3d 400 (Table), 1995 WL 732689, at *2 (2d Cir. 1995). That some damaging facts were elicited along the way does not bring defense counsel's conduct outside the range of reasonable professional assistance. Nor is this case in any way analogous to the case on which Petitioner relies, *People v. Vannoy*, 570 N.Y.S.2d 733 (N.Y. App. Div. 1991). In that assault case, after obtaining a ruling precluding the prosecution from questioning the defendant regarding a prior conviction for assault, defense counsel nonetheless opened the door to such questioning. *Id.* at 734. In addition, counsel failed to object to the prosecutor's questions regarding several other prior "violent clashes" with the victim. *Id.* No such circumstances are present here.

Accordingly, Petitioner's claim for ineffective assistance of counsel fails.

## II. Prosecutorial Misconduct, the Jury Charge, and Sufficiency of the Evidence

The remaining claims are procedurally barred from federal habeas review. A claim is procedurally barred if the state court's decision "rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). "A procedural bar will be deemed 'adequate' only if it is based on a rule that is 'firmly established and regularly followed' by the state in question." *Garcia v. Lewis,* 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991)). A petitioner can overcome this bar only if he can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Under New York law, to preserve an objection to a ruling, a criminal defendant must object "at the time of such ruling . . . or at any subsequent time when the [trial] court had an opportunity of effectively changing the same." N.Y. Crim. Proc. Law 470.05(2); *see also People v. Luperon,* 647 N.E.2d 1243, 1246–47 (N.Y. 1995) ("[470.05(2)] require[s], at the very least, that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave [it] the opportunity to remedy the problem and thereby avert reversible error."). Also referred to as the "contemporaneous objection rule," CPL 470.05(2) is "firmly established and regularly followed" and serves as an independent and adequate state-law ground upon which to bar a claim from federal habeas review. *Whitley v. Ercole*, 642 F.3d 278, 286–87, 292 (2d Cir. 2011).

Here, the Appellate Division found that Petitioner's objections to the People's examination of Jones, the People's summation, the jury charge, and the sufficiency of the evidence were not preserved for appellate review. *Cummins*, 872 N.Y.S.2d at 533. As to the People's conduct, Petitioner "either failed to raise any objection to the challenged remarks, voiced only general objections, or failed to seek further relief after objections were sustained and curative instructions given." *Id*. As to the remaining claims, the Appellate Division generally stated that they were unpreserved and cited *People v. Udzinski*, in which the court explained that the preservation doctrine applies equally to claims of insufficient evidence and an improper jury charge. 541 N.Y.S.2d 9, 13 (N.Y. App. Div. 1989). Thus, all four claims are barred. Petitioner has not demonstrated the requisite cause and prejudice, or that a fundamental miscarriage of justice would result from a failure to consider any of these claims, to overcome the bar. *See Coleman*, 501 U.S. at 750.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. Because Petitioner has not "made a substantial showing of the denial of a constitutional right," the Court declines to issue a certificate of appealability. 28 U.S.C. § 2253(c)(2).

    SO ORDERED.

Dated: Brooklyn, New York  
       November 27, 2019

/s/ LDH  
LaSHANN DeARCY HALL  
United States District Judge